**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EUGENE SCALIA, | ) | |
| SECRETARY OF LABOR, UNITED | ) | |
| STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:18-cv-01194-GEKP |
| v. | ) | |
| | ) | **Oral Argument Requested** |
| EAST PENN MANUFACTURING | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | | |

**EAST PENN'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR**
**SUMMARY JUDGMENT ON ITS GOOD FAITH DEFENSE TO LIQUIDATED**
**DAMAGES AND PLAINTIFF'S WILLFULNESS CLAIM**

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD..............................................................................................2

III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR EAST PENN ON ITS GOOD FAITH DEFENSE TO LIQUIDATED DAMAGES BECAUSE EAST PENN REASONABLY BELIEVED IT WAS COMPLYING WITH THE LAW AND ACTED IN GOOD FAITH ..............................................................................................3

     A.    East Penn Had Reasonable Grounds To Believe That Its Pay Practices Comply With The Law .......................................................................................... 4

          1.    East Penn's Pay Policies Are Objectively Reasonable In Light Of Case Law ...............................................................................................5

          2.    East Penn's Pay Policies Are Objectively Reasonable In Light Of DOL's Own Regulations and Internal Guidance Documents................................10

          3.    It Was Objectively Reasonable for East Penn To Believe Its Pay Practices Were Compliant Given DOL's Awareness Of the Practices And Decision Not To Challenge Them.................................................................12

               a.    DOL's Awareness of Shower Pay Practices...................................13

               b.    DOL's Awareness Of How East Penn Pays Hourly Employees and Keeps Records .............................................................................17

               c.    The 2016 OSHA Complaint..........................................................19

          4.    East Penn's Pay Practices Are Objectively Reasonable Even if the Trier of Fact Concludes That They Are Insufficient...............................................20

     B.    East Penn Took Steps To Ascertain How To Comply With The FLSA............... 22

          1.    East Penn Managers Stay Up to Date on Compliance Issues Through Professional Organizations ......................................................................23

          2.    East Penn Retains Outside Labor and Employment Counsel to Advise it on Compliance Issues ..............................................................................24

               a.    Mr. Melchionni's 2003 Advice....................................................25

               b.    East Penn acted on Mr. Melchionni's advice in 2003 ..................26

               c.    East Penn revised its policy in 2016 to increase shower pay for some employees, which Mr. Melchionni approved ......................30

3.      Other Undisputed Record Evidence Demonstrates East Penn's Honest
Intent To Follow the Law ...........................................................................32

IV.    EAST PENN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
WILLFULNESS CLAIM BECAUSE PLAINTIFF CANNOT POINT TO ANY
MATERIAL FACTS DEMONSTRATING THAT EAST PENN KNEW IT WAS
VIOLATING THE FLSA OR ACTED IN RECKLESS DISREGARD OF THE
STATUTE'S OVERTIME REQUIREMENTS...............................................................32

V.     CONCLUSION.......................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Southern Shuttle Servs., Inc.*,
  301 F. App'x 856 (11th Cir. 2008) ...................................................................10

*Adeva v. Intertek USA, Inc.*,
  No. 09-1096(SRC), 2010 Wl 97991 (D.N.J. Jan. 11, 2010) ....................................9

*Albanese v. Bergen Cnty.*,
  991 F. Supp. 410 (D.N.J. 1997) .......................................................................8

*Alvarez v. IBP, Inc.*,
  339 F.3d 894 (9th Cir. 2003) ...........................................................................7

*Amos v. U.S.*,
  13 Cl. Ct. 442 (Cl. Ct. 1987)............................................................................8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................3

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946).................................................................................5, 6, 7

*Anderson v. Sara Lee Corp.*,
  2004 WL 5615651 (E.D.N.C. Dec. 7, 2004), *aff'd in part, vacated in part on
  other grounds*, 508 F.3d 181 (4th Cir. 2007)......................................................8

*Berger v. National Collegiate Athletic Association*,
  843 F.3d 285 (7th Cir. 2016) ..........................................................................10

*Brown v. Dumbar & Sullivan Dredging Co.*,
  189 F.2d 871 (2d Cir. 1951)............................................................................12

*Brusstar v. Southeastern Penn. Transp. Authority*,
  No. 85-3773, 1988 WL 85657 (E.D. Pa. Aug. 17, 1988) .......................................34

*Bull v. U.S.*,
  68 Fed. Cl. 212 (Fed. Cl. 2005) ........................................................................8

*Cross v. Arkansas Forestry Comm'n*,
  938 F.2d 912 (8th Cir. 1991) ............................................................................9

*Dalheim v. KDFW-TV*,
  712 F. Supp. 533541 (N.D. Tex. 1989) .............................................................12

*De Asencio v. Tyson Foods, Inc.*,
    500 F.3d 361 (3d Cir. 2007)..........................................................................................25

*Durkin v. Steiner*,
    111 F. Supp. 546 (M.D. Tenn. 1953) ...............................................................................6

*Dybach v. State of Fla. Dept. of Corrections*,
    942 F.2d 1562 (11th Cir. 1991) .....................................................................................21

*Gonzalez v. Bustleton Servs., Inc.*,
    No. 08-4703, 2010 WL 1813487 (E.D. Pa. Mar. 5, 2010) .................................9, 33

*Goodman v. Mead Johnson & Co.*,
    534 F.2d 566 (3d Cir. 1976)............................................................................................2

*Hall v. Guardsmark, LLC*,
    No. 11-213, 2013 WL 4855328 (W.D. Pa. Sept. 11, 2013)...................................10

*Hellmers v. Town of Vestal*,
    969 F. Supp. 837 (N.D.N.Y. 1997) .................................................................................8

*Hodgson v. Barge, Waggoner and Sumner, Inc.*,
    377 F. Supp. 842 (M.D. Tenn. 1972) ............................................................................13

*Hodgson v. Katz & Besthoff*,
    365 F. Supp. 1193 (E.D. Va. 1973) ...............................................................................11

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005)....................................................................................................7, 8

*Knudsen v. Lee & Simmons*,
    89 F. Supp. 400 (S.D.N.Y. 1949) ..................................................................................12

*LaPorte v. Gen. Elec. Plastic, Business Group of Burkville, Ala.*,
    838 F. Supp. 549 (M.D. Ala. 1993) ...............................................................................34

*Lindow v. United States*,
    738 F.2d 1057 (9th Cir. 1984) .......................................................................................25

*Livers v. Nat'l Collegiate Athletic Ass'n*,
    No. CV 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018) (Baylson, J.)........................10

*Lopez v. Tyson Foods, Inc.*,
    690 F.3d 869 (8th Cir. 2012) ..........................................................................................8

*Lugo v. Farmer's Pride, Inc.*,
    802 F. Supp. 2d 598 (E.D. Pa. 2011) ..............................................................4, 12, 35

*Lugo v. Farmer's Pride, Inc.*,
   No. 07-0749, 2011 WL 2550376 (E.D. Pa. June 23, 2011)......................................................8

*Marshall v. Brunner*,
   668 F.2d 748 (3d Cir. 1982)......................................................................................................3

*Martin v. Cooper Elec. Supply Co.*,
   940 F.2d 896 (3d. Cir. 1991)....................................................................................................22

*Martinez-Hernandez v. Butterball, L.L.C.*,
   No. 5:07-cv-174-H, 2011 WL 4460332 (E.D.N.C. Sept. 26, 2011).........................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................................................3

*McGrath v. City of Philadelphia*,
   864 F. Supp. 466 (E.D. Pa. 1994)............................................................................................2

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988)...........................................................................................................32, 33

*Nelson v. Alabama Instit. For Deaf & Blind*,
   896 F. Supp. 1108 (N.D. Ala. 1995).......................................................................................23

*Perez v. Mountaire Farms, Inc.*,
   650 F.3d 350 (4th Cir. 2011) ..................................................................................................34

*Piazzo v. Meriden Molded Plastics, Inc.*,
   No. Civ. A. No. 87-752, 1989 WL 89419 (E.D. Pa. July 31, 1989)........................................36

*Pignataro v. Port Authority of New York and New Jersey*,
   593 F.3d 265 (3d Cir. 2010)....................................................................................................34

*Pollino v. City of Philadelphia*,
   No. Civ. A. 03-6288, 2005 WL 372105 (E.D. Pa. Feb. 15, 2005) (Pratter, J.)......................36

*Pongrac v. Consolidated Rail Corp.*,
   632 F. Supp. 126 (E.D. Pa. 1985) ..........................................................................................35

*Reich v. Gateway Press, Inc.*,
   13 F.3d 685 (3d Cir. 1994).......................................................................................................36

*Reich v. IBP, Inc.*,
   38 F.3d 1123 (10th Cir. 1994) ...............................................................................................7, 8

*Retail Store Employees Union Local 400 v. Drug-Fair Community Drug Co.*,
   307 F. Supp. 473 (D.D.C. 1969) .............................................................................................12

*Solis v. Tyson Foods, Inc.*,
   No. 2:02-cv-1174-VEH (N.D. Ala. Oct. 14, 2009) ..................................................................7

*Steiner v. Mitchell*,
   350 U.S. 247 (1956) ................................................................................6, 7, 11, 24

*Stone v. Troy Construction*
   935 F.3d 141 (3d Cir. 2019) ................................................................................33

*Trans World Airlines, Inc. v. Thurston*,
   469 U.S. 111 (1985) ................................................................................33, 34

*Tum v. Barber Foods, Inc.*,
   360 F.3d 275 (1st Cir. 2004) ................................................................................7, 8

**Statutes**

29 U.S.C. § 201 *et. seq.* ................................................................................3, 24, 33, 37

**Other Authorities**

29 C.F.R. 785.48 ................................................................................11

29 C.F.R. § 1910.1025 ................................................................................13

Fed. R. Civ. P. 56(c) ................................................................................3

FOH 31b01(a) ................................................................................10

FOH 53a01(a)(2) ................................................................................13

FOH § 53c00(a)(2) ................................................................................3, 24

FOH 53c02(a) ................................................................................33

Rule 30(b)(6) ................................................................................ *passim*

**List of Deponents Cited in East Penn's Statement of Undisputed Material Facts**
*In support of*
**East Penn's Motion for Summary Judgment on its Good Faith Defense to
Liquidated Damages and Plaintiff's Willfulness Claim**

| | |
|---|---|
| Braun, Timothy | Former OSHA official who referred this investigation to Wage and Hour |
| Bricker, James | East Penn Director of the Industrial/Specialty Division |
| Callahan, Jacqueline | DOL Wage and Hour Investigator |
| Cooper-Kreidler, Mallory | DOL Wage and Hour Investigator |
| Farrington, Brian | Former Wage and Hour Investigator and Assistant Area Director; East Penn expert witness |
| Fedock, Stephen | Former co-lead DOL Wage and Hour Investigator on East Penn investigation |
| Fernandez, Dr. Jeffrey | East Penn's expert witness re time studies |
| Garcia, Willie | East Penn Personnel Representative |
| Gregory, JoAnn | DOL Wage and Hour Assistant District Director who received the referral from OSHA |
| Greiss, Troy | East Penn Vice President for Environmental, Health, Safety, and Regulatory Affairs |
| Gristina, Alfonso | DOL Wage and Hour District Director |
| Guiles, Dave | East Penn Personnel Coordinator |
| Harrop, Bob | East Penn Vice President of Personnel |
| Hauser, Scott | East Penn Plant Manager for Smelter, Oxide 1, and Oxide 2 Plants |
| Iannelli, Aimee | DOL Wage and Hour Investigator |
| Johnson, Brian | DOL's Rule 30(b)(6) witness |
| Komis, Dr. Chrysoula | Former OSHA official |
| Leiby, Rick | East Penn Vice President, Metals operations (Metals Division) |
| Melchionni, Gary | East Penn's outside labor and employment counsel, Stevens & Lee law firm |
| Miksiewicz, Lawrence | East Penn Senior Vice President of Manufacturing and Purchasing |
| Mowday, Jason | DOL Wage and Hour Assistant District Director on East Penn investigation |
| Nieves, Luis | DOL final lead Wage and Hour Investigator on East Penn investigation |
| Olivares, Erick | East Penn Personnel Representative |
| Snyder, Alison | East Penn Assistant Vice President of Personnel |
| Rodriquez, Victor | East Penn Plant Manager, A2 (Automotive) Plant |

| | |
|---|---|
| Strauss, Randy | East Penn Plant Manager, A4 (Automotive) Plant |
| Zechman, Theresa | Labor and Employment attorney at Stevens & Lee law firm (East Penn's outside labor and employment counsel) |

**Exhibits to East Penn's Motion for Summary Judgment on Good Faith Defense to Liquidated Damages and Plaintiff's Willfulness Claim**

| Ex. No. | Description |
|---|---|
| 1 | 29 C.F.R. §785.48, EPM-00000053-54 |
| 2 | Mowday Deposition Exhibit 21: Field Operations Handbook § 30a03, EPM-00004789-90 |
| 3 | Deposition Transcript of Jason Mowday, taken May 10, 2019 |
| 4 | Deposition Transcript of Alfonso Gristina, taken September 4, 2019 |
| 5 | Deposition Transcript of Jeff Fernandez, taken December 18, 2019 |
| 6 | Field Operations Handbook § 53c00(a)(2) |
| 7 | Deposition Transcript of Chrysoula Komis, taken October 1, 2019 |
| 8 | Plaintiff's Responses and Objections to Defendant's First Set of Requests for Admission, dated January 4, 2019 |
| 9 | Deposition Transcript of Tim Braun, taken July 12, 2019 |
| 10 | Komis Deposition Exhibit 3: Letter from Bruce Hillenbrand to Alvin Starr, dated October 22, 1981 "1981 General Battery Letter," EPM-00001571 |
| 11 | Deposition Transcript of Troy Greiss, taken December 17, 2019 |
| 12 | Deposition Transcript of Troy Greiss, taken June 27, 2019 |
| 13 | Braun Deposition Exhibit 9: Email from Timothy Braun to JoAnn Gregory regarding Complaint at East Penn Manufacturing, dated February 26, 2016, DOL-EPM-000946-51 |
| 14 | Braun Deposition Exhibit 1: Memorandum of Understanding (MOU) between the Employment Standards Administration and OSHA, dated February 28, 1991, EPM00000191-281 |
| 15 | Braun Deposition Exhibit 2: OSHA Establishment Search Results (printed from search from https://www.osha.gov/pls/imis/establishment.html) |
| 16 | The Secretary's Supplemented and Revised Responses to Defendant's First Set of Requests for Admission, dated March 20, 2019 |
| 17 | DOL Deposition Exhibit 209: Handwritten Notes, EPM-00009582 – EPM-00009584 |
| 18 | Komis Deposition Exhibit 2: VPP Site Report, April 11, 2003, EPM-00009540-48 |
| 19 | Komis Deposition Exhibit 4: Memorandum from Troy Greiss to Chrysola Komis regarding OSHA VPP 90 Day Items Status, dated June 25, 2003, EPM-00004827-28 |
| 20 | Deposition Transcript of Brian Johnson, DOL's 30(b)(6) witness, taken July 31, 2019 |
| 21 | Komis Deposition Exhibit 6: Memorandum from Troy Greiss to Chrysoula Komis regarding 90 Day Item Status (30 Items), dated July 22, 2003, EPM-00004829 |
| 22 | Deposition Transcript of Luis Nieves, April 25, 2019 |
| 23 | Deposition Transcript of Alison Snyder, taken October 23, 2019 |
| 24 | Compliance Information Form for DOL's FMLA investigation commenced on April 6, 2011, DOL-EPM-000081-82 |
| 25 | Compliance Information Form for DOL's FMLA investigation commenced on October 8, 2014, DOL-EPM-000185-86 |
| 26 | Defendant's Sixth Set of Requests for Admission, dated September 27, 2019 *and* The Secretary's Responses to Defendant's Sixth Set of Requests for Admission, dated October 25, 2019 |

| Ex. No. | Description |
|---|---|
| 27 | Nieves Deposition Exhibit 16: Wage-Hour's Handy Reference Guide to the Fair Labor Standards Act |
| 28 | Gregory Deposition Exhibit 1: Compliance Action Report, DOL-EPM-000178 – DOL-EPM-000179 |
| 29 | Deposition Transcript of Mallory Cooper-Kriedler, taken September 25, 2019 |
| 30 | Deposition Transcript of Jacqueline Callahan, taken October 18, 2019 |
| 31 | Deposition Transcript of Alison Snyder, taken July 16, 2019 |
| 32 | Nieves Deposition Exhibit 15: Wage-Hour's Fact Sheet #44: Visits to Employers |
| 33 | Deposition Transcript of Gary Melchionni, taken September 24, 2019 |
| 34 | Field Operations Handbook 53a01(a)(2) |
| 35 | Deposition Transcript of Stephen Fedock, taken April 18, 2019 |
| 36 | East Penn Employee Interview Statements taken by Wage-Hour investigators Steven Fedock and Aimee Iannelli, DOL-EPM-000341 – DOL-EPM-000418 (redactions made by DOL) |
| 37 | Deposition Transcript of Aimee Iannelli, taken May 30, 2019 |
| 38 | DOL Deposition Exhibit 23: Legal Advice Memorandum from Gary Melchionni to Alison Snyder regarding Changing Clothes at Work as Compensable Time Under the Fair Labor Standards Act (the "FLSA"), dated April 30, 2003, EPM-00004900-07 |
| 39 | Deposition Transcript of Theresa Zechman, taken October 15, 2019 |
| 40 | Stevens & Lee Billing Records, EPM-S&L-000001-14 |
| 41 | Deposition Transcript of Robert Harrop, taken July 11, 2019 |
| 42 | DOL Deposition Exhibit 26: Draft Company Uniform Policy, EPM-0004928-29 |
| 43 | Deposition Transcript of James Henry Bricker, taken September 18, 2019 |
| 44 | Deposition Transcript of Lawrence Miksiewicz, taken September 13, 2019 |
| 45 | Deposition Transcript of Victor Rodriguez, taken September 4, 2019 |
| 46 | Deposition Transcript of Scott Hauser, taken September 19, 2019 |
| 47 | Deposition Transcript of Richard Leiby, Jr., taken November 1, 2019 |
| 48 | DOL Deposition Exhibit 3: 2003 Company Uniform Policy, EPM-00004931 – EPM-00004932 |
| 49 | Deposition Transcript of Randy Lee Strauss, taken September 4, 2019 |
| 50 | Deposition Transcript of Francis Bachman, taken October 11, 2019 |
| 51 | DOL Deposition Exhibit 124: Email from Troy Greiss to Scott Hauser dated February 28, 2016, EPM-00002803 |
| 52 | DOL Deposition Exhibit 25: Memorandum from Dave Nabozny regarding Uniform and Shower Time Policy, dated July 14, 2003, EPM-00004897-99 |
| 53 | Deposition Transcript of Brian Farrington, taken January 8, 2020 |
| 54 | DOL Deposition Exhibit 51: Email from Bob Harrop regarding Personnel Policy Committee and Policies for Review, dated August 5, 2015, EPM-00001935-37 |
| 55 | DOL Deposition Exhibit 33: Email from Troy Greiss attaching February 18, 2016 Letter from OSHA reporting receiving a complaint, EPM-00002464 – EPM-00002467 |
| 56 | Braun Deposition Exhibit 11: Email from Brian Birckbichler to Timothy Braun attaching Letter from Todd Greiss to OSHA, dated February 25, 2016, EPM-00001757-60 |

| Ex. No. | Description |
|---------|-------------|
| 57 | DOL Deposition Exhibit 39: Email from Troy Greiss to colleagues, dated February 26, 2016, EPM-00002567 |
| 58 | Braun Deposition Exhibit 8: Email from Tim Braun to JoAnn Gregory, dated February 18, 2016, DOL-EPM-000940 – DOL-EPM-000942 |
| 59 | DOL Deposition Exhibit 72: Email from Gary Melchionni to Alison Snyder regarding Uniform Policy, dated March 3, 2016, EPM-00002098-99 |
| 60 | DOL Deposition Exhibit 4: 2016 PPE (Personal Protective Equipment)/Uniform/Shower Policy, EPM-00001779 – EPM-000017980 |
| 61 | Deposition Transcript of Willie Garcia, taken June 26, 2019 |
| 62 | Deposition Transcript of David Guiles, taken October 3, 2019 |
| 63 | Deposition Transcript of Erick Olivares, taken October 3, 2019 |
| 64 | Plaintiff's Responses to Defendant's First Set of Interrogatories, dated July 6, 2019 |
| 65 | *Solis v. Tyson Foods, Inc.*, No. 2:02-cv-1174-VEH (N.D. Ala. Oct. 14, 2009) Instructions to Jury |

## I.     INTRODUCTION

Plaintiff wants to paint East Penn as a bad actor that exploits its workforce, exposes them to dangerous substances, and cheats them of wages by paying them by their shift time instead of their time clock swipe times.  But once Plaintiff's overheated rhetoric is stripped away, the facts reveal a different picture showing there is no genuine dispute that East Penn acted in good faith and did not willfully violate the law.  East Penn's pay practices are reasonable in light of case law, DOL regulations, DOL's internal enforcement guidelines, DOL's multiple prior findings that East Penn kept time records for the types of employees at issue here, and DOL's inaction after learning about East Penn's pay practices years ago.

This is not a fortuitous coincidence; East Penn has taken affirmative steps to ensure that its pay practices comply with the FLSA.  For decades, East Penn has retained outside legal counsel specializing in labor and employment issues to advise the company regarding its legal obligations, and its personnel department stays abreast of legal developments affecting pay practices.  Even before 2003, East Penn had been paying for end-of-shift clothes changing and showering (in different amounts at different plants).  When outside counsel notified East Penn in 2003 that it should consider whether to include paid time at the beginning of shift for clothes-changing or rely instead on arguments that the time at issue is not compensable, East Penn responded by treating start-of-shift changing as compensable time and formalizing a five-minute paid grace period to do so.  Thirteen years later, in response to a single employee complaint to OSHA that employees in his plant were not paid as much for shower time as those in other East Penn plants, the company responded within days by convening a committee to revise the pay policy.  Soon, after again consulting counsel, East Penn adjusted upwards its paid shower and clothes-changing time at the end of shift in certain plants, resulting in an increase in paid shower and clothes-changing time for any plants that were not already giving at least 10 minutes.  It did

1

so not because counsel advised that it was legally required to do so, but as a matter of employee relations.

These are not the actions of a miscreant employer seeking to skirt its legal obligations. To the contrary, they show an employer with an honest intention to follow the law and do the right thing. Even if it turns out that East Penn was incorrect, its good faith intent to comply and reasonableness of its policy decisions warrant the Court's declination of liquidated damages at this time. Likewise, even if East Penn is found liable, as a matter of law Plaintiff cannot prove that the violation was willful such that it is entitled to an enhanced three-year limitations period. Plaintiff has not adduced any material facts demonstrating that East Penn intentionally violated the FLSA or acted with reckless disregard of its obligations. DOL itself has failed to point to any facts supporting its willfulness claim in response to East Penn's interrogatory requesting the same. Instead, it rests its claim on the allegation that East Penn required some unidentified employees to arrive at their work stations 5 minutes early without being paid, which, even if supported by facts, does no more than state a violation of the FLSA. Despite deposing 38 fact witnesses and serving an avalanche of written discovery, DOL has been unable to supplement this meager allegation, and summary judgment should be granted to East Penn on DOL's willfulness claim.

## II.     LEGAL STANDARD

"The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *McGrath v. City of Philadelphia*, 864 F. Supp. 466, 472 (E.D. Pa. 1994) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)). The Court should grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

2

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is material

when it "might affect the outcome of the suit under the governing law" and genuine when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

[dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (citations omitted).

III.   **THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR EAST PENN ON ITS GOOD FAITH DEFENSE TO LIQUIDATED DAMAGES BECAUSE EAST PENN REASONABLY BELIEVED IT WAS COMPLYING WITH THE LAW AND ACTED IN GOOD FAITH**

Section 11 of the FLSA provides a defense to the imposition of liquidated damages,[1]

vesting the Court with discretion to award no liquidated damages, or award a reduced amount, if

the employer shows that (i) it acted in good faith and (ii) had reasonable grounds for believing

that it was not violating the Act.  29 U.S.C. § 260.  The subjective good faith prong of this

defense requires the employer to have an honest intention to ascertain and follow the dictates of

the FLSA.  *See Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982).  The "reasonable

grounds" prong imposes an objective standard by which to evaluate the employer's behavior.  *Id.*

In its internal enforcement manual, the DOL's Field Operations Handbook ("FOH") (SUMF

¶ 2), DOL states that with respect to liquidated damages, "objectively reasonable" means that the

violation "was an understandable mistake given the facts and the legal factors."  *See* FOH

§ 53c00(a)(2), attached as Ex. 6.  As Judge Baylson has recognized, it is appropriate to grant

summary judgment for an employer on the issue of liquidated damages in a donning and doffing

---

[1] Under Section 216(b) of the FLSA, an employer found to have violated the overtime provisions of the Act is liable not only for the amount of unpaid overtime, but also an equal amount as liquidated damages.  29 U.S.C. §216(b).

case where there is no genuine dispute of material fact that the employer made a subjective good faith effort to comply with the FLSA and had objectively reasonable grounds to believe it was in compliance. *Lugo v. Farmer's Pride, Inc.*, 802 F. Supp. 2d 598, 617 (E.D. Pa. 2011).

Here, the undisputed material facts demonstrate that East Penn reasonably believed that its pay policies were compliant given case law, DOL regulations and guidance, and DOL's decision not to bring an FLSA enforcement action prior to filing the instant lawsuit despite its awareness of East Penn's use of the challenged pay practices and DOL's conclusion in two prior instances that East Penn's time records were adequate.  East Penn also acted with an honest intention to comply with the FLSA **by relying on specific legal advice provided by its labor and employment counsel in a 2003 legal research memorandum** and staying up to date with relevant labor law developments.  On the two occasions when issues about its pay practices for clothes-changing and showering were raised (2003 and 2016), its responses were prompt, approved by counsel, and in employees' favor.  While Plaintiff tries to malign the Company as a greedy corporation unconcerned with legal requirements, the undisputed facts show that East Penn is the antithesis of a corporate bad actor.  Rather, East Penn is a company with good intentions to comply with the law, even if its decisions are ultimately found to be wrong.

## A.    East Penn Had Reasonable Grounds To Believe That Its Pay Practices Comply With The Law

The crux of Plaintiff's Complaint is that, since November 2014 (the maximum limitations period), East Penn has failed to record and pay for the actual time spent by employees on clothes-changing and showering activities, as measured by the time elapsed between first touch and last touch of a compensable clothing item or activity.  *See* Compl., dkt. 1, at ¶ 8.  Plaintiff faults East Penn for not paying employees by their timecard swipes, or "punches", as an approximation of time spent on compensable activities.  Plaintiff also suggests East Penn has

some ill-defined, nefarious intent in "adjusting" punch times, which are used to document

attendance, to shift start and end times for pay purposes.  But nothing in case law, DOL

regulations, or DOL's own guidance documents forbid East Penn's policy of ignoring the

attendance punches and instead paying a reasonable amount of time for clothes-changing and

showering as part of employees' paid shift time.  To the contrary, those sources support the

conclusion that East Penn's pay practices are objectively reasonable, even if the trier of fact

concludes that they are non-compliant.  This conclusion is also supported by DOL's enforcement

inaction prior to its 2016 investigation of East Penn, despite having specific knowledge for

decades that battery manufacturers paid an average number of minutes for showering, first-hand

knowledge of East Penn's shower pay policy in its smelter operations, and conclusions from

prior Family Medical Leave Act investigations of East Penn that it kept adequate time records

for hourly manufacturing employees.

        1.      <u>East Penn's Pay Policies Are Objectively Reasonable In Light Of Case Law</u>

Case law supports East Penn's policy of paying a reasonable amount of time to perform

the clothes-changing and showering activities at issue, as opposed to the actual time spent by

employees both on these activities and other interspersed non-compensable activities (e.g.,

socializing and smoking). Indeed, reasonable time has been a standard measure of

compensability since the early days of the FLSA, rooted in the public policy principle that pay

discrepancies should not depend on vagaries such as the alacrity of some employees compared to

others who dawdle, or an employee's position in the line at the time clock.  In *Anderson v. Mt.

Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), the Supreme Court laid down the rule of law for

measuring compensable pre- and post-shift activities, rejecting actual time as a measure of

compensation because it would reward personal pursuits, indirect performance of tasks, and

fortuity.  Instead, the Court held that "compensable working time [is] limited to the minimum

time necessarily spent in walking at an ordinary rate along the most direct route . . . ."  *Id*.  The

Court reasoned:

> Many employees took roundabout journeys and stopped off en route for purely
> personal reasons.  It would be unfair and impractical to compensate them for doing
> that which they were not required to do.  Especially is this so in view of the fact
> that precise calculation of the minimum walking time is easily obtainable in the
> ordinary situation.

*Id*.  In addressing other pre-shift activities, the Supreme Court pointed out that any other view of

the workweek could result in increased pay solely by reason of the fortuitousness of how early

some employees chose (or happened) to arrive for work.  *Id.* at 690.  ("It would be manifestly

unfair to credit the first person with 8 minutes more working time than credited to the last person

due to the fortuitous circumstances of his position in line [at the time clock].").

Reacting to *Mount Clemens Pottery*, Congress enacted the Portal Act, which amended the

FLSA to make preliminary and postliminary activities non-compensable across the board.  A few

years later, the Supreme Court countered with *Steiner v. Mitchell*, 350 U.S. 247 (1956), re-

establishing the compensability of certain pre- and post-shift activities that meet the amorphous

criterion of being "integral and indispensable" to the employee's work.[2]  The principle of

reasonable time survived *Steiner v. Mitchell*.  In *Steiner*, the district court had found 10 minutes

pre-shift "sufficient" time for clothes-changing and 20 minutes at the end of shift a "reasonable

period of time for change of clothes and shower."[3]  *See Durkin v. Steiner*, 111 F. Supp. 546, 548

---

[2] *Steiner* represents a judicial re-write of the Portal Act to re-establish the compensability of certain pre-
and post-shift activities.  As such, it improperly relied on meager legislative history to override the plain language of
the Portal Act.  Thus, East Penn reserves the right to appeal on grounds that *Steiner* was wrongly decided as a matter
of statutory construction.

[3] DOL may argue that the clothes-changing and showering time at issue in *Steiner v. Mitchell* – 10 minutes
pre-shift and 20 minutes post-shift – is an appropriate indicator of how much time East Penn should be paying even
if measured by a reasonableness standard.  But the Supreme Court never considered the question of how the amount
compensable time should determined.  Nor should the practices adopted in a different facility more than 60 years
ago have any bearing on the amount of time sufficient for clothes-changing and showering at East Penn's facilities.
The undisputed facts show that East Penn relies primarily on engineering controls to minimize the level of lead

(M.D. Tenn. 1953). The Supreme Court in *Steiner* said nothing about how to measure compensable time and did not abrogate *Mt. Clemens Pottery* on this issue. When the Supreme Court re-visited the issue of donning and doffing time in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), it did not change the measure of compensability announced in *Mt. Clemens Pottery*. While the Court held that post-donning walking time is compensable because it is part of the "continuous workday", it reaffirmed the *Mt. Clemens* language about how to measure it. In both *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), and *Tum v. Barber Foods, Inc.*, 360 F.3d 275 (1st Cir. 2004), which were consolidated in the Supreme Court, the district courts and appellate courts had specifically endorsed "reasonable time" over "actual time." In *Alvarez*, the Ninth Circuit explained, "Heeding *Mt. Clemens*' 'approximate' term, the Tenth Circuit, in *Reich*, affirmed a damage award based on 'reasonable time' measures where 'differences in personal routines occurred at the end of [a] shift." *Alvarez*, 339 F.3d at 914 (quoting *Reich v. IBP, Inc.*, 38 F.3d 1123 (10th Cir. 1994)).[4] Such a measurement is not a judgment call on whether a particular employee acted reasonably or not, but is a necessary byproduct of a representative action: "a 'reasonable' time sufficed for damage calculation where myriad internal 'differences' permeated a class-wide award . . . ." *Id.* Likewise, in *Tum*, the First Circuit expressly upheld a jury instruction based on "reasonable time." *Tum*, 360 F.3d at 283 n.7.

The Supreme Court in *Alvarez* was aware of the *Alvarez* district court's reasonable time measures, approving them as "consistent with the continuous workday rule." *See* 546 U.S. at 31-

---

exposure, and that the uniform limits the amount of skin exposed to lead dust. *See* SUMF ¶ 33. Both of these factors mean that the exposures at issue in today's battery plant environment are less than the exposures occurring in 1956. Thus, pay practices from the 1950s are not even a rough guide for what constitutes reasonable clothes-changing and showering time today.

[4] Like the instant litigation, *Reich v. IBP* was an FLSA enforcement action brought by the Secretary of Labor. *See also Solis v. Tyson Foods, Inc.*, No. 2:02-cv-1174-VEH (N.D. Ala. Oct. 14, 2009) Instructions to Jury, attached as Ex. 65, at p.7 (in DOL enforcement action seeking compensation for donning and doffing activities, instructing jury that "when activities occur pre-shift or post-shift, only the time reasonably spent is compensable").

31; *see also id.* at 26 (citing *Mt. Clemens Pottery* for the proposition that only "the time necessarily spent . . . must be treated as part of the workweek").  The Court was likewise aware of the *Tum* district court's use of a "reasonable time" standard for clothes-changing, although it remanded because the jury had not been also asked to evaluate walking time.  *See id.* at 39.  The Court said nothing about changing the jury instruction on reasonable time.  Thus, the "reasonable time" measure of compensability survives, even when looking at compensability through the lens of the continuous workday rule.

Through the years, including many decisions after *Alvarez*, numerous lower courts have endorsed a reasonable time standard.  *See, e.g., Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 878 (8th Cir. 2012) (affirming jury instruction on reasonable time in donning and doffing case and rejecting DOL's amicus curiae position that actual time was the appropriate standard*); Reich v. IBP*, 38 F.3d at 1127 (affirming 1996 WL 137817, at *4 (D. Kan. Mar. 21, 1996)); *Bull v. U.S.*, 68 Fed. Cl. 212, 227-228 (Fed. Cl. 2005); *Anderson v. Sara Lee Corp.*, 2004 WL 5615651 at *6 (E.D.N.C. Dec. 7, 2004), *aff'd in part, vacated in part on other grounds*, 508 F.3d 181 (4th Cir. 2007); *Albanese v. Bergen Cnty.*, 991 F. Supp. 410, 423-24 (D.N.J. 1997) ("employees must show that the overtime hours they worked must be reasonable in order for those hours to be compensable"); *Hellmers v. Town of Vestal*, 969 F. Supp. 837, 844 (N.D.N.Y. 1997); *Amos v. U.S.*, 13 Cl. Ct. 442, 448-50 (Cl. Ct. 1987).

While the Third Circuit has not addressed the issue since *Alvarez*, Judge Baylson has embraced post-*Alvarez* a reasonable time standard in FLSA donning and doffing cases by denying exclusion of expert witness Dr. Jeffrey Fernandez's elemental time study, despite the plaintiffs' arguments that such methodology failed to capture the actual time spent on pre- and post-shift activities.  *See Lugo v. Farmer's Pride, Inc.,* No. 07-0749, 2011 WL 2550376, at *3 (E.D. Pa. June 23, 2011) (citing numerous other donning and doffing cases using an elemental

time approach); *see also Martinez-Hernandez v. Butterball, L.L.C.*, No. 5:07-cv-174-H, 2011 WL 4460332, at *3 (E.D.N.C. Sept. 26, 2011) (denying motion to exclude employer's expert Dr. Jeffrey Fernandez for using reasonable time measure for donning and doffing).  Even if the Court considers the question of reasonable versus actual time a live issue, the wealth of case law supporting a reasonable time measure is an indicia of the objective reasonableness of East Penn's policies.  *See Gonzalez v. Bustleton Servs., Inc.*, No.  08-4703, 2010 WL 1813487, at *14  (E.D. Pa. Mar. 5, 2010) (relying on uncertainty of the law regarding Portal-to-Portal Act in declining award of liquidated damages for FLSA violations involving pre- and post-shift time); *see also Adeva v. Intertek USA, Inc.*, No. 09-1096(SRC), 2010 Wl 97991, at *3 (D.N.J. Jan. 11, 2010) (in determining whether liquidated damages are appropriate, court may consider ambiguity of the law and closeness of the question) (citing *Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912 (8th Cir. 1991) (holding that "uncertainty in the application of the FLSA may be considered in determining whether to impose liquidated damages)).[5]

Indeed, even Plaintiff's lead counsel has recognized during the course of this litigation that periods of time spent on personal activities unrelated to clothes-changing and showering, such as sitting in the plant cafeteria before shift, may be excludable from compensable time.  *See* SUMF ¶ 7 (conceding spending 40 minutes in lunchroom after donning would not be compensable).  But at the same time, Plaintiff is at a loss to articulate a bright-line test for what activities can be excluded and under what conditions.  This is a marked difference from the position asserted by Plaintiff in its Complaint that actual time must be compensated (*see* dkt. 1 at ¶8).  In the face of such confusion, coupled with the ample support in case law for a reasonable

---

[5] With respect to East Penn's use of time clocks for attendance purposes rather than for calculating pay, case law has little to say, because DOL's own regulations and internal guidance permit East Penn's practices, as shown below.

time standard, it was objectively reasonable for East Penn to believe that paying a reasonable number of minutes for clothes changing and showering as part of paid shift time was lawful, even if the trier of fact decides that East Penn's approach is incorrect.

        2.      <u>East Penn's Pay Policies Are Objectively Reasonable In Light Of DOL's Own Regulations and Internal Guidance Documents</u>

DOL's own Field Operations Handbook ("FOH") also makes clear that employers are not required to pay for the actual time spent on clothes-changing and personal washing activities. Instead, section 31b01(a) provides that employers may comply with the FLSA by paying a reasonable amount of time for compensable clothes-changing and washing activities, further stating that the time allowed will be considered reasonable if the majority of employees usually perform the activities within the allotted time. *See* FOH 31b01(a) available at **www.dol.gov/agenicies/whd/field-operations-handbook.** While the FOH is a handbook for DOL investigators, it also serves as a guidance document for the public. Section 31b01(a) is publicly available on DOL's website, and courts within the Third Circuit uniformly have found that the FOH is persuasive authority. *See Livers v. Nat'l Collegiate Athletic Ass'n*, No. CV 17-4271, 2018 WL 2291027, at *16 (E.D. Pa. May 17, 2018) (Baylson, J.); *Hall v. Guardsmark, LLC*, No. 11-213, 2013 WL 4855328, at *17 (W.D. Pa. Sept. 11, 2013); *see also Berger v. National Collegiate Athletic Association,* 843 F.3d 285, 292 (7th Cir. 2016) (same); *Abel v. Southern Shuttle Servs., Inc.*, 301 F. App'x 856, 859 (11th Cir. 2008). Disregarding its own guidelines, DOL did not address whether East Penn met this criterion during the Wage and Hour investigation's final conference with the Company. SUMF ¶ 7 (Wage and Hour official attending the final conference does not remember discussing whether majority of employees usually could perform the activities at issue during paid time allotted). Thus, nothing

communicated by DOL during the investigation contradicted the reasonableness of East Penn's policy of paying a reasonable amount of time for the activities at issue.

Likewise, at no point since *Steiner* has DOL promulgated a regulation or issued an opinion letter or other guidance stating that employers must pay from "punch to punch." To the contrary, DOL regulations state that employers are not required to use time clocks and, even if time clocks are used, the clock punches may be disregarded unless they match actual working time. *See* 29 C.F.R. 785.48. (This practice is known as "long-punching.") Section 30a03 of the FOH also states that where an employer uses a time clock, the Wage and Hour investigator may suggest to the employer, *but not require*, that the punch-time be kept as close to the work-time as possible to avoid any question that work was performed during such intervals. Further, that section of the FOH recognizes that time records may show elapsed time greater than the hours actually worked because of reasons such as employees choosing to enter their work places before actual starting time or to remain after their actual quitting time. Section 30a03 instructs that in such instances the investigator shall determine whether any time is worked in these intervals. If an employee came in early for personal convenience and did not work prior to the scheduled beginning time, then just recording paid shift time is all that is required. *See, e.g., Hodgson v. Katz & Besthoff*, 365 F. Supp. 1193, 1197-98 (E.D. Va. 1973) (no FLSA violation for not paying cashiers for early or late punches when such punches reflect personal convenience). Indeed, the Wage and Hour Assistant District Director who attended the investigation's final conference agreed that if employees do not perform compensable work until the start of paid time, then there is no violation of the FLSA. SUMF ¶4.

3.  <u>It Was Objectively Reasonable for East Penn To Believe Its Pay Practices Were Compliant Given DOL's Awareness Of the Practices And Decision Not To Challenge Them</u>

Prior to the 2016 investigation, DOL's Wage and Hour Division had never done an FLSA investigation of East Penn's pay practices for hourly employees who wear uniforms and shower SUMF ¶41.  Nor had DOL ever told East Penn or the lead acid battery industry generally that it must pay at least a certain amount of time for clothes-changing and showering activities, must record and pay for actual time spent on such activities, or must pay according to employee punch times.  Indeed, at no point during the investigation preceding this lawsuit did DOL tell East Penn how it should comply with the FLSA.  SUMF ¶53.  Even at the investigation closing conference in March 2018, DOL declined to take a position on these issues, leaving it a mystery as to what DOL's position on these issues was.  *See* SUMF ¶53.

East Penn is not relying just on this absence of action by DOL to prove the reasonableness of its pay practices.  However, as demonstrated below, DOL's undisputed *awareness* of these practices, gained through separate OSHA and Wage and Hour FMLA investigations, coupled with its decision to do nothing in response until filing the instant lawsuit, *does* demonstrate that East Penn has acted reasonably for purposes of the good faith defense to liquidated damages.  *See, e.g., Brown v. Dumbar & Sullivan Dredging Co.,* 189 F.2d 871, 875 and 876 (2d Cir. 1951) (affirming denial of liquidated damages where Wage and Hour Division "made no attempt to enforce the provisions of the F.L.S.A. with respect to" employees in the defendant's industry); *Lugo*, 802 F. Supp. 2d at 617 (employer produced evidence of its good faith, which included the fact that the employer had ongoing communications with DOL, and no new investigation ensued in response to those communications);  *Dalheim v. KDFW-TV,* 712 F. Supp. 533541 (N.D. Tex. 1989) ("District courts have declined to award [liquidated] damages where the Wage and Hour Administration was aware of the employer's practices and took no

12

action."); *Retail Store Employees Union Local 400 v. Drug-Fair Community Drug Co.*, 307 F. Supp. 473, 480 (D.D.C. 1969) (liquidated damages denied where employer had reasonable belief that plaintiffs were exempt and had reasonably continued its compensation practices because, "although aware of these practices, no action was taken by the Wage & Hour Administrator'); *Knudsen v. Lee & Simmons*, 89 F. Supp. 400 (S.D.N.Y. 1949) (no liquidated damages imposed where employer's belief that it was compliant was reasonable, noting that "the failure of [a prior wage and hour investigation] to find a violation would tend to secure defendant in its erroneous belief"); *see also Hodgson v. Barge, Waggoner and Sumner, Inc.,* 377 F. Supp. 842 (M.D. Tenn. 1972) (employer's misclassification violation not willful where DOL has previously checked and audited employer's records and never raised the issue of their inadequacy). Indeed, DOL itself recognizes that its failure to bring a violation to an employer's attention during a prior Wage and Hour investigation can excuse the employer's non-compliance regarding such violation. *See* FOH 53a01(a)(2), attached as Ex. 34.

a.    DOL's Awareness of Shower Pay Practices

DOL has been aware for decades of the practice in the lead acid battery industry of paying reasonable time for clothes-changing and showering time. In 1981, General Battery requested an opinion letter from OSHA regarding whether its policy of 10 minutes of paid shower time is in agreement with OSHA's lead standard, 29 C.F.R. § 1910.1025. SUMF ¶10. In a publicly available responsive opinion letter dated October 22, 1981, the Acting Director of OSHA's Federal Compliance and State Programs division noted that the lead standard does not address the issue of whether and how much time workers should be paid for showering, "because it was OSHA's expectation that employers would pay workers for the time **needed** to take showers required by the standard." (Emphasis added.) *See* SUMF ¶10 (including testimony of former OSHA official who investigated East Penn that she was aware of the 1981 letter). He

13

went on to note, though, that "General Battery's action of requiring employees to shower partly on their own time may, however, violate the [FLSA]" and directed General Battery to the Office of Fair Labor Standards, Employment Standards Administration.  *See* Ex. 10 (1981 General Battery letter).  The General Battery letter put OSHA on notice that a battery manufacturer was paying ten minutes of shower time to comply with the then-new OSHA lead standard.  *See* SUMF ¶10 (OSHA official who investigated East Penn aware of letter).  OSHA's response did not take the position that ten minutes shower time was insufficient.  In fact, the letter does not address either how much time should be paid or how such time should be tracked.[6]  SUMF ¶ 12. OSHA itself considers the letter "an interpretation" of the issue of pay for shower time; indeed, at the outset of the 2016 wage-and-hour investigation of East Penn, OSHA forwarded the General Battery letter to Wage and Hour Assistant District Director JoAnn Gregory, telling her that it was "an interpretation from our agency on this issue."  SUMF ¶16 (testimony of OSHA official who started the investigation that led to this litigation).  East Penn has been aware of this opinion letter since well before the 2016 investigation, as the head of Environmental, Health, Safety, and Regulatory Affairs, Troy Greiss, has been aware of the letter and its availability on OSHA's website since at least 2003 when VPP re-certification was in progress.  SUMF ¶14 (reviewed the letter in 2003 and again in 2016)**.**

OSHA is part of the Department of Labor, and its offices are in the same building as the Secretary's counsel in this case.  SUMF ¶9.  Since 1981, OSHA has had ample opportunity to learn about East Penn's clothes-changing and showering pay practices and, if it were to find such practices problematic, refer the issue to the Wage and Hour Division as it did in 2016.  Indeed,

---

[6] The 1981 General Battery letter only addressed pay for shower time at the end of shift, not time spent changing into work clothes before shift.  Nothing in the letter indicated that General Battery paid for clothes-changing at the start of shift, and OSHA's response did not flag pay for changing into work clothes and other PPE as a potential wage-and-hour issue.

14

since at least 1991, OSHA has been *obligated* to coordinate its enforcement efforts with DOL's Employment Standards Administration (where the Wage and Hour Division then-resided) by sharing information and making referrals when one of the agencies encounters situations that implicate compliance issues within the other agency's purview.  Beginning in approximately 1991, OSHA and the Wage and Hour Division have operated pursuant to a Memorandum of Understanding that sets forth their referral responsibilities.  SUMF ¶ 17.  In particular, the MOU states that there will be "the fullest possible cooperation and coordination between ESA and OSHA, at all organizational levels, in developing and carrying out compliance programs . . . . ."  SUMF ¶18.  In particular, "[f]or enforcement purposes, OSHA and ESA shall arrange for referrals, whenever appropriate."  SUMF ¶19.  Each shall respond to referrals from the other "concerning potential violations of the other Agency's requirements, when appropriate, by conducting investigations in a timely manner."  SUMF ¶20.  In addition, the agencies are obligated to cooperate in developing and conducting training programs on their regulations and requirements "to ensure that valid referrals are made when potential violations are found."  SUMF ¶21.  In fact, retired OSHA official Timothy Braun, who referred the current case to DOL, confirmed that OSHA personnel are trained how to identify Wage and Hour issues.  SUMF ¶23.  Thus, OSHA personnel involved in inspections are obligated to be aware of wage and hour requirements and how to spot possible wage and hour compliance issues.

OSHA's opportunity to learn about East Penn's clothes-changing and showering practices was not just theoretical.  Over the past few decades, OSHA has visited or investigated East Penn's Lyon Station facility on many occasions, which are tracked at least in part on OSHA's publicly-available website under East Penn's name.  SUMF ¶24.  And OSHA actually observed such practices and inquired about their paid status during a multi-day site visit to East Penn's smelter and oxide plants in 2003 as part of the recertification of East Penn's participation

15

in OSHA's Voluntary Protection Program ("VPP"). *See* SUMF ¶¶25-31.  OSHA's operational

review of the smelter and oxide plants was extensive.  It involved interviewing numerous hourly

employees, as well as management, and physical inspections over the course of several days,

which was a far more robust review than the Wage and Hour Division's 2016 investigation

preceding this lawsuit.  *See* SUMF ¶26.  During the 2003 recertification inspection, East Penn's

practice of paying Metals Division employees five minute showering time (since revised in

August 2003 to 20 minutes paid time at the end of shift for continuous operations employees)

was a topic of discussion.  In fact, OSHA raised the issue of whether shower time was paid in its

VPP Site Report recommending "star approval" for East Penn's Metals Division at Lyon Station.

SUMF ¶29.  That document included a list of OSHA's "90-day items," which comprised issues

that OSHA asked East Penn to address before finalizing re-certification. SUMF ¶29.  Item

number 4 stated in relevant part, "Employees exposed to lead should be permitted to shower on

company time at the end of the work shift."  SUMF ¶31.  This means that OSHA was aware that

shower time needed to be compensated and knew that Metals Division employees showered at

the end of shift.  *See* SUMF ¶32.  In fact, it is routine during lead-facility inspections for OSHA

to ask if employees shower at the end of shift and if they do so on paid time.  *See* SUMF ¶31.  In

a letter to OSHA dated June 25, 2003, East Penn addressed this issue, stating that it was

"currently evaluating our corporate policy with respect to company provided uniforms and

associated paid time for donning, doffing, and showers." SUMF ¶34 (including testimony from

DOL's Rule 30(b)(6) witness acknowledging East Penn's response to paid shower issue raised

by OSHA) .  This letter put OSHA on notice that East Penn was developing a pay policy for

clothes-changing and showering.  *See* SUMF ¶36.  In a follow-up letter to OSHA dated July 22,

2003, and upon making administrative changes to its Metals Division pay practices to make clear

in employees' pay records that shower time was being paid, East Penn informed OSHA that "[a]s

we discussed on July 10, 2003, Metals division employees are compensated for shower time. Completed." SUMF ¶37.  Through this letter, the Department of Labor OSHA official in charge of the VPP re-certification for East Penn believed that the Company was compensating Metals Division employees for showering.  *See* SUMF ¶37.  It was reasonable for East Penn to conclude from the fact that OSHA was aware of the issue of paid shower time but did not take further action that East Penn was in compliance with Department of Labor's expectation that lead-exposed employees be permitted to shower on paid time.  *See* SUMF ¶¶ 39-40 (OSHA took no further action after learning shower time was paid).

Together, these letters show that OSHA, which is part of DOL and coordinating with the Wage-Hour Division, was aware of the shower pay policy in the Metals Division at least as of 2003, discussed the policy with East Penn as part of VPP re-certification, and was informed that employees are compensated for shower time, without further written explanation.  OSHA did not follow up or take further action.  In conjunction with the OSHA/Wage and Hour MOU, OSHA's failure to refer the issue of shower time to the Wage and Hour Division until February 2016 can be read as an informed decision that East Penn's smelter and oxide plant pay practices did not implicate wage and hour concerns.

> b.  DOL's Awareness Of How East Penn Pays Hourly Employees and Keeps Records

Over the next few years, the Wage and Hour Division conducted at least four investigations at the Lyon Station facility regarding compliance with the Family Medical Leave Act ("FMLA"). SUMF ¶42.  Department of Labor Complaint Information Forms for two of these four investigations (in 2011 and 2014) demonstrate that DOL verified that East Penn was keeping time records for its hourly employees, which is also a key *FLSA* requirement. SUMF ¶43.  These two investigations involved review of two hourly production employees' regular and

overtime hours at plants that the Secretary includes in its back-wage calculations in this lawsuit, meaning the Wage and Hour Division had the opportunity to scrutinize East Penn's timekeeping and pay practices, and *agreed* that time records were kept, for the types of employees whom Plaintiff represents in this lawsuit. *See* SUMF ¶43 (East Penn Rule 30(b)(6) witness testified that she knows DOL reviewed employee time records in at least one FMLA investigation, which she identified in deposition); *see also* SUMF ¶44.

In another FMLA investigation, commenced in 2015, as well as in the 2014 investigation, DOL provided East Penn with its Handy Reference Guide for employers regarding the FLSA, as well as DOL Fact Sheet #44, in keeping with standard DOL practice. *See* SUMF ¶¶45-46 (including testimony from DOL officials that Wage and Hour investigators routinely hand out these documents during investigations). The former states, under the heading "Recordkeeping," that "[t]he records do not have to be kept in any particular form and time clocks need not be used." SUMF ¶48. Conveying these documents to East Penn demonstrates the reasonableness of East Penn's conclusion that it need not pay employees based on time clock punches. Fact Sheet #44, on the other hand, says that if FLSA violations have occurred, the Wage and Hour investigator will tell the employer "whether violations have occurred and, if so, what they are and how to correct them." SUMF ¶51. It was thus objectively reasonable for East Penn to believe that it was in compliance with the FLSA given that DOL never told East Penn, during four separate FMLA investigations or the instant FLSA investigation, that its pay practices or recordkeeping raised compliance concerns under the FLSA. *See* SUMF ¶53 (East Penn interpreted fact that DOL did not provide notice of problems with East Penn's recordkeeping and pay practices in FMLA investigations as acknowledgment that East Penn was in compliance with legal requirements). And in neither these investigations nor the FLSA investigation preceding

18

this lawsuit did DOL tell East Penn what it would need to do to come into the DOL's current view of "compliance."  *See id.*[7]

c.      The 2016 OSHA Complaint

Most recently, in February 2016, OSHA was once again alerted to East Penn's showering compensation practices.  As reported in a letter dated February 18, 2016, from OSHA to East Penn, OSHA informed the Company that it had received a complaint on February 17, 2016, alleging that employees in East Penn's S-1 plant at the Lyon Station complex do not get enough time at the end of shift to shower.  SUMF ¶117.  At that time, employees in this plant were given five minutes at the end of shift to shower and change into street clothes, in contrast to hourly employees working in other plants within the Lyon Station facility who are required to wear a uniform, who receive 10 minutes for showering and changing clothes at the end of shift.  *See* SUMF ¶118. As the letter references, and deposition testimony confirms, OSHA called Troy Greiss, East Penn's Vice President for Environmental Health and Safety Affairs, about this complaint on February 18, 2016.  *See* SUMF ¶119.  The letter requested that East Penn respond by February 25, 2016, explaining either what action was taken in response to the complaint or why East Penn believed no hazard exists.  *See* Ex. 55.  On February 25, East Penn responded, noting that it pays for shower time.  *See* SUMF ¶120 (including testimony from former OSHA official acknowledging East Penn's response).  OSHA did not take further action, but rather closed the complaint.  *See* SUMF ¶121.  Thus, on the next day, by email dated February 26, 2016, Mr. Greiss informed his colleagues that he had just spoken by telephone to an OSHA representative about the shower time complaint. See SUMF ¶122.  He recounts being told that "[w]hile the OSHA's expectation is that employees are paid for shower time they have no

---

[7] In addition, both Plaintiff's Rule 30(b)(6) witness and its final lead investigator on this investigation acknowledged that there were no prior FLSA investigations of East Penn, nor any  private FLSA lawsuits against the Company challenging the policies and practices at issue.  *See* SUMF ¶41.

defined time."  Also, "The S-1 complaint will be closed.  They do not plan to get an interpretation form [sic] the DOL."  *See* SUMF ¶¶123-124 .  Then-OSHA official Braun, who was involved in this OSHA complaint, confirmed that Mr. Greiss accurately stated OSHA's position that it did not have a defined amount of time that it expected employees to be paid for showering, and that this was consistent with the 1981 General Battery opinion letter.  See SUMF ¶15.  Thus, having been informed by an agency that is part of the Department of Labor that its shower pay practices did not require further inquiry, East Penn had good reason to believe that its pay practices did not raise FLSA compliance issues.  Nonetheless, in an abundance of caution and an effort to do right by its employees, East Penn took affirmative steps to change its pay practices in response to the OSHA complaint, as explained below in Section III.B.2.c.

4. <u>East Penn's Pay Practices Are Objectively Reasonable Even if the Trier of Fact Concludes That They Are Insufficient</u>

Not only was it objectively reasonable for East Penn to adopt a policy of paying reasonable time for the activities at issue instead of paying from "punch to punch," but the *amount* of paid time provided is also reasonable.  For starters, many of the employees at the S-1 plant interviewed *by DOL* during its investigation preceding this lawsuit agreed that they had been paid sufficient time.  *See* SUMF ¶¶58, 144.  This includes some employees who told DOL that even *before* pay for end-of-shift clothes-changing and showering was enlarged for S-1 and Industrial employees from five to 10 minutes (in response to a single complaint to OSHA), the five paid minutes was sufficient for end-of shift activities.  *See* SUMF ¶57.

These assertions by employees are consistent with management's observations.  Numerous managers testified having observed on a regular basis employees lining up and waiting to clock near the end of (but within) their paid shift, because they had already completed their clothes-changing and showering well before punch-out time.  *See* SUMF ¶91, 141.  Indeed,

20

East Penn's Rule 30(b)(6) witness Alison Snyder testified that management observations confirmed that a majority of employees appeared to have completed showering and clothes-changing before the end of paid time, as evidenced by such lines at the time clock, thus satisfying DOL' own FOH guidelines for when paying by a formula is compliant. *See* SUMF ¶142. In addition, managers, including those who were formerly hourly employees, testified that that paid time is enough time to change clothes and shower. *See* SUMF ¶¶91, 141.

Even if Plaintiff comes forward in response with its own employee statements claiming that they did not receive sufficient compensation for these activities, such statements do not make East Penn's pay practices unreasonable given the overwhelming volume of employees attesting to the contrary.[8] Nor, despite a year-and-a-half of discovery, can Plaintiff point to any specific employee complaint to management that the amount of paid time is insufficient other than the one complaint to OSHA that sparked the Wage and Hour investigation preceding this lawsuit. Indeed, management witnesses, including personnel department employees, uniformly testified that they had not received any such complaints. *See* SUMF ¶143.

While at the end of the day the trier of fact may conclude that East Penn should have been paying additional minutes for the activities at issue, such finding of liability would not alter the undisputed material facts demonstrating the reasonableness of East Penn's policies. *See Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1566-67 (11th Cir. 1991) ("precise conformity" with FLSA and DOL interpretations not necessary to establish reasonableness of employer's position; instead, "reasonable belief of conformity" is all that is required).

---

[8] The Court will also recall that Plaintiff asked to take up to 570 employee depositions in this case. *See* Plaintiff's Proposed Discovery Plan, faxed to Chambers on Feb. 4, 2019, at page 3. Plaintiff said it would take a minimum of 50-100 such depositions. *Id.* The Court agreed that Plaintiff had "propose[d] a rational approach …." Dkt. 47 at n.1. However, Plaintiff took *no* hourly employee depositions, and represented to the Court in a later hearing that it had *zero* hourly employee declarations. That speaks volumes.

### B.     East Penn Took Steps To Ascertain How To Comply With The FLSA

*"I know we were perplexed because we didn't know what to do because there were no guidelines.  So we weren't sure what was right and what was wrong.  And we tried to figure out what would be most reasonable."*

Assistant Vice-President for Personnel, Alison Snyder, testifying regarding East Penn's Uniform Policy revisions in 2003.  *See* SUMF ¶89.

*A Are you aware of any investigator having told East Penn what it should be doing to come into compliance?*

*A I am not*

\*\*\*

*B Are you aware of anyplace where the Department of Labor said in writing how it expected East Penn to come into compliance?*

*A I am not."*

DOL Wage and Hour Assistant District Director Jason Mowday.  *See* SUMF ¶53

The subjective component of the good faith defense requires the employer to have taken affirmative steps to figure out how to comply with the FLSA, even if its pay practices are later deemed incorrect. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d. Cir. 1991). Here, the undisputed material facts show that East Penn has been active in seeking to adopt pay practices that comply with the FLSA.  As noted above, neither the language of the FLSA, DOL regulations and interpretations, nor binding case law speaks to how much time East Penn must pay for the clothes-changing and showering activities at issue here.  Nor have Wage and Hour investigators filled this void.  Indeed, East Penn's Assistant Vice President for Personnel, Alison Snyder, voiced East Penn's frustration when she testified in deposition that if DOL had just told East Penn how many minutes to pay for the activities at issue, East Penn would have done so. *See* SUMF ¶55.  Instead, each time Wage and Hour investigators examined East Penn's pay records in FMLA investigations, they failed to note any deficiencies in overtime pay practices.

22

And even in the closing conference for the FLSA investigation preceding this lawsuit, Plaintiff remained silent regarding what it regards as compliance with respect to compensating for clothes-changing and showering activities.  *See* SUMF ¶53.

But East Penn did not remain passive in the face of such uncertainty.  Instead, it took steps to stay up to date with FLSA requirements, retained labor and employment counsel to advise the Company on the FLSA and review its pay polices, and acted in specific reliance on that counsel's advice regarding compliance.  Indeed, even *DOL* has recognized East Penn's good intentions in seeking to comply with the law, further demonstrating East Penn's subjective good faith.  *See infra* at III.B.3.

          1.    <u>East Penn Managers Stay Up to Date on Compliance Issues Through Professional Organizations</u>

The top managers in East Penn's Personnel department are members of the Society of Human Resource Managers ("SHRM"), which helps them stay abreast of developments in labor and employment law, including emerging FLSA issues.  *See generally* SUMF ¶¶138-140.  Indeed, both the Vice President and Assistant Vice President for Human Resources are certified by SHRM as human resource professionals, which required them to pass a test showing that they had knowledge of various aspects of human resource management, including FLSA compliance (and to satisfy continuing education requirements), and they receive weekly emails from SHRM about FLSA developments, including changes in the law.  *See id.*  It is one of the ways that East Penn ensures that it remains FLSA compliant.  *See id.*   East Penn relies both on both its participation in SHRM and its longstanding relationship with labor and employment counsel to ensure FLSA compliance.  *See* SUMF ¶140.   Such affirmative steps demonstrate East Penn's subjective good faith.  *See Nelson v. Alabama Instit. For Deaf & Blind*, 896 F. Supp. 1108, 1115

(N.D. Ala. 1995) (employer acted in good faith by attending FLSA seminars; studying statutes,

regulations, and agency opinions; and meeting with wage and hour specialist).

 2. East Penn Retains Outside Labor and Employment Counsel to Advise it
    on Compliance Issues

The primary way that East Penn ensures FLSA compliance is through retention of and

consistent, close interaction with outside labor and employment counsel, Gary Melchionni, who

has practiced law for 38 years and has represented East Penn for approximately 20 years. *See*

SUMF ¶¶59-60.  Mr. Melchionni spends between 500 and 800 billable hours per year on

advising East Penn on labor and employment matters.  SUMF ¶61.  He is in frequent contact

with the head of Personnel, Alison Snyder, and provides advice on a range of compliance issues,

including compliance with the FLSA.  SUMF ¶62.  East Penn relies on Mr. Melchionni to

provide legal counsel and knowledge and to interpret the written law, including bringing up

issues of which he is aware as an attorney might be of concern or interest to East Penn. SUMF

¶64.  But East Penn is not just relying on the fact of its relationship with Mr. Melchionni to

establish its good faith.  Rather, the Company acted on Mr. Melchionni's specific advice in

adopting the clothes-changing and showering pay policies at issue in this litigation, and Mr.

Melchionni approved changes in East Penn's clothes-changing pay policies in both 2003 and

2016.  *See* SUMF ¶¶107, 136.  DOL itself recognizes that an employer's consulting an attorney

and relying on that advice constitutes a "subjective belief that it was acting in good faith" for

purposes of the Section 260 good faith defense to liquidated damages. *See* FOH § 53c00(a)(2)

(stating that DOL may decide not to seek liquidated damages where an employer meets the

requirements of Section 260).

a.    Mr. Melchionni's 2003 Advice

As East Penn's outside labor and employment counsel, Mr. Melchionni was aware of the Supreme Court's decision in *Steiner v. Mitchell* regarding a lead-acid battery manufacturer (Melchionni Dep. 193:7-194:3) as well as publicly available sections of the DOL Field Operations Handbook affecting manufacturers such as East Penn, including DOL's allowance of "long punching," or using time clocks to gauge attendance but not measure paid working time. *See* SUMF ¶ 66.  But he has also investigated and provided advice to East Penn on the specific issues in this litigation.  In 2003, as part of his on-going efforts to remain apprised of legal developments that might be relevant to his clients, including East Penn, Mr. Melchionni read about DOL settlements with two car manufacturers, American Honda Motor Corp. and Mercedes-Benz, regarding time spent by production employees donning and doffing work uniforms.  SUMF ¶65.  In pondering the implications of these settlements for his client East Penn, Mr. Melchionni researched recent FLSA case law regarding donning activities.  See SUMF ¶66 .  He also sought further information about the two settlements.  Among other research efforts, he submitted to DOL a Freedom of Information Act request regarding the American Honda settlement (SUMF ¶67), but DOL rejected his request.  SUMF ¶68.

Undeterred, Mr. Melchionni called the DOL regional director in the Wilkes-Barre, Pennsylvania, office, Joseph Dietrick, to seek his input.  SUMF ¶69. Mr. Melchionni inquired about DOL's position regarding the donning of uniforms, without identifying his client.  SUMF ¶70.  Mr. Dietrick told Mr. Melchionni that in his opinion time spent donning uniforms would be compensable under the FLSA but did not state how to measure or track that time.  *See* SUMF ¶71.  Mr. Melchionni's associate likewise spoke to a Mr. Peebles in DOL's Alabama office

regarding the FLSA's de minimis rule[9] and donning activities. *See* SUMF ¶72. After speaking with these DOL representatives, Mr. Melchionni drafted an eight-page memorandum addressed to Alison Snyder at East Penn, dated April 30, 2003, in which he set forth his analysis and recommendations regarding the compensability of donning, doffing, and showering time and how to manage and track such time to be compliant. See SUMF ¶73. This memorandum is an example of the robust legal advice provided by Mr. Melchionni to his longstanding client East Penn. In it, Mr. Melchionni touched upon each aspect of the workday at issue in this litigation. Specifically, he advised that (i) changing clothes at the end of work was already part of paid production time and thus not a compliance issue (SUMF ¶74); (ii) the amount of paid time allotted for showering should be reasonable so as to ensure compliance with the FLSA (SUMF ¶75); and (iii) East Penn could argue that donning of the uniform is not compensable because it does not constitute work under the FLSA, is a de minimis activity, or qualifies as a non-compensable preliminary activity under the Portal Act. SUMF ¶76. But he also advised that with respect to donning time, East Penn should consider allowing employees to take clean uniforms home and wear them to work the next day, which is consistent with the solution accepted by DOL in the American Honda and Mercedes-Benz settlements. SUMF ¶77. In the alternative, he advised that clothes-changing time could be treated as compensable work time during the shift (i.e., paid as part of shift time). SUMF ¶78 .

        b.        East Penn acted on Mr. Melchionni's advice in 2003

After receiving and reviewing the April 30, 2003, memorandum, East Penn management, including Ms. Snyder, Vice President of Human Resources Robert Harrop, Mr. Greiss, and Chief

---

[9] Courts have recognized a de minimis defense to liability under the FLSA that considers the following factors: (i) the practical administrative difficulty of recording the time at issue; (ii) the small amount of compensable time at issue in aggregate; and (iii) the regularity of the activities at issue. *See Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984); *see also De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373-74 (3d Cir. 2007).

Operating Officer Bob Flicker (*see* SUMF ¶79) took immediate steps to review and revise its written uniform policy consistent with Mr. Melchionni's advice. *See id.* (management worked with Gary Melchionni and policy advisor Dave Nabozy to develop 2003 Uniform Policy; draft circulated July 14, 2003; effective date of new policy July 31, 2003).   With respect to donning activities, management first considered allowing employees wearing uniforms to take a clean uniform home after shift and wear it to work the next shift, in accordance with one of Mr. Melchionni's recommendations.  SUMF ¶80.  This option was memorialized in one version of the draft revised uniform policy.  SUMF ¶81.  However, the Company was concerned that it would not be able to ensure that the uniforms taken from the plant were in fact clean and free from lead, which could pose a health concern to families. SUMF ¶82 .  As a consequence, this provision was deleted from the draft policy. SUMF ¶83.   But rather than take its chances relying on the three legal arguments identified by Mr. Melchionni as supporting the non-compensability of donning activities, East Penn decided to make clear in its written uniform policy that hourly employees could don on paid time during the first five minutes of the shift, which East Penn believed was reasonable based on collective management experience.  *See* SUMF ¶84-85.  This was a codification of an existing, informal practice.  *See* SUMF ¶87.  Mr. Melchionni has affirmed that in codifying the grace period, East Penn was acting on the advice provided in his 2003 memo. SUMF ¶88 .

    With respect to doffing and showering activities, consistent with Mr. Melchionni's memorandum, management believed that the Company was compliant with the FLSA because management's collective experience and observations were that the time paid for these activities at the end of shift was sufficient.  *See* SUMF ¶90, 91(focused on the beginning of shift because the Melchionni memo opined that end of shift was not a concern because it was already compensated).  At that time, employees in the Automotive plants who were required to wear a

27

uniform and shower were paid 10 minutes at the end of shift to shower and change clothes, while employees in the S-1 and the Industrial plant, were paid five minutes at the end of shift for these activities.  *See* SUMF ¶92.  At that time (2003), the Company did not adjust the five minutes paid at the end of shift for clothes-changing and showering at the S-1 and Industrial plants to ten minutes because it was determined that employees in the S-1 and Industrial plants, which were smaller in population than the Automotive plants, required less time than employees in the Automotive plants to perform these activities. (The Smelter Annex did not exist in 2003.)  *See* SUMF ¶93.  Managers such as Andy Dietrich (now deceased), then the  Senior Vice-President of Manufacturing and Purchasing for Industrial and Stationary, determined that based on daily observation and conversations with employees and supervisors, most employees were showered, changed into street clothes, and waiting to clock out within the allotted five minutes, meaning that five minutes was sufficient for at least the majority of employees who showered.  *See* . SUMF ¶94.  Jim Bricker, former Plant Manager of the S-1 plant, and Alison Snyder, Personnel Director, were also part of this discussion.  *See* SUMF ¶95.   Accordingly, the final version of the 2003 uniform policy provided that employees receive five paid minutes at the end of shift for showering and changing clothes, in addition to five paid minutes on the plant floor to clean up before leaving the floor, which was intended to comply with Mr. Melchionni's advice contained in his April 30, 2003 memorandum.  SUMF ¶96.  In practice, though, employees in the Automotive plants who were required to wear uniforms continued to receive 10 paid minutes for showering and clothes-changing in addition to five minutes of on-the-floor clean up time.  *See* SUMF ¶97.

These provisions in the final version of the 2003 revised uniform policy (EPM-00004931-32) reflect the guidance provided by Mr. Melchionni in his April 2003 legal advice memorandum. *See* SUMF ¶108.  In addition, the revised policy made clear that only employees required to wear uniforms (for purposes of complying with the OSHA lead standard) were required to shower,

meaning those employees who chose to wear a uniform for their convenience were not required to shower. SUMF ¶98 .

The final 2003 policy also addressed hourly employees working in continuous operations jobs, where there is a seamless handoff between shifts so that operations do not stop and re-start between shifts.  *See* SUMF ¶99.  Such employees include gridcasters and many employees who work in the Smelter and Oxide plants.  SUMF ¶100.  As explained in the final revised uniform policy, the shift time for these employees is different from the standard eight-hour shift for non-continuous employees.  SUMF ¶101.  With respect to Smelter employees, a new pay system was implemented in August 2003, whereby continuous operations employees in the Smelter receive 10 paid minutes at the beginning of shift for donning activities and 20 paid minutes at the end of their shift for doffing and showering activities.  *See* SUMF ¶102.  For other continuous operations employees in other plants, such as employees who work as gridcasters, the shift was extended to eight hours and fifteen minutes (versus eight hours for non-continuous operations shifts) to allow for a seamless transition between shifts.  *See* SUMF ¶103.  For these employees, the last 10 minutes of the eight-hour and fifteen minute shift is allotted for showering and clothes-changing. *See* SUMF ¶104.

The revised policy was reviewed and approved by a team of East Penn executive management.  A July 14, 2003, memorandum from Dave Nabozny, former East Penn policy advisor, to senior East Penn management presented the final draft uniform policy for review in advance of a July 22, 2003, executive management meeting, where the policy was reviewed.  *See* SUMF ¶105.  As noted in the memorandum, the terms in the draft policy had been reviewed by both the East Penn policy review committee and legal counsel Stevens and Lee.  *See* SUMF ¶106 (attorney Melchionni reviewed the policy); *see also* SUMF ¶ 108 (final 2003 policy reflects legal advice provided by Mr. Melchionni in his April 2003 memorandum).  Mr. Melchionni likewise

confirmed that he approved of the 2003 revised policy.  SUMF ¶ 107.  The memorandum also states

that management sought approval of the revised uniform policy to obtain OSHA's recertification

of East Penn's VPP status that year (described above).  *See* SUMF ¶ 106.  Specifically, the 2003

changes to how continuous operations employees in the Smelter and Oxide plants are paid,

described above, were implemented for the purpose of showing administratively that the Company

was paying for shower time in response to the question raised by OSHA during the VPP re-

certification.  *See* SUMF ¶ 106 (citing Hauser deposition testimony). The new uniform and shower

policy went into effect at this time.  SUMF ¶ 110.

c.    East Penn revised its policy in 2016 to increase shower pay for
some employees, which Mr. Melchionni approved

The uniform and shower policy was next reviewed in 2016.  *See generally* SUMF ¶¶ 133-

137.  By that time, East Penn had a documented policy review process that it follows in periodically

reviewing and revising (if necessary) various company policies.  *See* SUMF ¶ 111.  An August 5,

2015, email from Vice President, Human Resources, Bob Harrop to various East Penn personnel

on East Penn's policy committee explains the committee's constitution and lists 5 policies to be

reviewed over the next months, including the "shower/clean-up" policy.  *See* ¶ 115.  (This was

more than *six months* before the employee complaint to OSHA that kicked off this lawsuit.) The

next page is a flow chart showing the "policy review process."  *See* SUMF ¶ 112.  This states that

the first step is for management/personnel/legal counsel to make recommendation changes, to be

put into draft form.  *See* SUMF ¶ 113.  After management review and approval, the "[f]inal revision

is typed into updated format and reviewed and approved by Legal Counsel."  *See* SUMF ¶ 114.

These documents confirm that there is a documented process for periodic review and adjustment

of policies, including those affecting pay, and that legal counsel is to be included in this process.

*See id.* (East Penn follows this process).

30

This process was followed and culminated in February and March 2016, when East Penn revised its uniform and shower policy, specifically considering the issue of whether to increase the amount of showering time allotted to hourly employees wearing uniforms in S-1, which had been the subject of the February 2016 OSHA complaint. *See* SUMF ¶133. The committee, comprising various managers within East Penn, met regarding the proposed revisions and reached a consensus that as part of those revisions the showering pay for S-1 and the Industrial plant should be increased to 10 minutes, not because the committee believed additional time was necessary, but to ensure that all employees wearing uniforms were subject to the same policy. *See* SUMF ¶134 (employee relations issue led to decision to make pay policy the same across plants). Although the change was driven primarily by a desire for consistency, by email, Ms. Snyder asked Mr. Melchionni to review the policy revisions in light of FLSA requirements. *See* SUMF ¶135 (Mr. Melchionni addressed compensability of time at end of shift in 2016). Mr. Melchionni approved the new policy. *See* SUMF ¶136 (Mr. Melchionni reviewed 2016 policy before implementation). East Penn relied on this advice in implementing its revised uniform and shower policy in 2016. *See* SUMF ¶¶136-137.

Thus, both the 2003 and 2016 policy changes affecting pay for clothes-changing and showering activities bear the imprimatur of attorney review and approval, reflecting East Penn's honest intent to comply with the law. East Penn's reliance on advice of counsel is prima facie proof of its subjective good faith. Indeed, as former Wage and Hour investigator and Assistant District Director and expert witness for East Penn Brian Farrington testified during his deposition, an advice of counsel defense should be dispositive on the state-of-mind issues of liquidated damages and willfulness. *See* SUMF ¶109.

3.      Other Undisputed Record Evidence Demonstrates East Penn's Honest Intent To Follow the Law

None of the current or former DOL officials deposed presented any facts demonstrating or even suggesting either East Penn's intent to violate or otherwise disregard its legal obligations or a reckless disregard of such violations.  To the contrary, Dr. Komis, the former OSHA official who raised the issue of compensation for showering during the 2003 VPP re-certification, testified that in her observation East Penn "cared about their employees" and was committed to doing whatever OSHA asked it to do.  SUMF ¶151.  When then-OSHA official Timothy Braun transmitted the 2016 OSHA complaint about shower time in the S-1 plant to the Wage and Hour division, which instigated the investigation preceding this lawsuit, he went out of his way to note that East Penn had told him that it was meeting with senior management to address the OSHA complaint and that they (i.e., East Penn) "want to be sure they are following the regulations."  *See* SUMF ¶132.

Nothing that occurred during the Wage and Hour investigation changes these conclusions.  DOL lacks any direct evidence of East Penn's state of mind.  DOL's Rule 30(b)(6) witness admitted that DOL did not have all the facts regarding what East Penn did to ensure it complied with the FLSA, and, in particular, DOL did not know during the investigation that East Penn had relied on the advice of counsel in developing its pay policies for clothes-changing and showering.  *See* SUMF ¶150.  And DOL official Jason Mowday, who attended the final conference for the investigation, admitted several times that DOL never told East Penn how to comply with the FLSA.  *See* SUMF ¶¶5, 6, 53.  There is thus no genuine dispute of material fact that East Penn had an honest intent to follow the law, even if its policies somehow fell short of the still-undefined compliance mark.

**IV.    EAST PENN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S WILLFULNESS CLAIM BECAUSE PLAINTIFF CANNOT POINT TO ANY MATERIAL FACTS DEMONSTRATING THAT EAST PENN KNEW IT WAS**

**VIOLATING THE FLSA OR ACTED IN RECKLESS DISREGARD OF THE STATUTE'S OVERTIME REQUIREMENTS**

Plaintiff claims that East Penn's alleged violation of the FLSA was "willful," thus entitling it to a three-year limitations period instead of the standard two-year period provided by the statute. *See* Compl. ¶5 and (2). Willfulness claims are not routine. Indeed, DOL's Field Operations Handbook provides that DOL's normal enforcement practice is to *not* assert a claim of willfulness. *See* FOH 53c02(a). To prove willfulness, Plaintiff must do more than demonstrate that East Penn violated the FLSA. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988) ("The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations."). Rather, it must prove that East Penn either knew it was violating the law or acted in reckless disregard of the FLSA's overtime requirements. *See Richland Shoe Co.*, 486 U.S. at 133 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985))[10]; *Stone v. Troy Construction* 935 F.3d 141, 150 (3d Cir. 2019).

The facts relevant to defeating Plaintiff's willfulness claim overlap those proving East Penn's Section 260 good faith defense to liquidated damages. But there are two important distinctions between Plaintiff's willfulness claim and East Penn's good faith defense. First, Plaintiff bears the burden of proving willfulness. *See Richland Shoe*, 486 U.S. at 135. Second, while the Section 260 good faith defense considers whether an employer acted reasonably,

---

[10]*Thurston* involved a claim under the Age Discrimination and Employment Act, which, unlike the FLSA, allows liquidated damages only for willful violations. While the standard for liquidated damages under the ADEA differs from that of the FLSA, the Supreme Court in *Thurston* and *Richland Shoe* articulated a definition of willfulness that applies under both statutes. *See Richland Shoe*, 488 U.S. at 133 ("The standard of willfulness that was adopted in *Thurston* . . . is surely a fair reading of the plain language of the [FLSA]."). As in this case, *Thurston* involved an employer's reliance on advice of counsel. The Supreme Court concluded that the airline had not acted willfully in adopting a new transfer policy after consulting with legal counsel, even though the policy violated the ADEA. *See Thurston*, 469 U.S. at 130.

demonstrating that East Penn acted unreasonably does *not* prove willfulness. *See id*. at 134 n.13 ("If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful. . . ."); *Gonzalez v. Bustleton Servs., Inc.*, No 08-4703, 2010 WL 1813487, at *5 (E.D. Pa. Mar. 5, 2010) (stating in rejecting willfulness claim, "I cannot equate an erroneous belief, however unreasonable, with a willful violation"). In *Richland Shoe*, the Supreme Court rejected DOL's attempt to tie willfulness to the reasonableness of the employer's belief that it was compliant, because such a position "would permit a finding of willfulness to be based on nothing more than negligence, or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *See id*. at 134-35. The Court noted that such a position would "apparently make the issue in most cases turn on whether the employer sought legal advice concerning its pay practices." *See Richland Shoe*, 486 U.S. at 134.

If absence of legal advice is too low a bar for proving willfulness, then East Penn's *reliance* on advice of counsel forecloses Plaintiff's claim that its clothes-changing and showering pay practices willfully violate the FLSA. This is true even if, as in *Thurston*, the trier of fact concludes that the advice was wrong and the practices are non-compliant. Decisions by the lower courts are likewise consistent in rejecting willfulness claims where the employer had sought advice of counsel. *See, e.g., Pignataro v. Port Authority of New York and New Jersey*, 593 F.3d 265, 273 (3d Cir. 2010) (employer not willful in misclassifying helicopter pilots as exempt where it relied on discussions with and research by employer's law department); *Brusstar v. Southeastern Penn. Transp. Authority*, No. 85-3773, 1988 WL 85657, at *8 (E.D. Pa. Aug. 17, 1988) (although mass transit agency did not have reasonable grounds for believing FLSA did not apply, facts showed it did not act with reckless disregard because it acted upon advice of counsel and followed developments in the law); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011)(employer acted in good faith where it believed time at issue was de

34

minimis, despite court finding time was not de minimis, as there was a lack of clear legal authority on the issue and evidence showed employer relied on advice of counsel and took action based on counsel's advice); *LaPorte v. Gen. Elec. Plastic, Business Group of Burkville, Ala.*, 838 F. Supp. 549 (M.D. Ala. 1993) (denying plaintiff summary judgment on willfulness where manager of non-exempt relations sought advice of in-house counsel on whether incidental time was compensable and obtained counsel's approval of practice at issue); *Alanis v. Tracer Indus. Man. Co.*, Inc., No. 1:13-cv-386, 2016 WL 7551073 (E.D. Tex. July 31, 2016) (recommending summary judgment for employer on good faith defense to liquidated damages and dismissal of willfulness claim where evidence showed employer sought advice about FLSA compliance defense from employment law firm and human resources organization, notwithstanding that there was a factual issue as to whether some of the time at issue was de minimis).

The facts discussed above demonstrating both the objective reasonableness of East Penn's policies and the Company's honest attempt to comply with the law not only establish East Penn's good faith, but also defeat a finding of willfulness.  As Judge Baylson explained in *Lugo*, "Here, the same facts that support the Court's finding as a matter of law that Defendant acted reasonably and in good faith also support a finding that Defendant did not knowingly or recklessly disregard the FLSA's requirements." 802 F. Supp. 2d at 618.  Plaintiff has not adduced any material facts that would create a genuine dispute sufficient to survive summary judgment, despite East Penn asking Plaintiff in discovery for the factual basis for its willfulness claim.  *See Pongrac v. Consolidated Rail Corp.*, 632 F. Supp. 126, 128 (E.D. Pa. 1985) (summary judgment movant can rely on non-movant's interrogatory answers in support of its motion).  East Penn's Interrogatory No. 9 was to the point:  "Explain the basis for your allegation that East Penn acted willfully in allegedly violating the FLSA."  After objecting that the interrogatory was "premature" until a "substantial amount of discovery has been conducted,"

Plaintiff responded that East Penn "deliberately and knowingly paid employees only for scheduled shift time" not when they clocked in and out.  *See* Ex. 64.   As demonstrated above, at III.A.1, DOL regulations do not require employers to use time clocks, and the FOH allows "long-punching," or using time clocks to measure attendance rather than paid time.  Thus, this assertion does not even state a per se violation of the FLSA.   Plaintiff also asserted that East Penn knew some unspecified employees were performing "work activities" between their clock times and shift times and did not provide enough time at the end of shift for showering and clothes-changing.  But even if true (which East Penn disputes), this does no more than allege a violation of the FLSA; Plaintiff still must establish that East Penn knew that its practices violated the law or recklessly disregarded the issue.

Plaintiff's only other assertion is that unidentified managers "verbally instructed many employees to be at their work station five minutes prior to the scheduled start of their shift."  *See* SUMF ¶146.  Plaintiff does not specify the manager(s) allegedly at issue, whether the Company knew about their alleged instruction, whether employees performed any work activities during the alleged five minutes pre-shift, and how many hourly employees were affected.  *See* SUMF ¶147.  Indeed, Plaintiff's position seems to be based on a general assertion in a single witness interview statement.  *See generally* Ex. 36.  To the extent that the interrogatory response refers to other alleged instances of "verbal instruction" by managers, such assertions are hearsay, which cannot be considered on a motion for summary judgment.  *See Pollino v. City of Philadelphia*, No. Civ. A. 03-6288, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005) (Pratter, J.).  Further, Plaintiff did not verify its interrogatory response, which disqualifies its use in opposing summary judgment.  *See Piazzo v. Meriden Molded Plastics, Inc.*, No. Civ. A. No. 87-752, 1989 WL 89419, at *1 (E.D. Pa. July 31, 1989) ("only answers [to interrogatories] which are signed under oath by the individual can be used in opposition to a motion for summary judgment.").

36

No other facts developed in discovery support Plaintiff's assertion that managers told employees to arrive early to their work station, nor has Plaintiff supplemented its interrogatory response after the benefit of 38 fact depositions, thousands of pages of produced documents, and East Penn's robust written discovery answers.  Even viewed in the light most favorable to Plaintiff as the non-movant, these facts do not support Plaintiff's willfulness claim.  *See Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702-703 (3d Cir. 1994) (DOL did not establish willfulness even where several newspaper employees testified that defendant's managing editor told them not to record more than 40 hours on their time slips and newspaper reprimanded those who did so and made them revise their time slips, as in many instances employees completed inaccurate time slips of their own volition).    Further, DOL's Rule 30(b)(6) witness Brian Johnson confirmed that DOL had no basis for bringing its willfulness claim other than those assertions set forth in its deficient response to Interrogatory No. 9.  *See* SUMF ¶145.  In sum, with respect to Plaintiff's willfulness claim, the undisputed facts show that "there is no there there", and East Penn is entitled to summary judgment on this claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to East Penn on its Section 260 good faith defense to liquidated damages and on Plaintiff's willfulness claim.

Dated:  January 29, 2020                    Respectfully submitted,

/s/ Michael J. Mueller
Michael J. Mueller *pro hac vice*
Evangeline C. Paschal *pro hac vice*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201
mmueller@huntonak.com
epaschal@huntonak.com


/s/ Daniel B. Huyett
Daniel B. Huyett
Pa. Attorney I.D. No. 21385
STEVENS & LEE, P.C.
111 North Sixth Street, P.O. Box 679
Reading, PA 19603-0679
Telephone:  (610) 478-2219
Facsimile:  (202) 988-0801
dbh@stevenslee.com
*Counsel for Defendant East Penn Manufacturing Co.*

## CERTIFICATE OF SERVICE

I, Michael J. Mueller, hereby certify that a true and correct copy of the foregoing was served on counsel listed below on January 29, 2020, through the Court's ECF system:

OSCAR L HAMPTON
U.S. DEPARTMENT OF LABOR
THE CURTIS CENTER, SUITE 630 EAST
170 S. INDEPENDENCE MALL WEST
PHILADELPHIA, PA 19106  (all further recipients are at this same mailing address)
215-861-5120; Email: hampton.oscar@dol.gov

ADAM F. WELSH
215-861-5159; Email: welsh.adam@dol.gov

BERTHA M. ASTORGA
215-861-5126; Email: Astorga.Bertha.M@dol.gov

PATRICK M. DALIN
215-861-5165; Email: dalin.patrick@dol.gov

ETHAN M. DENNIS
215-861-5142; Email: dennis.ethan.m@dol.gov

ANDREA LUBY
215-861-5128; Email:  Luby.andrea@dol.gov

Dated:  January 29, 2020                      /s/ Michael J. Mueller
                                              Michael J. Mueller