# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EUGENE SCALIA, SECRETARY OF LABOR, | ) | |
| U.S. DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 5:18-cv-01194-GEKP |
| | ) | |
| EAST PENN MANUFACTURING CO., | ) | **Oral Argument Requested** |
| | ) | |
| Defendant. | ) | |

## EAST PENN'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON EMPLOYEES WHO: WERE NOT AMONG THE EIGHT FACILITIES DR. RADWIN STUDIED; WORK OUTSIDE OF PENNSYLVANIA; DO NOT WEAR A UNIFORM AND SHOWER; OR WHO ARE CONTINUOUS OPERATIONS EMPLOYEES IN THE METALS DIVISION

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARD FOR SUMMARY JUDGMENT...................................... 3

III.    SUMMARY OF UNDISPUTED MATERIAL FACTS........................................ 3

IV.     LEGAL STANDARD FOR PLAINTIFF TO ESTABLISH LIABILITY ......................... 9

V.      THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR EAST PENN ON
        THE EMPLOYEES WHO WORK OUTSIDE OF PENNSYLVANIA, WHO
        WORK AT PLANTS THAT DR. RADWIN DID NOT STUDY, WHO DO NOT
        WEAR A UNIFORM AND SHOWER, OR WHO ARE CONTINUOUS
        OPERATIONS EMPLOYEES IN THE METALS DIVISION ....................................... 12

VI.     CONCLUSION................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................................3

*Anderson v. Mt. Clemens Pottery*,
   328 U.S. 680 (1946)........................................................................................ *passim*

*Beccerril v. Spartan Concerte Prods.*,
   __ Fed. Appx. __, 2020 WL 414389 (3d Cir. Jan. 27, 2020) ..................................12

*Goodman v. Mead Johnson & Co.*,
   534 F.2d 566 (3d Cir. 1976).........................................................................................3

*Gwynn v. City of Philadelphia*,
   719 F.3d 295 (3d Cir. 2013).......................................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).....................................................................................................3

*McGrath v. City of Philadelphia*,
   864 F. Supp. 466 (E.D. Pa. 1994) ...............................................................................3

*Rosano v. Township of Teaneck*,
   754 F.3d 177 (3d Cir. 2014)............................................................................11, 12, 13

*Sniscak v. Borough of Raritan*,
   86 Fed. Appx. 486, 2003 WL 23155276 (3d Cir. Dec. 11, 2003) ...........................12

*Steiner v. Mitchell*,
   350 U.S. 247 (1956)....................................................................................................10

**Statutes**

FLSA..............................................................................................................10, 11, 12

**Other Authorities**

Fed. R. Civ. P. 56.............................................................................................................1

Fed. R. Civ. P. 56(c) ........................................................................................................3

**List of Deponents Cited in East Penn's Statement of Undisputed Material Facts**
*In support of*
**East Penn's Motion for Summary Judgment on Employees Who: Were Not Among the Eight Facilities Dr. Radwin Studied; Work Outside of Pennsylvania; Do Not Wear a Uniform and Shower; or Who Are Continuous Operations Employees in the Metals Division**

| | |
|---|---|
| Bachman, Francis | East Penn Director of Diversified Division |
| Bierman, Kevin | East Penn A1 Pasting Leader |
| Brugger, John | East Penn A3 Pasting Leader |
| Fedock, Stephen | Former co-lead DOL Wage and Hour Investigator on East Penn investigation |
| Greiss, Troy | East Penn Vice President for Environmental, Health, Safety, and Regulatory Affairs |
| Gristina, Alfonso | DOL Wage and Hour District Director |
| Hauser, Scott | East Penn Plant Manager for Smelter, Oxide 1, and Oxide 2 Plants |
| Hole, Scott | East Penn Director of Corporate Maintenance |
| Illiano, Adonis | East Penn Senior Manager of Distribution Operations |
| Johnson, Brian | DOL's Rule 30(b)(6) witness |
| Leiby, Rick | East Penn Vice President, Metals Operations (Metals Division) |
| Mickonis, Shawn | East Penn Assistant Plant Manager for Injection Molding 1 and Injection Molding 2 Plants |
| Murray, Michael | DOL's damages witness |
| Nieves, Luis | DOL final lead Wage and Hour Investigator on East Penn investigation |
| Pruitt, Chris | East Penn CEO and President |
| Radwin, Robert | DOL's time-study expert witness |
| Snyder, Alison | East Penn Assistant Vice President of Personnel |

**Exhibits to East Penn's Motion for Summary Judgment on Employees Who: Were Not Among the Eight Facilities Dr. Radwin Studied; Work Outside of Pennsylvania; Do Not Wear a Uniform and Shower; or Are Continuous Operation Employees in the Metals Division**

| Ex. No. | Description |
| --- | --- |
| 1 | Deposition Transcript of Brian Johnson, DOL's 30(b)(6) witness, taken July 31, 2019 |
| 2 | Deposition Transcript of Christopher Pruitt, taken September 10, 2019 (filed in chambers only) |
| 3 | Deposition Transcript of Francis Bachman, taken October 11, 2019 |
| 4 | Deposition Transcript of Richard Leiby, Jr., taken November 1, 2019 |
| 5 | Deposition Transcript of Shawn Mickonis, taken September 20, 2019 |
| 6 | Johnson Deposition Exhibit 7: East Penn Location Listing, DOL-EPM-000431 – DOL-EPM-0000434 |
| 7 | Deposition Transcript of Luis Nieves, taken April 25, 2019 |
| 8 | Johnson Deposition Exhibit 10: Wage-Hour's FLSA Narrative (summary of East Penn investigation), DOL-EPM-000419 – DOL-EPM-000425 |
| 9 | Deposition Transcript of initial lead investigator Stephen Fedock, taken April 18, 2019 |
| 10 | Deposition Transcript of Troy Greiss, taken June 27, 2019 |
| 11 | Deposition Transcript of Alison Snyder, taken July 16, 2019 |
| 12 | DOL Deposition Exhibit 4: 2016 PPE (Personal Protective Equipment)/Uniform/Shower Policy, EPM-00001779 – EPM-000017980 |
| 13 | Declaration of Alison Snyder, dated January 28, 2020 |
| 14 | Deposition Transcript of Kevin Scott Bierman, taken November 6, 2019 |
| 15 | Deposition Transcript of John Brugger, taken November 8, 2019 |
| 16 | Radwin Deposition Exhibit 132: Corrected Amended Report of Robert G. Radwin, PhD, CPE, dated December 6, 2019, and served on December 12, 2019 |
| 17 | Radwin Deposition Exhibit 50: Select Handwritten Notes and Drawings of Plant Layouts Produced by Dr. Radwin, DOL-EPM-014965; DOL-EPM-014698 – DOL-EPM-014728 |
| 18 | Deposition Transcript of Robert Radwin, taken December 11, 2019 and December 12, 2019 |
| 19 | Excerpt of Radwin Deposition Exhibit 49: Radwin's Study Schedule, DOL-EPM-011299 – DOL-EPM-011306 |
| 20 | Deposition Transcript of Troy Greiss, taken December 17, 2019 |
| 21 | DOL Deposition Exhibit 20 and 82: Spreadsheet of Shift Schedules and PPE by Position for Various Lyon Station Plants (filed in chambers only) |
| 22 | Deposition Transcript of Scott Hauser, taken September 19, 2019 |
| 23 | Layouts of Various Plants, EPM-00000638 – EPM-000000666 (filed in chambers only) |
| 24 | Radwin Deposition Exhibit 135: Corrected Rebuttal Report of Jeffrey E. Fernandez, PhD, PE, CPE, dated November 25, 2019, and served January 13, 2020 |
| 25 | Murray Deposition Exhibit 22: Murray's Individual Plant Analyses Comparing Employees' Punch Time to Paid Time |
| 26 | Deposition Transcript of Michael Murray, taken January 10, 2020 |

| Ex. No. | Description |
|---------|-------------|
| 27 | Fedock Deposition Exhibit 4: Fedock's Case Diary Entries for Wage-Hour's investigation of East Penn |
| 28 | Nieves Deposition Exhibit 11: Email from Bertha Astorga to Gary Melchionni during Wage-Hour investigation, dated February 6, 2018, DOL-EPM-001157 – DOL-EPM-001160 |
| 29 | Gristina Deposition Exhibit 13: DOL's Press Release "U.S. Department of Labor Seeks Information from Battery Manufacturer's Employees as Wage Violations Case Continues in Federal Court," dated July 9, 2018 |
| 30 | Amended Rebuttal Report of Nathan D. Woods, PhD, dated January 7, 2020 |
| 31 | Deposition Transcript of Scott Hole, October 11, 2019 |
| 32 | Deposition Transcript of Jeffrey Fernandez, taken December 18, 2019 and December 19, 2019 |
| 33 | Deposition Transcript of Adonis Illiano, taken October 30, 2019 |
| 34 | DOL Deposition Exhibit 149: Injection Molding 2Spreadsheet of Shift Schedules and PPE by Position (filed in chambers only) |
| 35 | DOL Deposition Exhibit 151: Kutztown Wire and Cable Spreadsheet of Shift Schedules and PPE by Position (filed in chambers only) |
| 36 | Declaration of Jeannie Adam |
| 37 | Declaration of Paul T. Adams |
| 38 | Declaration of Luz Agramonte |
| 39 | Declaration of Juanita Aguilar |
| 40 | Declaration of Martha Alba |
| 41 | Declaration of Christina M. Alloggio |
| 42 | Declaration of Maria M. Almonte |
| 43 | Declaration of Edward S. Anderson, Jr. |
| 44 | Declaration of Shyneece T Asberry |
| 45 | Declaration of Robert E. Bachman |
| 46 | Declaration of Nathan Breininger |
| 47 | Declaration of Justine Brown |
| 48 | Declaration of Julio Burgos, Jr. |
| 49 | Declaration of Veronica Chagolla-Cortes |
| 50 | Declaration of Grisel Chevere |
| 51 | Declaration of Mayra Coello |
| 52 | Declaration of Patrick L. Coles |
| 53 | Declaration of Brandon Colon-Rodriguez |
| 54 | Declaration of Desiree Comas |
| 55 | Declaration of Quran Comfort |
| 56 | Declaration of Kathleen Dale |
| 57 | Declaration of Dylan Dallago |
| 58 | Declaration of Gregory Delgrosso |
| 59 | Declaration of Wade Deluca |
| 60 | Declaration of Peggy Sue Dennis |
| 61 | Declaration of Eric Diaz |
| 62 | Declaration of Gigliola Diehl |
| 63 | Declaration of Noble Donawa |

| Ex. No. | Description |
|---------|-------------|
| 64 | Declaration of Mike Eme |
| 65 | Declaration of Susan Evans |
| 66 | Declaration of Rosemary Falk |
| 67 | Declaration of Edwin Fernandez |
| 68 | Declaration of Carlton Firestine |
| 69 | Declaration of Ashley Fox |
| 70 | Declaration of Allen Gates |
| 71 | Declaration of Diane Gerhart |
| 72 | Declaration of Luis Manuel Gomez, Jr. |
| 73 | Declaration of Juan Gonzalez-Diaz |
| 74 | Declaration of Esperenza Gonzalez |
| 75 | Declaration of Vanessa Graves |
| 76 | Declaration of David H. Groff |
| 77 | Declaration of Alexander Hardy |
| 78 | Declaration of Giselle Herrera |
| 79 | Declaration of Nicole High |
| 80 | Declaration of Robert Hilbert |
| 81 | Declaration of Cynthia Hoffman-Hensley |
| 82 | Declaration of Albert Houston |
| 83 | Declaration of Jasmine Iraola |
| 84 | Declaration of Alejandra Jimenez-Perez |
| 85 | Declaration of Becky Kuhn |
| 86 | Declaration of Christopher Kulp |
| 87 | Declaration of Maxime Legal |
| 88 | Declaration of James S. Long |
| 89 | Declaration of Janice Lopez |
| 90 | Declaration of Vanessa Lopez |
| 91 | Declaration of Mayra Luna |
| 92 | Declaration of Katery Mancebo-Rodriguez |
| 93 | Declaration of Laura P. Marte-Lopez |
| 94 | Declaration of Kelly McGlynn |
| 95 | Declaration of James Melander |
| 96 | Declaration of Lorianne Melendez |
| 97 | Declaration of Casim Miller |
| 98 | Declaration of Darline Miller |
| 99 | Declaration of Erika Z. Molina |
| 100 | Declaration of Vedmarliz Morales |
| 101 | Declaration of Anthony A. Moyer |
| 102 | Declaration of Christian Munoz-Ortiz |
| 103 | Declaration of Donna Nelson |
| 104 | Declaration of Milady Nieves-Villanueva |
| 105 | Declaration of Annery Olivares |
| 106 | Declaration of Guercon Olivier |
| 107 | Declaration of Sara Olmo |
| 108 | Declaration of Jessica Orellana |

| Ex. No. | Description |
|---|---|
| 109 | Declaration of Trevor Parris |
| 110 | Declaration of Lisbeth Perez |
| 111 | Declaration of Gary Pfautz |
| 112 | Declaration of Barbara Placencia |
| 113 | Declaration of Genesis M. Polanco |
| 114 | Declaration of Susan Quinter |
| 115 | Declaration of Jarrett Reichard |
| 116 | Declaration of David Riegel |
| 117 | Declaration of Ryan Riegel |
| 118 | Declaration of Samuel Rivera |
| 119 | Declaration of Nicole Rosa |
| 120 | Declaration of Lissette Rosario-Moreta |
| 121 | Declaration of Sally Roth |
| 122 | Declaration of James Ruppert |
| 123 | Declaration of Jashira Salame |
| 124 | Declaration of Gayle Sallada |
| 125 | Declaration of Johanny A. Santos-Santana |
| 126 | Declaration of Selene Saucedo-Oliveras |
| 127 | Declaration of Aaron Schappell |
| 128 | Declaration of Scott Schappell |
| 129 | Declaration of Amanda Seiple |
| 130 | Declaration of Valerie A. Sgaramella |
| 131 | Declaration of Shelly L. Shade |
| 132 | Declaration of Vicki Shade |
| 133 | Declaration of John Skinner IV |
| 134 | Declaration of Mark Snyder |
| 135 | Declaration of Iran Soto |
| 136 | Declaration of Stephanie Stamm |
| 137 | Declaration of Andy Stamy |
| 138 | Declaration of Megan Stauffer |
| 139 | Declaration of Janice L Strunk |
| 140 | Declaration of Lisa Suazo-Aponte |
| 141 | Declaration of Harry Tees |
| 142 | Declaration of Jazmine Toro |
| 143 | Declaration of Leann Troutman |
| 144 | Declaration of Michael Unger |
| 145 | Declaration of Samantha Watson |
| 146 | Declaration of Joseph Wehr |
| 147 | Declaration of Loreen M. Werley |
| 148 | Declaration of Derek Michael Wise |
| 149 | East Penn's Objections and Response to DOL's First Set of Requests for Production, dated July 11, 2018 |

Pursuant to Fed. R. Civ. P. 56, Defendant East Penn Manufacturing Co. ("East Penn") respectfully moves for summary judgment as to liability on Plaintiff's claims on behalf of employees who: (1) were not among the eight facilities Dr. Radwin studied; (2) work outside of Pennsylvania; (3) do not wear a uniform and shower; or (4) are Continuous Operations employees in the Metals Division.  In support, East Penn states as follows.

## I.      INTRODUCTION

DOL's theory of its case has been, and continues to be, a moving target.  While it has been difficult to determine the representative group of East Penn employees for whom DOL seeks to recover back wages, it is clear that DOL is attempting to cast its net as wide as possible, and further than the evidence will allow.  Indeed, Plaintiff has prepared back wage estimates for the most far-reaching universe of East Penn employees, most of whom were not measured during Dr. Radwin's time study for DOL or even covered by his opinion based on that study.  Some of DOL's back wage calculations are even for facilities that are not covered by the claims in the operative Complaint.  Specifically, DOL's complaint only seeks damages on behalf of East Penn employees "working in the ***automotive*** plants, ***specialty*** plants, ***industrial*** plants, ***smelter*** plants, and ***molding*** plants" who "spent time ***putting on and removing uniforms*** and protective gear before and after their scheduled shifts, and spent time ***showering after their scheduled shifts***."  (Dkt. 1, ¶¶ 6-7) (emphases added).  But DOL has calculated back wages for every department at Lyon Station, such as the Personnel and Payroll departments, which do not fit within the "plants" that are mentioned within the Complaint and whose employees do not wear uniforms.  And DOL has calculated back wages for facilities in other states, such as a sales center in High Point, North Carolina, and a distribution center in Temple, Texas.

Even though DOL bears the burden of establishing liability under *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), DOL has *no measure* for employees at any plant other than the eight

plants that Dr. Radwin studied at East Penn's Lyon Station campus.  Even Dr. Radwin himself says that he does not extrapolate his measurements from these eight plants to the far-reaching universe of employees for whom DOL seeks to recover damages.  This makes sense, because the undisputed facts show that each plant is unique, and there are so many differences between the plants studied by Dr. Radwin and all of the many other places he did *not* study, that it is not possible to extrapolate his findings in such a manner.

In addition, Dr. Radwin says that he only studied employees who wear production-floor uniforms, which also makes sense since this case is about clothes changing and concomitant showering to remove lead dust.  Dr. Radwin himself says that his results are limited to employees who wear such uniforms.  Thus, DOL has no measure for any department where the employees do *not* wear uniforms.  (In fact, it is not even clear that DOL intends to do so, but DOL's back wage witness has calculated more than $11 million in back wages for employees in departments, or even entire plants, that do not wear uniforms to protect against lead dust.)

 Finally, DOL has calculated back wages for Continuous Operations employees in East Penn's Metals Division.  Dr. Radwin did not study any plant in the Metals Division, and for the same reasons listed above, his results do not apply to those plants.  But even more importantly, the pay practices at those plants are so substantially different from the plants studied by Dr. Radwin that there is no conceivable basis for continuing to include the Metals Division's Continuous Operations employees in this case.  Dr. Radwin's estimated time for daily clothes changing and showering is 26.6 minutes a day, but it is undisputed that Continuous Operations employees in the Metals Division receive *30 minutes* a day of paid time for clothes changing and showering.  Accordingly, even on DOL's best day, it has no evidence of unpaid time owed to those employees.

The foregoing material facts are not in dispute; therefore, summary judgment should be entered for East Penn as to liability on Plaintiff's claims on behalf of employees who: (1) were not

among the eight facilities Dr. Radwin studied; (2) work outside of Pennsylvania; (3) do not wear

a uniform and shower; or (4) are Continuous Operations employees in the Metals Division.

## II.       LEGAL STANDARD FOR SUMMARY JUDGMENT

"The purpose of summary judgment is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense." *McGrath v. City of Philadelphia*, 864 F.

Supp. 466, 472 (E.D. Pa. 1994) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d

Cir. 1976)). The Court should grant a motion for summary judgment "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is material when it "might affect the

outcome of the suit under the governing law" and genuine when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## III.      SUMMARY OF UNDISPUTED MATERIAL FACTS

Plaintiff's back wages calculation relies *exclusively* on the outcome of the study performed

by Plaintiff's time-study expert, Dr. Robert Radwin, as applied to every piece of payroll data

produced by East Penn.[1] Originally, DOL seemed to take the position that liability was predicated

on East Penn's own punch records, but DOL later clarified that it does *not* contend that all of the

---

[1] As we have long made clear to Plaintiff, East Penn does not concede that its production of payroll or
attendance (i.e., "punch") data for any particular aspect of its operations means that those operations are relevant to
this lawsuit. (*See* East Penn's objections and response (dated July 11, 2018) to DOL's first set of requests for
production No. 4, (SUMF Ex. 149) (objecting on relevance grounds and producing "in text delimited file format
electronic time and attendance, EICS, HMI, and payroll records from the period November 23, 2014 to the present *for
the hourly production employees at the plants for which pay records were produced during the wage and hour
investigation conducted by the Department of Labor at the Lyon Station complex*.") (emphasis added).

time between when an employee punches in and punches out is compensable.  For example, on July 9, 2018, DOL issued a press release about the instant case, admitting that only "some" of the time between the punches is at issue.  (SUMF ¶ 72; *see* https://www.dol.gov/newsroom/releases/-whd/-whd20180709-0 ("At least some of that time [between the punches] was spent putting on protective clothing after clocking in, and then removing that protective clothing and showering before clocking out.")).  DOL's lead counsel even concedes this point.  (SUMF ¶ 72; Fernandez Dep. 348:4-8 ("Even I concede that, you know, if someone puts on their pants and then – and shirt and then decides to go take a 40-minute break in the lunchroom that that's probably not compensable, Dr. Fernandez.").

To plan his study, Dr. Radwin briefly visited 29 East Penn buildings at the Lyon Station campus in May and June, 2019.  (SUMF ¶ 73).  He then recruited six individuals to videotape in 8 plants (A1, A2 East, A2 West, A3, A4, Industrial Automotive, Central Services, and S1)[2] for one shift each (both start and end) during the period June 17-22, 2019.  (SUMF ¶¶ 73, 76).  Dr. Radwin did not visit any East Penn facilities outside of the Lyon Station campus and admitted that his opinion is limited to employees in departments that wear production uniforms.  (SUMF ¶¶ 75, 83).

For start-of-shift and end-of-shift, Dr. Radwin took the recordings of his videographers and measured the time from when his sampled subjects performed any of four supposedly "first principal activities" for the day until their paid time started that day, and he separately measured when other sampled subjects performed any "last principal activities" for the day (irrespective of when paid time ended).  (SUMF ¶ 79).  From this he estimated one 8-plant average for time spent by employees on start-of-shift activities and end-of-shift activities.  (SUMF ¶ 80).  His Report

---

[2] Dr. Radwin's study skipped the following 21 facilities at Lyon Station:  Personnel, Special Project/Engineering, Acid Reclamation, Smelter Annex, Injection Molding Plant 1, Smelter 1 Annex, Automotive Administration, Engineering/Tech Center, Medical, Industrial Plant, Injection Molding Plant 2, Garage, Oxide Plant 1, Oxide Plant 2, Transload, Continuous Improvement, Administration Building, Waste Treatment, Manufacturing Services, S1 Plant Annex, and Smelter Buildings.  (SUMF ¶ 74).  In general, he spent very little time in the places where little to none of the employees wore uniforms.  (SUMF ¶78).

includes some simple descriptive statistics (mean, median, minimum, maximum, standard deviation, and 95% confidence interval). (SUMF ¶ 81). There are no comparative statistics, i.e., tests comparing the results among the 8 plants. (SUMF ¶ 82).

DOL uses Dr. Radwin's 8-plant average to calculate back wages supposedly owed *not* just at the 8 Lyon Station plants that were studied, or even other facilities at Lyon Station where employees wear uniforms. The Secretary has used another witness, Michael Murray, to extrapolate damages to *every* department and facility for which East Penn produced payroll data, even if inadvertently. Mr. Murray's back wage calculations apply to all departments and plants in the pay data whether or not Dr. Radwin says they are part of his opinion. (SUMF ¶ 87). This includes many facilities both inside and outside of Pennsylvania that Dr. Radwin never mentions in his report, including those which Dr. Radwin opines his report specifically does *not* apply to, such as Kutztown Wire & Cable. (SUMF ¶ 88). This includes facilities such as a sales center in North Carolina and a distribution center in Texas. (SUMF ¶ 89). It also includes departments and plants where employees do not wear uniforms. (SUMF ¶ 90).

DOL's attempt to use Dr. Radwin's limited study of eight of East Penn's plants to extrapolate his findings to other East Penn facilities is infirm, as each East Penn facility (and concomitantly *each* East Penn employee) is different and distinct. Even the Wage-Hour Division's lead investigator agrees that every East Penn plant is different. (SUMF ¶ 23). In fact, the employee complaint that precipitated the DOL's investigation was an employee at East Penn's S-1 plant who accurately reported to OSHA that employees at *other* East Penn plants were receiving 10 minutes for end-of-shift doffing and showering when his plant was receiving only 5 minutes. (SUMF ¶ 24). East Penn had originally believed this was justified by differences between plants. (SUMF ¶ 25). In June 2016, the Company decided to raise the end-of-shift number to 10 minutes in S-1 and Industrial. (SUMF ¶ 26). But both before and after that time, there has been a wide range of paid

minutes allowed for clothes-changing and showering activities, depending on the plant.  (SUMF ¶ 27).  In addition to those minutes, individual supervisors in departments (especially ones farthest away from the locker rooms) use their discretion to give employees *extra* minutes to leave early (on paid time) to start their end-of-shift doffing and showering.  (SUMF ¶ 28).

The reasons for these differences are obvious:  every plant is unique because most of the plants have different functions.  They either make different products, or else they get involved at different stages of the production cycle of a battery (or else recycling old batteries).  Thus, the layout of every plant is unique, which is why DOL insisted on the production of separate blueprints for every plant before Dr. Radwin could start his study.  (SUMF ¶ 31).  Dr. Radwin considered the blueprints before doing his study.  (SUMF ¶ 32).  In fact, he showed his videographers the different layouts for each of the 8 plants they studied as part of their training.  (SUMF ¶ 33, Radwin Dep. at 697:3-699:15 ("the physical layouts are different, yes.")).  Just looking at these blueprints and handwritten diagrams proves Dr. Radwin's concession about how each facility is different.  (SUMF ¶ 34; *see* Radwin Dep. at 358:20-359:5, 629:18-22 and 645:2-8 (Radwin admits that walking distance between locker room and time clock is different among plants, but he did not directly measure that); *id.* at 360:3-361:1 (availability of different locker doors could affect the distance that employees had to walk); *id.* at 627:15-628:9 (Radwin drew his plant diagrams because "each building was different" in terms of size, entrances, and number of lockers); *id.* at 629:7-14 (each plant had different numbers of shower heads); *id.* at 641:24-642:6 (agreeing that his handwritten diagrams note "different entrances, lockers, showers, breakrooms, and time clocks"); *id.* at 646:6-647:3 (locker rooms were different shapes and sizes)).

And every position within each plant has separate requirements for what combination of clothing and PPE must be worn.  (SUMF ¶ 35).  For example, employees in some positions must retrieve a respirator before entering the production floor and deposit it after leaving the production

floor, but many other positions do not use respirators.  (SUMF ¶ 36).  As another example, most of the employees in the Metals Division (all employees in Oxide 1 and 2, and all but two job positions in Smelter) must wear a hard hat, which they keep in their personal locker and must retrieve and don before shift, and doff and store after shift.  (SUMF ¶ 37).  But in the other plants, only Material Handlers must do this.  (SUMF ¶ 38).  As another example, the proportion of shower heads and personal showers (as opposed to communal showers) to employees varies by plant, which may affect showering time.  (SUMF ¶ 39).

Even employees who work in the same plant can receive varying paid donning and doffing time.  For example, Continuous Operations employees in East Penn's Metals Division "work at machines or equipment that can't be shut down" (SUMF ¶ 100); thus, the oncoming shift and the outgoing shift overlap.  (*Id.*).  While East Penn's regular production employees receive 5 minutes of paid donning time at the beginning of their shift and 10 minutes of paid doffing time at the end of their shift, these employees receive double the amount of paid donning/doffing time.  In other words, Continuous Operations employees in the Metals Division receive 10 minutes of paid donning time to change into their uniforms at start-of-shift and 20 minutes of paid doffing time to change out of their uniforms, shower, and change back into their street clothes at end-of-shift, for a total of 30 paid minutes for clothes changing and showering.  (SUMF ¶ 101).

As a result of these and other differences, it is not surprising that the times measured by Dr. Radwin vary widely.  As Dr. Radwin admits, it takes different workers different amounts of time, and that is why there is variability in his measurements.  (SUMF ¶ 40).  The range of results within each plant are masked by the way that Dr. Radwin reports them; he simply ignores plant-by-plant measurements.  But his Table 6 shows the wide range of times *across* plants.  For example, for "changing activities at beginning of workday" Dr. Radwin's measurements ranged from a minimum of 0.0 minutes (the employees who used East Penn's grace period to don entirely

on paid time) to 68.5 minutes (essentially employees who chose to arrive more than an hour early and then engaged in personal activities). (SUMF ¶ 41; *see* Radwin Dep. Ex. 132 at Table 6, line 1; Dep. Ex. 4 at Table R5A (Dr. Fernandez documenting that some of Dr. Radwin's subjects spent as much as 51.6 minutes in breakroom within the start-of-shift period that Radwin measured)).[3] For "changing and showering activities after departing the production floor," Dr. Radwin's measurements ranged from 2.2 minutes (fast employees) to 21.0 minutes (employees who took time to socialize).  (SUMF ¶ 42).

However, Dr. Radwin has *no* opinion about how much of these varying times were already compensated by East Penn, because he was not retained to do that.  (SUMF ¶ 44).  Dr. Radwin expressly disavows that he is offering an opinion as to how much of the clothes-changing and showering activities are uncompensated. (SUMF ¶ 45).  In fact, he admits that only "some" of the time "might" or "may" be uncompensated.  (SUMF ¶ 46).  He also admits that some of his subjects were already fully compensated for the start-of-shift and end-of-shift periods that he studied. (SUMF ¶ 47).  Indeed, for end-of-shift, Dr. Radwin admits that *half* of all employees either finished their last end-of-shift activity on paid time or within 46.2 seconds of the end of paid time. (SUMF ¶ 48).

The DOL's Mr. Murray, however, *did* compare actual punch times to "adjusted" punch times, i.e., paid time.  (SUMF ¶ 49).  Mr. Murray charted out the results for each plant by month over the entire limitations period. (SUMF ¶ 50).  If the time-keeping practices in each plant were the same, one would expect that all plants would show the same line, but they do not.  For this reason, Mr. Murray called his own analysis a "spaghetti" chart because the lines are all over the

---

[3] Dr. Fernandez did regression analyses to see if there was any statistical correlation between when Dr. Radwin's subjects punched in/out and the periods of activity that Radwin measured. These tests prove that the *highest* predictor of Dr. Radwin's start-of-shift times is either:  1) that an employee chose to arrive early, and/or 2) that an employee socialized with other employees after finishing dressing but before punching in.  For end-of-shift, the highest predictor of Dr. Radwin's times was similarly the amount of time that employees spent socializing.  (SUMF ¶ 43).

place. (SUMF ¶ 52). That is, not a single plant is identical to another plant based on these T&A records. (SUMF ¶ 53). Mr. Murray admitted that "[e]ach plant has a unique time adjustment for month to month." (SUMF ¶ 54; Murray Dep. at 98:2-10 (admitting that during any particular month, different plants trended in different directions). This is not surprising, since each plant is unique. For example, a number of the plants–those in the Metals Division–pay for doffing and showering in a manner that is completely different from the other plants; these "Continuous Operations" employees punch out and *then* have *20* minutes of remaining paid time to doff and shower. (SUMF ¶ 55).[4] As a result, Mr. Murray's lines for these Metals Division plants *should* be all negative, that is, paid time *followed* punching out for the day, but Mr. Murray was instructed by DOL to instead show them all as "zero" (implying that punch time and paid time were the same). (SUMF ¶ 56).

Finally, Mr. Murray admitted that simply adding Dr. Radwin's 26.6 minutes to time that East Penn already paid would be "double counting" to the extent that East Penn already paid certain employees for clothes changing and showering, as Dr. Radwin's own study shows happened. (SUMF ¶ 93).

## IV.    LEGAL STANDARD FOR PLAINTIFF TO ESTABLISH LIABILITY

The seminal case addressing DOL's burden of proof in this matter is *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946), which held that an FLSA plaintiff alleging an overtime violation "has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent

---

[4] Continuous Operations employees receive a total of 30 paid minutes a day for clothes changing and showering, with 10 of those minutes allocated for start-of-shift and 20 minutes allocated for end-of-shift. (SUMF ¶ 101). For example, Continuous Operations employees in the Smelter and Oxide Plants who work the first shift are required to report to the work floor by 7:55 am, but they are paid beginning at 7:45 am. (SUMF ¶ 102). Conversely, Continuous Operations employees in the Smelter and Oxide Plants who work the first shift leave the work floor at 3:55 pm, but they are paid until 4:15 pm. (SUMF ¶ 103).

of that work as a matter of just and reasonable inference." *Id.* at 687.[5]  Only after both elements are met does the burden shift to the employer to negate the just and reasonable inference or present evidence of the precise amount of earnings received and work performed.  *Id.* at 687-88.

In *Mt. Clemens,* the factory employee plaintiffs punched in and out at a time clock before and after their shift but were only paid for the length of their shift.  Their suit under the FLSA sought overtime compensation for clothes-changing and washing (and other) activities occurring before and after their paid shift, but falling somewhere within the bounds of their punch times.  Thus, the initial burden for the *Mt. Clemens* plaintiffs was to prove that the challenged pre- and post-shift activities were compensable.[6]  Their next burden was to show that the performed compensable overtime work for which they were not already paid.

This case presents a situation very similar to the facts in *Mt. Clemens*.  There, as in this case, employees could clock in up to 14 minutes before the start of shift and clock out up to 14 minutes after the end of shift.  But when within the 14 minute period the employee clocked in and out was up to the employee, and time between punching the time clock and paid time could include non-compensable time such as socializing.  Thus, the time clock records did not provide a measure of time spent on compensable activities.  The Supreme Court explained:

> Moreover, it is generally recognized that time clocks do not necessarily record the actual time worked by employees. Where the employee is required to be on the premises or on duty at a different time, or where the payroll records or other facts indicate that work starts at an earlier or later period, the time clock records are not controlling. Only when they accurately reflect the period worked can they be used as an appropriate measurement of the hours worked. In this case, however, the evidence fails to indicate that the time clock records did so mirror the working time.

---

[5] *Anderson v. Mt. Clemens Pottery Co.* was a private collective action, but the standard is the same for the Secretary of Labor as for private plaintiffs.

[6] DOL may argue that this initial burden is not at issue in this case because the Supreme Court's subsequent decision in *Steiner v. Mitchell*, 350 U.S. 247 (1956), found that the donning, doffing, and showering activities at issue here are compensable. However, *Steiner v. Mitchell* does not absolve DOL from proving liability, i.e., proving that each employee was deprived of some overtime pay for compensable acts performed.  Here, in contrast to *Mt. Clemens,* East Penn disputes that the activities at issue are not compensated, because it allots paid time at the beginning and end of the employees' scheduled paid shift. Thus, DOL bears the burden of proving that such allotted time is insufficient to compensate employees for the activities.

> They did not show the time during which the employees were compelled to be on the premises or at any prescribed place of work.

*Mt. Clemens,* 328 U.S. at 690.  The Court then remanded the case to determine the amount of compensable pre- and post-shift overtime.

The Third Circuit has, on at least three occasions, upheld summary judgment for an employer based on the burden shifting framework established in *Mt. Clemens*.  The Third Circuit's decision in *Rosano v. Township of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014), is an important precedent because, like here, it involved claims that a variety of tasks were compensable and caused overtime, including "donning and doffing" time, and that the employer did not keep records of all such time beyond the "regularly scheduled hours."  In *Rosano*, the employees only *assumed* that uncompensated overtime had accrued without submitting any other evidence.  The district court granted the employer summary judgment because, as the Third Circuit put it, "such a framework does not provide any basis for discerning whether the hours worked by each individual officer exceeded the necessary threshold for overtime under the FLSA …."  *Id*. at 188-89.  "An estimation of damage, which fails to set forth the proper method of calculation and does not account for day-to-day differences in officer scheduling, hardly provides a foundation for an inquiring court to 'reasonably infer[]' FLSA violations …."  *Id.* at 189 (citation omitted) (bracketing in original).  Despite the punch records and pay records maintained by the employer, not a single one of the employees "was able to provide an estimate of his or her *uncompensated* overtime damages or time worked *for which they believe they were not compensated." Id.* (emphases added).  The Third Circuit held that the employee's assumptions that they worked uncompensated overtime were "mere speculation, and are insufficient to support the requisite inference necessary to meet their burden."  *Id*. (citation omitted).  The Third Circuit concluded the discussion of the overtime claim as follows: "Because Appellants had the burden of proving that they performed work for which they were not properly compensated, and failed to do so, the

District Court properly granted summary judgment on their claim for overtime damages." *Id.* at 190.

> *See also Gwynn v. City of Philadelphia*, 719 F.3d 295, 304 (3d Cir. 2013) (affirming summary judgment for employer on FLSA claim where employees failed to produce any evidence rebutting employer's evidence that it had already paid them overtime; "Appellants, as the plaintiffs, were required to present some evidence showing that they were not credited for working overtime.") (citing *Anderson*, 328 U.S. at 686-87); *Sniscak v. Borough of Raritan*, 86 Fed. Appx. 486, 2003 WL 23155276 (3d Cir. Dec. 11, 2003) (affirming summary judgment for employer on FLSA claim because employees "bore the burden of proving that they performed work for which they were not compensated," and they did not produce evidence to show that they were denied overtime remuneration and instead they merely made a "blanket allegation that certain amounts were still owed to them") (citing *Anderson*).

> *Cf. Beccerril v. Spartan Concerte Prods.*, __ Fed. Appx. __, 2020 WL 414389 (3d Cir. Jan. 27, 2020) (citing *Anderson* for proposition that "the employee ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'") (analyzing calculation of damages and upholding district court's reliance on employer's spreadsheet instead of employees' speculation as to how much overtime they allegedly worked per week, especially where "Plaintiffs' work varied") (relying on *Rosano*).

## V.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR EAST PENN ON THE EMPLOYEES WHO WORK OUTSIDE OF PENNSYLVANIA, WHO WORK AT PLANTS THAT DR. RADWIN DID NOT STUDY, WHO DO NOT WEAR A UNIFORM AND SHOWER, OR WHO ARE CONTINUOUS OPERATIONS EMPLOYEES IN THE METALS DIVISION

Because *Mt. Clemens* shows why time clock records are not sufficient to shift the burden of proof, DOL must come forward with other evidence *for each employee* proving two things: 1) that the activities at issue were not already compensated as part of paid shift time; and 2)

establishing the amount of *uncompensated* time by just and reasonable inference. DOL has chosen to do so through Dr. Radwin's time study combined with Mr. Murray's calculations.

DOL's time study, as applied to existing payroll records (even for employees who were already paid for clothes-changing) is the *exclusive* method by which it advances its premise that East Penn owes back wages to its employees. DOL advances no other vehicle to prove damages. As discussed *supra*, Dr. Radwin's time study is wholly insufficient to adduce damages for employees who have not worked in the eight plants Dr. Radwin studied, or for employees who do not wear uniforms (whether in those eight plants, or at any other plant). As such, East Penn is entitled to summary judgment as to Plaintiff's liability claims for all East Penn employees who did not work in the eight plants Dr. Radwin studied and wore a uniform and showered.

*First*, DOL's Complaint does not advance any claim for relief for employees who work outside of Pennsylvania. As such, East Penn is entitled to summary judgment as to Plaintiff's claims on behalf of all out-of-state employees for whom DOL seeks back wages. This includes select employees in Texas and North Carolina who are included in Mr. Murray's back wage calculation. (SUMF ¶¶ 89).

*Second*, Dr. Radwin himself stated that he does not apply his results to any plant that he did not study. This includes other facilities at the Lyon Station campus such as Medical, Industrial, and all Metals Division plants, as well as facilities outside of Lyon Station such as Kutztown Wire & Cable, Topton, and Alburtis. He admitted that the reason is because one must know that the layouts and operations are the same in other facilities before he could extrapolate his results to plants that he did not study. However, the undisputed facts demonstrate that there are myriad differences among plants that, as Dr. Radwin conceded, could affect the times he measured within any particular plant. (SUMF ¶¶ 23-56). Accordingly, Plaintiff has no evidence of uncompensated overtime work for employees at facilities that Dr. Radwin did not study, and certainly cannot

produce sufficient evidence to show the amount and extent of allegedly uncompensated work at those facilities.

*Third*, DOL's Complaint does not advance any claim for relief for employees who do not wear a uniform and/or shower.  While many of East Penn's employees are required to wear a uniform and shower at the end of their work shift, many are not.  Specifically, employees in the Topton,[7] Alburtis,[8] Kutztown Wire and Cable,[9] IM1,[10] IM2,[11] Smelter Annex,[12] and Central Services[13] facilities are not required to wear a uniform and/or shower at the end of their work shift. (SUMF ¶¶ 112, 115, 119-121, 131, 139, 144, 147).  As discussed *supra*, Dr. Radwin affirmatively did not study *any* of these employees, as they do not don/doff a uniform and shower at the conclusion of their work shift.  Yet, Mr. Murray includes these employees in his back wage calculation.  Accordingly, East Penn is entitled to judgment on liability as to all employees at the Topton, Alburtis, KWC, IM1, IM2, Smelter Annex, and Central Services facilities who do not wear a uniform and/or shower.  In general, East Penn is entitled to judgment as to all employees in departments that do not wear a uniform and shower, even if they worked within the eight plants that Dr. Radwin studied, because he himself states that his study applies only to employees who

---

[7] With limited exceptions, the vast majority of employees in the Topton facility do not wear East Penn uniforms. (SUMF ¶ 119). Instead, Topton employees wear casual clothes, including jeans, t-shirts, and shorts.  (*Id.*). One Topton employee and the maintenance department are required to wear a uniform. (SUMF ¶ 120).  The lone non-maintenance Topton employee who is required to wear a uniform is a battery repair worker, who repairs lead posts if they are damaged. (*Id.*). This individual is only exposed to lead hazards when "repairing posts", which has not happened "in a very long time." (*Id.*).  The maintenance employees are required to wear a uniform "not so much for lead and acid as much as it is for grease and dirt." (*Id.*).

[8] Employees in the Alburtis facility do not wear East Penn uniforms and are not required to shower.  (SUMF ¶¶ 114-115).

[9] Employees in 28 of the 30 KWC departments are not required to wear a uniform and shower. (SUMF ¶ 148).

[10] IM1 employees are not required to shower. (SUMF ¶ 131).

[11] IM2 employees are not required to shower. (SUMF ¶ 139).

[12] The only positions in the Smelter Annex that are required to wear uniforms are the maintenance positions. (SUMF ¶ 144).

[13] Seven departments within the Central Services facility are not required to wear a uniform and/or shower. (SUMF ¶ 112).

wear uniforms.  (*See* Declaration of Alison Snyder (SUMF Ex. 13) at ¶¶ 2-3) (identifying the departments and plants where employees are not required to wear a uniform and/or shower).

*Fourth*, DOL's claim cannot possibly extend to the Continuous Operations employees in East Penn's Metals Division.[14]  Even if Dr. Radwin's "average" of 26.6 minutes a day to change clothes and shower survives our upcoming *Daubert* challenge, it is still below the undisputed amount of extra time (30 minutes) that Continuous Operations employees in the Metals Division receive for these activities.  That is, even on DOL's best day, Dr. Radwin's study conclusions do not prove *any* unpaid time for those employees (in addition to the fact that, as discussed above, Dr. Radwin did not study any of the plants in the Metals Division and thus would not extrapolate his results to them).

The undisputed paid donning and doffing time for Continuous Operations employees in the Metals Division is more than anything that DOL claims based on Dr. Radwin should have been paid.  Because DOL's suit is premised on the argument that East Penn should be paying an additional 26.6 minutes a day to its employees who wear uniforms and shower, East Penn is entitled to summary judgment on Plaintiff's claims on behalf of Continuous Operations employees in East Penn's Metals Division who are indisputably paid 30 minutes for those activities.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to East Penn as to liability on Plaintiff's claims on behalf of employees who: (1) were not among the eight facilities Dr. Radwin studied; (2) work outside of Pennsylvania; (3) do not wear a uniform and shower; or (4) are Continuous Operations employees in the Metals Division.

 Dated:  January 29, 2020                          Respectfully submitted,

                                                              /s/ Michael J. Mueller

---

[14] The Continuous Operations employees in East Penn's Metals Division include most Smelter Plant employees and all employees in the Oxide 1 and Oxide 2 Plants.  (SUMF ¶ 98-99).

Michael J. Mueller *pro hac vice*
Evangeline C. Paschal *pro hac vice*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201
mmueller@huntonak.com
epaschal@huntonak.com

/s/ Daniel B. Huyett
Daniel B. Huyett
Pa. Attorney I.D. No. 21385
STEVENS & LEE, P.C.
111 North Sixth Street, P.O. Box 679
Reading, PA 19603-0679
Telephone:  (610) 478-2219
Facsimile:  (202) 988-0801
dbh@stevenslee.com
*Counsel for Defendant East Penn Manufacturing Co.*

## CERTIFICATE OF SERVICE

I, Michael J. Mueller, hereby certify that a true and correct copy of the foregoing was served on counsel listed below on January 29, 2020, through the Court's ECF system:

OSCAR L HAMPTON
U.S. DEPARTMENT OF LABOR
THE CURTIS CENTER, SUITE 630 EAST
170 S. INDEPENDENCE MALL WEST
PHILADELPHIA, PA 19106  (all further recipients are at this same mailing address)
215-861-5120; Email: hampton.oscar@dol.gov

ADAM F. WELSH
215-861-5159; Email: welsh.adam@dol.gov

BERTHA M. ASTORGA
215-861-5126; Email: Astorga.Bertha.M@dol.gov

PATRICK M. DALIN
215-861-5165; Email: dalin.patrick@dol.gov

ETHAN M. DENNIS
215-861-5142; Email: dennis.ethan.m@dol.gov

ANDREA LUBY
215-861-5128; Email:  Luby.andrea@dol.gov

Dated:  January 29, 2020                          /s/ Michael J. Mueller
                                                          Michael J. Mueller