## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EUGENE SCALIA,**[1] | : | |
| ***Acting Secretary of Labor,*** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| **v.** | : | |
| | : | |
| **EAST PENN MANUFACTURING CO.,** | : | |
| **INC.,** | : | **No. 18-1194** |
| *Defendant* | : | |

### MEMORANDUM

PRATTER, J.                                                        JUNE  /2 , 2020

### INTRODUCTION

The Secretary of Labor initiated this FLSA enforcement action against East Penn Manufacturing Co., Inc., asserting that East Penn failed to compensate its employees for all hours spent changing into and out of uniforms and showering. In support of its summary judgment briefing, East Penn gathered over 750 declarations from at least 650 of its employees regarding their clothes-changing and showering activities. The parties vociferously dispute whether East Penn coerced its employees into making and signing these declarations.

According to the Secretary, East Penn gathered the declarations in an effort to force those employees to waive their rights to overtime compensation and to dissuade them from testifying as witnesses for the Secretary in violation of Section 15(a)(3) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3). The Secretary's motion—styled as a motion for protective order—requests the Court to (1) require East Penn to notify all employees that their declarations will not be used against them in any way; (2) require East Penn to provide the employees copies of their statements; (3) prohibit East Penn from taking any additional employee statements; and (4) forbid

---

[1]      Pursuant to Federal Rule of Civil Procedure 25(d), Acting Secretary of Labor Eugene Scalia has been substituted for R. Alexander Acosta as the plaintiff in this action.

East Penn from using employee declarations at either the summary judgment stage of this case or at trial. Of course, such a substantial ask requires strong evidentiary support. Because the Secretary failed to meet his burden in demonstrating that the remedies he seeks are appropriate, the Court refrains from imposing the drastic measures that the Secretary requests. For the reasons discussed below, the Court denies the Secretary's motion.

**BACKGROUND**

The Secretary initiated this FLSA enforcement action against East Penn in March 2018. According to the Secretary, East Penn violated the FLSA by failing to pay employees for all hours spent clothes-changing and showering. From March 18, 2019 to April 17, 2019, East Penn interviewed many of its employees regarding their clothes-changing and showering activities to collect declarations in support of its defense for this litigation. East Penn submitted the declarations in support of its summary judgment motion and briefing. Now, the parties submit competing evidence regarding the manner in which East Penn collected these declarations.

### A. East Penn's Evidence

Alison Snyder, the Assistant Vice President of Personnel at East Penn, coordinated the declaration-gathering project under the advice and direction of outside counsel. A week before the project began, Ms. Snyder explained to each member of East Penn's Personnel Department that they would be paired with an attorney who would lead the interviews. She also explained that the goal of the project was to gather voluntary, truthful statements from any employee who was willing to be interviewed.

A few days before the project began, East Penn's Chief Executive Officer held a meeting with the company's management team to explain the scope of the project. He directed each supervisor to read the following prepared statement—known as a "tailgate"—to the employees:

2

As you may know, the U.S. Department of Labor has brought a civil lawsuit against East Penn. The government claims that the Company has not been paying enough wages for time spent by employees putting on required uniforms and PPE before shift, and time spent removing those items and showering at the end of shift. The Company believes it is paying sufficient time for these activities and that it is complying with the federal wage law. The Company is vigorously defending against the government's claims.

To prepare its defense of the lawsuit, the Company, through its outside lawyers, would like to speak to employees about their routines before and after shift. The lawyers will be on-site for a few weeks starting the week of March 18 to interview employees who choose to speak to them. You may be asked if you would like to participate in this project. If you decide to speak with the attorneys, you may be asked to review and sign a sworn statement about the information that you provide, and that information may be used by the Company in its defense of this lawsuit, including but not limited to filing your declaration with the court. ·

All interviews will occur during your paid shift, on paid time, at a location in the plant that you work in. A personnel representative will arrange for your interview and come to get you when it is time to speak with the attorney. You may choose to ask the personnel representative to remain with you during the interview or to leave you to speak to the attorney alone.

Participating in these interviews is voluntary. You will not be disciplined or retaliated against for deciding not to participate. If you agree to participate, your responses to the attorney's questions will not in any way affect your employment with East Penn. The Company will not retaliate against you, regardless of what you say, and your responses will not be used for performance evaluation purposes. Likewise, you will not receive a promotion, a raise, or any other benefit based on your decision to participate or the substance of the information you provide.

Snyder Decl. ¶ 4 (Doc. No. 207-1); Def.'s Notice of Filing, Ex. A (Doc. No. 220-1).

On March 18, 2019, defense attorney Cullan Jones, Esq. held a meeting with the attorneys, personnel representatives, and management to explain the scope of the project and answer questions. During that meeting, Mr. Jones explained that the attorneys were to read the following prepared script, verbatim, to each employee before beginning every interview:

3

I am an attorney representing East Penn in a lawsuit brought by the U.S. Department of Labor alleging violations of the federal Fair Labor Standards Act. The lawsuit alleges that the Company violated federal law by failing to pay employees for all hours worked, specifically, for changing into and out of their uniform and showering.

Before going any further with our discussion, are you represented by a lawyer as it relates to any lawsuit against East Penn? [If yes, the interview should stop].

Have you been contacted by the U.S. Department of Labor relating to their investigation into East Penn's pay practices or the litigation I just described? [If yes, explain that we are not trying to learn what they may have told DOL and ask if they want to continue].

Because I am an attorney representing East Penn, it is important for you to know that I do not represent you. I represent the Company. Do you understand? [Ensure individual understands].

At this stage of the case, the attorneys for both sides are investigating the claims and gathering information. I would like to speak with you about activities related to starting and concluding your scheduled work shift. The goal is to, potentially, use the information to show the Court that [sic] whether East Penn's employees are fully paid for all hours worked.

My goal is to make sure that the information I gather is complete and truthful. Therefore, it is important that your responses to my questions be entirely truthful and candid.

Your participation in this interview is completely voluntary. You do not have to talk to me. If you do not want to talk to me for any reason now or as the interview progresses, please let me know, and we will stop the interview. If you do not want to answer a specific question, just say so and I'll move on. You do not have to answer any question that you do not want to answer.

If you agree to talk to me today, your responses will not in any way affect your employment with East Penn. The company will not retaliate against you if you talk with me, regardless of what you tell me. While the information may be used in connection with the lawsuit, your responses will not be used for performance evaluation purposes. Likewise, you will not receive a promotion, a raise, or any other benefit just for speaking with me today. At the same time, if you decide not to talk to me today, that will not impact your employment with East Penn in any way.

4

> After the interview, I may ask you to review and sign a statement that describes some or all of what you have told me in this interview. It is up to you whether you sign the statement. But, it is very important that anything you sign be entirely accurate as we may need to submit it to the Court in defending against the government's claims. By signing a statement, you should understand that you are assisting East Penn in defense of this lawsuit.
>
> Do you have any questions? Are you willing to continue?

Jones Decl. at 5 (Doc. No. 207-2).

During the meeting, Mr. Jones "explained that any employee who did not want to participate in the interview should be released to return to the work floor at any time for any reason." *Id.* at ¶ 5. Mr. Jones reiterated these points during another meeting held with the attorneys, personnel representatives, and management.

Moreover, Ms. Snyder instructed managers to ask the workers if they would be interested in speaking with an East Penn attorney to explain their clothes-changing and showering activities, and to explain to employees that speaking with the attorney was not mandatory. If an employee expressed an interest in participating, a personnel representative would call the employee to come to the plant office during their work shift. Employees who were not interested in interviewing were not called to the plant office. Ms. Snyder also instructed personnel staff sitting in on the interviews to refrain from asking employees questions during the interviews.

After the attorney finished collecting information and typing the draft declaration during an interview, the attorney or personnel representative printed out the draft and gave it to the employee to review for accuracy. A declaration would be modified if an employee requested to alter any portion. After the employee confirmed the accuracy of the declaration, the employee was given an opportunity to sign and then usually returned to work. Occasionally, an employee would return to work and then later return to the plant office to sign the declaration.

When the declaration-gathering project was initially explained to the employees,

approximately 200 to 250 employees declined to participate. Of those employees who attended an interview, approximately 10% chose not to complete the interview after speaking to defense counsel. According to Ms. Snyder, East Penn did not retaliate against anyone who said that they were unwilling to participate in the interview process, who walked out of an interview, or who declined to sign a draft declaration.

### B. The Secretary's Evidence

In support of its motion, the Secretary relies on three redacted declarations[2] from confidential informants[3] and the deposition testimony of Derek Kanavins. The Secretary also relies on his own characterization of the hundreds of declarations East Penn submitted to the Court and the sufficiency of the tailgate and interview scripts.

---

[2]     The parties hotly dispute whether East Penn may view unredacted versions of these declarations. After oral argument, the Secretary submitted unredacted declarations to the Court for an *in camera* review. In addition to submitting the unredacted declarations, the Secretary also filed a praecipe to file a declaration in support of his assertion of the informer's privilege. That same day, East Penn submitted a motion to strike the praecipe, or in the alternative, set a briefing schedule to fully brief the issue on whether the Secretary's filing is appropriate. According to East Penn, because the Secretary seeks to use the unredacted declarations to combat the admissibility of declarations it relied on to support its summary judgment briefing, the Secretary can no longer withhold identifying information from East Penn by attempting to invoke the informer's privilege. *See Perez v. Am. Future Sys., Inc.*, No. 12-6181, 2013 WL 5728674, at *5 (E.D. Pa. Oct. 21, 2013). The Court acknowledges both the strength of the informer's privilege when properly invoked, as well as the fact that the privilege is by no means "'absolute.'" *Id.* at *3 (quoting *Solis v. Delta Oil Co., Inc.*, No. 11-233, 2012 WL 1680101, at *3 (S.D. Ohio May 14, 2012)).

Even so, because the evidence the Secretary relies on—redacted or not—fails to sufficiently demonstrate the need for the remedies he seeks, the Court refrains from requiring the Secretary to submit unredacted versions of the declarations to East Penn at this time. Because the Court need not determine whether the Secretary properly invoked the informer's privilege to make its determination as to the Secretary's motion for protective order, the Court denies East Penn's motion to strike. The Court stresses that its denial of the motion to strike is not in any way based on the merits of the motion. Accordingly, the Court's denial should not be cited by either party as an indication of the Court's approval or disapproval of the Secretary's invocation of the informer's privilege at this time.

[3]     This Memorandum refers to the author of the Secretary's first attachment (Doc. No. 203-1) as Informant No. 1, the author of the second attachment (Doc. No. 203-2) as Informant No. 2, and the author of third attachment (Doc. No. 203-3) as Informant No. 3.

### 1. Informant No. 1's Declaration

According to Informant No. 1, he or she attended an interview where an attorney and Dan Miksiewicz, a personnel representative and the deceased company founder's grandson, were present.[4] Informant No. 1 states that near the end of questioning, he or she said, "I honestly do not think we were getting paid for [showering time]." Informant No. 1 Decl. at ¶ 44 (Doc. No. 203-1). According to Informant No. 1, Mr. Miksiewicz responded, "'yes you are,' in a combative tone." *Id.* After Informant No. 1 explained that he or she "did not agree with that and tried to explain that [he or she] never see[s] the shower time on [his or her] paystub, Mr. Miksiewicz said, 'You are getting paid for that!'" *Id.* Informant No. 1 asserts that he or she no longer wanted to argue with Mr. Miksiewicz "because he might eventually run the company. To avoid further argument, after [Mr. Miksiewicz] raised his voice, [Informant No. 1] just agreed with [him]." *Id.* Informant No. 1 states, "I was not able to give honest answers to all the questions asked by the attorney because Dan Miksiewicz was there. Dan interrupted multiple times to challenge my response." *Id.* at ¶ 46. Informant No. 1 also states that he or she did not receive a copy of the signed declaration and that Mr. Miksiewicz was taking notes on his computer during the interview.

In his declaration, Mr. Miksiewicz states that he is certain that he "did not speak with any employee in a combative, argumentative, or confrontational tone." Miksiewicz Decl. at ¶ 16 (Doc. No. 207-3). Nor did he "try to coerce any employee into giving specific answers to the Company lawyer's questions during any interview." *Id.*

### 2. Informant No. 2's Declaration

Informant No. 2 states in the declaration that he or she agreed to be interviewed. According to Informant No. 2, Mr. Miksiewicz was also present and taking notes during the interview.

---

[4]     The declaration and the Secretary incorrectly refer to Mr. Miksiewicz as holding a managerial position.

7

Informant No. 2 states:

> I remember at one point feeling like the lawyer wanted me to change
> the time I said I clocked in. I think I told the lawyer that I usually
> clock in at 5:46 am, but the lawyer kept suggesting that I actually
> clocked in at 5:47 am. I remembered that interaction because I
> thought it was odd that East Penn cared since they never paid me for
> the time anyway. They didn't really focus on the time I punched out
> though, just the time I punched in.

Informant No. 2 at ¶ 56 (Doc. No. 203-2). Informant No. 2 could not remember if he or she signed

a declaration, but, if he or she did, then he or she did not receive a copy of the signed declaration.

### 3. Informant No. 3's Declaration

As for Informant No. 3, he or she states that he or she agreed to talk to an East Penn

attorney, signed a statement, and did not receive a copy of the declaration. Informant No. 3 states

that he or she did not know that the 5-minute grace period[5] existed and that he or she had been

written up for arriving to his or her workstation at the scheduled start time. The personnel

representative who was present during the interview reportedly said that "it doesn't affect the

employees, nothing really happens with the write-ups." Informant No. 3 at ¶ 62 (Doc. No. 203-

3).

### 4. Derek Kanavins' Deposition Testimony

Derek Kanavins testified that his supervisor told him to report to the office without telling

him why he was being called, which caused him to panic. According to Mr. Kanavins, he and two

other employees in his department were interviewed despite not volunteering to do so. Kanavins

Dep. at 101:9-1 (Doc. No. 203-4). The other two employees "said they got called over to the office

---

[5]     According to East Penn, employees are permitted a 5-minute grace period at the beginning of their
shifts.

8

to get interviewed and that was pretty much all they said." *Id.* at 101:19-20.[6]

## DISCUSSION

The crux of the Secretary's position is that East Penn impermissibly coerced its employees into making and signing the declarations it now relies on to support its summary judgment briefing and will perhaps rely on at trial. As a result, the Secretary requests the Court to forbid East Penn's use of the employee declarations at summary judgment and trial, to require East Penn to notify its employees that the declarations will not be used, to require East Penn to provide copies of the declarations to all declarants, and to prevent East Penn from collecting any additional statements from its employees.

The Secretary styles his motion as one seeking a "protective order." Federal Rule of Civil Procedure 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." The party seeking a protective order bears the burden of persuasion and "must show good cause by demonstrating a particular need for protection." *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* As East Penn argued during oral argument, the Secretary is seemingly attempting to fit a square peg into a round hole by characterizing his motion as one seeking a protective order. Protective orders are not typically used to prevent a party from using evidence that is already gathered and filed or to instruct a party as to how they can cross-examine a witness at trial.[7] In any event, in arguing that a protective

---

[6]     Mr. Kanavins' testimony concerning what the other 2 employers said is, of course, inadmissible hearsay.

[7]     The Federal Rules of Evidence permit parties to introduce a declaration into evidence if a live witness' testimony contradicts statements set forth in his or her prior declaration. FED. R. EVID.

order is warranted here, the Secretary first and primarily asserts that Section 15(a)(3) of the FLSA allows the Court to provide the remedies he seeks. For the first time in his reply, the Secretary also invoked the Court's inherent authority and Federal Rule of Civil Procedure 56(h).

As East Penn points out, the Secretary in part requests that the Court "enter an *injunction* forbidding East Penn from taking any additional employee statements[,]" Pl.'s Mot. for Prot. Or. at 24 (Doc. No. 203) (emphasis added), but did not submit a motion for an injunction or even attempt to explain how he has met his burden for demonstrating that such an injunction is warranted. At one point, and essentially proving the point concerning the nature of the Secretary's approach, the Secretary also requests the Court to "enjoin East Penn from future retaliation against its employees." *Id.* at 2.

The "extraordinary remedy" of preliminary injunctive relief "should be granted only in limited circumstances." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief: '(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)). The movant must "meet the threshold for the first two 'most critical' factors," and if "these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all

---

801(d)(1)(A). Thus, a litigant can typically use a declaration to demonstrate the existence of a prior inconsistent statement during cross examination.

four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).[8]

Regardless of how the Secretary did or should have characterized his motion and the applicable legal standards, he nonetheless fails to provide the requisite evidence needed to overcome the strong evidence presented by East Penn to justify any of the remedies that he seeks.

The Court first addresses the Secretary's argument that Section 15(a)(3) of the FLSA warrants Court intervention. Under Section 15(a)(3), it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). The Secretary has not brought a retaliation claim. Nor has he pointed to *any* evidence demonstrating *any* retaliatory conduct taken by East Penn. Instead, the Secretary contends that Section 15(a)(3) applies because East Penn employees presumably must have signed declarations out of fear that they would be retaliated against if they declined to participate or spoke against its employer.

The Secretary heavily relies on *Mollichella v. Bd. of Supervisors of West Brandywine Twp.*, No. 18-4868, 2020 WL 1904593 (E.D. Pa. Apr. 16, 2020). According to the Secretary, *Mollichello* stands for the proposition that a plaintiff need only show that an employer's behavior could be viewed as coercive in order to warrant the applicability Section 15(a)(3). But, unlike here, the plaintiff in *Mollichella* pleaded a Section 15(a)(3) retaliation claim based on an employer allegedly subjecting him to "unnecessary disciplinary action, suspension, removal of job responsibilities,

---

[8]       The Secretary did not request an evidentiary hearing in support of his motion. Conducting an evidentiary hearing is not a "prerequisite for ruling on a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990)). More specifically, "a district court is not obliged to hold a hearing when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Id.* at 1176. Because the Secretary refrained from presenting any evidence in support of the merits of his claim, conducting an evidentiary hearing was not necessary.

demotion, and termination" after complaining about a change made to his time entries. *Id.* at \*5 (citation omitted). Thus, *Mollichella* simply invokes the rudimentary principle that an invocation of the FLSA's *retaliation* provision necessarily requires the allegation of some sort of *retaliatory* conduct. Such a proposition assuredly cannot be considered groundbreaking or controversial.

Because the Secretary has failed to present any evidence of retaliatory conduct, the Court denies the Secretary's request for an injunction pursuant to Section 15(a)(3). *See, e.g.*, *Soler v. G & U, Inc.*, 690 F.2d 301, 303 (2d Cir. 1982) (denying Section 15(a)(3) injunction where the plaintiff failed to convincingly demonstrate any harm or "chill" from employer's actions). And even if the Secretary could properly invoke Section 15(a)(3) based on what the Secretary alleges was the coercive context and manner in which the declarations were gathered, as discussed below, he fails to present evidence that sufficiently demonstrates that East Penn's declaration-gathering initiative was indeed coercive in nature.

The Secretary's argument that the Court's inherent power necessitates the relief he seeks likewise fails. Certainly, courts do have an inherent "responsibility to restrict communications that are potentially coercive or misleading." *Zamboni v. Pepe West 48th St. LLC*, No. 12-3157, 2013 WL 978935, at \*3 (S.D.N.Y. Mar. 12, 2013) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 (1981)); *see also In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) ("Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally."). However, "[t]he inherently coercive nature of the employer-employee relationship [] is insufficient to demonstrate that [a defendant employer's] interviews were improper." *Slavinski v. Columbia Ass'n, Inc.*, No. 08-890, 2011 WL 1310256, at \*4 (D. Md. Mar. 30, 2011); *see also Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1227 (S.D. Ala. 2008) ("In tracing out the fault line between

12

conduct which warrants restrictions and conduct which does not, it bears emphasis that mere inherent coerciveness in the employment relationship is insufficient, in and of itself, to warrant imposition of limitations on employers' ability to speak with potential class members prior to certification."). Although courts have a responsibility to guard against coercive communications, courts also have a responsibility to not infringe upon litigants' constitutional rights. Restricting East Penn's ability to communicate with potential witnesses and prepare declarations in support of its defense in the absence of adequate evidentiary justification risks infringing upon such rights.

The Secretary sets forth a myriad of arguments for why he believes the context and manner in which East Penn gathered the declarations were coercive, some of which being more appropriate for the Court to legitimately entertain than others.[9]  The Court focuses on the Secretary's main arguments.

First, the Secretary argues that the disclosures East Penn and its counsel made to employees were woefully insufficient.  The overwhelming weight of the evidence, however, suggests otherwise.  The evidence presented by East Penn shows that East Penn and its attorneys went to great lengths to collect declarations only from employees who made an informed decision to voluntarily participate.

---

[9]      For instance, the Secretary argues that East Penn is threatening to bring perjury charges against their employees by including in each declaration an acknowledgement that the employee swears to the truthfulness of their statements.  The Court reminds the Secretary that 28 U.S.C. § 1746 *requires* the inclusion of this language.  In fact, nearly identical language was used in the three redacted declarations that the Secretary submitted to the Court. *Compare* Decl. Alba at 3 (Doc. No. 156-40) ("Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.") *with* Informant No. 1 Decl. at 8 (Doc. No. 203-1) ("I declare under penalty of perjury that the foregoing is true and correct.").  East Penn's adherence to this statutory requirement does not demonstrate that it coercively gathered declarations from its employees.  Needless to say, this is not one of the Secretary's more compelling arguments.

13

Specifically, East Penn's Chief Executive Officer directed each supervisor to read the comprehensive "tailgate" script to their employees.  The tailgate script informed employees that (1) participation in the interview program was voluntary; (2) that participating or declining to participate would not positively or negatively impact their employment; (3) that employees would be asked to review and sign sworn statements about the information they provided; (4) that East Penn may use the information provided in its defense of this lawsuit; (5) that the Department of Labor brought this action against East Penn because it believes that East Penn is not paying enough wages for time spent by employees donning and doffing and showering; and (6) that East Penn is "vigorously defending" against the Department of Labor's claims.  Def.'s Notice of Filing, Ex. A (Doc. No. 220-1).  Indeed, one of the confidential informants admits that a statement was read to employees during two meetings that he or she attended.  Indicative of the efficacy of the prologue, when the declaration-gathering project was initially explained to the employees, about 200-250 employees declined to participate.

During two separate meetings, an attorney for East Penn also explained to lawyers, the personnel representatives, and management that the interviewing attorney had to read another comprehensive script, verbatim, to each employee before conducting each interview.  The interview script informed employees (1) that the attorney conducting the interview represents East Penn, and not the employees, in this lawsuit; (2) that the Department of Labor alleges that East Penn failed to pay employees for the time spent changing into and out of uniforms and showering; (3) that the attorney sought to gather complete and truthful information; (4) that participation in the interview was completely voluntary; (5) that the employee could stop the interview at any time; (6) that employees need not answer any question that they did not want to answer; (7) that East Penn would not retaliate against the employee, regardless of what he or she said; (8) that an

14

employee would not receive any benefit for participating; (9) that the information may be used in connection with the lawsuit; (10) that the employee may be asked to review and sign a statement describing some or all of the information presented; (11) that the employee would decide whether he or she wants to sign the declaration; and (11) that by signing a statement, the employee understood that he or she was assisting East Penn in its defense of this lawsuit. For good measure, the script concludes by offering the employee an opportunity to ask questions and confirming that he or she was still willing to continue. Of the employees who attended interviews, approximately 10% chose not to complete the interviews after speaking to defense counsel.

The Secretary faults East Penn and its counsel for (1) failing to advise employees of their right to consult with the Secretary's counsel before making or signing a declaration; (2) failing to advise employees that the statements could be used against them; and (3) failing to inform employees that East Penn's interests in this litigation were "adverse" to the employees' interests. To be clear, the court is unaware of any "'magic words' that must be disclosed" in this situation. *Bobryk v. Durand Class Mfg. Co., Inc.*, No. 12-5360, 2013 WL 5574504 (D.N.J. Oct. 9, 2013). Despite nit-picking the specific wording East Penn used in its scripts, the Secretary's counsel himself admits that the Court should holistically evaluate all of the evidence presented by both parties to determine whether the declarations were coercively gathered because there is no "magic phrase" that must be used. The Secretary's own critiques do not fare well in such a holistic analysis. It is clear that East Penn's attorneys disclosed that East Penn might use the statements to defend against the Secretary's allegations that it does not properly compensate its employees. It is equally clear that employees were informed that participating in the interviews and signing a declaration was entirely voluntary and would not affect their employment in any way. An omission that the employees may consult with the Secretary's counsel beforehand does not transform the

15

otherwise transparent and informative scripts into coercive communications.

The Secretary next relies on the three informant declarations and Mr. Kanavin's deposition testimony, the strongest of which being Informant No. 1's declaration. According to that declarant, a personnel representative interjected during an interview to "combatively" assert that employers were properly compensated for all hours worked. The personnel representative denies that he spoke "with any employee in a combative, argumentative or confrontational tone" or "tr[ied] to coerce any employee into giving specific answers to the Company lawyer's questions during any interview." Miksiewicz Decl. at ¶ 16 (Doc. No. 207-3). After the staff member's alleged interjections, this informant stated that he or she was not able to provide truthful answers. The other two declarants admit that they agreed to be interviewed. Informant No. 2 stated that he or she remembered feeling as though the attorney wanted him or her to change the time that he or she clocked in at work. Informant No. 3 stated that a personnel representative interjected at one point during the interview to state that "nothing really happens" when employees are written up for arriving late to his or her scheduled start time. Informant No. 3 at ¶ 62 (Doc. No. 203-3). Finally, Mr. Kanavins testified that his supervisor told him to report to the plant office without telling him why he was being called.[10]

The Court is not persuaded that the Secretary's sampling of evidence overcomes the otherwise overwhelming evidence presented by East Penn. The Secretary asserts that his evidence demonstrates that hundreds of employees did not volunteer to participate in the declaration-gathering initiative. Two of the three confidential informants even admitted that they agreed to be

---

[10]     He also states that two other employees "said they got called over to the office to get interviewed and that was pretty much all they said." Kanavins Dep. at 101:19-20 (Doc. No. 203-4). In addition to this statement being inadmissible hearsay, it also does not demonstrate that the two employees were forced to participate in the declaration-gathering process. Pursuant to East Penn's own evidence, every employee who volunteered to participate was called to the office in order to conduct the interview. Logically, the interviews had to happen somewhere, and the office setting is not inherently a flawed location.

interviewed.[11]    Although Mr. Kanavins testified that he did not volunteer to be interviewed, this one statement is insufficient to overcome East Penn's evidence showing that hundreds of employees were offered the opportunity to decline to participate and took advantage of that opportunity.  And although the declarations suggest that there may have been a few instances where the attorney or personnel representative purportedly interjected (perhaps even in an animated way) during the interview, this evidence is simply insufficient to justify the exclusion of hundreds of past and future declarations.

Regardless, the Secretary insists that East Penn's actions in procuring the declarations were as misleading and deceptive as the strategies employed by the defendant employer in *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008).  In that case, the court determined that the employer improperly procured employee declarations during the pre-certification stage because it engaged in conduct that could reasonably be expected to mislead and deceive prospective plaintiffs concerning the nature, purposes, and implications of making and signing a declaration.  *Id.* at 1225. There, the employer called in employees to individual meetings with defendant's attorneys, told employees that the purpose of the interview was to conduct a "survey," and failed to inform employees that executing the declaration "might compromise and waive their rights, and "prevent them from participating in a class action lawsuit whose existence [the employer defendant] covertly concealed from them." *Id.* at 1227-28.

Unlike in *Longcrier*, there is strong evidence to support East Penn's proposition that the employees knowingly and voluntarily participated in the declaration-gathering program. Moreover, the *only* evidence presented regarding the scripts demonstrates that East Penn did not omit or disguise the purpose of the interviews and declaration-gathering initiative.  Rather, the

---

[11]    The other confidential informant does not actually state one way or another whether he or she agreed to participate in the interview and declaration-gathering process.

17

scripts clearly communicated that East Penn sought this information to support its defense in this litigation. Nor is there any concern that execution of the declaration alone could impact the employees' rights or otherwise prevent them from participating in the class action. *Id.* at 1227-28. Indeed, neither party asserts that the declarations constitute a valid waiver of any employees' rights. Rather, if the Secretary ultimately prevails in prosecuting this case, there is no reason why the employees who signed declarations would not recover their share of a monetary damages award. Because this a Department of Labor enforcement action, rather than a private FLSA collective action like the one at issue in *Longcrier*, there is also no concern that East Penn used its declaration-gathering process as a tool to deter employees from joining a class.

The Secretary's last primary argument similarly fails. The Secretary asserts that the hundreds of declarations that East Penn submitted in support of its summary judgment briefing themselves demonstrate the coercive nature of East Penn's information-gathering activities. The Secretary asserts that because many of these declarations state that the declarants believe that they were sufficiently compensated for their work despite not being paid for the "actual time" spent clothes changing and showering—as opposed to a "reasonable time"—the declarations are "false *on their face*." Pl.'s Mot. for Prot. Or. at 24 (Doc. No. 203) (emphasis in original).[12] The Secretary reasons that the declarants could not have actually meant what they stated and lacked the requisite personal knowledge to make these statements because they were not informed as to "what it means to be 'properly compensated,' what the FLSA requires, or what the Secretary's position in this case is." *Id.* The Court construes the Secretary's focus on an apparent lack of personal knowledge as an argument that East Penn should be sanctioned pursuant to Rule 56(h). Under this rule, a

---

[12]     The Secretary also characterizes these statements as disclaimers that the declarant would be entitled to back pay. The Court reiterates that neither party asserts that the declarations constitute a valid waiver of any employees' rights.

court can subject a party to "appropriate sanctions" in the event the court is satisfied that a party submitted a declaration in "bad faith." FED. R. CIV. P. 56(h). "In the rare instances in which [Rule 56(h)] sanctions have been imposed the conduct has been particularly egregious." *See Allegheny Ludlum Corp. v. Nippon Steel Corp.*, No. 89-5940, 1991 WL 1776, at *4 (E.D. Pa. Jan. 7, 1991).[13]

The "actual time" / "reasonable time" battle is a key to this case and seasons almost every of the many skirmishes. The Court has yet to determine—and will not determine in this Memorandum—whether the time at issue should be calculated based on "reasonable" or "actual" time spent clothes-changing and showering. Nor has the Supreme Court provided a clear answer as to which calculation method is proper. *See Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 878 (8th Cir. 2012). Regardless, the declarations are not deemed coercive simply because they could be used to support an understanding of the law that is contrary to what the Secretary believes is applicable. Moreover, East Penn *did* inform its employees through both the tailgate and interview scripts that the Secretary brought this suit against East Penn on the basis that the company allegedly failed to compensate employees for all hours employees spent clothes-changing and showering. And the declarations contain more than plentiful facts to demonstrate that the declarant employees had the requisite personal knowledge to make statements about their *own* employment. *See Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 601 (M.D. Pa. 2014). Thus, to the extent the Secretary argues that a lack of personal knowledge demonstrates that East Penn submitted these declarations in bad faith, that argument too fails.[14]

---

[13]     Rule 56(h) was formerly known as Rule 56(g). *Allegheny Ludlum Corp. v. Nippon Steel Corp.*, No. 89-5940, 1991 WL 1776, at *4 (E.D Pa. Jan. 7, 1991) cites to Rule 56(g).

[14]     The Court notes that the Secretary frequently referred to East Penn's declarations as "sham" declarations during oral argument. In its response, East Penn explained why it believes the "sham affidavit" doctrine is inapposite here. This doctrine "generally 'refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir.

19

In sum, the onus is on the Secretary to show that the remedies he seeks are proper. After taking into consideration all of the evidence presented, the Court concludes that the Secretary failed to meet his burden. There is simply insufficient evidence for the Court to determine that it would be appropriate to preclude East Penn from collecting future statements from employees.[15] Because the evidence presented weighs in favor of East Penn, the Court also declines to preclude East Penn from using these declarations at summary judgment or trial on this basis. Therefore, it follows that the Secretary's request for notification to employees that the declarations will not be used is unnecessary. The Court similarly refrains from requiring East Penn to provide a copy of the signed declaration to every employee. In an abundance of caution, however, the Court will ensure that East Penn has met the requirements set forth in Federal Rule of Civil Procedure 26(b)(3)(C) for providing statements to declarants.[16] Accordingly, the Court instructs East Penn to contact all employees who gave statements and explain to them that they can receive copies of their statements upon request.

---

2006) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). This doctrine "is applied sparingly because of the harsh effect [it] may have on a party's case." *Ortiz v. NAC Dynamics, LLC*, No. 12-1998, 2013 WL 12388567, at *2 (M.D. FL. Feb. 14, 2013) (quotation marks and citations omitted). Because the Secretary did not depose any hourly employees, the doctrine is inapplicable in this case. Despite his affinity for the term "sham" at oral argument, the Secretary failed to respond to East Penn's argument in his reply and never explained at oral argument why the "sham affidavit" doctrine could plausibly be applicable here. Thus, to the extent the Secretary's word choice was intended to refer to the sham affidavit doctrine, the Court notes that this doctrine does not provide a basis to forbid East Penn's use of the declarations.

[15]    For good measure, the Court also notes that even if the evidence weighed in favor of limiting East Penn's communications with its employees, the outright ban in taking additional statements that the Secretary seeks is in no way "carefully drawn" in a manner "that limits speech as little as possible." *Gulf Oil*, 452 U.S. at 102.

[16]    In relevant part, Rule 26(b)(3)(C) provides: "Any party or other person may, *on request* and without the required showing, obtain the person's own previous statement about the action or its subject matter." (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court denies the Secretary's Motion for Protective Order. The Court also denies East Penn's Motion to Strike for the reasons set forth in footnote 2. East Penn shall communicate to all employees who signed declarations that they can receive copies of their statements upon the employee's request. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

21