## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EUGENE SCALIA,**[1] | : | |
| *Acting Secretary of Labor,* | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| **EAST PENN MANUFACTURING CO.,** | : | |
| **INC.,** | : | **No. 18-1194** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                    SEPTEMBER *9*, 2020

### INTRODUCTION

The Secretary of Labor initiated this Fair Labor Standards Act (FLSA) enforcement action against East Penn Manufacturing Co., Inc., asserting that it failed to compensate its employees for all hours spent changing into and out of uniforms and showering. After extensive discovery efforts, both parties seek to exclude, either in whole or in part, the testimony of the other's expert witnesses. This Memorandum addresses East Penn's motion to exclude the testimony of Dr. Robert G. Radwin, the Secretary's motion *in limine* to preclude certain testimony of Dr. Jeffrey Fernandez, and the Secretary's motion to exclude the expert report and testimony of Brian T. Farrington. For the foregoing reasons, the Court denies the motions concerning Drs. Radwin and Fernandez and grants in part and denies in part the Secretary's motion to exclude the report and testimony of Mr. Farrington.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Acting Secretary of Labor Eugene Scalia is substituted for R. Alexander Acosta as the plaintiff in this action.

## BACKGROUND

### I.    Dr. Robert G. Radwin

Dr. Robert G. Radwin is an industrial engineer.  The Secretary retained Dr. Radwin to conduct a Type II standard time-study, also known as a "did-take" study, to measure how much time employees actually spent performing a task or tasks.[2]  To plan his study, Dr. Radwin visited 29 East Penn buildings at the Lyon Station campus to observe their operations.  He designed his study to observe what he believes was a representative sample of employees performing their beginning- and end-of workday activities in eight of the plants.  The eight plants consisted of three large plants, three medium plants, and two small plants, in total comprising 84% of the uniformed employees at East Penn's Lyon Station campus.  Dr. Radwin hired six research assistants to videotape four measurable activities during 16 shift observations over the course of one week in June 2019.  A total of 370 randomly selected employees were observed at the start of their shift and 131 randomly selected employees were observed at the end of their shift.

Dr. Radwin's assistants taped randomly selected employees as they arrived and entered the plant at the beginning of a shift and followed those employees as they departed the production floor at the end of a shift.  Dr. Radwin and his team created a continuous record of employee activities and measured time using Multimedia Video Task Analysis (MVTA) software, a leading video-based work measurement and time study software created by Dr. Radwin and his graduate students.  Dr. Radwin used his measurements to estimate a single eight-plant average for each of

---

[2]      Analysts also sometimes perform Type I standard studies, known as "should take" studies, where they set a time standard as the reference for efficiently performing a task in a manner that eliminates delays.

2

the four specific activities that were monitored. He also calculated a 95% confidence interval[3] within a range of approximately one minute from the sample's mean.

## II.   Dr. Jeffrey Fernandez

Dr. Fernandez is a registered professional engineer. Defense counsel retained Dr. Fernandez to evaluate the time it took East Penn employees to perform certain activities at the start and end of shifts and provide observations and impressions of the data collection conducted by Dr. Radwin and his team at the East Penn plants. East Penn did not retain Dr. Fernandez to conduct his own independent time study. Instead, Dr. Fernandez and his associates accompanied and observed the same employees that Dr. Radwin observed during his time study.

Dr. Fernandez used what is known as the "elemental method" to measure what he considered was the core time taken for donning and doffing activities and showering. Dr. Fernandez's team used stopwatches and wall-mounted video cameras to measure the time it took employees to complete certain discrete tasks, such as donning and doffing safety shoes, uniform pants, and uniform shirts, and showering (including the time it took to walk to and from the shower), while excluding other measurements, such as the time employees spent walking after retrieving their uniforms and personal protective equipment, donning and doffing personal clothes, and the time taken between the measured discrete tasks. Dr. Fernandez's team also recorded delay activities, including the time employees took when using the restroom, storing and retrieving personal clothing and items from their lockers, smoking, and talking.

---

[3]     A confidence interval is a range of values that is likely to include a population value within a certain degree of confidence. A confidence interval is centered around the sample average and is obtained by adding and subtracting a suitable multiple of the standard error. *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 244 (3d ed. 2011). A 95% confidence interval is achieved by adding and subtracting two standard errors to the average. *Id.* Dr. Radwin stated in his report that a confidence interval "is a margin of error." Radwin Report dated Dec. 6, 2019 at 13 (Doc. No. 171-2).

### III.   Brian T. Farrington

While working as a Wage and Hour investigator from 1975 to 1984, East Penn's retained expert, Brian Farrington estimates that he conducted 500 to 600 full investigations. From 1984 to 1989, Mr. Farrington held the position of an Assistant District Director in the Dallas office of the Wage and Hour Division. In that role, he supervised a team of twelve to sixteen investigators and oversaw "some 5,000 investigations." Farrington Report at 4 (Doc. No. 170-1). As an initial effort to undermine him, the Secretary points out that the back wages in those cases Mr. Farrington oversaw rarely, if ever, exceeded $1 million and that Mr. Farrington could not recall if he had overseen more than ten cases in which the back wages exceeded $250,000.

After Mr. Farrington left the Wage and Hour Division in 1989, he became a private consultant on labor matters. He obtained his law degree in 1994, practicing as a solo practitioner until 2012 when he joined his current law firm. His legal practice has consisted almost exclusively of representing and advising clients in Wage and Hour and Equal Employment Opportunity Commission (EEOC) matters. During his more than thirty years of experience consulting for employers in Wage and Hour investigations, he has interacted with Wage and Hour personnel "all the time," Farrington Dep. Tr. at 80:23-25 (Doc. No. 170-2) and observed their procedures first-hand. He has also communicated with Wage and Hour officials regarding enforcement policies and practices. Moreover, Mr. Farrington wrote a book on Wage and Hour compliance as well as other wage-hour publications.

In his report for this case, Mr. Farrington (1) opines that the duration of Wage and Hour's two-year investigation of East Penn was unduly long and prejudiced East Penn; (2) states that Wage and Hour should have interviewed more than 37 East Penn employees from more than one location; (3) contends that Wage and Hour should have pursued other investigative techniques to

4

prove that East Penn's paid time was inadequate; (4) criticizes Wage and Hour's back-wage estimates; (5) critiques Wage and Hour for concluding that East Penn was liable before it had opened files and assigned investigations to any plant other than the S1 plant; and (6) opines that Wage and Hour violated its rules for final conferences. His expert report also includes a section concerning allegations of East Penn's alleged willfulness and good faith belief that it was complying with the FLSA. The parties dispute precisely what Mr. Farrington is opining in this final section of his report.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), district courts act as gatekeepers to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017). The district court's gatekeeping function extends beyond scientific testimony to "testimony based on technical and other specialized knowledge." *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002) (cleaned up) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

5

137, 141 (1999)). "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). "The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." *Checkpoint Sys., Inc.*, 198 F. Supp. 2d at 602 (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)).

Concerning the first restriction, "[q]ualification refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit Court of Appeals has interpreted this requirement "liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.'" *Id.* (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)). Because of the Third Circuit Court of Appeal's "liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996).

"In order for expert testimony to meet *Daubert*'s reliability standard, it must be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *In re TMI Litig.*, 193 F.3d 613, 703-04 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000). Admissibility does not require the scientific opinion at issue to have "the best foundation" or be supported "by the best methodology or unassailable research." *Id.* at 665. Rather, district courts are to assess whether the expert's testimony is supported by "'good grounds.'" *Karlo*, 849 F.3d at 81 (quoting *In re TMI Litig.*, 193 F.3d at 665); *see also In re Paoli*, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are

6

better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."). The standard for determining reliability is "'not that high'"—it is "'lower than the merits standard of correctness.'" *Karlo*, 849 F.3d at 81 (quoting *In re TMI Litig.*, 193 F.3d at 665). "Each aspect of the expert's opinion 'must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Karlo*, 849 F.3d at 81 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)).

In assessing the "good grounds" for an expert's opinions, district courts in this circuit examine the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re TMI Litig.*, 193 F.3d at 664-65. This list of factors "is non-exclusive and . . . each factor need not be applied in every case." *Elcock*, 233 F.3d at 746. A district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

In cases not involving scientific testimony, "'[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 150). Instead, "'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Id.*

7

"The question of whether a study's results were properly calculated or interpreted ordinarily goes to the weight of the evidence, not to its admissibility." *Karlo*, 849 F.3d at 83 (citing *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The "fit" requirement ensures that the expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue.'" *In re TMI Litig.*, 193 F.3d at 670 (quoting *Daubert*, 509 U.S. at 591). The admissibility of an expert's testimony "depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case." *In re TMI Litig.*, 193 F.3d at 670 (citing *In re Paoli*, 35 F.3d at 743).

**DISCUSSION**

The Court addresses East Penn's motion to exclude the testimony of Dr. Radwin, the Secretary's motion *in limine* to preclude certain testimony of Dr. Fernandez, and the Secretary's motion to exclude the expert report and testimony of Mr. Farrington below.

## I.    East Penn's Motion to Exclude Opinion Testimony of Dr. Radwin

East Penn argues that the Court should exclude the opinion testimony of the Secretary's time-study expert, Dr. Radwin, because it believes that his methodology is unreliable. In particular, East Penn faults Dr. Radwin for calculating one all-plant average, to be extrapolated to other plants, without running various statistical analyses, for not conducting tests to determine a sufficient sample size, and for having conclusions which it avers suffer from high rates of error.

According to the Secretary, Dr. Radwin's methodology satisfies the *Daubert* reliability test for multiple reasons. First, the Secretary contends that Dr. Radwin's methodology can easily be tested because he documented every employee observation with a video record, marked each

8

measured activity in the videos with MVTA software, and recorded his calculations in spreadsheets. The Secretary produced these videos and spreadsheets to East Penn. Second, various peer-reviewed articles discuss using video-based analyses with MVTA software for accurate measurement of work activities. Third, the Secretary points out that Dr. Radwin provided in his report the standard deviation[4] and confidence interval for his computation of the average daily changing and showering time. According to Dr. Radwin, he selected a sample size that would achieve a 95% confidence interval within "a range of approximately one minute." Radwin Report dated Dec. 6, 2019 at 13 (Doc. No. 171-2). Fourth, the Secretary avers that Dr. Radwin implemented recognized standards to control the technique's operation by implementing a randomization plan for selecting employees for observation when selecting his sample size, conducting a continuous study, and recording each observation. Fifth, the Secretary contends that Dr. Radwin is certainly qualified to testify as to his methodology. Dr. Radwin is a highly credentialed professor of Industrial Engineering and Biomedical Engineering who in part focuses on the study and practice of work measurement. He has published over 100 peer-reviewed articles, many of which address work measurement. Dr. Radwin has also conducted various donning and doffing time studies in litigation, which he has testified about in court.

East Penn argues that Dr. Radwin's methodology is unreliable, and thus his testimony should be excluded at trial, because he performed a "did take" study rather than a "should take" study,[5] his methodology is not supported by an authoritative textbook or treatise, and his

---

[4]     A standard deviation shows how far a typical element deviates from the average. *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 298 (3d ed. 2011).

[5]     East Penn criticizes Dr. Radwin for conducting a "did take" study instead of a "should take" study in its lengthy background section, rather than advancing this position as an independent basis for exclusion. For the sake of thoroughness, the Court assesses this argument as a separate ground for exclusion.

9

methodology suffers from various statistical deficiencies.[6] Concerning the latter, East Penn argues that Dr. Radwin did not perform any tests to determine if he could combine averages from different plants, that Dr. Radwin did not perform any tests to determine if his sample sizes were large enough, and that Dr. Radwin's conclusions suffer from a high error level.

First, East Penn faults Dr. Radwin for conducting a "did take" study rather than a "should take" study, reasoning that "did take" studies are "quick and dirty", done to nonengineered standards, have few objective characteristics, and are of limited temporal utility. Konz & Johnson, WORK DESIGN OCCUPATIONAL ERGONOMICS 526, 528 (5th ed. 2000). The Secretary counters that the authority East Penn cites states that "should take" studies are preferred over "did take" studies when developing time standards to improve productivity. However, Dr. Radwin's objective was "not to conduct a time study to 'document and improve inefficient methods, eliminate or reduce avoidable delays in the workplace, and develop time standards.'" Radwin Rebuttal Report at 13 (Doc. No. 171-3). Rather, he intended to measure actual time used for employee changing and showering activities, which the Secretary maintains is the most relevant time measurement at issue in this case. Overall, East Penn's criticism that Dr. Radwin performed a "did take" study rather than a "should take" study veers too close for comfort to suggesting that he must have performed the *best* type of study (for purposes which are not necessarily at issue here) in order for his methodology to be reliable. A study need not be the "best" to be deemed admissible. Such a focus on conducting the best study is inappropriate in the context of assessing a *Daubert* reliability challenge. *See Karlo*, 849 F.3d at 81 (noting that a *Daubert* reliability assessment does not test

---

[6]     East Penn also argues that Dr. Radwin's testimony should be excluded because he and his assistants filmed without a lens cap on in East Penn's locker rooms. After conducting an extensive evidentiary hearing and holding oral argument on East Penn's motion for sanctions concerning Dr. Radwin's conduct, the Court determined that his actions amounted only to a *de minimus* violation of the protective order issued in this case. Given the *de minimus* nature of the violation, the Court will not exclude Dr. Radwin's testimony on this basis.

whether the expert's testimony "has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research").

Second, East Penn argues that a lack of textbooks and peer-review publications concerning Dr. Radwin's methods weighs in favor of exclusion.[7] Because East Penn is not challenging Dr. Radwin's use of MVTA software, the Secretary's reliance on peer-reviewed publications concerning his method of using MVTA software to measure the length of activities seen on his recordings misses the mark. Even so, "[w]here there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point." *Schneider*, 320 F.3d at 406.

Third, East Penn sets forth a multitude of statistical criticisms with respect to Dr. Radwin's methodology. East Penn avers that Dr. Radwin has no scientific basis for combining the results of eight plants into one average. It argues that there are statistically significant differences between Dr. Radwin's per-plant changing and showering times[8] and faults Dr. Radwin for not reporting

---

[7] Along similar lines, East Penn contends that because "you wouldn't find [his methods] in a current peer-reviewed journal[,]" Radwin Dep. Tr. at 165:21-166:2 (Doc. No. 171-5), his approach is a "made for litigation" approach and, therefore, inherently "suspect." Def.'s Mem. in Supp. of Mot. at 21 (Doc. No.171-1). In response, the Secretary cites a passage from the Judiciary Branch's Federal Judicial Center's *Reference Manual on Scientific Evidence,* which states that "an experiment that is designed and executed for the purposes of litigation" should not be "summarily discovered simply because it is new." Federal Judicial Center, MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Engineering*, 935 (3d ed. 2011). The parties' arguments on this point are not particularly persuasive one way or the other.

[8] East Penn cites *In re Zoloft Prods. Liab. Litig.*, No. 12-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), in support of its position that "statistical significance is critical." Def.'s Mem. in Supp. of Mot. at 23 (Doc. No. 171-1). In that case, the court analyzed the admissibility of an epidemiological study examining whether the use of a certain medication early in pregnancy causes cardiovascular birth defects. *In re Zoloft*, 2015 WL 7776911, at *1. The court there emphasized "the importance of replicated, statistically significant findings *in the field of teratology*, noting that scientists 'who are examining potential teratogens generally will not draw causal conclusions in the absence of replicated statistically significant *epidemiological findings*. . . .'" *Id.* at *5 (emphasis added). The Secretary contends that East Penn's reliance on *In re Zoloft* is misplaced because the court there emphasized the importance of statistical significance only in the field of epidemiology.

11

separate confidence intervals for each plant, performing a regression analysis,[9] weighing the means, reporting different averages for each strata of plant (*i.e.*, small, medium, large), running "t-tests",[10] or reporting "p-values."[11]  East Penn also argues that despite using stratified sampling, which assumes that differences exist among plants, Dr. Radwin failed to perform any comparative statistical tests to determine whether the averages for each plant could be combined.  Moreover, East Penn contends that because its expert, Dr. Fernandez, ran tests for statistical significance on Dr. Radwin's data that produced p-values of less than or equal to 0.05, the averages cannot be combined.  It further criticizes Dr. Radwin for not performing a test to determine whether his sample sizes were large enough, despite Dr. Radwin having once criticized sample sizes of less than 10% of a population  and time-study experts who have not tested whether their sample sizes were large enough to obtain a ±5% error.  Finally, East Penn faults Dr. Radwin's conclusions for obtaining error levels higher than the ±5% he has aimed for in other situations.

The Secretary counters that East Penn incorrectly argues that Dr. Radwin needed to perform a variety of tasks and calculations which, according to the Secretary, are not actually required for or relevant to this case.  The Secretary argues that there exists no case mandating that Dr. Radwin had to perform a regression analysis in this context.[12]  Instead, Dr. Radwin avers that

---

[9]     Regression analyses are used to estimate relationships between a dependent variable and independent variables.  *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 294-95 (3d ed. 2011).

[10]     A t-test is a statistical test based on the t-statistic, which measures how far away an estimate is from its expected value, relative to the standard error.  *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 299-300 (3d ed. 2011).

[11]     A p-value measures the probability of getting, just by chance, a test statistic as large as or larger than the observed value.  *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 291-92 (3d ed. 2011).

[12]     During oral argument, defense counsel clarified that East Penn's argument is not exclusively focused on the failure to run a regression analysis, but rather that Dr. Radwin failed to run a variety of statistical analyses.  Even so, the Secretary's position that East Penn is faulting Dr. Radwin for failing to

his combined average calculation is reliable when viewing its practical significance, as opposed to the statistical significance.[13] The Secretary asserts that Dr. Radwin's calculations of the mean time for each of the four measured activities and the 95% confidence interval are sufficient for purposes of surviving a *Daubert* challenge.

The Secretary further contends that Dr. Radwin applied "the same accepted principles and methodology that he has used for [twenty] years" in writing his reports for this case. Pl.'s Resp. in Opp'n at 12 (Doc. No. 197). According to East Penn, Dr. Radwin has never relied on one average time across multiple plants after his testimony was excluded in *Fox v. Tyson Foods, Inc.*, No. 99-1612 (N.D. Ala.).[14] Despite East Penn's assertions to the contrary, Dr. Radwin has relied on one average time across more than one plant since *Fox*. He has similarly computed one average across multiple departments in the same plant. For instance, after Dr. Radwin studied multiple departments in two different plants in *DeKeyser v. ThyssenKrupp Waupaca*, No. 08-488 (E.D.

---

perform or report various statistical tests in the absence of a mandate that such tests are definitively required is well taken.

[13]     Results are practically significant when a reported difference is substantial enough to be meaningful in the real world. According to the Federal Judicial Center's *Reference Manual on Scientific Evidence*: "[S]ignificant differences may be evidence that something besides random error is at work. They are not evidence that this something is legally or practically important. Statisticians distinguish between statistical and practical significance to make the point. When practical significance is lacking—when the size of a disparity of negligible—there is no reason to worry about statistical significance." *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Statistics*, 252 (3d ed. 2011). The *Manual* further explains, "[b]y inquiring into the magnitude of an effect, courts can avoid being mislead by p-values. To focus attention on more substantive concerns—the size of the effect and the precision of the statistical analysis—interval estimates (e.g., confidence intervals) may be more valuable than tests." *Id.* at 253.

[14]     In *Fox*, those plaintiffs engaged Dr. Radwin to measure activities at eight plants and to calculate an all-plant average on the basis that the plant-to-plant variations were not significantly different. *Fox v. Tyson Foods, Inc.*, No. 99-1612 (N. D. Ala.) Mem. Op. dated Nov. 15, 2006, at 15-16 (Doc. No. 171-16). That court excluded Dr. Radwin's testimony, reasoning that his opinion was based on the false assumptions that the uniform policies at issue, the uniforms themselves, and the equipment were all the same at the differing plants. *Id.* at 16-17. The Secretary counters that Dr. Radwin's exclusion in *Fox* is limited to the facts of that case, that the *Fox* decision did not include any analysis of the *Daubert* factors or case law, and that Dr. Radwin frequently computes and relies on one average time for multiple plants and/or departments.

Wis.), he relied on one average time for employees who showered and one average for employees who did not shower across two plants and all departments.[15]  Similarly, for *Harris v. Smithfield Packing Co., Inc.*, No. 09-41 (E.D.N.C.), Dr. Radwin studied a plant that had two separate and unconnected sides, formulating one average donning and doffing time across the departments and sides. After examining 40 different departments for *Chao v. Tyson Foods, Inc.*, No. 02-1174 (N.D. Ala.), he likewise combined those results into one average.  For those cases, Dr. Radwin reported similar calculations to the ones set forth in this case, without referencing regression or other additional statistical analyses in his expert reports.[16]

As for the confidence interval, the Secretary contends that Dr. Radwin demonstrated the reliability of his methodology by calculating a 95% confidence interval within a range of approximately one minute from the sample's mean.  According to the Secretary, reporting this amount as an absolute measure of error of an approximate one-minute range, rather than a relative measure of error of ±5%, is an accepted methodology in time studies.  *See* Konz & Johnson, WORK DESIGN OCCUPATIONAL ERGONOMICS 526, 528 (5th ed. 2000) (noting that "[a]ccuracy can be given in relative or absolute terms").  East Penn faults Dr. Radwin for apparently failing to derive

---

[15]     East Penn accuses the Secretary of inaccurately misrepresenting that Dr. Radwin combined the results for two plants in *DeKeyser* when he apparently only studied one plant. After reviewing Dr. Radwin's report submitted in that case, it is clear that he studied two plants.  Indeed, East Penn wrote in its opening memorandum in support of its motion that Dr. Radwin studied two plants in DeKeyser. Def.'s Mem. in Supp. of Mot. at 9 (Doc. No. 171-1) (acknowledging that the expert report "report[ed] results for each separate department at 2 plants").

[16]     *Compare* Radwin Revised Report dated Dec. 12, 2019 for *Scalia v. East Penn Mfg. Co.*, No. 18-1194 (E.D. Pa.) at 12 (Doc. No. 171-1) (reporting the average, median, minimum, maximum, standard deviation, number in the population, and 95% confidence interval), *with* Radwin Report dated Oct. 3, 2011 for *DeKeyser v. ThyssenKrupp Waupaca*, No. 08-488 (E.D. Wis.) at 9 (Doc. No. 171-24) (reporting the mean, standard deviation, number in the population, minimum, maximum, and 95% confidence interval); Radwin Report dated Nov. 15, 2012 for *Harris v. Smithfield Packing Co., Inc.*, No. 09-41 (E.D.N.C.) at 7 (Doc. No. 171-27) (reporting mean, standard deviation, number in the population, upper 95% confidence interval, and lower 95% confidence interval); Radwin Report dated Sept. 18, 2006 for *Chao v. Tyson Foods, Inc.*, No. 02-1174 (N.D. Ala.) at 11 (Doc. No. 171-17) (reporting number in the population, mean, standard deviation, lower 95% confidence interval, and upper 95% confidence interval).

14

his confidence interval with any particular reliability. In other words, East Penn contends that Dr. Radwin's confidence interval is meaningless on its own if he did not also report his error levels, which Dr. Radwin has typically aimed for error levels of 5% throughout his career. The Secretary counters that Dr. Radwin did measure accuracy, albeit he communicated it in absolute terms of minutes rather than in a relative term of percentages. The Secretary argues that despite East Penn's focus on an error level of ±5%, East Penn did not submit any authority supporting the position that the error level at issue here *must* be a particular percentage in order to deem Dr. Radwin's testimony admissible. Moreover, the Secretary avers that the precision demanded by East Penn regarding Dr. Radwin's results demands much more than what is required to meet his actual burden to establish violations and damages by a reasonable inference.

East Penn also faults Dr. Radwin for using fractional stratified sampling without weighing the means derived for each strata. Dr. Radwin testified that he did perform such a calculation, but that he did not produce it because he no longer possessed it. In his response in opposition, the Secretary offered a chart displaying the weighted averages per-plant by both population and by percent of overall sample. The Secretary contends that these weighted calculations demonstrate that Dr. Radwin's sample was proportional, and therefore representative of the population, because the figures show that no one plant had an undue effect on the average.[17]

After taking the parties' arguments into consideration, the Court finds that East Penn's many critiques of Dr. Radwin's methodology more appropriately go toward the weight of his testimony rather than its admissibility. In doing so, the Court again stresses that the standard for

---

[17]     East Penn contends that the Court ought not consider the chart, as it did not appear in Dr. Radwin's reports or materials. It is true that a district court need not "provide a plaintiff with an open-ended and never-ended opportunity to meet a *Daubert* challenge until plaintiff 'gets it right.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000). However, considering information that Dr. Radwin testified he calculated at one point, but later did not possess, is not unreasonably indulgent or prejudicial to East Penn.

reliability is "not that high." *In re TMI Litig.*, 193 F.3d at 665. Dr. Radwin's methodology does not have to be the best in order to be deemed admissible. Rather, his methodology must be based only on good grounds. After taking into consideration the Secretary's application of the *Daubert* factors and East Penn's nuanced critiques of Dr. Radwin's methodology, the Court finds that the methodology was based on "good enough" grounds that his testimony, vulnerable as it may very well be, ought not be excluded at trial. Instead, East Penn can address its many challenges to Dr. Radwin's methodology through a vigorous cross-examination and by offering dueling expert testimony. Therefore, the Court denies East Penn's motion to exclude Dr. Radwin's testimony.

## II. The Secretary's *Motion in Limine* to Preclude Dr. Fernandez from Testifying with Respect to his Time Measurements and the "Hawthorne" Effect

The Secretary moves for the Court to preclude Dr. Fernandez from testifying as to certain topics at trial. First, the Secretary seeks to preclude Dr. Fernandez's testimony with respect to the data and findings he derived from using the elemental method of measuring employee time. Second, the Secretary contends that Dr. Fernandez should be precluded from testifying as to his collection of data from certain mounted cameras and conclusions drawn from that data. Third, the Secretary wants the Court to prohibit Dr. Fernandez from testifying about the "Hawthorne" or "observer effect."

### A. The Elemental Method and Exclusion of Delays and Personal Pursuits

Dr. Fernandez used what is known as the elemental method to measure the time spent by Dr. Radwin's subjects to don and doff their core uniform and personal protective equipment and shower, as well as to measure the time they spent on personal pursuits. The elemental method measures activities by breaking down a series of tasks into their component parts (*i.e.*, "elements") and measuring how long employees spend on each element. Fernandez Report at 5 (Doc. No. 172-4); *see also* Niebel & Frievalds, METHODS, STANDARDS, AND WORK DESIGN 415 (12th ed. 2008)

16

("For ease of measurement, the operation should be divided into groups of motions known as *elements* . . . . Elements should be broken down into divisions that are as fine as possible and yet not so small that reading accuracy is sacrificed.") (emphasis in original). This method allows the measurer to eliminate "delays" which occur in-between the elements. Niebel & Frievalds, METHODS, STANDARDS, AND WORK DESIGN 421 (12th ed. 2008) ("During a time study, the operator may encounter unavoidable delays, such as an interruption by a clerk of supervisor, or tool breakage. The operator may also intentionally cause a change in the order of work by going for a drink of water or stopping to rest. Such interruptions are referred to as *foreign elements*. . . . These values can then be subtracted when the time study is calculated . . . .") (emphasis in original). "District courts routinely admit expert opinions based on elemental or time study methodology in FLSA cases." *Lugo v. Farmer's Pride Inc.*, No. 07-749, 2011 WL 2550376, at *3 (E.D. Pa. June 23, 2011) (collecting cases).

## B. The Secretary's Fit Requirement Argument

The Secretary contends that Dr. Fernandez's data collection and resulting opinions fail to satisfy Rule 702's fit requirement. According to the Secretary, Dr. Fernandez's data collection is irrelevant because it allegedly in no way pertains to calculating the amount of compensable time owed to East Penn employees.

The Court would be remiss if it did not acknowledge that the parties' continuing hotly contested dispute as to whether the compensable time at issue should be calculated based on the actual time or reasonable time that it takes to perform certain tasks. Although the parties discuss this dispute at length in their summary judgment briefing, without fail, it makes a cameo appearance in the parties' *Daubert* briefing. Even so, although each assiduously took care to give no ground on the issue, both parties represented at oral argument that the Court need not determine

17

whether the applicable standard is actual time or reasonable in order to resolve this motion. Accordingly, the Court thanks the parties for reminding the Court of the continued presence of this important issue but will refrain from making its determination as to which standard applies at this time.

According to the Secretary, the "continuous workday" rule as set forth in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), mandates that—excluding bona fide meal breaks or off-duty periods amounting to more than 20 minutes—once the workday begins, employers must pay employees for all hours worked until the last principal activity. In other words, the Secretary takes the position that employers must pay for all time after an employee first touches something before a shift and until the employee last touches something after a shift. Thus, the Secretary contends that measuring how long a discrete activity should have taken an employee to perform is of no moment to the compensability standards set forth pursuant to the continuous workday rule. Moreover, the Secretary asserts that the Third Circuit Court of Appeals confirmed that his understanding of how to measure compensable time is proper in *Sec'y of Labor v. Am. Future Sys., Inc.*, 873 F.3d 430 (3d Cir. 2017).[18]

East Penn does not dispute that the continuous workday rule applies. Rather, it argues that, despite the Secretary's assertions to the contrary, Dr. Fernandez's use of the elemental method and measurement of delay time are consistent with the continuous workday principle, thus rendering them relevant. Since the Supreme Court decided *Alvarez*, courts entertaining strikingly similar

---

[18]     In *American Future Systems*, the Third Circuit Court of Appeals determined that once the continuous workday begins, compensable time does not stop unless an employee takes a break for more than 20 minutes. 873 F.3d at 430. East Penn vigorously disputes that *American Future Systems* supports the Secretary's position that the actual time standard applies. East Penn contends that the case is inapposite because there, the Third Circuit Court of Appeals considered short, uncompensated breaks during employees' productive work shifts, a time period which is regulated by specific Department of Labor regulations separate from the regulations at issue here.

18

arguments to the one the Secretary advances here have determined that Dr. Fernandez's use of the elemental method provided relevant information. *See, e.g., Hosler v. Smithfield Packing Co.*, No. 07-166, 2010 U.S. Dist. LEXIS 87883, at *15 (E.D.N.C. Aug. 20, 2010), *adopted*, No. 07-166, 2010 U.S. Dist. LEXIS 101776, at *14 (E.D.N.C. Sept. 24, 2010) (determining that Dr. Fernandez's opinion, developed using the elemental method, "would shed light [on] whether the amount of time for which defendant paid employees for these activities was adequate, whether the amount of time spent on particular activities is so small they do not have to be compensated under the applicable law, and whether the amount of time claimed by plaintiffs for particular activities is excessively high"); *Martinez-Hernandez v. Butterball, L.L.C.*, No. 07-174, 2011 WL 4460332, at *2 (E.D.N.C. Sept. 26, 2011) (determining that Dr. Fernandez's evaluation of "the time it takes employees to don and doff certain items, dip, sanitize, wash and to perform walking activities" at a poultry processing facility measured pursuant to the elemental method was relevant).[19]

Courts have determined that Dr. Fernandez's opinions based on the elemental method "would be helpful and thereby relevant even if it is assumed, as plaintiffs contend, that it reflects only a portion of the time required for the various activities, not the full time required when they are performed on a continuous basis . . . . [E]ven purportedly incomplete information would be better than none. Plaintiffs will, of course, have the opportunity to point out any purported gaps

---

[19]      East Penn also cites *Chao v. Tyson Foods, Inc.*, No. 02-1174 (N.D. Ala.), a case in which the Secretary raised a similar challenge to Dr. Fernandez's report there. Specifically, the Secretary argued that Dr. Fernandez's elemental measurements did not satisfy the fit requirement and were irrelevant because he measured discrete activities, rather than the full amount of time the employees took during the continuous work day. *Chao v. Tyson Foods, Inc.*, No. 02-1174 (N.D. Ala.) Mem. Op. dated Sept. 7, 2007 at 3-4 (Doc. No. 196-1). That court determined that Dr. Fernandez's opinions were ultimately relevant, even if his measurements could not be aggregated to measure the total amount of uncompensated time. *Id.* at 4. It reasoned that Dr. Fernandez's opinion was "relevant to whether the time spent performing the uncompensated activities is *de minimis*, and therefore not compensable under the FLSA." *Id.* at 7.

in [Dr.] Fernandez's opinions at trial to assist the jury in evaluating it." *Hosler*, 2010 U.S. Dist. LEXIS 87883, at *14-15. Following this reasoning, this Court finds no reason why it should determine that Dr. Fernandez's opinion based on the elemental method could not assist a trier of fact, even if the Court were to ultimately determine that the Secretary's position on calculating compensatory time is correct.[20]

At oral argument, the Secretary argued that even if the reasonable time standard applied, Dr. Fernandez's opinion fails to assist the trier of fact because he left out a period of time which should have been measured under the reasonable time standard. However, challenges that an expert witness erred by omitting certain time measurements goes to weight and credibility rather than admissibility. *See Lugo*, 2011 WL 2550376, at *3 ("Plaintiffs' assertion that Dr. Fernandez erred by omitting time measurements of certain activities—including opening and closing lockers, gathering protective equipment, and waiting to obtain protective equipment—from the 'total time' goes to weight and credibility."). Because the Court is satisfied that Dr. Fernandez's testimony will assist the trier of fact, the Secretary's other criticisms as to the relevancy of Dr. Fernandez's method are of no moment.[21] Therefore, the Court rejects the Secretary's fit challenge and is confident that the Secretary's concerns will be more appropriately addressed through cross examination.

### C. The Secretary's Rule 403 Argument

The Secretary similarly argues that Dr. Fernandez should be precluded pursuant to Federal

---

[20]     To be clear, the Court at this time refrains from opining as to whether the reasonable or actual time standard is applicable here. As noted, the Court reserves that battle for another day, expecting yet more briefing and advocacy on the issue.

[21]     The Secretary criticizes Dr. Fernandez's method as being irrelevant to the amount of compensable but uncompensated time and for not measuring the employees' walking time to their workstations on the production floor.

Rule of Evidence 403 because his testimony allegedly has the potential to confuse or mislead the jury about the applicable legal standard. Relevant evidence may otherwise be excluded under Rule 403 if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. East Penn counters that it believes Dr. Fernandez's testimony is highly probative for critiquing Dr. Radwin's measurements, that the Secretary's invocation of Rule 403 is premature, and that the Secretary did not even attempt to demonstrate how the probative value of Dr. Fernandez's report is substantially outweighed by a danger of misleading or confusing the jury. The Court agrees with East Penn that the Secretary's Rule 403 challenge is premature and, accordingly, rejects it.

### D. The Secretary's Arguments Concerning Dr. Fernandez's Video Footage

The Secretary argues that Dr. Fernandez's use of mounted camera footage of employees waiting in break rooms (Table 9) and by time clocks (Table 12) and conclusions drawn from those sources are unreliable and, therefore, warrant exclusion.[22] According to the Secretary, the videos are unreliable because Dr. Fernandez failed to employ a methodology for choosing the employees to be studied and did not record who the employees were, for which shift times the employees were scheduled, and at what point the employees were currently in their work shifts.

During oral argument, East Penn represented that assessing the reliability of Dr. Fernandez's methodology in recording this footage is inappropriate because it will not provide the basis of any expert opinion testimony. Rather, East Penn asserts that it intends on offering this

---

[22]     East Penn's response in opposition expends considerable effort in discussing Tables R5A and R5B. In his reply, the Secretary for the first time made it clear that he is not challenging those tables on the grounds of reliability. Rather, the Secretary challenges the data in Tables R5A and R5B as an extension of its fit argument, reasoning that they tabulate irrelevant delays. The Court rejects this argument for the reasons discussed above. *See supra* Discussion section II.B.

information as Federal Rule of Evidence 1006 summary witness testimony, not an average or any descriptive statistics originating from the tapes. Relying on East Penn's representation, the Court will not engage in an analysis as to the reliability of Dr. Fernandez's methodology in recording and cataloging this footage and related information. However, the Court may exclude such evidence at trial if it becomes apparent that defense counsel's representation advanced at oral argument is not maintained.

### E. Dr. Fernandez's Testimony Concerning the "Hawthorne" Effect

According to Dr. Fernandez's expert report, he may criticize Dr. Radwin's study at trial by referencing what is known as the "Hawthorne"[23] or "observer effect." The Secretary seeks to preclude Dr. Fernandez's testimony concerning the effect, reasoning that such testimony would be unreliable because, according to the Secretary, no peer-reviewed publications suggest that such a phenomenon exists. The Secretary contends that this effect is nothing but a "myth." Pl.'s Mem. in Support of Mot. at 17 (Doc. No. 172-1).

As Dr. Radwin explained in his report, the "Hawthorne" or "observer effect" is "[t]he effect where participants in an experiment may respond differently than they normally would, because they know they are part of an experiment." CONCISE OXFORD DICTIONARY OF MATHEMATICS (2009); *see also* Salkind, ENCYCLOPEDIA OF RESEARCH DESIGN 561 (2010) ("The term Hawthorne effect refers to the tendency for study participants to change their behavior simply as a result of being observed. Consequently, it is also referred to as the observer effect."). In support of his statement that the effect is a myth, Dr. Radwin focuses on how some modern researchers describe the original 1924 study. However, one encyclopedia explained: "Although there has been some controversy regarding the rigor of the original studies at Hawthorne Works and the subsequent

---

[23] The effect is sometimes referred to as the "Hawthorne" effect due to a 1924 study about how General Electric employees at its Hawthorne Works plant reacted to being observed.

inconclusive findings, most people agree that the Hawthorne effect is a powerful but undesirable effect that must be considered in the design or research studies." Salkind, ENCYCLOPEDIA OF RESEARCH DESIGN 563 (2010). Given the fact that sources do indeed acknowledge the existence of the effect and that such an effect should be considered in designing studies, the Secretary's challenge fails. Therefore, the Court declines to preclude Dr. Fernandez from testifying with respect to the "Hawthorne" effect.

In sum, the Court denies the Secretary's motion *in limine* to preclude Dr. Fernandez from testifying with respect to certain topics.

## III.    The Secretary's Motion to Exclude the Expert Report and Testimony of Mr. Farrington

The Secretary moves to exclude the expert report and testimony of one of East Penn's expert witnesses, Mr. Farrington. The Secretary argues that Mr. Farrington's expert report and testimony concerning the Wage and Hour investigation leading to this litigation fail to satisfy Rule 702's fit and reliability requirements. Moreover, the Secretary contends that Mr. Farrington is impermissibly offering his legal opinion that any alleged FLSA violations committed by East Penn were non-willful and were made in good faith.

### A. Mr. Farrington's Opinions Concerning the Wage and Hour Investigation

The Secretary argues that Mr. Farrington's opinions concerning Wage and Hour's investigation and related legal conclusions fail to satisfy Rule 702's fit and reliability requirements.

The Court first addresses the Secretary's fit argument. The Secretary argues that Mr. Farrington's expert report regarding the Wage and Hour investigation in no way concerns East Penn's liability in this case.[24] East Penn contends that it is premature—and likely incorrect—to

---

[24]    The Secretary's focus on whether Mr. Farrington's opinions can assist the trier of fact in determining East Penn's liability misses the mark. East Penn stresses that Mr. Farrington's testimony

determine that Mr. Farrington's opinions fail to fit the issues in this case, particularly given the Secretary's own initial disclosures and the discovery it propounded on East Penn.

More specifically, the Secretary's most recent disclosures served upon East Penn identified the following three categories of documents that it may rely upon to support its claims: (i) non-privileged documents from Wage and Hour's investigation file of East Penn; (ii) additional documents produced by East Penn to Wage and Hour and the Office of the Solicitor in connection with this investigation and litigation; and (iii) additional non-privileged documents acquired by Wage and Hour and the Office of the Solicitor after the close of the investigative period. East Penn points out that the first category, solely, and the second category, in part, relate to Wage and Hour's investigation. Moreover, three of the four individuals who the Secretary listed by name to have discoverable information work in Wage and Hour and were involved in the East Penn investigation. At the pre-trial stage, the Court can, at the very least, infer that the Secretary may put the investigation at issue at trial. Accordingly, the Secretary's request for the Court to deem Mr. Farrington's testimony unfit is premature at this time. Observing the Secretary's case-in-chief at trial will better enable both the Court and East Penn to more appropriately assess whether Mr. Farrington's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue.

The Court next turns to assessing the reliability of Mr. Farrington's expert report and testimony. The Secretary argues that Mr. Farrington's experience working at Wage and Hour is too long ago and was on too small a scale to form the basis for reliable expert testimony about how Wage and Hour currently conducts its investigations. The Secretary also avers that Mr. Farrington's opinions are otherwise not based on sufficient facts. Although the Secretary

---

regarding the investigation will be offered to provide the jury information as to the context in which East Penn operates.

insists that Mr. Farrington lacks the specialized knowledge needed to assert the opinions he made, the Secretary challenges Mr. Farrington's alleged lacking personal knowledge or experience through its reliability challenge, rather than directly challenging Mr. Farrington's qualifications as a separate ground for exclusion.[25]

As noted, Mr. Farrington estimates that he conducted 500 to 600 full investigations during the nine years in which he was employed as a Wage and Hour investigator. Afterwards, he oversaw "some 5,000 investigations" while supervising 12 to 16 investigators during the five years in which he was employed as a Wage and Hour Assistant District Director. Farrington Report at 4 (Doc. No. 170-1). Upon leaving Wage and Hour, he obtained his law degree, has focused on employment law, has been engaged as an expert on Wage and Hour issues roughly 80 to 90 times, and has written various literature concerning Wage and Hour. The Secretary's concern over Mr. Farrington's supposed inexperience in handling cases of a particular magnitude and during a particular time frame can be more appropriately addressed through cross-examination rather than exclusion. Indeed, the Secretary's argument strays dangerously close to bolstering the incorrect position that an expert must have the best qualifications in order to testify as an expert. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2009) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.") (citation and quotation marks omitted).

Many of the Secretary's assertions that Mr. Farrington's opinions are not based on sufficient facts essentially reiterate the Secretary's concerns that Mr. Farrington lacks the specialized knowledge to offer such an opinion. In addition to supporting his various opinions

---

[25]     To the extent the Court can construe the Secretary's motion as challenging Mr. Farrington's qualifications, such an argument fails for the reasons addressed in this subsection.

25

concerning the Wage and Hour investigation on his personal experience and specialized expertise, he also cites various materials in support of his opinions, such as provisions in the Field Operations Handbook, Department of Labor regulations, the Department of Labor training manual, Wage and Hour policies, and statements from a Wage and Hour District Director. For instance, the Secretary asserts that Mr. Farrington's opinion that Wage and Hour should have interviewed more than 37 of 8,000 employees, or roughly 0.46% of the workforce, proffers nothing more than a speculative "because I said so" opinion. In support of this proposition, however, Mr. Farrington cites the Department of Labor's investigative training manual, which provides that Wage and Hour investigators should interview about 20% of employees when assessing such a large pool of employees. Department of Labor, *Introduction to Full Investigation and Litigation (FIL) Training*, (Doc. No. 171-38).

The Court is satisfied that the grounds East Penn cites for each of Mr. Farrington's Wage-and-Hour-related opinions sufficiently justifies their admissibility. The Secretary's disagreement with Mr. Farrington's conclusions does not render them unreliable. Instead, the Court invites the Secretary to raise his challenges to Mr. Farrington's testimony during cross-examination.

## B. Mr. Farrington's Alleged Legal Opinions Concerning Willfulness and Liquidated Damages

The Secretary argues that Mr. Farrington is attempting to offer impermissible legal opinions regarding liquidated damages and willfulness.[26] "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Expert witnesses are

---

[26] The Secretary again briefly reiterates that he believes that Mr. Farrington lacks the requisite special knowledge to offer these opinions. The Court rejects this argument for the reasons already discussed in Discussion section III.A.

26

prohibited from rendering legal opinions because such testimony usurps a court's "pivotal role in explaining the law to the jury." *Id.*; *see also Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (noting that Rule 704 "prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards"). Experts are, however, permitted to testify as to an established custom and practices in an industry. *See Berckeley*, 455 F.3d at 218. Moreover, the question of intent is one for a jury to decide, not experts. *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004); *accord Wolfe v. McNeil-PPC, Inc.*, 881 F. Supp. 2d 650, 661-62 (E.D. Pa. 2012). Other courts have excluded Mr. Farrington from testifying on various legal opinions at issue in other cases. *See, e.g., Welch v. All Am. Check Cashing, Inc.*, No. 13-271, 2014 WL 11514960, at *1 (S.D. Miss. Aug. 12, 2014) (granting motion to exclude Mr. Farrington to the extent he "intend[ed] to express an opinion concerning the application of regulations under the [FLSA] to plaintiff's job duties and concerning whether those duties fall within the 'administrative capacity' exemption to the FLSA's overtime compensation requirement").

East Penn insists that Mr. Farrington is using relevant law, the Wage and Hour Field Operations Handbook, and the underlying facts from Wage and Hour's investigation "as the *predicates* for offering context to help a jury understand why an employer in East Penn's position could be viewed as having an *objectively* reasonable basis for its viewpoint." Def.'s Resp. in Opp'n at 23 (Doc. No. 195) (emphasis in original); *see also* Farrington Dep. Tr. at 172:23-173:1 (Doc. No. 170-2) ("I was not engaged to give an opinion on whether or not there was liability of whether or not there are back wages due or how those back wages were to be computed. That's not part of my report."). In doing so, it cites *Chao v. Tyson Foods*, No. 02-1174 (N.D. Ala.), a case in which Mr. Farrington was permitted to offer an opinion regarding the objective reasonableness of that employer's belief that it was complying with the FLSA.

27

Although East Penn invites the Court to take it at its word that Mr. Farrington will not cross any impermissible lines at trial, the Court uses this as an opportunity to guarantee that he will not. Accordingly, the Court determines that Mr. Farrington will be permitted to testify in order to help the jury weigh the objective reasonableness of East Penn's viewpoint and to provide background information concerning established customs and practices in his respective field. Mr. Farrington, however, is prohibited from testifying about elements of the law, East Penn's intent, or whether East Penn actually acted reasonably. With these guidelines in place, the Court sees no reason why excluding any portion of Mr. Farrington's expert report is necessary. Accordingly, the Court grants in part and denies in part the Secretary's motion to exclude Mr. Farrington's expert report and testimony. The motion is granted in part only to the extent it precludes Mr. Farrington from testifying with respect to the specific topics detailed above.

## CONCLUSION

For the foregoing reasons, the Court denies East Penn's motion to exclude the testimony of Dr. Radwin, denies the Secretary's motion *in limine* to preclude Dr. Fernandez from testifying with respect to his time measurements and the "Hawthorne" effect, and grants in part and denies in part the Secretary's motion to exclude the expert report and testimony of Mr. Farrington. The motion concerning Mr. Farrington is only granted in part to the extent that the Court prohibits him from testifying about elements of the law, East Penn's intent, or whether East Penn actually acted reasonably. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE