IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARTIN J. WALSH, | : | |
| *Secretary of Labor*,[1] | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| **EAST PENN MANUFACTURING** | : | |
| **CO., INC.,** | : | No. 18-1194 |
| *Defendant* | : | |

**MEMORANDUM**

PRATTER, J.                                                    AUGUST *17th*, 2021

The Secretary of Labor initiated this action against East Penn Manufacturing Co., Inc., a battery manufacturer, alleging that East Penn has failed to compensate its employees for time spent changing into and out of uniforms and personal protective equipment and showering at the end of a work shift. East Penn does not dispute that the time spent donning, doffing, and showering is compensable under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 203 *et seq.* The crux of the dispute is whether East Penn's pay policies, which compensate employees based on what it deems a "reasonable" time for these tasks, are sound as a matter of law and sufficient as a matter of fact. Contrary to the Secretary's contentions, East Penn disputes that it is legally required to compensate for the actual time expended by any given employee. But to the extent that such compensation as it pays is deficient, East Penn then maintains that the difference between what is "reasonable" and what would be "actual" is de minimis. Like the Energizer Bunny, the parties have pounded their steady drumbeats, with each side steadfast in its belief that it poses the correct standard of measurement.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the latest Secretary of Labor, Martin J. Walsh, is substituted for Eugene Scalia as the plaintiff in this action.

Following an extensive discovery period and a multitude of discovery disputes, including expert discovery[2], both parties moved for summary judgment. East Penn moved for partial summary judgment first on its good faith defense to the Secretary's claim for liquidated damages and to foreclose the Secretary's claim that East Penn willfully violated the FLSA. Doc. No. 155. East Penn then followed up with a second motion for partial summary judgment to foreclose certain categories of employees from a potential recovery class on the basis that the Secretary failed to produce sufficient evidence to prove uncompensated time as to them. Doc. No. 156.

In response, the Secretary filed a motion for partial summary judgment on no less than 11 separate issues. Doc. No. 161. The Secretary asks the Court first to find, as a matter of law, that East Penn must pay its employees for actual time worked, not a "reasonable" duration of time for the subject tasks. He also moves for a finding that East Penn violated the recordkeeping and overtime provisions of the FLSA, that such violations were willful, and that the uncompensated time was not de minimis. The Secretary then filed two motions to strike certain of East Penn's exhibits supporting its motion for summary judgment, Doc. No. 198, and East Penn's Notice of Supplemental Authority, Doc. No. 231. The Court held oral argument on these fully briefed motions.

While the motions for summary judgment were pending, the parties could not resist filing additional discovery related motions. The Secretary filed a notice to amend Schedule A to his complaint, adding a few thousand additional East Penn employees to the group deserving

---

[2] The Court previously considered and ruled on the admissibility of each of the parties' respective *Daubert* challenges. *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 5409164 (E.D. Pa. Sept. 9, 2020).

compensation under the Secretary's theories. East Penn responded with a motion to strike. Doc. No. 251.[3]

Having powered through literally stacks of competing briefs, the Court finds that many of the issues raised in parties' motions for summary judgment to be premature and thus not properly resolvable at this stage of the proceeding.

**TABLE OF CONTENTS**

**BACKGROUND** ........................................................................................................................ 4
    A.    Tracking East Penn Employees' Time ................................................................. 5
    B.    East Penn's Pay Policies for Donning and Doffing ........................................... 7
    C.    Time Spent by Uniformed Employees on Pre and Post Shift Activities .......................... 8
**LEGAL STANDARDS** ........................................................................................................... 10
I.    Applicable FLSA Law ............................................................................................... 11
II.    The Secretary's Motion for Partial Summary Judgment ...................................... 14
    A.    Uncontested Issues ............................................................................................... 14
    B.    Correct Measurement of Compensable Time .................................................... 14
    C.    FLSA Recordkeeping Violation ......................................................................... 22
    D.    Whether East Penn Violated the FLSA Overtime Requirements ................... 25
    E.    East Penn's Time Clock Records as Minimum Amount of Uncompensated Time ....... 30
    F.    East Penn's de minimis Defense ......................................................................... 32
III.    East Penn's Motion for Partial Summary Judgment as to Scope of Employees .............. 36
    A.    Employees Who Work Outside of Pennsylvania .............................................. 37
    B.    Continuous Operations Employees .................................................................... 38
    C.    Employees Who Do Not Wear a Uniform and Shower .................................... 42
    D.    Uniformed Employees Not at the Eight Facilities Studied .............................. 44
IV.    Damages .................................................................................................................... 48
    A.    Background on DOL Investigations and East Penn's Policies ........................ 48
      i.    The 2003 Uniform Policy .......................................................................... 48
      ii.    Pre-2016 OSHA Investigations ................................................................. 50

---

[3]    The Court previously granted the Secretary's motion to compel East Penn to provide an updated list of names and contact information for its Pennsylvania-based employees. *Walsh v. E. Penn Mfg. Co.*, No. CV 18-1194, 2021 WL 1318003, at *1 (E.D. Pa. Apr. 8, 2021).

iii.   The 2016 OSHA Complaint ............................................................. 51

iv.   Wage and Hour Division Investigations..................................... 52

B.   Liquidated Damages.......................................................................... 53

i.   The Secretary's Motion ................................................................. 54

ii.   East Penn's Motion........................................................................ 55

C.   Whether East Penn's Violations Were Willful ............................ 61

i.   The Secretary's Motion ................................................................. 62

ii.   East Penn's Motion........................................................................ 66

D.   Injunctive Relief................................................................................ 66

V.   The Secretary's Motions to Strike ......................................................... 68

A.   The Secretary's Motion to Strike East Penn's Exhibits ................ 68

B.   The Secretary's Motion to Strike East Penn's "Notice of Supplemental Authority" .... 70

VI.   East Penn's Motion to Strike ................................................................. 73

CONCLUSION ............................................................................................... 74

## BACKGROUND[4]

East Penn manufactures and recycles lead acid batteries at its Lyon Station, Pennsylvania campus.  Doc. No. 156-2 ¶ 1; Doc. No. 157 ¶ 2.  The Lyon Station facility consists of roughly 30 separate divisions and plants, including automotive, industrial, metals, and manufacturing support services.  Doc. No. 156-2 ¶¶ 2-4; Doc. No. 157 ¶¶ 5-6, 8.  East Penn employees are not union represented and have not entered into a collective bargaining agreement with their employer.  Doc. No. 157 ¶ 11; Doc. No. 176-1 ¶ 11(a).

Most of East Penn's plants operate 24 hours a day, divided into three consecutive eight-hour shifts.  Doc. No. 157 ¶ 19; Doc. No. 176-1 ¶ 19(a).  The exception is East Penn's "continuous operations" departments which—as its name suggests—operate with partially overlapping eight-and-a-half hour shifts.  *Id.*  The overlapping scheduling ensures that the machines in those plants are never taken offline.

---

[4]   The relevant facts are from the undisputed factual record.  Facts that remain in dispute are so noted.

East Penn requires that all employees at the Lyon Station campus wear personal protective equipment, regardless of their risk of exposure to lead, chemicals, or other hazards. Doc. No. 157 ¶ 39; Doc. No. 176-1 ¶ 39(a). Because of the chemicals with which they work, certain East Penn employees are required to change out of their street clothes and into a uniform prior to entering the production floor at the beginning of their shifts. Doc. No. 157 ¶ 42; Doc. No. 176-1 ¶ 42(b). This uniform is supplied each day and the employee is required to be fully dressed in the uniform prior to entering the production floor. Doc. No. 157 ¶ 47-48; Doc. No. 176-1 ¶¶ 47(b), 48(a). Depending on the hazards associated with the job, East Penn also requires certain employees to wear additional PPE, including safety shoes, respirators, and hard hats. Doc. No. 157 ¶ 41; Doc. No. 176-1 ¶ 41(a).

At the end of their shifts, uniformed employees remove their uniforms and change back into their street clothes prior to leaving the facility. Doc. No. 157 ¶50; Doc. No. 176-1 ¶ 50(a). Some of them also shower as part of their end-of-shift activities. The parties dispute whether all uniformed employees are required to shower as part of the end of shift activities. Doc. No. 157 ¶ 54; Doc. No. 156-2 ¶ 109; Doc. No. 176-1 ¶ 54(b). East Penn maintains that only uniformed employees who work in defined lead exposure areas must shower. Doc. No. 176-1 ¶ 54(b). But it is undisputed that employees face disciplinary action for failing to wear their uniforms and for failing to shower, if showering is required. Doc. No. 176-1 ¶¶ 60-61.

## A. Tracking East Penn Employees' Time

East Penn maintains two sets of time records for each of their employees. The first is what East Penn deems "actual" time (or "Actl" as appears on some time sheets). Per East Penn policy, all employees are required to swipe in and out using a card-scanning system located in the plant to which they are assigned. Doc. No. 157 ¶¶ 62, 63; Doc. No. 176-1 ¶¶ 62(a), 63(a). Employees are

required to swipe in no more than 14 minutes before the start of their shift and 14 minutes after the end of their paid shift. Doc. No. 157 ¶ 69; Doc. No. 176-1 ¶ 69(b). The time clock system records these swipe times to the minute, which are then preserved in East Penn's "mainframe." Doc. No. 157 ¶¶ 65-67; Doc. No. 176-1 ¶¶ 65(a)-67(a).

The second set of time records is for "adjusted" time. Adjusted time corresponds to the employees' scheduled shift times and does not show the 1-14 minutes before and after shifts.[5] Doc. No. 157 ¶¶ 77, 82; Doc. No. 176-1 ¶¶ 77(b) 82(b). Both the actual and adjusted time entries appear on an employee's Payroll Transaction Edit List. Doc. No. 157 ¶ 82; Doc. No. 176-1 ¶ 82(a). East Penn does not pay for "actual" time—that is, the recorded between the swipes. Instead, East Penn pays employees based on "adjusted" time—the length of their scheduled production shift—which is paid out in 15-minute increments. Doc. No. 157 ¶ 69; Doc. No. 176-1 ¶ 69(b). Some employees swipe in when their shift time officially starts so there is no discrepancy between "actual" and "adjusted" time. Doc. No. 176-1 ¶ 123(b) (Secretary's time study expert admitted some of his subjects did indeed have identical "actual" and "adjusted" times).

The parties dispute the import of time clocks and East Penn's requirement that employees clock in and out no more than 14 minutes from the start and end of their shifts. East Penn maintains that the time clock policy is used only as an attendance tool to ensure that employees are in the plant for their full shift, not to mark the official beginning or ending of the continuous workday as a means to calculate pay.[6] Doc. No. 176-1 ¶ 69(b). The Secretary contends that the "14-minute

---

[5]     For example, an employee who swipes in at 6:46 a.m. for a 7:00 a.m. shift would have an Actual Time entry of 6:46 a.m. and an Adjusted In time of 7:00 a.m.

[6]     Department of Labor ("DOL") regulations do not require that employers use time clocks for purposes of calculating pay. 29 C.F.R. § 785.48(a) ("In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded.").

rule" is probative of East Penn's knowledge that its employees required more than the time East Penn has allotted to complete pre- and post-shift activities.

## B. East Penn's Pay Policies for Donning and Doffing

There are two pertinent East Penn policies governing beginning and end-of-day activities. East Penn's Time Clock and Pay Procedures, effective as of 1998, require that each employee be at her or his workstation at shift starting time. Doc. No. 157 ¶ 71; Doc. No. 176-1 ¶ 71(a). In 2003, East Penn formalized a five-minute "grace period" for compensable start-of-shift clothes changing (the 2003 Company Uniform Policy). Doc. No. 157 ¶ 94; Doc. No. 176-1 ¶ 94. Under this policy, "for pay purposes," employees have five minutes after the start of their shift to report to their workstation. Doc. No. 176-1 ¶ 71(b).

In 2016, in response to an employee complaint, East Penn increased its paid shower and end-of-shift clothes changing time in all plants to ten minutes (the 2016 Personal Protective Equipment/Uniform/Shower Policy).[7] Since then, if an employee works in an area that requires a uniform, the following policy applies:

1. Employees are expected to be at their designated workstations wearing their uniform and other PPE (Personal Protection Equipment) at the start of their shift. For pay purposes, ***employees will be granted a five-minute grace period*** after the start of the shift to report to their workstation for the purpose of donning uniforms. Employees may be granted longer clean up time in departments or under certain circumstances when approved by Plant Management of Supervisor.

2. Employees will be granted a ***10-minute shower time*** which includes walking distance to the locker room, doffing the uniform and showering.

Doc. No. 155-64 (emphases in original).

---

[7]     The evolution of East Penn's compensation policies bears on both the Secretary's motion for summary judgment as to East Penn's liability for liquidated damages and willfulness claim and East Penn's motion for summary judgment as to its good faith defense to the Secretary's request for liquidated damages. For that reason, the Court recounts that history in detail in Section IV, *infra*.

### C. Time Spent by Uniformed Employees on Pre and Post Shift Activities

The time that East Penn employees spend donning, doffing, and showering is compensable. The parties dispute whether the employees performed this compensable work outside of their eight-hour shift times.

During discovery, East Penn stated that its pertinent personnel are aware that some employees don their uniforms prior to the start of their shift and that some employees arrive at their workstations prior to the start of their shift. Doc. No. 176-1 ¶ 98(b). In support of its motion for summary judgment, East Penn submitted some 650 employee declarations.[8] Employees attest to the time they arrive at work and their pre- and post-shift routine, including estimating the amount of time for each. Of those, roughly 200 employees acknowledged that the grace period exists, and of that subset, some of them stated that they make use of the grace period some portion of the time. Doc. No. 176-1 ¶¶ 94(b), 97(b), 98(b). Other employees declare that they acquire and don their uniform prior to the shift start.

To support its claim that employees were expected or made to work off the clock, the Secretary submitted the results of a time study conducted by his expert, Dr. Robert G. Radwin. Dr. Radwin conducted what is known as a "did-take" study that measures the actual time employees spent to perform given tasks. Of the 29 plants within the Lyon Station complex, he selected a subset of eight plants to study. Within those eight plants, he and his research team ultimately observed the pre-shift activities of 370 randomly selected employees who were required

---

[8]        In his reply to his motion for partial summary judgment, the Secretary again asks the Court to prevent East Penn from using these witness declarations. The Secretary contends that these declarations were obtained through coercion and were made against the employee's legal interests. The Court previously considered—and rejected—the Secretary's arguments of this ilk, finding that the evidence weighed in East Penn's favor and that the Secretary failed to provide evidence to support his claims. *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 3186213, at *11 (E.D. Pa. June 13, 2020). The Court finds no reason to disturb its prior ruling.

to wear uniforms and PPE and post-shift activities of 131 employees who were likewise required to wear uniforms and shower.  Doc. No. 174 at 9.

To determine when uniformed employees begin their pre-shift activities, Dr. Radwin measured the time between their "first touch"—i.e., when they acquired their uniform or PPE item—and compared that time to their shift start time.  Doc. No. 157 ¶ 112.  Dr. Radwin concluded that, for those uniformed employees, the 370 uniformed employees performed their "first touch" approximately 15.6 minutes before their shift time started.  Doc. No. 157 ¶ 114.  As for measuring the time to complete end-of-shift activities, Dr. Radwin recorded the time that uniformed employees left the production floor and the time of their last touch.  Doc. No. 157 ¶ 115.  For this span of time, he estimated that an average of 11.0 minutes had elapsed.  Doc. No. 157 ¶ 116.  Dr. Radwin did not compare the results of his study to the amount of time East Penn's pay policies operate to compensate an employee.

As with its *Daubert* challenge to Dr. Radwin, East Penn once again raises several challenges to his methodology, as well as the results of the study.  Doc. No. 176-1 ¶ 116(b).  East Penn criticizes Dr. Radwin for estimating a single average he then extrapolated to all plants, disputes the scope of activities Dr. Radwin considered to trigger a "first touch," and challenges the relevance of his estimates to non-uniformed employees given Dr. Radwin's admission that his study results were "applicable only to employees who were [sic] uniforms."  Doc. No. 156 Ex. 18 (Radwin Depo. Tr.)*.* at 115:22-24; 579:21-23; 583:14-19.

Regardless of East Penn's challenges to the time study, East Penn admits that Dr. Radwin's "own subjects acquired and donned their uniform either entirely or *partially on paid time*, i.e., during East Penn's grace period."  Doc. No. 176-1 ¶ 98(b) (emphasis added).

## LEGAL STANDARDS

A court can properly grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is

appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

When parties file cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration omitted) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

DISCUSSION

## I.  Applicable FLSA Law

The Court begins its evaluation of the three cross-motions for summary judgment and three motions to strike by providing an overview of the FLSA, the Portal-to-Portal Act, and case law bearing on the compensability of the activities at issue in this case and an employer's statutory obligations.

Though perhaps surprising, the FLSA does not define "work." The Supreme Court has described work, for purposes of the Act, as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005). Over 50 years ago, the Supreme Court held that the time spent walking to workstations after punching a timecard was compensable. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 682-84 (1946). But the Court also introduced a limiting principle to the idea that any time spent on such work is necessarily compensable. "[I]nsubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek." *Id.* at 693. The "de minimis" doctrine

11

thus allows for "only a few seconds or minutes of work beyond the scheduled working hours . . . [to] be disregarded . . . " to avoid "[s]plit-second absurdities." *Id.* at 692; *see also* 29 C.F.R. § 785.47. The doctrine, which accounts for the realities of the industrial world, is not an unfamiliar principle of practicality.[9]

Concerned about the potential overbreadth of the result in *Mt. Clemens*, Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251 *et seq.*, which amended provisions of the FLSA and carved out activities that might otherwise be considered compensable. Relevant to this case, the Portal-to-Portal Act precluded compensation for "preliminary or postliminary" activities to the principal work. 29 U.S.C. § 254(a)(2). "Principal activities" are those that the employee is "employed to perform" or activities that are integral and indispensable to the principal activity. 29 C.F.R. § 790.8. The Portal-to-Portal Act did not, however, alter or amend the Court's definition of "work," nor did it disturb the de minimis doctrine. 29 C.F.R. § 785.7.

The Supreme Court subsequently held that activities before or after the workday that are an "integral and indispensable part of the principal activities" are compensable under the FLSA. *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). *Steiner* held that donning and doffing personal protective gear and post-work showering were integral and indispensable for certain workers in a

---

[9]     For example, the Internal Revenue Code recognizes that "de minimis fringe benefits," such as occasional snacks or coffee, provided by an employer can be excluded from an employee's gross income. I.R.C. § 132(a)(4). The de minimis principle is prevalent in property law too. When a party's encroachment onto a neighboring property is unintentional and slight, such that the cost of removal would be "so great as to cause grave hardship or otherwise make its removal unconscionable," the proper course of action is not to issue a mandatory injunction to compel the removal of the encroaching structure. *See, e.g.*, *Golden Press, Inc. v. Rylands*, 235 P.2d 592 (Colo. 1951). Similarly, a defendant in a copyright action might assert a de minimis defense where the copying is so trivial "as to fall below the quantitative threshold of substantial similarity" and does not "qualitatively embod[y] the distinctive expression of the copyrighted material." *William A. Graham Co. v. Haughey*, 430 F. Supp. 2d 458, 473 (E.D. Pa. 2006); *see also Ringgold v. Black Entm't Television Inc.*, 126 F.3d 70, 74 (2d Cir. 1997). Collectively, the de minimis principle reflects judicial wisdom that the law does not engage in mere trifles. *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).

battery plant who regularly handled hazardous materials. *Id.* at 249. The Court confirmed that it "would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees." *Id.* at 256. Because the time spent changing clothes and showering constituted "work" under the FLSA, the battery plant employees were entitled to compensation during or for those activities.

Most recently in *IBP, Inc. v. Alvarez*, the Court sought to clarify the definition of "compensable time" under the FLSA in light of both the Portal-to-Portal Act and *Steiner*. 546 U.S. 21 (2005). Finding that doffing gear that is integral and indispensable to work is a principal activity, the Court went on to hold that time spent waiting to doff is covered by the FLSA and is not affected by the Portal-to-Portal Act. *Id.* at 40. Conversely, it held that time spent waiting to don the first piece of gear—to mark the start of the continuous, and compensable, workday—is not covered by the FLSA. *Id.* at 42.

In some respects, the *Alvarez* decision announced some clear markers. The Department of Labor interpreted *Alvarez* to "clearly stand[] for the proposition that where the aggregate time spent donning, walking, waiting and doffing exceeds the de minimis standard, it is compensable." DOL Wage & Adv. Mem. No. 2006–2 n.1 (May 31, 2006). The Court, however, did not resolve all ambiguities that have percolated since *Steiner*—notably what the parties contend is a burgeoning circuit split over how to calculate compensable time.[10]

---

[10]    The district court in *Alvarez* pegged "the compensable time for each activity [] [to] the basis of a reasonable time, rather than the actual time required for each activity." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 914 (9th Cir. 2003). When it affirmed the damages award, the Court did not weigh in either way on the appropriate method of calculating compensable time.

## II.     The Secretary's Motion for Partial Summary Judgment

The Secretary requests that the Court rule in his favor on 11 separate issues that go both to East Penn's liability and available damages.[11]   The Secretary seeks summary judgment in his favor as to the substantive FLSA claims as to liability and to foreclose East Penn from contesting damages, including by presenting a de minimis defense.   The Court, having carefully reviewed the disputes of fact that prevent resolution of certain issues on summary judgment, grants the Secretary's motion in part and denies it in part.

### A.   Uncontested Issues

Of the 11 grounds raised by the Secretary, East Penn does not dispute two of them:   it admits (1) that it is a covered enterprise engaged in commerce or in the production of goods for commerce under the FLSA, and (2) that the donning and doffing activities at issue are considered "integral and indispensable" within the meaning of *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). Accordingly, the Court grants summary judgment in the Secretary's favor as to these two undisputed issues.

### B.   Correct Measurement of Compensable Time

The Secretary moves for summary judgment as to the activities that start and stop the "continuous workday."   The "continuous workday rule" defines the "workday" as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." *Alvarez*, 546 U.S. at 29 (quoting 29 C.F.R. § 790.6(b)).   The Supreme Court held that "principal activity or activities . . . embraces all activities which are an integral and

---

[11]     Among other things, the Secretary moves for a finding that East Penn's violations were willful, that it is liable for liquidated damages, and that its actions warrant injunctive relief.   Because these arguments go to the scope of appropriate damages, the Court considers them along with East Penn's cross-motion as to its good faith defense and East Penn's effort to foreclose the Secretary's willfulness claim.   *See* Section IV, *infra*.

indispensable part of the principal activities." *Id.* at 29-30. Although East Penn admits that donning, doffing, and showering are integral and indispensable activities, it does not agree that it is obligated to pay for all time between the start and stop of the continuous workday (excluding meal breaks or off-duty breaks).

As has been previewed in prior memoranda throughout this litigation, the parties vigorously dispute the correct measure of the continuous workday. The Secretary asks the Court to find, as a matter of law, that East Penn must record and pay their uniformed employees for the *actual* time it takes to don and doff a uniform and shower. East Penn asserts that it must compensate its employees only for time reasonably spent donning, doffing, and showering. East Penn admits that it does not record and has not recorded and does not pay for the actual time spent on the indisputably compensable activities. But it contends that the 15 minutes of compensable time it applies to its employees (i.e., the five-minute grace period at the start, and the ten minutes at the end of the day) is reasonable and sufficient.

As a matter of legal principle, the Court cannot adopt East Penn's position. The Court reaches this conclusion having reviewed relevant case law, as well as the Department of Labor's rulings, opinions, and interpretations. Collectively, these sources support the Secretary's interpretation as a matter of precedent, pragmatism, and, of no small moment, achieving the purpose of the FLSA.

Although the Supreme Court in *Alvarez* did not reach the issue of the correct method of measurement, it unequivocally held that the continuous workday rule requires that employees be compensated for all time spent during the continuous workday. 546 U.S. at 37. Nothing in the Court's opinion suggests that "all" is interchangeable or otherwise synonymous with "reasonable."

At first glance, the circuit courts of appeals that have addressed the correct measure appear to be split between an actual and reasonable time standard. Absent binding precedent from the Third Circuit Court of Appeals on this issue, this Court may look to other circuits for helpful guidance.[12] The Ninth and Tenth Circuit Court of Appeals appear to adopt a reasonable time standard, while the Second and Sixth Circuits have endorsed an actual time requirement.[13] But partitioning in this way is overly reductive. That is because no circuit court has endorsed the reasonable time standard after *Alvarez* was issued.[14]

Moreover, when those courts that have endorsed a reasonable time standard, it was in the context of fashioning a damages award when there were no records of actual compensable time worked. The circuit "split" disappears when one considers the difference between liability and damages. In *Alvarez v. IBP, Inc.*, the Ninth Circuit affirmed the district court's decision to calculate compensable time on the "basis of a reasonable time" as "within the district court's discretion." 339 F.3d 894, 914 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005). Although the Tenth Circuit in *Reich v. IBP, Inc.* discussed a reasonable time measure for

---

[12]     Searching for a toehold in this Circuit, the Secretary relies on *Williams v. Tri-County Growers, Inc.*, involving estimating hours worked by farm laborers in the fields. 747 F.2d 121 (3d Cir. 1984). The appellate court held that the employers' estimation system failed to maintain the accurate records required under Section 11(c) of the FLSA. *Tri-County Growers*, although relevant insofar as it articulates an employer's record-keeping requirements, does not settle the actual versus reasonable time standard debate.

[13]     Compare *Alvarez v. IBP, Inc.*, 339 F.3d 894, 914 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005) *and Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994) *with Brock v. City of Cincinnati*, 236 F.3d 793, 903 (6th Cir. 2001) *and Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 528 (2d Cir. 1998). The Eighth Circuit Court of Appeals in *Lopez v. Tyson Foods, Inc.* briefly discussed the split where the jury instructions provided that "only the time reasonably spent [on pre-shift or post-shift activities] is compensable" before finding that the employees failed to preserve the jury instruction challenge on appeal. 690 F.3d 869 (8th Cir. 2012). Reviewing the instructions only for clear error, the appellate court did not disturb the instructions given in the trial court; nor did it reach the question of the correct calculation method, although it did note the absence of existing precedent endorsing either method.

[14]     Contrary to East Penn's claim, the district court decisions endorsing the reasonable time standard that East Penn cites to were not all issued after *Alvarez*. Doc. No. 155-1 at 20.

calculating back pay damages, the resulting permanent injunction obligated the defendant to "implement recordkeeping practices sufficient to record the time spent by each employee in performing pre-shift and post-shift activities found to be compensable under the Act." *Garcia v. Tyson Foods, Inc.*, 474 F. Supp. 2d 1240, 1248 (D. Kan. 2007) (discussing 38 F.3d 1123 (10th Cir. 1994)); *Jordan v. IBP, Inc.*, No. 3:02-1132, 2004 WL 5621927, at *13 (M.D. Tenn. Oct. 12, 2004) (discussing same).   So put, the Tenth Circuit was not endorsing an employer's own "reasonable" calculation of work in perpetuity.

Within this Circuit, East Penn interprets *Lugo v. Farmer's Pride Inc.* to "embrace" a reasonable time standard.   No. CIV.A. 07-0749, 2011 WL 2550376 (E.D. Pa. June 23, 2011).   It is true that *Lugo* permitted the defendant's expert to present evidence "to assist the jury in determining the reasonable amount of time that Defendant's employees spend on certain activities at the poultry production plant, including donning, doffing, sanitizing, washing, and walking." *Id.* at *1.  But finding that the expert's methodology is admissible for consideration is not a ruling on the proper standard for measuring time worked.

In each of these cases, the courts relied on reasonable estimations as a proxy to reconstruct the amount of time the employees spent because there were no time records.   It does not absolve an employer of its obligations under the FLSA to record and compensate for actual time.   29 U.S.C. § 211(c).[15]

---

[15]    As for the remainder of the district court opinions relied on by East Penn, the Court finds that these cases re-affirm the proposition that employees must be compensated for the actual time they worked.   *See, e.g., Albanese v. Bergen Cty., N.J.*, 991 F. Supp. 410, 426 (D.N.J. 1997) (ordering plaintiff to be compensated "for the actual time they spent . . . provided plaintiffs show that such time was reasonable"); *Bull v. United States*, 68 Fed. Cl. 212, 227-28 (Fed. Cl. 2005) (where employer has failed to maintain accurate records, the time claimed by plaintiffs must be reasonable); *Reich v. IBP, Inc.*, No. CIV. A. 88-2171, 1996 WL 137817 (D. Kan. Mar. 21, 1996), *aff'd sub nom. Metzler v. IBP, Inc.*, 127 F.3d 959 (10th Cir. 1997) (parties used reasonable amount of compensable time where employer failed to keep accurate records of pre- and post-shift activities).

Indeed, recent donning and doffing cases have held actual time is the appropriate standard because it more faithfully adheres to precedent and the statutory purposes of the FLSA. *See, e.g., Abadeer v. Tyson Foods, Inc.*, 975 F. Supp. 2d 890, 904 (M.D. Tenn. 2013) (holding that Tyson's reasonable time standard is wrong "[a]s a legal matter" and that neither the DOL regulation [regarding the continuous workday rule], nor the Supreme Court's recent affirmation of it in *Alvarez*, qualifies the rule with a reasonableness standard"); *Helmert v. Butterball LLC*, 805 F. Supp. 2d 655 (E.D. Ark. 2011) (holding that the policy of paying for six minutes a day to don and doff did not comply, as a matter of law, with the FLSA); *Smith v. Safety-Kleen Sys., Inc.*, No. 10 C 6574, 2011 WL 1429203, at *5 (N.D. Ill. Apr. 14, 2011) (finding that employee who presented sufficient evidence that employer did not pay based on actual time spent donning and doffing may violate FLSA's overtime requirements).

East Penn seizes on certain language in *Mt. Clemens* that comments on the unfairness and impracticality of compensating employees who take "roundabout journeys [to their workstation] for purely personal reasons." *Mt. Clemens*, 328 U.S. at 692. East Penn's argument is pragmatic and, for that reason, tempting. But it is not legally sound. Theoretically, a worker could arrive well in advance of his shift, don his uniform—thereby initiating the continuous workday—then lounge about for some extended amount of time, and claim compensation for that leisure time. The Court is certainly mindful of this possibility. To the extent East Penn is fearful of excess idling, it can implement policies to manage the work performed during the continuous workday. But speculation that an intrepid, self-indulgent employee might take advantage of the legal standard cannot support prophylactically chiseling wages.

Beyond persuasive jurisprudence, the Court can also consider the Secretary of Labor's and the Wage and Hour Division's rulings, opinions, and interpretations as they "constitute a body of

experienced and informed judgment." *Mabee v. White Plains Pub. Co.*, 327 U.S. 178, 182 (1946) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Support for the actual time standard appears in Department of Labor regulations, including one that East Penn relies on. Although 29 C.F.R. § 785.48(a) does not obligate an employer to use time clocks, for those that do—like East Penn—the regulation discourages discrepancies between clock records and "actual hours worked." That is because gaps in those time values "raise a doubt as to the accuracy of the records of the hours actually worked."

In what has pre-occupied much of the parties' post-summary judgment briefing here, the parties have submitted dueling notices of supplemental authority from prior DOL interpretations and guidance. Each side claims they are providing the clean, unambiguous answer. The Court cannot agree. The stacks of briefing on competing interpretations alone suggest the answer is not so obvious. So, the Court gives minimal probative value to these "authorities."

The Secretary cites to a 2001 Opinion Letter from the Wage and Hour Division, which it argues establishes the DOL's endorsement of actual time. In response to whether an employer could permissibly pay all employees based on an average amount of time that all employees work, the DOL responded that "company must record and pay for each employee's actual hours of work, including compensable time spent putting on, taking off and cleaning his or her protective equipment, clothing or gear." Opinion Letter Fair Labor Standards Act (FLSA), 2001 WL 58864, at *2.[16]

---

[16]   On September 2, 2020, East Penn filed a second notice of supplemental authority to attach a final rule published by the DOL on August 28, 2020. Doc. No. 238. East Penn argues that the new rule (which took effect on September 28, 2020) voided the January 15, 2001 DOL Opinion Letter upon which the Secretary relies as support for an actual-time standard.

East Penn notes that the January 15, 2001 Opinion Letter is conspicuously absent from the DOL's web archive. Doc. No. 238 at 2. The new Final Rule provides that any document not posted to its website is considered withdrawn. For this reason, East Penn argues that the Opinion Letter must be considered withdrawn. The Secretary responds that, regardless of whether the Opinion Letter currently applies, it was

19

East Penn relies on the DOL's Wage and Hour Division Field Operations Handbook for what it contends supports a reasonable time standard. Courts have found that the Handbook lacks the force of law and is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844-45 (1984). *See, e.g.*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1275 n.65 (11th Cir. 2008); *Chao v. Barker Bros., Inc.*, No. CV 04-1764, 2005 WL 8174446, at *9 (W.D. Pa. Nov. 22, 2005). However, the Handbook may be considered to the extent it offers persuasive guidance. *Skidmore v. Swift & Co.*, 323 U.S. 140 (1944); *Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 716 n.2 (E.D. Pa. 2014) (collecting cases).

The Handbook authorizes employers to "set up a formula by which employees are allowed given amounts of time to perform clothes changing and washup activities, provided the time set is reasonable in relation to the actual time required to perform such activities." Dep't of Labor Wage and Hour Division, Field Operations Handbook ("FOH") § 31b01(a) (Sept. 19, 1996), https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-31#B31b01 (last accessed July 23, 2021). To the extent the Court considers the Handbook, it is at most of little relevance. That is because the cited provision applies where a collective bargaining agreement governs but is silent whether clothes changing and wash-up time should be included in hours worked.[17] *See* FOH

_____

issued around the time East Penn implemented its written policies in 2003 and in 2016. So, it is relevant for the time period at issue.

On September 29, the Secretary filed a notice to address the state of the DOL's guidance, including an Opinion Letter and Field Assistance Bulletin issued last month. Doc. No. 244. The Secretary asserts that, since 1995, the DOL's guidance has consistently been to compensate for "all hours actually worked." Per a 1995 Opinion Letter, employers cannot average out an estimate of time worked and comply with overtime requirements of the FLSA. And, as recently as August 31, 2020, the DOL published an opinion letter advising that employers must pay overtime "for all hours actually worked."

Moreover, even adopting East Penn's argument that the August 2020 Final Rule explicitly provides for "reasonable" compensation—which it does not—the Court finds nothing that makes this rule retroactive.

[17]    In its Notice of Supplemental Authority, East Penn produced a 1956 DOL Opinion Letter stating that an employer could use a "reasonable" formula to calculate compensable pre- and post-shift activities. Doc. No. 223. East Penn argues that the reasonable formula was "ultimately memorialized in Section

§ 31b01 (entitled "Clothes changing and washup time where collective bargaining agreement makes no mention of practice."). CBAs are a means of ordering a labor relationship between employer and employees through the private law. *William F. Walsh Elec. Const., Inc. v. Int'l Bhd. of Elec. Workers, Loc. Union 98*, 587 F. Supp. 979, 982 (E.D. Pa. 1984) (citing *Nolde Brothers, Inc. v. Local No. 358 Bakery and Confectionery Workers Union*, 430 U.S. 243, 256 (1977) (Stewart, J. dissenting) ("A collective-bargaining agreement erects a system of industrial self-government"). Here, there is no CBA for East Penn employees.

But even if a CBA were in place, East Penn relies on version of the FOH from 1996. The later-in-time 2001 Opinion Letter from the DOL states that a company must record and pay for actual hours of work.[18]

Finally, the Supreme Court has consistently held that the FLSA should be liberally construed in favor of employees. *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959); *American Future Sys.*, 873 F.3d at 426 ("The FLSA is a humanitarian and remedial legislation . . . ."). The actual time standard effectuates this employee-centric policy goal,

---

31b011 of the FOH" and not conditioned on the existence of a CBA. The Court disagrees that this provision of the FOH applies whether or not the employer and employees have entered into a CBA. The current version of the FOH (at least since 1996) has slotted the formula clause under the CBA header and specifically provided that where the collective bargaining agreement is silent, the employer may use a reasonable formula. Endorsing East Penn's interpretation would require the Court to disregard the structure and logical relations of the parts of the FOH. *Accord* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 145 (2012) (discussing the "whole-text" canon).

[18]    East Penn also relies on DOL regulations which state that employers are not even required to use time clocks, and, even if they are used, the swipe time records may be disregarded if they do not match actual working time. The FOH acknowledges this practice, known as long-punching, by recognizing that time records may show elapsed time greater than the hours actually worked. This happens if "an employee came in early for personal convenience and did no work prior to the scheduled beginning time" or "remain[ed] after their actual quitting time." But, because East Penn admits the swipes do not mirror *working* time, the Court fails to see the relevance of "long-punching" here.

incentivizing employers to comply with the FLSA's record-keeping requirements while guaranteeing that employees are appropriately compensated.

Accordingly, the Court grants summary judgment in the Secretary's favor on this point. It is improper as a matter of law for East Penn to pay an estimated amount of time for compensable pre- and post-shift activities, as they are properly part of the continuous workday. To the extent that the concept of "reasonableness" permeates this case, it is limited to the calculation of damages once liability is established.

To be sure, the Court's holding today does not absolve the Secretary, or any FLSA plaintiff, from the burden of establishing that the employees were not compensated for pre- and post-shift work. *See* Section II.D, *infra* (discussing the burden shifting under *Mt. Clemens* applies at the damages phase, not when establishing liability). Rather, the Court holds that the standard for compensable time is "actual" time, not "reasonable" time.

### C. FLSA Recordkeeping Violation

Building from the position that the correct standard of compensable time is "actual" time, the Secretary next asks this Court to find that East Penn has violated its recordkeeping obligations under the FLSA because it does not have any records establishing the actual time spent on pre- and post-shift activities. At oral argument, East Penn conceded that it did not keep recorded measurements of each employee's actual time.

Section 11(c) of the FLSA requires employers to "make, keep, and preserve" accurate records of their employees' "wages, hours, and other conditions and practices of employment." Pay records must include hours worked per day and week, the amounts paid to each employee, and the daily starting and stopping time of individual employees. 29 C.F.R. §§ 516.2(7), 516.2(8); 516.6(a)(1). The significance of the recordkeeping requirement is its effect on the burden of

proving liability.  When an employer's records are inadequate, an employee need only show that he "performed work for which he was improperly compensated" and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 2001).  This abbreviated standard of proof does not penalize a worker whose employer has been derelict in his recordkeeping duties.

As a threshold matter, the parties dispute the meaning of adequate and accurate records. The Secretary contends that the records that East Penn does maintain are insufficient because there is time not accounted for.  First, he maintains that the records of employees' shift times undercount work time.  It is undisputed that certain uniformed employees donned and doffed their uniforms and showered outside of the eight-hour scheduled shifts.  Second, the clock-in and clock-out times are not accurate because, according to the Secretary, the record evidence shows that employees performed compensable activities outside of this range too.  And East Penn maintains that the swipe times are used only for attendance purposes, so the time intervals are not probative of time worked either.

East Penn does not have records of how long it actually takes each employee to perform the pre- and post-shift activities each day, although it admits that the activities at issue are integral and indispensable (and therefore compensable).  Doc. No. 176 at 7; *see* Section II.A, *supra*.  East Penn maintains that it is not required to record the actual time worked because the standard is that the employer pay for reasonable time worked.  As outlined above, the Court disagrees with East Penn's interpretation of the correct measure of compensable time as a matter of law.  *See* Section II.B, *supra*.  So, it rejects East Penn's attempt to side-step a potential recordkeeping violation in this manner.

East Penn admits that the paid eight-hour shift times "constitute[] the record of time worked." Doc. No. 176-1 ¶ 91(b). It maintains that the "punch-in and punch-out" time records are irrelevant for pay purposes because they "are used solely for attendance purposes." Doc. No. 176-1 ¶ 123(b). It is undisputed that there are no records of the actual time East Penn employees spend donning, doffing, and showering—even though such work is compensable. Doc. No. 176-1 ¶ 104(b) (admitting that "it has no documents that establish that each uniformed employee actually used some or all of the paid time at the end of their shift . . . ."). Because there is no dispute that the actual time spent on donning, doffing, and showering were not recorded for any employee at any time, the Court finds that the record-keeping practices here are deficient.

East Penn also misconstrues the nature of a recordkeeping violation. It responds that, to prove a recordkeeping violation, the Secretary must first show that the amount of time paid for donning, doffing, and showering is not sufficient. Not so. The problem here, as East Penn admits, is that it does not record the actual time spent on indisputably compensable activities. So, the records that East Penn does maintain may be an inaccurate reflection of its employees' work hours. It has estimated how much it deems reasonable to complete these tasks and compensated based on that estimation. But recording only shift times is a recordkeeping violation when it is not reflective of actual hours worked. *Cf. U.S. Dep't of Lab. v. Cole Enters., Inc.*, 62 F.3d 775, 779 (6th Cir. 1995) (finding recordkeeping violation where only the scheduled shift hours were recorded, not the actual hours worked).

East Penn has not pointed to, nor is the Court aware of any de minimis defense to a record keeping violation. *Accord Perez v. Am. Future Sys., Inc.*, No. CV 12-6171, 2015 WL 8973055, at *14 (E.D. Pa. Dec. 16, 2015), *aff'd sub nom. Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420 (3d Cir. 2017) (granting summary judgment to Secretary on recordkeeping

claim when employer conceded that it failed to record the times its employees logged on and off its computer and telephone systems at its call center locations).

Because an employer commits a per se recordkeeping violation exists when its records are inadequate, the Court grants the Secretary's motion for summary judgment on this issue.

### D.  Whether East Penn Violated the FLSA Overtime Requirements

The Secretary also moves for a finding that East Penn violated the FLSA's overtime provision by failing to compensate its uniformed employees for the actual time spent donning, doffing, and showering.  In other words, the Court must find that no reasonable jury could find that East Penn did not fully compensate its uniformed employees for the actual time spent on these activities. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).[19]

Even though the Court found that East Penn's records are inadequate, *see* Section II.C, *supra*, the Secretary has the burden of proving that the employees have actually performed work for which they were improperly compensated.  *Sec'y United States Dep't of Lab. v. Cent. Laundry Inc.*, 790 F. App'x 368, 371 (3d Cir. 2019); *Diabate v. MV Transp., Inc.*, No. CIV.A. 14-857, 2015 WL 4496616, at *12 (E.D. Pa. July 20, 2015) ("Although *Mt. Clemens* may offer a classwide basis for proving *damages*, proving liability in this case requires that [plaintiff] show that those in the plaintiff class performed uncompensated 'work.'").  It is only when such proof is offered that the Secretary can take advantage of *Mt. Clemens'* burden shifting to prove damages on a class-wide basis.  *Mt. Clemens* does not relieve the Secretary of the initial burden of establishing that the employees have not been properly compensated for liability purposes.

---

[19]      In their most recent exchange of notices, the parties appeared to contest whether the Secretary expanded the damages claim beyond the time uniformed employees spent donning, doffing, and showering. Regardless, the Secretary moved for partial summary judgment here only as to a finding that East Penn's *uniformed* employees were not properly compensated for those activities. So, the Court will only consider that claim.

East Penn does not dispute that it does not compensate for actual time spent on these activities.  That is because East Penn maintains that it pays for what it deems a "reasonable" amount of time as part of the shift time.  East Penn's undisputed pay policy for uniformed (non-continuous operations) employees provides for five minutes of donning time, should the employee use the "grace period," and ten minutes of doffing and showering time—independent of whether it takes employees more or less than this allotted amount of time.  But, in opposing summary judgment as to its liability, East Penn argues that the Secretary has failed to show that the employees' claims exceed the time already compensated.

East Penn also asserts that the Secretary is required to establish liability as to each employee for whom the Secretary seeks damages.  Again, not so.  As the Supreme Court recently affirmed in *Tyson Foods v. Bouaphakeo*, 557 U.S. 442, 456 (2016), representative evidence is a permissible means of proving hours worked in an FLSA case when, as here, the employer has failed to keep adequate records.  *See also Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees.") (collecting cases).

In support of its motion, the Secretary relies on (1) East Penn's admissions, (2) employee declarations that East Penn gathered and submitted, (3) time study data from Dr. Radwin, and (4) East Penn's time clock records showing the swipe in and out time.

*First*, the Secretary relies on East Penn's own admissions that its pay practices violate the FLSA's overtime provision.  In its responses to requests for admission and deposition testimony from managers, East Penn admits that it is aware that "some employees chose to don required PPE before their scheduled shift starting time, that "some employees chose to shower after their schedule shift time," and that management observed employees arriving at their workstation prior

to their shift time.  Doc. No. 176-1 ¶¶ 96, 99-100.  It is undisputed that East Penn employees are paid for their scheduled eight-hour shift time.  Doc. No. 176-1 ¶ 88(b).  So, if an employee dons his uniform prior to the start of his shift—an activity that East Penn does not dispute is compensable work—East Penn admittedly does not compensate for that time.

East Penn responds that not all employees don uniforms and PPE prior to the start of their shift, opting instead to use the grace period, nor are they required to.  But it undisputed that East Penn's Time Clock and Pay Procedures require that each employee be at his workstation at shift starting time.  East Penn does not square this seeming inconsistency.  Rather, it relies on employee declarations that acknowledge the existence of the grace period and their use of it.  Because the correct legal standard is payment for "actual" work, the existence of the five-minute grace period— whether illusory as the Secretary contends or fully in effect as East Penn urges—does not change the analysis.  If an employee acquires and dons his uniform prior to the start of his shift, that employee has "suffered" work and is legally entitled to compensation.

*Second*, the Secretary points to the roughly 650 declarations from East Penn employees that the company gathered and submitted as evidence that its employees routinely used more than five minutes for donning activities.  East Penn does not dispute the authenticity or contents of the hundreds of these declarations.

A cautionary note about these declarations is in order.  The Court has previously considered—and rejected—the Secretary's motion to prevent East Penn from relying on the declarations at either the summary judgment stage or at trial.  *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 3186213, at *1 (E.D. Pa. June 13, 2020) (rejecting the Secretary's request for a protective order and injunction).  The Court found that the Secretary failed to present evidence

to show that the method by which East Penn gathered its declarations was coercive, and the Secretary failed to present any evidence of retaliatory conduct taken by East Penn. *Id.* at *6-7.

Although the Secretary previously sought to exclude the declarations, he now maintains that overtime violations appear on the face of the declarations that East Penn produced. Certain employee declarants attest to the grace period but take more than the allotted five minutes. *See, e.g.*, Doc. No. 176-4 at 239 ¶¶ 7-8 (six minutes to don and walk to workstation and "sometimes" uses grace period); *id.* at 248 ¶¶ 7-8 (eight minutes to don and walk to workstation but "usually" uses grace period). Still others do not acknowledge the grace period but estimate needing more than five minutes for pre-shift work. *See, e.g.*, Doc. No. 176-4 at 451 ¶ 7 (eight to nine minutes to don and walk to workstation); *id.* at 971 ¶ 7 (seven to eight minutes to change and walk to workstation).

East Penn responds that the declarants also state that they "believe that [they] have been properly and fully compensated for all straight time and overtime hours associated with [their] regular production work as well as [their] donning/doffing activities before and after [their] regularly scheduled shift time." So, East Penn maintains, the employees themselves undermine the Secretary's case. The Court is not so convinced for two reasons. First, to the extent East Penn questions the reliability of the time estimates, such a challenge does not raise a genuine dispute of material fact. That is because East Penn does not dispute the fact the employees have stated that they don their uniforms and PPE *prior* to the start of their shift. It is this admission of work performed outside of the compensable eight-hour shift that the Secretary relies on to establish liability.

Second, at summary judgment, the Court avoids credibility determinations as to the declarants' beliefs. To the extent the declarations contain evidence that is unfavorable to East

Penn's case, that evidence can nevertheless be construed against East Penn. That is because East Penn is the party proponent of the evidence and because it is clear that the formats of the declarations, which each follow the same format, were prepared by counsel.

On the basis of East Penn's admissions and its own declarations—the contents of which East Penn does not dispute—the Court finds that the Secretary has established that East Penn's pay practices violate the FLSA's overtime provisions as to its uniformed non-continuous operations employees.[20]   Although the Court finds East Penn has admitted liability as to this subgroup of employees, that is not the end of the inquiry.  Rather, this ruling is separate and distinct from determining whether East Penn can assert a de minimis defense that may reduce or eliminate any damages.  *See* Section II.F, *infra*.

The Secretary also offers Dr. Radwin's time study as representative evidence to establish that employees donned, doffed, and showered outside of their paid shift times.  As for end-of-shift activities, Dr. Radwin calculated that, for the 125 uniformed employees he studied, 11 minutes passed between leaving the production floor and completing their last activity.  Doc. No. 176-1 ¶ 116.  East Penn does not dispute that he reported an 11-minute average, to the extent he documented his observations.  But it notes that this figure does not account for the ten minutes of paid time (and 20 minutes for continuous operations employees) that its employees are allotted at the end of a shift.  Doc. No. 176 at 42.  Indeed, Dr. Radwin testified that he did not calculate a measure of uncompensated time and acknowledged that some number of his subjects were

---

[20]    The Secretary moves for summary judgment as to uniformed employees.  As the Court explains in detail below, *see* Section III.B, *infra*, continuous operations employees are subject to different pay policies, although some are required to wear a uniform.  They receive ten minutes of paid donning time at the start of their shift and 20 minutes at the end of their shift.  Doc. No. 176-1 ¶¶ 9(b); 96(b).  Dr. Radwin did not include continuous operations employees as part of his time study.

compensated—in whole or in part—for those activities measured. Doc. No. 176-1 ¶ 114(b) (collecting from Radwin Depo. Tr.).

As to pre-shift activities, of the 370 uniformed employees he chose to study, Dr. Radwin estimated that, on average, they began their workday roughly 16 minutes before shift started. Doc. No. 176-1 ¶ 111-14. East Penn does not dispute that this is the figure Dr. Radwin reported. But it again criticizes the reliability of this assertion, including whether the employees' activity actually is "integral and indispensable"—hence, compensable—so as to start the continuous workday.

East Penn has launched numerous challenges to Dr. Radwin's methodology and calculations, including his admitted extrapolating the estimated one-plant average to all plants and employees, the reliability of his methodology. The Court has already found that these attacks go to the weight of his testimony—"vulnerable as it may very well be"—and not to its admissibility. *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 5409164, at *8 (E.D. Pa. Sept. 9, 2020).

The Court already found that the task of evaluating Dr. Radwin's methodology and the import of his findings should go to the jury. Indeed, a reasonable jury could very well discredit or give little weight to this expert's sampling testimony, including whether it is "representative," and whether it measured compensable activities. The Court declines to step into the jury's shoes and conduct the weighting itself as a matter of law on the papers. Moreover, the Court finds that Dr. Radwin's estimations arguably go to any damages determination at trial.

### E. East Penn's Time Clock Records as Minimum Amount of Uncompensated Time

The Secretary also moves for summary judgment on a finding that East Penn's swipe in and out time clock records constitute the "indisputable" minimum measure of overtime hours worked. According to the Secretary, the amount of time between punch time and shift time is time

that East Penn knowingly "shaved off." So doing, the Secretary seeks to use these records as a proxy for uncompensated time.

The parties dispute whether the punch records are probative of anything that would establish liability. East Penn contends that its "14-minute rule" serves only as an attendance policy and is common throughout the manufacturing industry, including being used by the employer in *Mt. Clemens*. The Supreme Court found there that "the time clocks do not necessarily record the actual time worked by employees." *Mt. Clemens*, 328 U.S. at 690. Nor are time clocks controlling when "the employee is required to be on the premises or on duty at a different time or where the payroll or other facts indicate that work starts at an earlier or later period." *Id.*

The Secretary argues that the time clock data is the best evidence of the minimum amount of uncompensated time that East Penn owes its uniformed employees. He bases this claim on certain of East Penn's own employees' declarations that describe performing their donning and doffing activities contemporaneous with clocking in and out. *See* Doc. Nos. 176-4, 176-5 (East Penn employee declarations), as well as Dr. Radwin's observations that, on average, employees in his time study swiped in after their first donning activity.

The fundamental problem with the Secretary's hopscotch to damages, as East Penn notes, is that the Secretary has not carried his burden yet to establish liability as to the 10,000-some employees he purports to represent. Although the Court finds that the Secretary has established that he succeeds on liability as to non-continuous operations uniformed employees, *see* Section II.D, *supra*, he seeks overtime damages for many other categories of employees for which he has certainly not adduced representative evidence. *See* Section III, *infra*.

Moreover, the Secretary's argument presupposes that employees contemporaneously clock-in with performing their first and last principal activity. East Penn does not admit this fact.

31

Although the Secretary cites to certain employee declarations attesting to this fact, other declarants state that they clock in, attend to non-compensable work, then retrieve and don their uniform. *See, e.g.*, Doc. No. 176-4 at 131 ¶ 6 (clocks in, puts lunchbox away, then dons uniform); *id.* at 146 ¶ 7(clocks in, reads in cafeteria, then goes to workstation); *id.* at 185 ¶ 6 (clocks in, takes clothing, goes to lunchroom, drops off lunch box, gets coffee); *id.* at 205 ¶ 6 (clocks in, goes to breakroom then locker room); *id.* at 216 ¶ 6 (clocks in, eats, then changes into work clothes). East Penn has raised at least a factual issue to show that it does not have to compensate for all "recorded" time between the punches because employees began their compensable workday after clocking in.

The Secretary's claim is also complicated by the findings of its own time study expert. Dr. Radwin estimated that, on average, the employees he studied swiped their timecard 1.2 minutes *after* they had completed their last clothes-changing activity. Even accepting the Secretary's premise that the time swipes are any sort of proxy, it is undisputed that the time swipe records on average overestimate the amount of compensable work for post-shift activities. Accordingly, the Court cannot find that the record "indisputably" establishes that the actual clock swipe records are the minimum amount of time worked for purposes of establishing damages.

To be sure, the Court's decision on this point does not preclude, nor should it be taken as precluding or otherwise limiting, the Secretary from submitting the actual clock records at trial to try to establish his claim for damages.

## F. East Penn's de minimis Defense

Preliminary and postliminary activities that are deemed integral and indispensable are theoretically compensable although they may not be automatically so. The de minimis doctrine provides a "limiting principle to compensation for trivial calculable quantities of work." *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3d Cir. 2007). The Secretary moves for summary

32

judgment to foreclose East Penn from presenting a de minimis defense at trial.  According to the Secretary, East Penn has failed to establish that it satisfies the requirements of 29 C.F.R. § 785.47. At summary judgment, the Secretary must show that no reasonable jury could find that the amount of compensation is not de minimis.

In evaluating a de minimis defense, the Third Circuit Court of Appeals has held the following factors be considered:  "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work."  *Id.* at 374.  The line between compensable and de minimis time is fact-specific and the defense necessarily applies on a case-by-case basis.  Indeed, the Court is not aware of any court within this Circuit that has granted summary judgment to an FLSA plaintiff to prevent a defendant from asserting a de minimis defense at trial.  (The Secretary, to his advocate-nature credit, located two out-of-circuit decisions.)

As a threshold matter, there is no genuine dispute of fact that East Penn's employees regularly don, doff, and shower as part of their work.  East Penn required all employees to wear PPE and required its uniformed employees to be fully dressed in their uniform and boots prior to entering the production floor.  Doc. No. 176-1 ¶ 48.  East Penn points out that its employees may perform their donning and doffing activities differently each day.  But the order in which an employee opts to don his uniform and PPE on a particular day does not rebut a finding that the activities are performed on a regular basis.  *See Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1321 (N.D. Ala. 2008).

The Secretary submits that whatever practical administrative challenges inherent in measuring the time worked are minimized by the fact that East Penn already uses time clocks and requires employees to swipe in and out.  The mere existence of the time clocks, according to the

Secretary, establishes that East Penn could—but chooses not to—promulgate a policy that pays based on actual swipe times.

According to East Penn, the Secretary's proposal that East Penn simply install more time clocks and implement new policies governing clocking in and out cannot be considered at summary judgment because it derives from the Secretary's descriptions of other battery manufacturing plants. Although these third-party practices are not in evidence in this case, the Court rejects that East Penn's claim that it cannot consider whether East Penn can theoretically add more clocks to its production floors. East Penn controls how and where it places time clocks as well as the policies governing swiping in and out. Moreover, East Penn's timekeeping system permits it to accurately record increments of time to the minute. So, the system that East Penn already has in place rebuts the notion of administrative difficulties it may face in accurately tracking the actual amount of time spent on pre- and post-shift compensable work.

But East Penn's more compelling argument is that the focus of this factor is not on the employer's theoretical technological capability. Rather, the proper inquiry is whether there is wide variation in the amount of time spent on pre- and post-shift activities among East Penn's uniformed and PPE-wearing employees. *See, e.g.*, *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) (holding uncompensated time was de minimis in part based on the "wide variance in the amount of pre-shift time spent on compensable activities as opposed to social activities"). The fact of variation is corroborated by Dr. Radwin's measurements. For example, he reported a range of zero minutes to greater than 51 minutes reflecting the time between the employees starting their pre-shift activities and their shift. Doc. No. 160-12 at 11. Neither party expressly addresses how much of this pre-shift time was spent on actual compensable work. And despite the breath-taking

volumes of briefing and exhibits, "the court is not obliged to scour the record to find evidence that will support a party's claims." *Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011).

That said, the Court has reviewed the contents of employee declarations that include estimates of the amount of time to don a uniform and walk to their workstations. Without weighing the credibility of these declarants, the Court notes a pattern among employees who attest to spending between three and nine minutes on these activities. So, within Dr. Radwin's own limited study, there are swaths of time spent on non-compensable activities (i.e., time spent in the break room, cafeteria, or "smoke shack"). At a minimum, East Penn has raised a genuine issue of fact as to the practical feasibility of precisely recording time for purposes of payroll that separates out compensable from social and non-compensable activities.

As for the aggregate amount of compensable time involved, the Court finds that genuine disputes preclude granting summary judgment to the Secretary. As a threshold matter, the amount of time that employees don, doff, and shower each day is a disputed issue. The parties' time-study experts employed different methodologies to calculate the amount of time employees spent performing their pre and post-shift activities. And the Court has permitted each party to introduce evidence of both methodologies and findings. Even crediting the results of Dr. Radwin's study, East Penn submits that the results support a finding that any left-over uncompensated time for post-shift work is de minimis.

In particular, Dr. Radwin estimated an average of 11 minutes and a median 10.8 minutes for end-of-shift clothes changing and showering. It is undisputed that East Penn's policy (since 2016) provides for ten minutes of paid time for these activities. Accepting the validity of Dr. Radwin's calculations—which East Penn does not—a rational trier of fact could find that the remainder of uncompensated time according to Dr. Radwin at the end of the shift is on average a

single minute.  Although the Secretary may dispute whether employees are actually afforded the full ten minutes (i.e., if they are not timely released from their workstations), that dispute also supports the Court's finding that summary judgment is inappropriate.  As for the 15.6 minutes that Dr. Radwin estimated for pre-shift activities, East Penn contests the validity of this finding.  And because the Court has already determined that East Penn can make its arguments challenging the time study, it is inappropriate to treat these figures as established, particularly when it is the Secretary's burden here on summary judgment.

Notwithstanding the Court's finding that regularity of the work has been established, factual issues prevent the Court from granting summary judgment as to this claim.  The Court finds a genuine issue of material fact remains as to the size of the aggregate claim as well as whether East Penn can practically record the time spent, given the variation of time needed in the record.  The Court finds that East Penn may present a de minimis defense at trial, which will be a critical factual issue for the jury to resolve.  *See Lugo v. Farmer's Pride Inc.*, 802 F. Supp. 2d 598, 612 (E.D. Pa. 2011); *Albanese v. Bergen Cty., N.J.*, 991 F. Supp. 410, 422 (D.N.J. 1997).

### III.   East Penn's Motion for Partial Summary Judgment as to Scope of Employees

East Penn moves for summary judgment on the issue of *which* employees are properly part of any eligible recovery class.  Doc. No. 156.  East Penn contends that there are several categories of employees who fall outside of the Secretary's investigation and for whom the Secretary has not adduced evidence to establish violations of the FLSA.  The Court agrees with some but not all of East Penn's arguments to carve out of the Secretary's claims certain employees.  So, it grants East Penn's motion in part, as explained below.

When an employer does not maintain proper records, "the remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making the burden of proving

uncompensated work an impossible hurdle for the employee." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (citing *Mt. Clemens*, 328 U.S. at 687). The Secretary's burden is somewhat lessened because East Penn does not have actual records of the amount of time necessary for the uniformed employees to don/doff/shower. *See* Section II.D, *supra*. However, the burden is not wiped away entirely. Here, the Secretary's evidence consists of the time clock records (which he maintains are a proxy for the minimum amount of uncompensated time), the time study conducted by Dr. Radwin, and a handful of declarations from current and former East Penn employees at certain—but not all—facilities.

In light of the less onerous evidentiary burden, the Secretary may use a "representative sample to fill [the] evidentiary gap." *Bouaphakeo*, 136 S. Ct. at 1047. But, in order to satisfy the Secretary's evidentiary burden, the proffered employees must actually be representative. A sample is representative when "each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Id.* at 1046. The Court does not find that this burden is met for certain of the employees to which the Secretary broadly seeks to extrapolate his evidence. Indeed, in certain cases the Secretary seeks back wages for employees for whom he presents no representative evidence whatsoever.[21] This stretches beyond the permissible bounds for what the Secretary may do, even with the benefit of East Penn's lack of precise records.

## A. Employees Who Work Outside of Pennsylvania

The Court will grant summary judgment in East Penn's favor for all out-of-state employees. The Secretary conceded at oral argument that he is not seeking back wages for these employees.

---

[21] Following oral argument, the Secretary submitted a revised Schedule A to his complaint, listing additional employees at East Penn. Doc. No. 250. East Penn moves to strike. The Court considers the merits of East Penn's motion in Section VI, *infra*.

## B. Continuous Operations Employees

East Penn requests the Court grant summary judgment as to the continuous operations employees in its Metals Divisions, which includes employees in the Smelter, and Oxide 1 and 2 plants. East Penn has implemented different pay practices for these employees given that the work is substantially different from that of other locations. As a threshold matter, Dr. Radwin did not include any continuous operations employees in his study. But even accepting the validity of Dr. Radwin's average of 26.6 minutes to complete pre- and post-shift activities and assuming it is proper to extrapolate this result, it is undisputed that the continuous operations employees already receive 30 minutes of paid time for that work.[22]

First, the Secretary contends that there is a dispute as to whether casting employees are considered continuous operations. The Secretary relies on deposition testimony from East Penn's Vice President for the Metals Division, Richard Leiby, who was presented with an unauthored document which grouped the "casting crew" with non-continuous operations departments. East Penn responds that the Secretary has stretched the testimony. Mr. Leiby was not asked to confirm the veracity of the contents of the exhibit; counsel read from the document and asked Mr. Leiby to confirm that he had read the document correctly. Moreover, East Penn maintains this is a non-issue because the company's Rule 30(b)(6) representative testified that casting employees are indeed part of continuous operations and subject to 30-minute pay policy. Doc. No. 156-24 (Hauser Rule 30(b)(6) Depo. Tr.) at 142:5-10.

Viewing the evidence in the light most favorable to the Secretary on this issue, the Court agrees that there is a dispute as to the classification of casting employees. Moreover, East Penn

---

[22]    These employees are paid for the ten minutes prior to their official shift. Doc. No. 174-1 (Response to SUMF) ¶ 102 (admitted that an employee whose shift time begins at 7:55 a.m. is paid starting at 7:45 a.m.). Similarly, those employees are paid to the quarter hour following their shift end time, thus paying out an additional 20 minutes. *Id.* ¶ 103.

has not come to grips with its own conflicting testimony, leaving the Court to uncover it on its own. The evidence from East Penn's own Rule 30(b)(6) witness establishes that, at one point, casting employees were considered non-continuous employees. *See* Hauser Depo. Tr. at 144:12-14 ("You asked as of today what jobs are continuous; casting has been changed."). Mr. Hauser then testified that casting employees' shift times were adjusted in "April 2019, I believe," but he was unable to recall with specificity when the change was made. Hauser Depo. Tr. at 166:14-20.

The Secretary is seeking back wages for the period between October 20, 2014 and September 30, 2017, noting that he may also seek damages for violations that continued after. Doc. No. 1 (Compl.) at 4. So, during the time period contemplated by the Complaint, casting employees were classified both as non-continuous and continuous operations. East Penn gathered its employee declarations in March and April 2019. *See* Doc. Nos. 176-4, 176-5. Crediting the corporate representative's testimony that the change was implemented in April 2019, certain employee declarants in the casting department were governed by the five-minute grace period and ten-minute post-shift pay practices at the time they provided their declaration. *See, e.g.*, Doc. No.176-5 (Decl. of Beth Ann Wertman, Automatic Parts Casting at Smelter Annex Plant).

The Court must then consider the material effect—if any—of this information. The Court has previously found that the Secretary established that East Penn was liable for overtime violations as to its uniformed non-continuous operations employees. *See* Section II.D, *supra*. To the extent that certain casting employees were then classified as non-continuous operations employees and donned uniforms and PPE prior to the start of their shift, the Court has already found the Secretary marshalled sufficient representative evidence to meet his burden. But as for whether casting employees post-April 2019, as well as other continuous employees throughout the

time period contemplated by the Complaint have not been compensated for their work, the Court finds that the Secretary has not met his burden.

Absent any time study conducted on continuous operations plants, the remaining evidence adduced by the Secretary does not create a material dispute. In support of its motion, East Penn relies on 33 declarations from continuous operations employees, all attesting that they were paid fully for their pre- and post-shift activities. In response, the Secretary relies on two employee declarations from Eduardo Perez and Steven Graczyk to argue otherwise. The Court declines to find, as the Secretary hopes it will, that a material dispute is established here. That is because neither declaration appears to satisfy the "representation" requirement.

As a threshold matter, one of the Secretary's proffered declarants, Mr. Graczyk, does not appear to have been employed as a continuous operations employee, although he was employed in the Smelter. Mr. Hauser testified that the shift times for continuous employees begin at 7:55 a.m., 3:55 p.m., and 11:55 p.m. Mr. Graczyk declared that his shift began at 8:00 a.m., which is the first scheduled shift for non-continuous employees in the Smelter. So, Mr. Graczyk's declaration cannot be evidence of pay practices as regards continuous operations employees.

This leaves Mr. Perez's declaration as the sole piece of evidence offered by the Secretary on this issue. Although the Court does not make credibility determinations at this stage, it notes that Mr. Perez states he worked in a smelter plant that does not exist. Even assuming that Mr. Perez did work at the Smelter, was a continuous operations employee and crediting his estimations as to his pre- and post-shift work, a single declaration does not come close to suggesting a representative sampling of the entirety of East Penn's continuous operations outfit, which indisputably covers multiple plants.[23]

---

[23]   There are 248 uniformed employees across the Smelter Plant, Smelter Annex Plant, Oxide 1 Plant, and Oxide 2 Plant. However, it is not clear from the record as to how many of those are considered

The Court, having conducted its own independent review of the declarations, found only one other continuous operations employee who acknowledged the ten-minute grace period at the start of his shift and estimated needing ten to 15 minutes of pre-shift time.  Doc. No. 176-4 (Decl. of Gregory Arnold, Reverb Furnace Operator at Smelter Plant).   But even this additional declaration—assuming the reliability of the employee's estimate—does not satisfy the Secretary's burden of proof.

Not only is this evidence insufficient in terms of the percentage of "representative" employees, the Secretary has not produced declarations that represent any of the plants other than the Smelter that employ continuous operations employees.  *See Reich v. S. Maryland Hosp., Inc.*, 43 F.3d 949, 952 (4th Cir. 1995) (holding that Secretary did not meet the "fairly representational" requirement because there "were several departments for which no employee testimony was produced by the Secretary").

In opposing a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Absent any time-study data from the continuous operations plants or declarations from such employees that are actually representative, the Court cannot and, hence, will not, find that there is evidence that continuous operations employees were not appropriately compensated.

Accordingly, the Court grants East Penn's request for summary judgment as to continuous operations employees with the narrow caveat that it denies East Penn's request for summary judgment as to those employees within the casting crew prior to the 2019 re-classification as continuous operations employees.

---

continuous operations employees.  *See* Doc. No. 157 (SUF) ¶ 5; Doc. No. 158-20 (Leiby Depo Tr.) at 52:1-20).

### C. Employees Who Do Not Wear a Uniform and Shower

East Penn moves to foreclose liability as to those employees who do not wear a uniform and/or take showers after their workday concludes, including those employees who work at the eight plants that Dr. Radwin studied. It contends summary judgment is warranted because the Secretary has not put forth any evidence that employees who do not wear a uniform are not compensated for their work.

East Penn primarily relies on Dr. Radwin's admission that "all the employees that [he] studied and observed wore uniforms." Radwin Depo. Tr. at 114:14-18. Dr. Radwin also conceded that his conclusions were "applicable only to employees who were [sic] uniforms." *Id.* at 115:22-24; 579:21-23; 583:14-19. So, whatever measurements from the time study are, they are not representative of time spent by employees who do not wear uniforms, including, for example, those in the payroll department, personnel offices, and medical buildings.

In moving for summary judgment, East Penn must establish that no rational trier of fact could find that the Secretary has adduced representative testimony for those employees who are not required to wear uniforms and shower. The Secretary first asserts there are disputed facts as to *which* employees are required to wear a uniform and shower. But, as East Penn notes, whether certain employees wear a uniform—optional or not—is a separate and distinct inquiry from whether employees who do not wear a uniform were properly compensated. It is the latter that the Court must consider here in determining whether no reasonable juror could find that non-uniformed employees were not fully compensated.

East Penn contends that the scope of the Secretary's case has been a "moving target." The Court understands, but cannot agree with, this frustration. Although the Secretary is seeking back wages for those East Penn employees who must wear a uniform and shower, he is likewise seeking

42

those damages for employees who spend time "putting on and removing . . . protective gear before and after their scheduled shifts." Compl. ¶ 7.

Regardless of whether East Penn requires certain employees to don a uniform and to shower, it is undisputed that East Penn's policy is that all employees must wear personal protective equipment. This policy is in effect regardless of the risk of exposure to chemicals and other hazards. It is a company-created and mandated policy to provide additional protections and is done primarily for the benefit of the employer (although there is a benefit to the employee). Although neither party here has discussed the import of the universal PPE requirement, East Penn, by its own conduct, has also made the act of donning PPE integral and indispensable to the job. 29 C.F.R. § 790.8(c) n.65; *accord Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 912 (9th Cir. 2004).

Again, the Secretary relies on the employee declarations that East Penn submitted to satisfy his burden of representative testimony. As a threshold matter, the declarations are silent as to when each employee's shift time started. Because they do tend to include the time for which the employee is permitted to leave the floor, it is possible to calculate the shift start time from the undisputed premise that each employee works an eight-hour shift. The Secretary highlights several of non-uniformed employee declarations, which each discuss the amount of time needed to gather personal protective equipment and to walk to their workstations.[24]

---

[24] For example, both Luz Agramonte and Vedmarliz Morales, case line operators at an injection molding plant, work the 3 p.m. to 11 p.m. shift. Although Ms. Morales usually arrives ten minutes before the start of her shift, she estimates it takes her roughly two minutes to gather her personal protective equipment and another two minutes to walk to her workstation. Doc. No. 156-99. Similarly, Ms. Agramonte arrives about 15 minutes prior to 3 p.m. but estimates it takes her five minutes total to gather PPE and walk to her station. Doc. No. 156-37. Both stop working at 10:55 p.m. to change out of work gear and clock out. The third declarant, Paul Adams, also stated that it takes him roughly five minutes to obtain his PPE and arrive at his workstation. Mr. Adams acknowledged the five-minute grace period at the start of his shift, although it is unclear whether he took advantage of it. Doc. No. 156-36.

Some of the non-uniformed employees refer to the grace period without stating whether they use it. *See, e.g.*, Doc. Nos. 156-36; 156-48; 156-112; 156-147. Still others admit to using it only occasionally. *See, e.g.*, Doc. No. 136-41. But many of these declarants do state that they acquire and don at least some of their PPE prior to the start of their shift. *See, e.g.*, Doc. Nos. 156-42; 156-45 (four minutes to gather PPE and two minutes to walk to workstation); 156-79 (five to six minutes to put on protective gear and walk to workstation). As the Court has previously explained, it does not judge the credibility of the makers of these statements. But it is mindful that this is evidence that *East Penn* has adduced, ostensibly to satisfy its burden that no reasonable jury could find that non-uniformed employees performed compensable work for which they were not compensated.

In denying East Penn's motion for summary judgment as to non-uniform employees, the Court finds there is a genuine issue as to whether these employees were compensated for the time spent donning and doffing their company-mandated PPE. But it likewise remains an open issue as to whether that time is de minimis. At trial, East Penn may present argument and evidence as to its de minimis defense to the jury.

### D. Uniformed Employees Not at the Eight Facilities Studied

Finally, East Penn moves for summary judgment as to the employees working at plants other than the eight that Dr. Radwin studied. East Penn contends that Dr. Radwin cannot extrapolate his findings to plants not included in his time study. And, because there is no significant employee testimony from uniformed employees at plants not studied, East Penn argues that the Secretary has not adduced representational testimony.

To be sure, representative evidence based on an expert witness's estimation is a permissible means to establish uncompensated time. In many cases, "a representative sample is 'the only

practicable means to collect and present relevant data' establishing a defendant's liability." *Bouaphakeo*, 136 S. Ct. at 1046 (citing Manual of Complex Litigation § 11.493 at 102 (4th ed. 2004)); *Martin v. Citizens Fin. Grp., Inc.*, No. CIV.A. 10-260, 2013 WL 1234081, at *7 (E.D. Pa. Mar. 27, 2013) ("Testimony of a representative sampling of Plaintiffs is a procedure often used in FLSA actions, within this Circuit and elsewhere.").

At summary judgment, East Penn is essentially asking the Court to find that no reasonable juror could find that uniformed employees outside of the eight facilities studied are theoretically entitled to damages. That is, East Penn's position is that there is insufficient evidence as to these employees.

As an initial matter, the parties dispute whether the time study results can be extrapolated to other plants with uniformed employees. East Penn has previously challenged Dr. Radwin's average that he seeks to apply to other plants in its *Daubert* motion. *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 5409164, at *4 (E.D. Pa. Sept. 9, 2020). As the Court previously found, East Penn's arguments went to the weight of Dr. Radwin's testimony, not to its admissibility—which is not a proper issue at summary judgment to resolve. Notably here, the parties dispute whether the differences among the eight plants Dr. Radwin selected and the remainder of the Lyon Station campus facilities are "superficial."

East Penn submits that there are "myriad differences" among facilities that could affect the time study results. It emphasizes that each of the battery facilities have different functions, differ in terms of their size, products manufactured, number of employees, and the amount and type of PPE worn by employees. East Penn concedes that the Secretary is permitted to rely on a subset of employees to represent the interest of a larger number. But it maintains that, in such circumstances, "the representative employee performed substantially similar, if not identical, work to the non-

testifying employees." *Reich v. S. Maryland Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995) (collecting cases).

The Secretary disputes East Penn's efforts to undermine the representativeness of the study. The Secretary counters that Dr. Radwin visited all 29 facilities, and supposedly studied their layouts and observed the actual flow of employees in each, before selecting the eight plants for his study. Dr. Radwin concluded that the plants were overall "very similar" and opined that any differences did not significantly affect his measurements. Moreover, the Secretary emphasizes that, even if the workers performed different tasks between shifts, these uniformed employees are subject to the same policies and procedures regarding donning, doffing, showering, and recording their time. On this basis, the Secretary contends he has pulled together sufficient "fairly representational" testimony of uniformed employees. *S. Maryland Hosp., Inc.*, 43 F.3d at 951. At the summary judgment stage, the Court agrees that the Secretary has at least raised something of a genuine factual dispute as to whether Dr. Radwin's results can be extrapolated to other *uniformed* employees in the Lyon Station complex, so that they may be included in any theoretical recovery class. East Penn will presumably vociferously challenge the extrapolation effort.

To the extent the parties also dispute the percentage of uniformed employees studied, there is no bright-line threshold below which the evidence fails to be sufficiently representative. East Penn relies exclusively on out-of-circuit case law, particularly the Fourth Circuit's opinion in *Southern Maryland Hosp., Inc.* where the court held that 1.6% of the employees was insufficiently representative. 43 F.3d at 951. It is unclear the percentage of uniformed employees Dr. Radwin's time study captures. East Penn admits it employs over ten thousand workers—although it does not give the breakdown between uniformed and non-uniformed employees. Even assuming *all* employees—thereby diluting the representativeness of uniformed employees—Dr. Radwin's

study captured roughly 3.6% and 1.3%, of East Penn's workforce for pre- and post-shift work, respectively. Viewing the evidence in the Secretary's favor as the non-movant, the study sits on the edge of what at least one appellate court has deemed acceptable. It is not so woefully deficient that the Court can find, as a matter of law, that the remainder of uniformed employees outside of the eight plants be excluded given the similarities in policies across plants.

Because the Court finds a factual issue as to the representativeness of the time study that precludes summary judgment, it need only briefly address the handful of employee declarations the Secretary submitted from uniformed employees in the plants not studied.[25] "Drawing liability conclusions about a large group based upon a small portion of statements can be problematic, especially when testimony among the representatives themselves is disparate." *Martin v. Citizens Fin. Grp., Inc.*, No. CIV.A. 10-260, 2013 WL 1234081, at *7 (E.D. Pa. Mar. 27, 2013) (citing *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 677 n.20 (W.D. Pa. 2011)). Here, the 12 declarations offered for the remaining plants outside of the eight studied—absent the overlay of the time study—would be insufficient to constitute "representative" testimony.

As for the plants that are in Pennsylvania but not within the Lyon Station complex, Dr. Radwin admitted that he had not visited them.[26] Moreover, he testified that, because he had not been to those facilities, he lacked the information to extrapolate his study results to those

---

[25]    At oral argument, East Penn submitted that the Secretary did not submit any testimony from employees at the following plants: Auto Admin (Plant 07), DC (Topton) (Plant 08), Fleetwood Warehouse (Plant 10) Industrial Engineering (Plant 12), Industrial Service/Sales (Plant 14), Specialty Plan/ENG S1 (Plant 18), Injection Molding Plant 1 (Plant 31), Waste Treatment (Plant 44), Garage (Plant 51), Transportation (Plant 52), Innovation (Plant 53), Special Project/Engineering (Plant 70), Continuous Improvement (Plant 76), ITS (Plant 83), Mfg. Service (Plant 84), Medical (Plant 85), Tech Center (Plant 86), Personnel (Plant 87), Administrative Building (Plant 88).
       In addition, East Penn moves for summary judgment as to Industrial Plant (Plant 11), Wire/Cable (Plant 21), DC (Alburtis) (Plant 22), Injection Molding Plant 2 (Plant 32), and Smelter (41). But for this set of five plants, the Secretary has produced 12 employee declarations.

[26]    This includes Alburtis, Topton, and Kutztown Wire & Cable locations.

locations. Radwin Depo. Tr. at 113:7-22. Because there is no representative evidence to meet the burden set forth by *Mt. Clemens*, the Court grants summary judgment for East Penn as to the Pennsylvania plants that are *outside* of the Lyon Station campus.

## IV.    Damages

The parties have also filed cross motions for summary judgment as to the scope of applicable and appropriate damages. The Secretary moves for liquidated damages and a finding that East Penn willfully violated the FLSA. East Penn moves for summary judgment on its good faith defense to liquidated damages and to foreclose a finding that any violations were willful. Before considering each of these motions, the Court sets forth relevant background as to East Penn's knowledge of its obligations under the FLSA.

### A.  Background on DOL Investigations and East Penn's Policies

#### i.    The 2003 Uniform Policy

For at least 20 years, East Penn has retained outside counsel to advise it on labor and employment issues. In April 2003, Gary Melchionni, Esq. of Stevens and Lee authored a memorandum for East Penn regarding "Changing Clothes at Work as Compensable Time under the Fair Labor Standards Act." Doc. No. 155-42. The memorandum summarized two then recent DOL Wage and Hour Division investigations in which manufacturers owed back wages for failing to compensate their workers for donning time.

In preparing the memorandum, Mr. Melchionni reached out to the Regional Director of DOL's Wage and Hour Division, Joseph Dietrich, for guidance applying the recent Wage and Hour investigations to East Penn's situation.

> It was [Mr. Dietrich's] strong opinion that East Penn is violating the FLSA by not compensating its employees for time spent donning work clothes prior to the start of their shifts. His opinion is consistent with the position taken by his counterpart in Alabama involving the same issue. Thus, it seems likely that if challenged by

the DOL or the employees themselves in a class action lawsuit, at the very least East Penn would be engaged in lengthy, time consuming and costly litigation in federal court. In addition, if East Penn was to settle or lose, damages likely would be measured in the millions of dollars.

Doc. No. 155-42.

At the time, East Penn did not have a formal written policy that addressed donning and doffing. East Penn represents that the five-minute grace period was an informal policy, a characterization that the Secretary disputes. As for end-of-shift work, the memorandum stated that East Penn already counted it "as work time," so it would appear to "not be an issue" for the company. In so stating, Mr. Melchionni did not personally investigate East Penn's actual practices then in place or interview any employees . Doc. No. 155-37 (Melchionni Depo. Tr.) at 219-20. Mr. Melchionni did caution that "to the extent that the amount of work time allotted to shower and change clothes at the end of the shift is inadequate to reasonably cover the time needed to perform these activities, an FLSA violation may be occurring." Doc. No. 155-42 at 8. Based on the recent investigations, case law, and litigation risk, Mr. Melchionni suggest the "simplest solution" would be to "include the clothes changing time as compensable work during each shift." *Id.* at 9.

A few months after Mr. Melchionni transmitted his memorandum, East Penn management drafted a Uniform and Shower Time policy. Doc. No. 155-56. The 2003 policy provides:

If an employee works in an area that **requires a uniform and shower due to lead exposure**, the following standards apply:

1. Employees will be expected to be at their designated workstations with their uniform and other PPE (Personal Protection Equipment) on at the start of their shift. For pay purposes, employees will be allowed a five-minute grace period after the start of the shift to report to their workstation.

2. Employees will be given a 5-minute workstation clean-up **starting 10 minutes before the designated end of his/her shift.** (Some departments or circumstances such as a customer visit, ma [sic] require a longer clean-up time when approved by the Plant Manager of Supervisor.

3. Then employees will be dismissed from their workstation **5 minutes prior to the designated end of his/her shift** to doff their uniform, place it in the appropriate laundry bin and shower.

Doc. No. 155-52 (emphasis in original). East Penn did not conduct any study (or equivalent) to determine whether the amount of time provided in the policies were sufficient. Doc. No. 155-2 ¶¶ 149-50; Doc. No. 176-1 ¶¶ 149-50. Rather, it states that it relied on the approval of its counsel, Stevens & Lee. Doc. No. 175-1 ¶ 106 (An internal East Penn memorandum prepared contemporaneously with the draft uniform policy states that the policy was reviewed by outside counsel).

East Penn's Vice President of Environmental Safety, Health and Regulatory Affairs, Troy Greiss, testified that he also reviewed a 1981 OSHA opinion letter while drafting the 2003 policy. The Secretary argues that there is no evidence other than East Penn's self-serving testimony that it did review the letter. But even if East Penn did review the letter in 2003, the Secretary maintains that East Penn would have been on notice from the text of the letter that it was to direct all FLSA compliance questions to the Wage and Hour division, not to OSHA. East Penn's Assistant Vice President of Personnel was unable to recall whether it ever requested that Wage and Hour Division review the company policies. Doc. No. 155-35 (Snyder Depo. Tr. at 241:11-242:5).

ii. **Pre-2016 OSHA Investigations**

The Occupational Safety and Health Administration (OSHA) is part of the Department of Labor (DOL). Doc. No. 155-2 ¶ 9; Doc. No. 175-1 ¶ 9(a). OSHA has visited and investigated East Penn's Lyon Station facility on several occasions. Doc. No. 155-2 ¶ 24; Doc. No. 175-1 ¶ 24(a). In 2003, OSHA conducted a multi-day site visit to only East Penn's Smelter and Oxide plants as part of the recertification of East Penn's participation in OSHA's Voluntary Protection Program (VPP). Doc. No. 155-2 ¶ 25; Doc. No. 175-1 ¶ 25(a). The parties dispute the depth to

which OSHA conducted its study and whether OSHA reviewed East Penn's shower and clothes-changing policies at that time. Doc. No. 155-2 ¶¶ 26-27; Doc. No. 175-1 ¶¶ 26-27.

It is clear that OSHA did not tour the other plants in the Lyon Station campus. Likewise, it is undisputed that OSHA included the issue of paid shower on time on its "90-day items" list, i.e., open issues for East Penn to address before OSHA would re-certify the company. Specifically, OSHA flagged that "Employees exposed to lead should be permitted to shower on company time at the end of the work shift." Doc. No. 155-2 ¶¶ 29-30; Doc. No. 175-1 ¶¶ 29-30. East Penn represented to OSHA that it was "currently evaluating our corporate policy with respect to company provided uniforms and associated paid time for donning, doffing, and showers." Doc. No. 155-2 ¶¶ 34; Doc. No. 175-1 ¶¶ 34(a). During the next month East Penn notified OSHA that "[a]s we discussed on July 10, 2003, Metals division are compensated for shower time. Completed." Doc. No. 155-2 ¶¶ 37; Doc. No. 175-1 ¶¶ 37(a).

OSHA did not independently verify East Penn's new uniform policy, including by conducting a subsequent site visit. Doc. No. 155-2 ¶¶ 39; Doc. No. 175-1 ¶¶ 39(b). OSHA's representative testified that for purposes of a VPP evaluation—as distinct from an enforcement action—the agency accepts "what the company is in good faith telling" the government. Doc. No. 155-11 (Komis Depo. Tr.) at 99:8-101:9.

### iii.     The 2016 OSHA Complaint

In February 2016, OSHA received a complaint from an employee in the S-1 plant that employees were not receiving enough compensable time to shower. Doc. No. 155-17. OSHA notified East Penn of the complaint on February 18, 2016 and requested that East Penn respond explaining either what action was taken in response or why East Penn believed that no hazard existed. Doc. No. 155-2 ¶ 119; Doc. No. 175-2 ¶ 119(a).

East Penn responded to OSHA that it did pay for shower time. Doc. No. 155-2 ¶ 120; Doc. No. 175-2 ¶ 120(a). That same day, OSHA forwarded East Penn's response to the Wage and Hour Division, because it determined that the concerns were "not well covered by OSHA regulations." Doc. No. 155-62. OSHA explained that the employee's complaint had less to do with compliance with the agency's lead standard and more to do with East Penn's requirement that employees shower and failure to compensate adequately for that time. *Id.* The OSHA representative stated that he had spoken with East Penn representatives who had confirmed the five-minute shower time policy, that East Penn's senior management would meet to "re-address" the issue, and that " [East Penn] want to be sure they are following the regulations." Doc. No. 155-2 ¶¶ 129-32.

As a result of the employee complaint, East Penn's policy committee determined that the showering pay for S-1 and the Industrial plants should be increased from five to ten minutes. East Penn requested that Mr. Melchionni review the proposed revised policy. Doc. No. 155-2 ¶ 135. East Penn contends that, in relying on Mr. Melchionni's advice, the revised policy went into effect on June 27, 2016. Doc. No. 155-2 ¶ 136.

The Secretary disputes this entire series of events, including whether Mr. Melchionni approved of the new policy and whether it complied with the FLSA. Doc. No. 175-2 ¶¶ 135(b), 136(b).

### iv.   Wage and Hour Division Investigations

Prior to the 2016 complaint prompting this suit, the Wage and Hour Division had not investigated East Penn regarding its compliance with the FLSA. Doc. No. 155-2 ¶ 41; Doc. No. 175-1 ¶ 41(b). The Wage and Hour Division has conducted at least four investigations at the Lyon Station facility regarding compliance with the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* Doc. No. 155-2 ¶ 42; Doc. No. 175-1 ¶ 42(a). In conjunction with two of these FMLA

investigations, investigators previously noted that East Penn kept time records.  Doc. No. 155-2 ¶ 43; Doc. No. 175-1 ¶ 43(a).  The Secretary contends that this does not demonstrate that the investigators verified that East Penn was keeping time records in compliance with the FLSA.

At the end of the FLMA investigation, the DOL provided East Penn with a "Handy Reference Guide" and DOL's Fact Sheet #44.  Doc. No. 176-1 ¶ 45.  The Handy Reference Guide states that "[t]he records do not have to be kept in any particular form and time clocks need not be used."  Doc. No. 176-1 ¶ 48.  But the guide defines "hours worked" to include "all time an employee must be on duty, or on the employer's premises or at any other prescribed place of work, from the beginning of the first principal activity of the work day to the end of the last principal work activity of the workday."  Doc. No. 155-31 at 11.  Fact Sheet #44 provides that, if FLSA violations have occurred, the Wage and Hour investigator will tell the employer "whether violations have occurred and, if so, what they are and how to correct them."  Doc. No. 176-1 ¶ 51(a).

After OSHA forwarded the 2016 complaint, the Wage and Hour Division opened an investigation.  The FLSA narrative following the 2016 complaint and investigation states that the investigators communicated to East Penn that was in violation of the recordkeeping and overtime provisions of the FLSA.  Doc. No. 176-1 ¶ 51(b); Doc. No. 175-9 (FLSA Narrative).

**B.  Liquidated Damages**

The parties have cross-moved for summary judgment on the Secretary's claim for liquidated damages.  When an employer violates the overtime provisions of the FLSA, Section 216(b) provides for payment of both unpaid wages and the equivalent amount in "mandatory" liquidated damages.  29 U.S.C. § 216(b); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991).  The Third Circuit Court of Appeals has held that the Secretary "need not establish

an intentional violation of the Act to recover liquidated damages." *Williams v. Tri-Cty. Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984). Rather, liquidated damages are compensatory and the norm in FLSA actions. *Martin*, 940 F.2d at 907.

Notwithstanding the mandatory language of the FLSA, Section 11 of the Portal-to-Portal Act provides a defense to liquidated damages: the employer must "show to the satisfaction of the court that the act or omission giving rise to [an] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. Section 260 requires a subjective showing of good faith—the employer had "an honest intention to ascertain and follow the dictates of the FLSA"—and an objective showing of reasonableness—that it "act[ed] as a reasonably prudent man would have acted under the same circumstances." *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999). To be clear, not surprisingly, the employer bears the "plain and substantial" burden of establishing it is entitled to this discretionary relief; otherwise, the Court must grant liquidated damages. *Martin*, 940 F.2d at 907-08.

i. **The Secretary's Motion**

The Secretary argues that East Penn should be required to pay liquidated damages because it fails to produce "plain and substantial evidence" that it both acted in good faith and had reasonable grounds for believing it complied with the FLSA. The Secretary has not moved for a ruling that East Penn is liable for a sum certain.

The Secretary maintains that his entitlement to liquidated damages is clear. He argues that East Penn misrepresented to its outside counsel that employees completed their end of shift activities on paid time and that East Penn failed to independently investigate how much time its employees actually needed. Moreover, the Secretary emphasizes that East Penn's "belief" that it

could pay only for reasonable time is not objectively reasonable.  To that end, the Secretary argues that East Penn's "grace period" is an illusory policy, about which that East Penn took no steps to inform its employees or management.  Finally, the Secretary argues that East Penn cannot rely on DOL guidance or other publication when there is no evidence that it actually reviewed such information when formulating and implementing its policies.

ii.     **East Penn's Motion**

East Penn opposes the Secretary's request for liquidated damages.  In moving for summary judgment as to its entitlement to a good faith defense, East Penn bears the burden of demonstrating it had "an honest intention to ascertain and follow the dictates of the Act."  *Tri-County Growers*, 747 F.2d at 129.

To meet that burden, East Penn must affirmatively establish that it made a subjective good faith effort to comply with the FLSA and had objectively reasonable grounds to believe it complied with applicable law.  *Lugo*, 802 F. Supp. 2d at 617.  "Whether an employer's conduct under the FLSA was in good faith and reasonable is a mixed question of law and fact."  *Id.* at 616 (citing *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007)).  East Penn asserts that its review of the FLSA and its implementing regulations, reliance on the advice of outside counsel, and the DOL's decision not to bring an FLSA enforcement action prior to this suit demonstrate that it is entitled to a good faith defense.

*First*, East Penn argues that, even if it is ultimately incorrect in using reasonable time to calculate time worked, the split in the case law and the DOL's own regulations and internal guidance documents shows that East Penn's belief is objectively reasonable.  *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 187 (3d Cir. 1988) (holding that "ambiguity of the regulation" and the "closeness of the question" constituted sufficient evidence on both sides of legal issue for

employer to avoid liquidated damages); *Adeva v. Intertek USA, Inc.*, No. CIV.A. 09-1096 (SRC), 2010 WL 97991, at *3 (D.N.J. Jan. 11, 2010) (finding liquidated damages inappropriate "given the lack of controlling authority in this Circuit"). The Court must agree.

Although the Court concludes that East Penn's policy of paying a reasonable amount of time does not comply with the FLSA, *see* Section II.B, *supra*, that conclusion alone does not operate to bar a good faith defense. The Secretary's response reiterates his substantive arguments that East Penn violated the FLSA. But whether East Penn is liable for FLSA violations is a separate analysis from whether East Penn has carried its burden to show that it is entitled to a good faith defense.

*Second*, East Penn argues that, despite the lack of clarity surrounding the appropriate measure of compensation, it took proactive steps to ensure its compliance with the FLSA. East Penn submits that its management are members of the Society of Human Resource Managers, a professional society that discusses FLSA coverage. East Penn also engaged its outside labor and employment counsel to advise the company on compliance with the FLSA, and that it acted in reliance on counsel's advice. The parties do not dispute East Penn's membership in professional organizations that focus on compliance or that East Penn had conversations with Mr. Melchionni about its compliance with the FLSA generally. Rather, the Secretary contends that East Penn's inquiries about its pay practices at issue here are insufficient as a matter of law to sustain a good faith defense to liquidated damages.

Although it is not a complete defense, East Penn has asserted an advice of counsel defense. As the Third Circuit Court of Appeals has made clear, the defense is "available only to those who, after full and honest disclosure of the material facts surrounding a possible course of action, seek and obtain the advice of counsel on the potential legality of their actions." *Impala Platinum*

*Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, No. CV 16-1343, 2017 WL 960941, at *1 (E.D. Pa. Mar. 10, 2017) (citing *United States v. Traitz*, 871 F.2d 368, 382-83 (3d Cir. 1989)); *see also United States v. Park*, 505 F. App'x 186, 189 (3d Cir. 2012). In support of its position, East Penn relies primarily on deposition testimony from Mr. Melchionni, including his statement that he approved the 2003 Company Uniform Policy, as well as subsequent policy changes, which East Penn represents were adopted in response to the memorandum. The Court considers the evidence supporting the advice of counsel defense, which is either undisputed or viewed in the light most favorable to the Secretary.

The Secretary first claims that East Penn is not entitled to the defense because it did not seek out the advice. East Penn faults the Secretary for relying on out of Circuit case law and engaging in unnecessary "hairsplitting." Doc. No. 190 at 4. Although perhaps indicative of a research oversight, the Third Circuit Court of Appeals does limit the defense to a party who "seek[s] and obtain[s] advice. *See Traitz*, 871 F.2d at 382-83. It is unclear from the record whether Mr. Melchionni acted on a specific question from East Penn as to whether its then-current pay practices were compliant or whether, as part of his longstanding relationship with East Penn, supplying the company with legal updates fell within a general mandate to keep it abreast of any developments.

The parties next dispute whether East Penn actually acted on Mr. Melchionni's advice regarding pre-shift donning. The memorandum includes a statement from the Department of Labor's regional office that it was its "strong opinion that East Penn is violating the FSLA by not compensating its employees" for pre-shift donning. In light of the DOL's position, Mr. Melchionni suggested that East Penn "include the clothes changing time as compensable work time during each shift." Doc. No. 155-42. The memorandum offers arguments for why donning

activities might not be compensable before adding these defenses "may likely be outweighed" by case law, DOL litigation and guidance.  East Penn submits that it formalized the five-minute "grace period" in response to the memorandum—even though it represents that the policy informally existed prior to 2003.

In light of counsel's advice, namely that it appeared more likely than not that East Penn was required to compensate for donning activities, a rational trier of fact could find it reasonable for East Penn to take steps to further clarify its obligations.  There is no evidence that East Penn initiated contact with the Department of Labor, for example, to inquire as to whether a "grace period" was sufficient.

Likewise, a rational trier of fact could find that East Penn did not disclose to counsel all material underlying facts.  Despite indicating that the pre-shift activities at issue were likely compensable in the memorandum, Mr. Melchionni was unable to recall whether he advised East Penn that the grace period complied with the FLSA, whether he followed up to ensure that East Penn had followed his advice, or how the grace period was implemented, especially given the interplay with East Penn's long-standing requirement that employees arrive at their workstation at the start of their shift.  This gap in the evidence could also lead the trier of fact to find that East Penn did not follow counsel's advice when counsel had not actually advised that East Penn's policies were compliant.

The parties also dispute whether Mr. Melchionni's advice provides any cover for East Penn's adoption of the reasonable time standard.  Mr. Melchionni advised East Penn in the memorandum that an FLSA violation may be occurring if the amount of time allotted for end of shift activities "is inadequate to reasonably cover the time needed to perform" them.  Doc. No. 155-42.  East Penn relies on this language as endorsing reasonableness as the appropriate measure

of compensation.  Other than this passing reference, East Penn offers no evidence that it relied on the word "reasonably" in the memorandum or that it otherwise sought advice on this legal issue from Mr. Melchionni.  Indeed, Mr. Melchionni appeared to contradict or at least misstate East Penn's own payment policies when he testified that he "know[s] that East Penn employees are paid for the actual time worked."  Melchionni Depo. Tr. at 332:3-4.

The Court will not make a definitive ruling at this time as to whether East Penn is effectively insulated by the advice of its counsel.  That is because there are disputed facts regarding whether East Penn fully disclosed to Mr. Melchionni all of the relevant underlying facts, which is a predicate to asserting the defense.

*Third*, East Penn submits evidence that the Department of Labor was aware of the East Penn pay practices through prior investigations but did not challenge them.  East Penn claims that it relied on the fact that representatives from OSHA and Wage and Hour investigated East Penn on several occasions and that no adverse actions were taken—until this litigation.  An employer may be found to have acted in good faith when it relies on representations made by the DOL.  To that end, East Penn relies heavily on representations made by OSHA during its 2003 recertification inspection.  It highlights OSHA's awareness that East Penn compensated for shower time and East Penn's post-visit representation that it was "currently evaluating [its] corporate policy" for paid time for donning, doffing, and showers.  But the Court does not find the evidence to conclusively establish East Penn's good faith.

Although compensating for these activities may have been discussed, a rational trier of fact might understand them to place OSHA only on notice that East Penn had a policy.  OSHA did not make any specific findings during its investigation that East Penn was compliant with the FLSA, for example, nor does East Penn point to such evidence.  Nor does East Penn state that OSHA was

aware of the "grace period" because it appears that only post-shift showering was discussed in any detail.[27]  Moreover, the Secretary raises a genuine dispute as to whether it was reasonable to rely on guidance from OSHA, when it does not have authority to enforce the FLSA.

There is no evidence that East Penn corresponded with the Department of Labor regarding the pay practices at issue.[28]  *Cf. Lugo*, 802 F. Supp. 2d at 617 (finding employer produced evidence of its good faith based in part on its ongoing communications with DOL about its pay practices).  In some respects, East Penn's line of argument seeks to shift the burden of compliance with the FLSA to the government.  But it does not absolve East Penn of its affirmative duty to determine its obligations under the FLSA.  Nor does this analysis reward an "ostrich" for burying its head in the sand.

The Court finds that, although East Penn has attempted to adduce "plain and substantial evidence" as is its burden, material issues of fact remain before the Court can exercise its

---

[27]      Among other things, East Penn submits testimony that it relied on a 1981 OSHA opinion letter when formulating its pay policies in 2003 and 2016.  The parties dispute the import of this 1980s opinion letter.  The letter does not address how much time should be paid or how time should be tracked.  It was issued in response to another battery manufacturer's question as to whether its ten minutes of paid shower time complied with the OSHA lead standard.  The letter does not discuss compliance with the FLSA and instead refers questions regarding FLSA compliance to the Wage and Hour division, not OSHA.  For these reasons, the Secretary responds that the mere existence of this letter does not establish East Penn's ten-minute paid shower time was compliant with the FLSA because the agency to which the question was posed could not address the propriety of the policy.

          Moreover, the only evidence East Penn produced to establish its reliance on this letter prior to this litigation is deposition testimony from Mr. Greiss that he reviewed the letter in 2003.  *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (holding that self-serving deposition testimony is insufficient to withstand a motion for summary judgment).

[28]      East Penn relies on 53a01(a)(2) of the Wage and Hour's Field Operations Handbook which provides that an employer's noncompliance may be the result of "a failure by the Wage Hour Investigator, during a prior investigation, to recognize or to bring to the employer's attention violative pay practices . . . ."  East Penn, however, excises the rest of the provision which qualifies *when* an employer may avail itself of this excuse:  the prior investigation must have "involved the *same* circumstances in the current investigation."  FOH 53a01(a)(2).  It is undisputed that East Penn's compensation practices for its pre- and post-shift activities were not the focus of any prior investigations.  Prior Wage and Hour investigations were focused on East Penn's compliance with the Family Medical Leave Act.

discretion. Among other things, the parties dispute East Penn's entitlement to an advice of counsel defense. Although the 2003 memorandum indicates that East Penn was likely required to compensate its employees for pre-shift donning activities, the record is sparse as to Mr. Melchionni's actual advice regarding the "grace period." Given that East Penn has placed Mr. Melchionni's credibility at issue, the Court finds that additional testimony necessary before deciding whether East Penn acted in good faith.

Neither the Secretary nor East Penn is entitled to summary judgment on the issue of liquidated damages.

### C. Whether East Penn's Violations Were Willful

The parties also filed cross-motions for summary judgment on the Secretary's claim that East Penn willfully violated the FLSA. If the Secretary establishes that the alleged FLSA violations were "willful," the statute of limitations expands from the standard two years to three. 29 U.S.C. § 255(a). To establish willfulness, the Secretary must prove that East Penn either knew it was violating the law or acted in reckless disregard of the FLSA's overtime requirements. Merely establishing an FLSA violation is not enough, *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33 (1988), although the Secretary need not show that East Penn's conduct was egregious, *Stone v. Troy Construction, LLC*, 935 F.3d 141, 148 (3d Cir. 2019). East Penn cross-moves to foreclose the Secretary's claim that its alleged violations were willful.

The Third Circuit Court of Appeals has not definitively held that willfulness is a question of law or fact. However, to the extent the Court finds the reasoning used in the appellate court's recent cases more persuasive, willfulness is treated as a factual inquiry. *Compare Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) ("willfulness is a 'question of fact'") *and*

*Pignataro v. Port Auth. of New York & New Jersey*, 593 F.3d 265, 273 (3d Cir. 2010) (same) *with*

*Martin v. Selker Bros.*, 949 F.2d 1286, 1292 (3d Cir. 1991) (willfulness is a question of law).

i.    **The Secretary's Motion**

The Secretary relies on three "buckets" of evidence to justify its request to expand the potential damages limitation period. First, the internal timekeeping and payroll system suggests knowledge that East Penn would pay only the shift time, not time clock swipes. Second, East Penn has not taken "affirmative steps to ensure compliance" with the FLSA, including failing to conduct a time study and failing to publicize its policies to uniformed employees. Third, East Penn ignored the advice of outside counsel as early as 2003 that it might be violating the FLSA.

As for East Penn's record-keeping policies, the Court has found that they do violate the FLSA because they do not record the actual amount of time worked. *See Section II.C, supra.* But this violation alone does not support a finding that East Penn intentionally violated the FLSA or that it was reckless in adopting such a policy. Here, the Secretary has no evidence that East Penn destroyed or sought to conceal any of the records it does maintain. To the contrary, East Penn produced volumes of records reflecting both swipe and shift times, upon which the Secretary's experts then relied. This is not the sort of case in which an employer's recordkeeping violation was done in an effort to disguise a failure to compensate employees. *Cf. Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007) (affirming finding of willfulness based upon employer's "intentional manipulation of the records").

As to the Secretary's contention that East Penn knew that employees perform compensable activities outside of shift time, East Penn disputes the premise of the claim. Although the Court found it indisputable that East Penn has not fully compensated certain of its uniformed non-

continuous operations employees—based on East Penn's own admissions—East Penn will still be permitted to present a de minimis defense at trial. *See* Sections II.D and II.F, *supra*.

The Court does not find that the record conclusively establishes that East Penn failed to inform its employees about its pay policies or that its employees did not avail themselves of those policies. At a minimum, East Penn adduces sufficient evidence to counter the Secretary's claim that it failed to publicize its 2016 policy. East Penn cites to deposition testimony describing employee meetings to explain the changes to uniform, PPE, and shower policies, and produced the script used in these meetings. Employee declarations relied on by *both* the Secretary and East Penn attest that employees were aware of the changes to pay practices. As to whether East Penn was either unaware of or inattentive to employee complaints as the Secretary maintains, East Penn offers testimony that the 2016 pay policy change was enacted in response to an employee complaint.

Similarly, East Penn produced testimony that management discussed the "grace period" with employees and the Secretary's own expert Dr. Radwin found that some of the employees within his study made use of that time window for pre-shift activities. With this evidence, East Penn has created a dispute of material fact as to whether it informed those employees who were affected. East Penn's evidence at least calls into doubt whether it intentionally or recklessly violated the FLSA by implementing "illusory" policies—as the Secretary contends. *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 116 (3d Cir. 2020) (affirming denial of plaintiffs' willfulness claim).

Moreover, the Secretary overstates his case that East Penn clearly acted willfully by focusing on East Penn's failure to compensate for actual time spent donning, doffing, and showering. It is the Secretary's burden to prove willfulness. But willfulness is distinct from the

dispute of law arising from the actual versus reasonable time debate. East Penn sought out and relied on legal advice regarding the FLSA's requirements. Reliance on that advice—even if mistaken—does not render East Penn's alleged violation unreasonable, let alone a willful act. *See, e.g.*, *Pignataro*, 593 F.3d at 273 (violation was not willful where Port Authority relied on discussions and extensive research by its law department and there was legal authority supporting its conclusion at the time); *Brusstar v. Se. Pa. Transp. Auth.*, No. CIV.A. 85-3773, 1988 WL 85657, at *8 (E.D. Pa. Aug. 17, 1988) (finding conduct was not willful where "SEPTA acted upon the advice of counsel and vigilantly followed the developments in the area").

The Secretary does present evidence to support his position that East Penn was unresponsive to outside counsel's admonitions of possible FLSA violations. East Penn's outside counsel alerted its client to the risk of a violation if it failed to compensate employees for time spent donning work clothes before shift start. With that knowledge, the pre-shift polices that East Penn adopted appear contradictory: an employee is required to be at his or her workstation at the start of his or her shift, but that same employee may arrive up to five minutes late in order to use that time to don a uniform. East Penn does not contend with its policies other than self-serving deposition testimony from management that it seldom disciplined employees for arriving late. But standing alone, the Court does not find that this evidence satisfies the Secretary's burden to prove willfulness.

Moreover, the Court is aware that this particular case presents a question of first impression within this Circuit as to the correct measurement of time for pre- and post-shift activities. Although the Court concludes the Secretary's position correctly aligns with the statute's text and purposes, it likewise finds that East Penn did not reach its opposite conclusion with an intention to "thwart" the FLSA. *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702-03 (3d Cir. 1994).

Finally, East Penn correctly notes that it is not required to conduct a time study *ex ante* to avoid a finding of willfulness. The Court is not aware of any such requirement, nor has the Secretary brought such authority to the Court's attention.

To grant summary judgment on the willfulness claim, the Secretary "implicitly argues that no reasonable jury could conclude that Defendant[ ] had not acted willfully." *Acosta v. Osaka Japan Rest., Inc.*, No. CV 17-1018, 2018 WL 3397337, at *11 (E.D. Pa. July 12, 2018). Based on its careful review of the record here, the Court cannot agree. The absence of a clear standard for compensating based on actual or reasonable time, including inconsistent approaches adopted by other courts and lack of binding precedent from the Third Circuit Court of Appeals, and disputed facts regarding East Penn's publication of its pay policies s prevent a conclusive finding that East Penn "deliberate[ly]" or "intentional[ly]" violated the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

The Court is mindful that there is scant FLSA case law in the Third Circuit in which the appellate court has upheld the granting of a plaintiff's motion for summary judgment on a willfulness claim. *See Osaka Japan Rest., Inc.*, 2018 WL 3397337, at *11 (collecting cases). On the record before it, the Court cannot say that no reasonable jury could find that East Penn's actions were not willful. To the contrary, a reasonable jury may well find that East Penn was negligent or assumed incorrectly that it complied with its obligations under the FLSA. But even such a finding is insufficient to constitute willfulness. *McLaughlin*, 486 U.S. at 132.

Although the Court declines to rule in the Secretary's favor as to East Penn's willfulness, the Secretary is not foreclosed from presenting this argument at trial.

ii.    **East Penn's Motion**

Although the Court declines to grant the Secretary's motion, it does not then grant East Penn's motion to foreclose the Secretary's willfulness claim.  As it notes above, East Penn does not address the seeming inconsistency between permitting workers to arrive late in order to don on paid time while maintaining a disciplinary infraction system that penalizes workers should they not arrive at their workstation at the start of their shift.  Based on the undisputed pay practices, a rational trier of fact could not only reject East Penn's argument that it implemented its policies to comply with the FLSA (regardless of whether an actual or reasonable time standard is the law) but also find that the "grace period" was an administrative fig leaf designed to skirt the actual dictates of the FLSA.

As for relying on the advice of outside counsel, East Penn's consultation with Mr. Melchionni is certainly evidence that can argue with some credibility against a claim of willful conduct.  But consultation with a lawyer by itself is insufficient to find in favor for East Penn at summary judgment.  The Court's focus is whether the employer was diligent given its statutory obligations, not whether it was aware of the relevant law. *McLaughlin*, 486 U.S. at 134-35.

Viewing this evidence in the light most favorable to the Secretary, as the Court must on East Penn's cross-motion, the evidence is sufficient for the issue to proceed to trial.  Accordingly, the Court denies both cross-motions as to the willfulness claim.

**D. Injunctive Relief**

Based on the summary judgment record, the Secretary requests a prospective injunction to prevent East Penn from further violating the FLSA.  Whether to grant such relief rests within the Court's sound discretion. 29 U.S.C. § 217; *Sec'y United States Dep't of Labor v. Am. Future Sys, Inc.*, 873 F.3d 420, 424 (3d Cir. 2017).  In exercising its discretion, the Court considers the previous

conduct of the employer, the current conduct of the employer, and the dependability of the employer's promises for future compliance. *Acosta v. Cent. Laundry, Inc.*, No. CV 18-190, 2019 WL 3413514, at *15 (E.D. Pa. July 29, 2019).

The Court is unaware of a case in which such relief was granted at this stage of the litigation, nor has the Secretary cited to any authority in which a court within the Third Circuit has done so. *See Acosta v. Heart II Heart, LLC*, No. 2:17-CV-1242, 2019 WL 5197329, at *9 (W.D. Pa. Oct. 15, 2019) (denying injunctive relief without a hearing). When courts have ordered such relief, it is on a record with an employer's demonstrated history of disregard of the FLSA's requirements. *See Cent. Laundry, Inc.*, 2019 WL 3413514 (E.D. Pa. July 29, 2019) (granting permanent injunction after court had already issued an injunction in a related case and recently issued a preliminary injunction to which defendants failed to object); *Acosta v. Las Margaritas, Inc.*, No. CV 16-1390, 2018 WL 6812370 (E.D. Pa. Dec. 27, 2018) (entering permanent injunction following a five-day bench trial).

Even crediting the facts put forth by the Secretary, it is not clear whether a permanent injunction would be a valid remedy at this stage. This is the first time East Penn was investigated by Wage and Hour in conjunction with a potential FLSA violation. East Penn has not previously been subject to private FLSA suits. One complaint does not establish a "pattern" for the court to grant permanent injunctive relief. And, East Penn has put forth evidence that it responded to the 2016 OSHA complaint by amending its shower policy to increase the amount of paid time.

Accordingly, the Court denies the request to issue a permanent injunction, without prejudice to considering the propriety of such relief following trial.

### V.   The Secretary's Motions to Strike

In response to East Penn's supporting documentation filed with its motions for summary judgment, the Secretary moves to strike two exhibits submitted by East Penn, Doc. No. 198, and, separately, East Penn's Notice of Supplemental Authority, Doc. No. 231.  It is clear to the Court that the parties have used motion practice following the summary judgment briefing to shoehorn evidence or nitpick against evidence and arguments relating to the actual versus reasonable time standard dispute.

The Court denies the first motion as moot and the second motion on its merits.

### A.  The Secretary's Motion to Strike East Penn's Exhibits

The Secretary moves to strike two exhibits submitted by East Penn:  Exhibit 65 attached to East Penn's motion for partial summary judgment on its good faith defense, Doc. No. 155, and Exhibit 1007 attached to its opposition to the Secretary's motion for partial summary judgment, Doc. No. 193.  The exhibits in question are the jury instructions (Ex. 65) and the jury verdict form (Ex. 1007) from *Solis v. Tyson Foods, Inc.*, No. 2-1174, 2009 WL 4959741 (N.D. Ala. Oct. 14, 2009).  The Secretary argues the exhibits are irrelevant, unduly prejudicial, and would be inadmissible at trial.

As a threshold matter, East Penn contends it is not appropriate to use a motion to strike to attack the admissibility of summary judgment evidence.  *Ankney v. Wakefield*, No. 10-1290, 2012 WL 1633803, at *1 (W.D. Pa. May 8, 2012) (citing *Smith v. Interim Healthcare of Cincinnati, Inc.*, No. 10-582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011); *Cutting Underwater Techs. USA, Inc. v. ConDive, LLC*, No. 09-387, 2011 WL 1103679, at *3 (E.D. La. Mar. 22, 2011)).

However, courts have dealt with improper motions to strike as construing them as objections under Rule 56(c)(2).[29] *Id.* (citing *Cutting Underwater Techs.*, 2011 WL 1103679, at *3).

East Penn also argues that the Court should not consider the Secretary's challenges because they are untimely. The Secretary moved to strike the exhibits on March 25, 2020. East Penn argues that the Secretary should have raised his challenge to Exhibit 65 in opposition to East Penn's summary judgment motion (i.e., by February 19, 2020) and his challenge to Exhibit 1007 in his reply in support of his motion for summary judgment (i.e., by March 11, 2020). A party should raise its challenges to summary judgment exhibits in a conspicuous manner and in a timely fashion. That said, no rule definitively says what should be considered "timely." And this Court is unaware of case law interpreting the timeliness requirement. Indeed, the Federal Rules of Civil Procedure do not specify a deadline for filing a Rule 56(c)(2) objection. The Court thus exercises its discretion to treat the Secretary's arguments as objections under Rule 56(c)(2).[30]

In reaching its decisions on the motions for summary judgment, the Court did not rely on either exhibit. So, the Court will not reach the evidentiary issues raised in the Secretary's motion to strike.[31] The Court thus denies the motion as moot.

---

[29]     "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

[30]     At the February 21, 2020 hearing on the motion for sanctions, counsel for East Penn noted both parties had difficulty in "keeping up" with the briefing. In the light of the copious amount of briefing in this case and East Penn's prior requests for extensions, the Court is disinclined to deny a motion to strike on a procedural ground.
        However, the Court is compelled to note that, since that hearing, the parties have not heeded their own concerns about inundating the Court and each other with reams of paper. This should serve as a reminder to parties who choose to engage in protracted motion practice.

[31]     The Secretary argues that the exhibits at issue would be inadmissible at trial because they are irrelevant. *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004) (noting that the Court should only consider evidence "capable of being admissible at trial" when ruling on a motion for summary judgment). The Secretary argues that what a jury was instructed and ultimately decided in another FLSA trial has no bearing on the facts at issue in this case. Doc. No. 198 at 2. East Penn contends that the

**B. The Secretary's Motion to Strike East Penn's "Notice of Supplemental Authority"**

The Secretary also moves to strike the supplemental exhibits and briefing East Penn submitted in support of its summary judgment filings. Doc. No. 231. Much of the documents East Penn seeks to introduce were produced pursuant to a third-party FOIA request in May 2020 regarding the Department of Labor's positions on time-keeping practices. The Secretary argues that the "Notice" is untimely, lacks any new authorities or new arguments, and is a pretext to justify filing a supplemental reply brief.

*First*, the parties dispute the propriety of using the third-party FOIA request as a supplemental discovery tool. It is undisputed that the new documents were produced following the close of summary judgment briefing. East Penn maintains that it was diligent in pursuing production, so its supplement should be treated as timely. It accuses the Secretary of delaying its production of FOIA files and interfering with the FOIA process.

The record indicates that East Penn was diligent, although it does not support East Penn's speculative accusations as to the Secretary's alleged malfeasance. A non-party to this litigation, the law firm of Wiley Rein LLP, initially filed the FOIA request.[32] Wiley Rein made repeated

---

exhibits are relevant to the objective reasonableness of East Penn's pay practices and East Penn's lack of willfulness[.]" Doc. No. 202 at 3.

    It is clear to the Court that East Penn is only using these exhibits to support its legal argument that the compensable time at issue should be measured based on "reasonable time"—as opposed to "actual time"—and not to support any factual determination. If East Penn is truly using these jury instructions and verdict form to demonstrate objective reasonableness and lack of willfulness, then it should have put forth some evidence suggesting that East Penn relied on these jury materials in implementing and maintaining the policies at issue.

    Any such evidence is absent here. Notably, East Penn does not rely on Exhibit 65 in its statement of undisputed facts. It is cited once in its brief in support of its motion for summary judgment to support its legal argument. East Penn does not cite Ex. 1007 in its response to the Secretary's statement of undisputed facts to his motion for summary judgment.

[32]    Per the 2019 FOIA Summons and Complaint, the firm identified its client as "the U.S. battery manufacturing industry," rather than identifying East Penn by name.

inquiries to the FOIA office for the status of the documents. Roughly two months before the summary judgment deadline, in November 2019, Wiley Rein was notified that the documents were in secondary review prior to production. A week before the briefing deadline, with the production still outstanding, Wiley Rein again inquired as to the status of production. The firm made subsequent requests for production during the briefing period in February 2020. When East Penn's reply brief was due and the production remained outstanding, Wiley Rein filed its FOIA complaint. East Penn received the requested documents roughly three months after briefing closed.[33]

As to the accusation of willful interference, East Penn does not have any evidence that the Secretary has inappropriately delayed the FOIA production other than to note the "Solicitor's office had a hand in the document review and delay." Doc. No. 231-1 at 2. Without more, this alleged interference is speculative at best. Wiley Rein's correspondence with the Department of Labor does not reveal that it is acting on behalf of East Penn, that summary judgment deadlines were imminent in this case, or even that the documents were requested for inclusion as part of ongoing litigation. Doc. No. 233-1. Although the Department of Labor could theoretically connect the dots to infer the requested documents were for use in this suit, absent more, the Court will not endorse East Penn's claim that the Secretary maliciously interfered to cover up certain documents.

The mere fact of a delay in processing a request alone does not establish bad faith. *Cozen O'Connor v. U.S. Dep't of Treasury*, 570 F. Supp. 2d 749, 768-69 (E.D. Pa. 2008) (finding no evidence of bad faith given the number of agencies involved, the nature of information sought, the

---

[33]     Among other things, Wiley Rein requested "all materials pertaining to any investigations of East Penn" from 2016 to 2018. Doc. No. 223-1. Wiley Rein later narrowed the scope of its requests regarding East Penn to only compliance action reports and case narratives. *Id.* East Penn later appears to have sought those previously excluded document categories, including enforcement guidance. So, at least as to these documents, the Secretary was not purposefully delaying production of certain documents.

volume of documents to be searched and reviewed, and sensitivity of documents requested). Here, there is no other compelling evidence of bad faith. In light of East Penn's request for documents dating back to the 1950s, the length of time and resources needed to locate that information does not establish some underhanded action on the part of the Department of Labor. Moreover, the request itself was not denied and the documents were produced.

*Second*, the Secretary argues that the "Notice" functions as a reply brief and is thus untimely. The Secretary correctly states the rule in this district and in this Court that reply and surreply briefs are not permitted as of right; the parties are not permitted to file supplemental briefing absent the Court's leave. General Pretrial and Trial Procedures, Civil Cases § III.C.; E.D. Pa. R. Civ. P. 7.1(c). But the Secretary makes this point before launching into a recitation of his own arguments. So, the Court now is functionally presented with a reply and a sur-reply brief—neither of which was invited or directed by the Court. Moreover, as the docket reflects, both parties were equal offenders who embraced the transparent technique of filing "Notices" after the close of briefing.

To the extent the exhibits are helpful to resolving the issues on summary judgment, the Court exercises its discretion to consider the arguments raised—and re-raised by the parties in the Notice and motion to strike. *Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, No. 07-CV-01078, 2011 WL 11559549, at *18 (E.D. Pa. Mar. 24, 2011) (considering a reply brief filed without permission where it is helpful to determination of the issues). Because the Secretary likewise employs motion practice to again dispute the relevance—or lack thereof—of the supplemental authority, the Court finds that both parties have been afforded a more than sufficient—if not undeniably and ultimately pointless—opportunity to be heard.

Accordingly, the Court denies the motion to strike to the extent it seeks to strike the contents of the documents produced from the FOIA request.

## VI.    East Penn's Motion to Strike

While the parties' various motions for summary judgment were pending, the Secretary filed a notice to revise Schedule A to the Complaint. Doc. No. 250. Schedule A lists the employees identified during this litigation as allegedly due back wages. The revised version adds roughly 2,300 claimants. It does not alter the allegations in the Complaint itself. In response to the notice and revised Schedule A, East Penn filed a motion to strike. Doc. No. 251. East Penn raises a procedural and substantive challenge to the Secretary's efforts to amend Schedule A.

*First*, East Penn objects to expanding the scope of Schedule A in light of its motion challenging the Secretary's "representative" group of employees. As East Penn notes, approximately half of the names the Secretary seeks to add are employees working outside of the Lyon Station campus and the eight plants that Dr. Radwin studied. In light of the Court's grant of East Penn's motion for partial summary judgment, certain of these employees in the revised Schedule A are not eligible for recovery in any case. For this reason, the Court grants East Penn's motion to strike.

*Second*, East Penn objects to the Secretary's method of filing. The Secretary submitted a "notice" instead of moving to amend the schedule. Given the procedural posture of the case—the parties have briefed summary judgment—East Penn maintains that the Secretary should articulate his reasons why significantly expanding the number of claimants complies with Rules 15 and 16. Fed. R. Civ. P. 15, 16. The Court notes that the Secretary has, on other occasions, engaged in formal motion practice when he has sought to revise a Schedule A. *See, e.g., Acosta v. Holland Acquisitions, Inc.*, No. 2:15-cv-1094, 2017 WL 4685304 (W.D. Pa. Oct. 18, 2017); *Acosta v. Five*

*Star Automatic Fire Prot., LLC*, No. EP-16-CV-282-PRM, 2017 WL 3139835 (W.D. Tex. July 24, 2017); *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037 (D. Or. 2010), *as amended* (May 13, 2010). So, the Court is not concerned that the Secretary was unable to do so here. Moreover, it is this Court's stated existing practice and preference that parties submit substantive requests via motion.[34]

The Court grants the motion to strike without prejudice. The Secretary may file a motion for leave to submit a second revised Schedule A that takes into consideration the limits placed by the Court's decision on East Penn's motion for summary judgment. *See supra* Section III. East Penn may, of course, formally oppose such a motion.

## CONCLUSION

For the reasons set out in this Memorandum, the Court grants in part and denies in part the Secretary's motion for partial summary judgment. Summary judgment is granted as to East Penn's status as a covered enterprise under the FLSA; a finding that the uniformed employees' clothes-changing and showering are "integral and indispensable" activities that are compensable under the FLSA; East Penn's violations of the FLSA's recordkeeping provisions; that the appropriate standard of compensation for clothes-changing and showering is the actual time spent on such tasks; and East Penn's violations of the FLSA's overtime provisions as to its uniformed non-continuous operations employees.

Summary judgment is denied the Secretary as to a finding that East Penn's time clock records are indisputably the minimum measure of number of overtime hours worked; to foreclose East Penn from presenting a de minimis defense; the willfulness of East Penn's alleged violations

---

[34] *See* Judge Pratter's General Pretrial and Trial Procedures, available at https://www.paed.uscourts.gov/documents/procedures/prapol2.pdf.

of the FLSA; the Secretary's entitlement to liquidated damages; and the Secretary's request for a permanent injunction.

The Court grants in part and denies in part East Penn's motion for partial summary judgment as to the scope of employees at issue. Summary judgment is granted to exclude from the case East Penn employees who work outside of Pennsylvania; East Penn employees who are "continuous operations" employees in the Metals Division (excluding "casting crew" prior their reclassification); and East Penn uniformed employees outside of the Lyon Station campus. Summary judgment is denied as to East Penn's motion to exclude from the case East Penn employees who do not wear uniforms and do not shower but who must wear PPE; casting crew employees prior to their reclassification as continuous operations employees; and uniformed employees at plants in the Lyon Station campus that were outside of the eight plants Dr. Radwin studied.

The Court denies East Penn's motion for summary judgment on its good faith defense to liquidated damages and to foreclose the Secretary's willfulness claim. These issues remain for trial.

The Court denies the Secretary's motion to strike East Penn's exhibits as moot and denies the Secretary's motion to strike East Penn's Notice of Supplemental Authority. The Court grants East Penn's motion to strike the Secretary's notice of filing a second revised Schedule A.

An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE