UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE SU, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>EAST PENN MANUFACTURING CO.,<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)　Civil No. 5:18-cv-01194<br>)<br>)<br>)<br>)<br>)<br>) |

**EAST PENN'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL STANDARD...........................................................................................1

III.    ARGUMENT .......................................................................................................3

    A.   East Penn is Entitled to Judgment as a Matter of Law With Respect to Four Plants for Which the Secretary Did Not Present Evidence ............................................................3

    B.   East Penn is Entitled to Judgment as a Matter of Law on all Remaining Liability and Back Wages Issues Because The Secretary has Failed to Present Representative Evidence Establishing Employees' Entitlement to Damages ...........................................4

    C.   There is no Evidence Which the Jury Could Properly Find a Verdict that Non-Uniformed Employees are Entitled to Compensation Under the FLSA, Both Because the Time Spent on Standard PPE Items is Non-Compensable as a Matter of Law and There is Not Sufficient Evidence that These Items Were Always Donned/Doffed on Unpaid Time .................................................................................................14

    D.   D. There is no Evidence Upon Which the Jury Could Properly Find a Verdict That East Penn Acted Willfully ...............................................................................18

IV.     CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alford v. Perdue Farms, Inc.*,
   No. CIV.A. 5:07-CV-87CAR, 2008 WL 879413 (M.D. Ga. Mar. 28, 2008)...........................2

*Anderson v. Mt. Clemens Pottery*,
   325 U.S. 680 (1946)...........................................................................................4, 5, 7

*Bianchi Trison Corp. v. Chao*,
   409 F.3d 196 (3d Cir. 2005)................................................................................2

*Brock v. The Claridge Hotel and Casino*,
   846 F.2d 180 (3d Cir. 1988).............................................................................22, 24

*Brooks v. Village of Ridgefield Park*,
   185 F.3d 130 (3d Cir. 1999)................................................................................20

*Brusstar v. Southeastern Penn. Transp. Auth.*,
   No. 85-3773, 1988 WL 85657 (E.D. Pa. Aug. 17, 1988) ......................................................18

*Butela v. Midland Credit Mgmt. Inc.*,
   341 F.R.D. 581 (W.D. Pa. 2022) .........................................................................4

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ......................................................................5

*Donovan v. New Floridian Hotel, Inc.*,
   676 F.2d 468 (11th Cir. 1982) ..........................................................................6

*Gonzalez v. Bustleton Servs., Inc.*,
   No 08-4703, 2010 WL 1813487 (E.D. Pa. Mar. 5, 2010) ......................................................18

*Grochowski v. Phoenix Constr.*,
   318 F.3d 80 (2d Cir. 2003).............................................................................5

*Howard v. Post Foods, LLC*,
   No. 1:19-cv-570, 2022 WL 4233221 (W.D. Mich. Sept. 14, 2022).........................................16

*IBP, Inc. v. Alvarez*,
   546 U.S. 21 (2005).....................................................................................16

*Indian Coffee Corp. v. Procter & Gamble Co.*,
   752 F.2d 891 (3d Cir. 1985)............................................................................1

*Integrity Staffing Solutions, Inc. v. Busk*,
   574 U.S. 27 (2014)...................................................................................15, 16

*Marshall v. Truman Arnold Distrib. Co.*,
  640 F.2d 906 (8th Cir. 1981) ........................................................................5

*Martin v. Citizens Fin. Grp., Inc.*,
  No. CIV.A. 10-260, 2013 WL 1234081 (E.D. Pa. Mar. 27, 2013)............................8

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988)........................................................................................18

*Mitchell v. King Packing Co.*,
  350 U.S. 260 (1956)........................................................................................16

*Mt. Clemens Pottery v. Anderson*,
  149 F.2d 461 (6th Cir. 1945) ............................................................................7

*Patzig v. O'Neil*,
  577 F.2d 841 (3d Cir. 1978)..............................................................................2

*Pignataro v. Port Authority of New York & New Jersey*,
  593 F.3d 265 (3d Cir. 2010)..............................................................18, 19, 22

*Rego v. ARC Water Treatment Co.*,
  181 F.3d 396 (3d Cir. 1999)..............................................................................2

*Reich v. Gateway Press*,
  13 F.3d at 703 ..............................................................................6, 19, 21

*Reich v. IBP, Inc.*,
  38 F.3d 1123 (10th Cir. 1994) ....................................................................2, 25

*Reich v. S. Maryland Hosp., Inc.*,
  43 F.3d 949 (4th Cir. 1995) ..............................................................................6

*Rhea Lana, Inc. v. Dept. of Labor*,
  824 F.3d 1023 (D.C. Cir. 2016)........................................................................21

*Rosano v. Twp. of Teaneck*,
  754 F.3d 177 (3d Cir. 2014)..............................................................................4

*Secretary of Labor v. DeSisto*,
  929 F.2d 789 (1st Cir. 1991)..........................................................................6, 7

*Secretary United States Dep't of Labor v. Central Laundry Inc.*,
  790 F. App'x 368 (3d Cir. 2019) ......................................................................4

*Smith v. Allegheny Tech., Inc.*,
  754 F. App'x 136 (3d Cir. 2018) ......................................................................16

*Souryavong v. Lackawanna Cty.*,
  872 F.3d 122 (3d Cir. 2017)................................................................................2

*Stone v. Troy Construction, LLC*,
  935 F.3d 141 (3d Cir. 2019)..............................................................................18

*Trans World Airlines, Inc. v. Thurston*,
  469 U.S. 111 (1985)..........................................................................................18

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).......................................................................................4

*Tyger v. Precision Drilling Corp.*,
  594 F. Supp. 3d 626 (M.D. Pa. 2022)..............................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).................................................................................4, 5, 14

*United States v. Vista Hospice Care, Inc.*,
  No. 3:07-cv-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016)............13, 14

*Von Friewalde v. Boeing Aerospace Operations, Inc.*,
  339 F. App'x 448 (5th Cir. 2009).......................................................................2

*Walter v. Holiday Inns, Inc.*,
  985 F.2d 1232 (3d Cir. 1993).........................................................................1, 2

## Statutes

Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201, *et seq.* (FLSA) ............................ *passim*

## Other Authorities

Fed. R. Civ. P. 50(a) ............................................................................................1, 2

## I.      INTRODUCTION

Pursuant to Fed. R. Civ. P. 50(a), East Penn respectfully moves for judgment as a matter of law at the end of the Secretary's case-in-chief on all matters on which the Secretary carries the burden of proof, including the following issues: (i) the Secretary's failure to prove her claims with respect to four plants; (ii) the Secretary's failure to prove that each employee on Schedule A performed compensable clothes-changing and showering activities on unpaid overtime such that they are entitled to recover back wages under the FLSA; (iii) the Secretary's failure to prove that the time spent donning and doffing standard personal protective equipment ("PPE") items is compensable; (iv) even if the time spent on donning and doffing standard PPE items is compensable, the Secretary's failure to prove that each non-uniformed employee on Schedule A had unpaid overtime caused by donning and doffing standard PPE items; and (v) the Secretary's willfulness claim. In support of its motion, East Penn further states as follows.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 50 provides that judgment as a matter of law should be granted at the conclusion of plaintiff's case-in-chief if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party." Fed. R. Civ. P. 50(a)(1). A Rule 50(a) motion should be granted if, "'viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor.'" *Walter v. Holiday Inns, Inc*., 985 F.2d 1232, 1238 (3d Cir. 1993) (quoting *Indian Coffee Corp. v. Procter & Gamble Co*., 752 F.2d 891, 894 (3d Cir. 1985)). In making this determination,

federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Id*. (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

The Court may determine that the time spent donning and doffing standard PPE items is non-compensable as a matter of law. *See, e.g.*, *Reich v. IBP, Inc.*, 38 F.3d 1123, 1125 (10th Cir. 1994) (finding that donning and doffing standard safety gear, including safety eyewear, safety footwear, ear plugs, and hard hats, were not compensable as a matter of law because such items were "uniformly required throughout many industries" and were not "uniquely and closely related to the dangers inherent in meat production"); *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (finding that donning and doffing of PPE, including safety glasses and hearing protection, were non-compensable as a matter of law); *Alford v. Perdue Farms, Inc.*, No. CIV.A. 5:07-CV-87CAR, 2008 WL 879413, at *6–7 (M.D. Ga. Mar. 28, 2008) (finding that donning and doffing of generic PPE, including boots, ear plugs, goggles, and other items, were not compensable as a matter of law because these were simple tasks that did not add much time, and plaintiff had not put forth any evidence that these items were more difficult to put on than any other boot, etc.).

Likewise, with respect to willfulness, although it is a "question of fact," *Bianchi Trison Corp. v. Chao*, 409 F.3d 196, 208 (3d Cir. 2005), "a district court may take the question from the jury and grant a Rule 50(a) motion for judgment as a matter of law if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for' the non-moving party." *Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *Rego v. ARC Water Treatment Co.*, 181 F.3d 396, 400 (3d Cir. 1999)).

## III.    ARGUMENT

### A.    East Penn is Entitled to Judgment as a Matter of Law With Respect to Four Plants for Which the Secretary Did Not Present Evidence

Of the 24[1] plants at issue in this case, the Secretary has failed to present any testimony relating to policies and practices within the limitations period for the following: Oxide 1, Oxide 2,[2] Special Projects, and Medical.[3] No hourly employee has testified to working in any of these locations during the limitations period, and the Secretary's expert Dr. Radwin did not include them among the eight locations in which he conducted his study. *See* March 28 Tr. 145:21-146:4, 146:11-16; April 4 Tr. 57:20-23 (Dr. Radwin).

The Secretary may point to the 2003 and 2016 uniform/PPE policies and time and attendance policy and argue that their general applicability supports the inference that all hourly employees who perform donning and doffing and showering activities do so outside paid time. But this argument fails because the documents on their face do not demonstrate that employees at these four locations perform compensable overtime for which they have not been fully compensated. Doing so would require employee testimony regarding their actual practices, which is missing

---

[1] This figure includes both A2 East and A2 West and treats Laundry as separate from the remainder of Central Services.

[2] The Secretary may argue that Jack Sell testified as to the Oxide plants, but his testimony made clear that he never performed any beginning of shift or end of shift activities there whatsoever. April 11 Tr. 222:12-19, 226:19-227:8 (Mr. Sell). At most, Mr. Sell supervised one Oxide employee for a year or so, *id.*, and he testified that he would be "lying" if he tried to speak for that gentleman. April 11 Tr. 225:1-4 (Mr. Sell). The Secretary further may argue that her Transload witness, Ricky Hafer, testified as to Oxide 2, but Mr. Hafer testified that he does not work out of Oxide 2. April 12 Tr. 27:1-10 (Mr. Hafer). He has merely used the locker rooms in that building because the Transload plant does not have locker rooms. *Id.* 27:18-23.

[3] While Mr. Ulrich mentioned that he worked in Baghouse (medical) on the weekends, the Secretary elicited no testimony as to any donning or doffing practices related to Mr. Ulrich's work there but rather intentionally left "that out for the sake of efficiency." March 20 Tr. 190:13-21 (Mr. Ulrich).

from the record. Accordingly, East Penn is entitled to judgment as a matter of law with respect to Oxide 1, Oxide 2, Special Projects, and Medical.

### B.   East Penn is Entitled to Judgment as a Matter of Law on all Remaining Liability and Back Wages Issues Because The Secretary has Failed to Present Representative Evidence Establishing Employees' Entitlement to Damages

To prove damages under the overtime provisions of the FLSA, the Secretary must prove that each employee on Schedule A performed compensable clothes-changing and showering activities on unpaid overtime such that they are entitled to recover back wages. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (Article III does not give federal courts the power to award relief to uninjured plaintiffs); *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 588 (W.D. Pa. 2022) (same); *see also Secretary United States Dep't of Labor v. Central Laundry Inc*., 790 F. App'x 368, 372 (3d Cir. 2019) (to shift burden of proof under *Anderson v. Mt. Clemens Pottery*, 325 U.S. 680 (1946), Secretary must produce evidence from which a fact finder can make reasonable inference as to amounts due to employees, and Secretary's calculations based on "mere speculation" will not suffice); *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 189 (3d Cir. 2014) (speculation as to amount of uncompensated work performed not sufficient to carry plaintiffs' burden of proof under *Mt. Clemens Pottery*).

The Secretary may prove her case by presenting evidence that is representative of hourly workers for whom she seeks to recover damages. But while not all affected employees need testify to be awarded back wages, the Secretary must demonstrate that the employees who did testify are substantially similar to non-testifying employees with respect to the activities at issue that their testimony may be deemed to apply to non-testifying employees by inference. Thus, for evidence to be representative, it must be capable of establishing each hourly employee's entitlement to damages as if s/he had brought a claim individually. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455-56 (2016) (representative evidence is reliable for proving or disproving elements of

wage claim if it could sustain a finding in an individual worker's action asserting the same claim); *id*. at 459 ("Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked"); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 204 (D.D.C. 2020) ("The Supreme Court has held that representative evidence is a 'permissible method of proving classwide liability' only where '*each* class member could have relied on that sample to establish liability if he or she had brought an individual action.'") (citing *Tyson Foods, Inc.*, 577 U.S. at 455-56 (emphasis added)); *Grochowski v. Phoenix Constr*., 318 F.3d 80, 87-89 (2d Cir. 2003) (plaintiffs must "present sufficient evidence for the jury to make a reasonable inference as to the number of hours worked by the non-testifying employees").

The burden-shifting framework established by *Anderson v. Mt. Clemens Pottery* does not obviate the Secretary's obligation to produce sufficient evidence of the "amount and extent of uncompensated work" to support a damages award to non-testifying employees. *See Marshall v. Truman Arnold Distrib. Co*., 640 F.2d 906, 910-11 (8th Cir. 1981) (rejecting Secretary's argument that he had presented sufficient evidence to support damages award to eight non-testifying employees where company had substantially rebutted wage projections of testifying employees through cross examination and trial court had awarded less than 50 percent of the amount claimed). While there is no bright line as to the percentage of representative employees necessary, courts have denied the Secretary's damages claims with respect to all or some of the non-testifying employees on whose behalf s/he had brought suit where the percentage of testifying employees was low and the differences among their jobs and work situations rendered the testimony presented at trial unrepresentative.

For example, in *Reich v. S. Maryland Hosp., Inc.*, 43 F.3d 949 (4th Cir. 1995), the Fourth Circuit remanded for a more precise determination of back wages, noting the unrepresentative nature of the evidence at trial:

> Virtually all of the cases using representative testimony involve a fairly small employee population, a limited number of employee positions, and uniform work tasks. In contrast, this case involves the largest number of employees of any reported case, and a variety of departments, positions, time periods, shifts, and staffing needs. The 'fairly representational' requirement . . . was simply not met in this case. There were several departments for which no employee testimony was produced by the Secretary on missed lunches, including Nursery, Laboratory (Hematology), Laboratory (Microbiology), Blood Bank, Occupational Therapy, and Community Relations. There were also departments for whom employees were awarded back wages who specifically testified that they had never missed lunch, including the Emergency Room and Medical Surgery Unit 3-East.

*Id*. at 952; *see also id.* at 951 (1.6% of the employees was insufficiently representative).

Likewise, in *Reich v. Gateway Press, Inc*., the Third Circuit remanded to the district court to determine back wages for non-testifying employees with the specific direction to "carefully scrutinize the evidence before denying or allowing back pay to the non-testifying reporters." 13 F.3d 685, 702 (3d Cir. 1994). At trial in that case, the Secretary had called 22 out of 70 employees to testify, with one employee-reporter from each geographical group at issues, all of whom provided similar testimony about the pattern and practice of their hours worked. The Secretary had also presented a back wage calculation. Yet the Third Circuit was concerned with the sufficiency of the evidence to award back pay to the non-testifying employees, recommending that the trial court supplement the record with additional evidence regarding hours worked and hours paid. *Id*. In making this determination, the Third Circuit cited *Donovan v. New Floridian Hotel, Inc*., 676 F.2d 468, 471-73 (11th Cir. 1982), where the court upheld a back wage award to 151 employees but denied an award to 56 non-testifying employees. It also cited *Secretary of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991), where the First Circuit found that the trial testimony of one employee out of 244 was insufficient to sustain a back pay award.

Here, the scant testimony of 39 hourly witnesses out of 11,780 employees in Mr. Murray's back-wage estimate (*see* PX-4; April 4 Tr. 188:13-23 (Mr. Murray)) is not sufficient to assuage the concerns with representativeness identified by the Third Circuit and other Courts of Appeal expressed above, because the jury cannot tell from the evidence adduced by the Secretary which employees have been injured (*i.e.*, were not fully paid for overtime caused by compensable clothes-changing and showering), and by how much. While there is no bright-line test of what percentage of employees is necessary to achieve a representative sample, the Secretary has asserted that she has to meet the 2.7% blessed in *Mt. Clemens Pottery*:[4] "In Mount Clemens it was 2.7 percent of the workforce, and we have to meet that obligation." April 5 Tr. 120:21-121:1.[5] Here, that equates to 318 employees; the Secretary called only 12 percent of that number, or less than 0.33 percent of the employees that the Secretary represents. Even if one accepts the flawed premise that the 39 witnesses called can speak for the workforce as a whole, the Secretary falls short of any numerical sample coming close to the *Mt. Clemens* 2.7%.

---

[4] *Mt. Clemens Pottery v. Anderson*, 149 F.2d 461, 461-62 (6th Cir. 1945) (noting eight employees of the 300 in suit testified).

[5] The Secretary may also assert a 1.6% sample is sufficient, relying on *DeSisto*. But as acknowledged by the Secretary's own position in that case, "there is no ratio or formula for determining the number of employee witnesses required to constitute a representative sample of employees," 929 F.2d at 793-94; and even so, 1.6% of the East Penn workforce in issue would require 188 testifying employees.

| Facilities on Lyon Station Campus | Employee Count[6] | Witness Count[7] | Ratio |
|---|---|---|---|
| Automotive Plant 1 (A1) – Plant 1 | 1,015 | 7 | 0.69% |
| Automotive Plant 2 (A2) – Plant 2 (East and West) | 2,980 | 11 | 0.37% |
| Automotive Plant 3 (A3) – Plant 3 | 1,780 | 5 | 0.28% |
| Automotive Plant 4 (A4) – Plant 4 | 2,495 | 6 | 0.24% |
| Central Services (CS) – Plant 50 | 536 | 1 | 0.19% |
| Continuous Improvement (Plant 76) | 24 | 1 | 4.17% |
| Fleet Maintenance (Garage) – Plant 51 | 122 | 1 | 0.82% |
| Industrial Automotive (incl. Industrial Expansion) (Ind Auto) – Plant 17 | 983 | 7 | 0.71% |
| Industrial Plant – Plant 11 | 1,190 | 2 | 0.17% |
| Injection Molding Plant 1 – Plant 31 | 307 | 1 | 0.33% |
| Injection Molding Plant 2 – Plant 32 | 780 | 4 | 0.51% |
| Laundry (in Central Services) –Plant 50 | 165 | 1 | 0.61% |
| Manufacturing Services (in Central Services) – Plant 84 | 98 | 1 | 1.02% |
| Medical (Plant 85) | 18 | 0 | 0.00% |
| Oxide Plant 1 – Plant 42 | 5 | 0 | 0.00% |
| Oxide Plant 2 – Plant 43 | 3 | 0 | 0.00% |
| Smelter (incl. Acid Reclamation) – Plant 41 | 172 | 3 | 1.74% |
| Smelter Annex – Plant 47 | 581 | 1[8] | 0.17% |
| Special Project/Engineering – Plant 70 | 11 | 0 | 0.00% |
| Specialty Plant (S1) – Plant 15 | 1,951 | 4 | 0.21% |
| Specialty Plant Annex (S1 Annex) – Plant 16 | 173 | 1 | 0.58% |
| Transload – Plant 45 | 23 | 1 | 4.35% |
| Waste Treatment – Plant 44 | 30 | 1 | 3.33% |
| Total | 15,442 | 59 | 0.38% |

*Source: PX-4 and Exhibit A hereto*

[6] This represents the number of employees in Mr. Murray's back wage estimate who worked in each of the listed facilities at any time during the maximum limitations period. Because some employees worked in multiple plants, the total (15,442) is higher than the number of unique individuals (11,780).

[7] While only 39 hourly employee witnesses testified during the Secretary's case, the data presented here accounts for the fact that some witnesses worked at more than one plant during the applicable time period.

[8] Mr. Arechiga testified that he was a quality supervisor for both A1 and Smelter Annex from 2014-2016, March 16 Tr. 136:13-20; but PX-4 does not reflect Mr. Arechiga in an hourly position in Smelter Annex. The discrepancy is not material to the instant motion. Mr. Arechiga was salaried from 2016 through the end of his tenure with East Penn in 2020.

Moreover, in addition to the Secretary's evidence not being numerically representative of the 11,780 employees at issue in this case, the substance of the Secretary's evidence also demonstrates why the testimony elicited does not come close to meeting the burden of proof for representative evidence.[9] In particular:

- Employees elect to perform personal activities once on the East Penn campus. *See, e.g.*, March 16 Tr. 77:20-78:5, 78:12-79:12, 79:9-16, 89:12-90:9 (Mr. Seyfried); March 16 Tr. 252:5-253:4 (Mr. Arechiga); March 20 Tr. 103:10-14, 112:22-113:9, 114:4-8 (Mr. Baez); March 20 Tr. 255:6-14 (Ms. Stump); March 21 Tr. 8:15-20, 27:17-25 (Ms. Sweitzer); March 21 Tr. 119:18-25 (Mr. Meitzler); March 22 Tr. at 126:2-6 (Ms. Kozak); March 23 Tr. 90:12-21, 99:5-17 (Mr. Gilmer); April 6 Tr. 204:20-24, 205:6-19 (Mr. Molina); April 10 Tr. 13:11-15 (Mr. Kuhns); April 10 Tr. 69:17-21 (Mr. Frantz); April 10 Tr. 77:16-18 (Mr. Gallucci); April 10 Tr. 115:14-19 (Mr. Adams).

- Witnesses repeatedly testified that they had individualized routines in which they exercised choice as to both timing and order of performing tasks. *See, e.g.*, March 16 Tr. 251:18-20, 253:5-7 (Mr. Arechiga); March 20 Tr. 121:19-122:1 (Mr. Baez); March 20 Tr. 212:3-12 (Mr. Ulrich); March 21 Tr. 200:13-17 (Mr. Rogers); March 23 Tr. 127:1-17 (Ms. Christman); April 10 Tr. 12:21-13:1, 28:2-4 (Mr. Kuhns); April 12 Tr. 32:8-18 (Mr. Hafer); April 10 Tr. 116:22-25 (Mr. Adams); March 29 Tr. 37:2 -39:1, 44:5-19 (Dr. Radwin) (every person has different times, and same people have different times from day to day); March 29 Tr. 51:7-9 (Dr. Radwin) (employees have different routines).

- The plants on the Lyon Station campus differ from each other. *See, e.g.*, March 14 PM Tr. 61:1-5, 16-18, March 16 Tr. 6:2-4, 7:1-12:14, 16:23-19:5, 19:6-8 (Mr. Seyfried); March 16 Tr. 192:3-5 (Mr. Arechiga); March 21 Tr. 147:12-148:5 (Mr. Pittman); March 21 Tr. 115:18-116:8 (Mr. Meitzler); March 22 Tr. 89:7-90:3 (Mr. Gilmer); March 23 Tr. 43:18-44:4 (Mr. Canela); April 5 Tr. 26:9:22 (Mr. Hartman); April 13 Tr. 79:22-80:12 (Mr. Hausman); April 4 Tr. 55:8-21 (Dr. Radwin).

- East Penn employees confirmed the existence of the five minute grace period in which one may don his/her uniform and/or PPE on paid time. *See, e.g.*, March 14 Tr. 85:3-9 (Mr. Seyfried); March 21 Tr. 23:21-24:3 (Ms. Sweitzer); March 21 Tr. 238:5-7, 263:12-264:6 (Mr. Fernandez); March 21 Tr. 283:20-284:5 (Mr. Brendle); March 22 Tr. 104:13-105:9 (Mr. Gilmer); March 22 Tr. 157:19-158:1 (Ms. Kozak); March 22 Tr. 194:9-196:1 (Mr. Rivera); March 22 Tr. 245:18-246:3 (Mr. Zumas); March 23 Tr. 39:6-40:18 (Mr. Canela); March 23 Tr. 186:23-187:8 (Ms. Brader); April 5 Tr. 55:14-20, 23-24 (Ms. Carter); April

---

[9] As the Court previously found, "'Drawing liability conclusions about a large group based upon a small portion of statements can be problematic, especially when testimony among the representatives themselves is disparate.'" *See* dkt. 273 at 47 (citing *Martin v. Citizens Fin. Grp., Inc.*, No. CIV.A. 10-260, 2013 WL 1234081, at *7 (E.D. Pa. Mar. 27, 2013)).

6 Tr. 191:6-192:10 (Mr. Molina); April 6 Tr. 235:1-10 (Mr. Muthard); April 6 Tr. 289:9-21 (Mr. Kerchner); April 12 Tr. 233:5-9 (Mr. Civitarese).

- Not only were employee witnesses aware of the grace period for start of shift donning, but they also used or observed others using it. *See, e.g.*, March 14 Tr. 89:12-14 (Mr. Seyfried); March 21 Tr. 23:1-4 (Ms. Sweitzer); March 21 Tr. 87:3-7, 21-23 (Ms. Vaquero); March 22 Tr. 32:9-18 (Mr. Brendle); March 23 Tr. 92:10-25 (Mr. Gilmer); April 6 Tr. 214:12-215:5 (Mr. Molina); April 13 Tr. 72:13-16 (Mr. Hausman); DX-932 (Dr. Radwin).

- Supervisors have extended schedules from the employees they oversee and can dress on paid time. *See, e.g.*, March 16 Tr. 83:8-13 (Mr. Seyfried); March 21 Tr. 28:20-29:4 (Ms. Sweitzer); March 21 Tr. 232:8-233:4 (Mr. Fernandez); March 22 Tr. 86:4-11; 106:24-27 (Mr. Gilmer); April 6 Tr. 215:11-17 (Mr. Molina); April 10 Tr. 100:14-101:1 (Mr. Gallucci); March 22 Tr. 52:10-24 (Mr. Brendle).

- The PPE worn by employees varies by employee. *See e.g.*, March 16 Tr. 54:17-21, 63:14-64:24, 66:2-24, 67:13-68:10, 68:14-69:10, 74:10-12, 75:19-76:13 (Mr. Seyfried); March 16 Tr. 189:14-20 (Mr. Arechiga); March 23 Tr. 226:23-227:8 (Mr. Tomlinson); DX-380 (identifying uniform and PPE requirements for every job position in most plants).

- Employees of one plant cannot speak for others. *See, e.g.*, March 16 Tr. 19:9-21:9 (Mr. Seyfried); March 20 Tr. 97:25-98:10 (Mr. Baez); March 21 Tr. 75:20-23 (Ms. Vaquero); March 22 Tr. 90:1-9 (Mr. Gilmer); March 23 Tr. 181:12-14 (Ms. Brader); April 6 Tr. 223:21-22 (Mr. Molina); April 10 Tr. 65:9-66:1, 69:9-16 (Mr. Frantz); April 12 Tr. 193:23-25 (Mr. Drago).

- While many employees depart the production floor 10 minutes before end of shift, others get more time varying from 12 to 15 minutes. *See, e.g.*, March 14 PM Tr. 53:4-9 (Mr. Seyfried); March 20 Tr. 79:17-24, 123:8-15 (Mr. Baez); March 21 Tr. 91:1-18 (Ms. Vaquero); April 10 Tr. 32:2-7 (Mr. Kuhns); April 12 Tr. 266:14-24 (Mr. Civitarese); April 13 Tr. 77:9-17 (Mr. Hausman).

- The time an employee takes to perform beginning or end of shift activities varies per the individual. *See, e.g.*, March 14 Tr. 51:23-25 (Mr. Seyfried); March 22 Tr. 124:24-126:1 (Ms. Kozak); April 12 Tr. 33:1-8 (Mr. Hafer); March 23 Tr. 232:2-21 (Mr. Tomlinson); March 22 Tr. 235:9-16 (Mr. Zumas); April 11 Tr. 228:9-23 (Mr. Sell).

- East Penn employees are routinely able to complete their end of shift showering and dressing activities in the ten minutes provided. *See, e.g.*, March 21 Tr. 18:3-15 (Ms. Sweitzer); March 22 Tr. 18:24-19:3 (Mr. Brendle); March 21 Tr. 90:20-91:21 (Ms. Vaquero); March 21 Tr. 120:6-9 (Mr. Meitzler); March 21 Tr. 154:22-155:20 (Mr. Pittman); March 22 Tr. 245:9-17 (Mr. Zumas); March 23 Tr. 36:14-17, 36:23-37:1, 37:9-16 (Mr. Canela); March 22 Tr. 106:4-21 (Mr. Gilmer); March 22 Tr. 154:21-155:6 (Ms. Kozak); April 5 Tr. 24:22-25:3 (Mr. Hartman); April 5 Tr. 57:20-58:9 (Ms. Carter); April 5 Tr. 79:21-80:8 (Mr. Leone); April 6 Tr. 245:20-246:20 (Mr. Muthard); April 12 Tr. 35:11-36:6 (Mr. Hafer); April 10 Tr. 33:1-3 (Mr. Kuhns); *see also* April 5 Tr. 176:20-23, 204:4-205:12 (Mr. Mowday testifying with respect to East Penn declarants).

10

- In fact, it is common for employees to be waiting at a time clock to clock out, meaning they finished their showering/re-dressing on paid time. *See, e.g.*, March 16 Tr. 29:3-46:2, 90:10-91:25 (Mr. Seyfried); March 22 Tr. 137:7-17 (Ms. Kozak); March 22 Tr. 204:2-12 (Mr. Rivera); April 12 Tr. 218:14-20 (Mr. Berger-Mercado); April 10 Tr. 121:5-7 (Mr. Adams); April 13 Tr. 10:8-24, 11:21-12:8 (Mr. Civitarise); DX-931 (Dr. Radwin).

The Secretary cannot bridge all these gaps by relying on the testimony of Dr. Radwin. As demonstrated through cross-examination, Dr. Radwin's time study was not representative because he only at best examined eight plants and admitted to not studying the remainder. *See* March 28 Tr. 144:24-147:1, 148:7-18, 149:13-18, 150:10-15, 151:11-15, 203:2-20; April 3 Tr. 166:9-167:4, 168:1-169:5 (Dr. Radwin). The only plants studied by Dr. Radwin were A1, A2, A3, A4, Central Services, S1, and Industrial Auto. April 3 Tr. 167:2-4. He found not only different times for each person but also different minimums and maximums for each plant. *See* March 29 Tr. 38:16-20, 43:9-17 (Dr. Radwin); PX-54 (Radwin Table 6), DX-377. He admits not studying Continuous Improvement, Garage, Industrial, IM1, IM2, Laundry, Manufacturing Services, Medical, Oxide 1, Oxide 2, Smelter, Smelter Annex, Special Projects Engineering, Specialty Plant Annex, Transload, or the Waste Treatment Plant. March 28 Tr. 144:24-146:22; April 4 Tr. 57:20-23 (Dr. Radwin). For the eight plants Dr. Radwin did study, his findings as to them were averaged at the instruction of the Secretary's counsel, a further act making his data not representative of any employee, set of employees, or plant. March 28 Tr. 203:2-20 (Dr. Radwin). Although he tried to downplay the significance, his own work shows that the averages are different from plant to plant. *See* March 28 Tr. 174:10-179:5 (Dr. Radwin); DX-2826. Moreover, Dr. Radwin admitted that he did not extrapolate his findings on the eight plants he studied to the remaining 16 plants, recognizing that to extrapolate the facilities must be similar in layout. March 28 Tr. 157:7-18, 159:5-9 (Dr. Radwin). For example, he expressly testified that his study did not apply to Medical and he was not sure about Continuous Improvement. March 28 Tr. 148:7-13 (Dr. Radwin). Thus, the Secretary cannot

reliably use Dr. Radwin's study to carry her burden of proof as to all of these 16 non-studied locations.

Similarly, the Secretary cannot point to the gap between "actual" and "adjusted" times as representative evidence of unpaid time "necessarily spent" on dressing or showering. As recognized by the Court, "the witnesses thus far have demonstrated no reliable consistency as to what occurs between punch time and shift start and end times." *See* dkt. 554 at 2 n.5. At the start of shift, Dr. Radwin admitted that *most* employees clocked in first and *later* got their uniform and got dressed. April 28 Tr. 70:11-71:12, 74:13-76:25 (219 of 370 subjects, or 59%, swiped in and got their uniform later); PX-51 (Dr. Radwin). And Dr. Radwin agreed that a number of his subjects did their start-of-shift activities entirely on paid time, meaning after they had clocked in. *See* March 28 Tr. 88:1-89:5, DX-932, PX-54 (Activity 1 "Min" of 0.00) (Dr. Radwin). As a result of these facts, Dr. Radwin acknowledged that the punch times are not the same as when one dresses. March 28 Tr. 71:11-12 ("I don't agree that the swipe time is equivalent to touching the uniform"); April 4 Tr. 37:5-13 (Dr. Radwin). Likewise, trial testimony demonstrates employees perform donning tasks *after* they have clocked in at beginning of shift. March 16 Tr. 141:21, 145:3-4, 257:13-15 (Arechiga); March 20 Tr. 153:26-154:10 (Mr. Berk); March 21 Tr. 57:25-58:9 (Ms. Vaquero); March 21 Tr. 106:18-107:15 (Mr. Meitzler); March 21 Tr. 163:23 - 164:3, 165:12-17 (Mr. Rogers); March 21 Tr. 233:11-15 (Mr. Fernandez); March 23 Tr. 60:22 - 61:16 (Mr. Miller); March 23 Tr. 168:3-7 (Ms. Brader); March 23 Tr. 204:27-205:15 (Mr. Tomlinson); March 23 Tr. 281:12-14 (Mr. Brendle); April 5 Tr. 64:22-65:1 (Mr. Leone); April 6 Tr. 186:21-23 (Mr. Molina); April 6 Tr. 233:15-20 (Mr. Muthard); April 10 Tr. 13:7-10 (Mr. Kuhns); April 13 Tr. 81:12-15, 85:22-86:1 (Mr. Hausman).

At the end of shift, 51 of Dr. Radwin's 131 subjects (39%) did all or some of their walking, showering and redressing on paid time, that is, before clocking out.  *See* DX-931 (Dr. Radwin). And 99% of the declarations in the provisionally admitted PX-2 state that the 10 minutes allotted by East Penn for end-of-shift activities was "sufficient," meaning that they had completed those tasks on paid time before clocking out. Likewise, hourly employees called by the Secretary testified that they are able to perform their end of shift doffing, showering, and redressing activities on paid time. March 16 Tr. 29:3-39:5 (Mr. Seyfried); March 20 Tr. 183:20-184:4, 184:16-25 (Mr. Berk); March 20 Tr. 257:4-258:16 (Ms. Stump); March 21 Tr. 18:8-18:20 (Ms. Sweitzer); March 21 Tr. 91:12-92:2 (Ms. Vaquero); March 21 Tr. 154:22-155:20 (Mr. Pittman); March 22 Tr. 204:2-12 (Mr. Rivera); March 23 Tr. 69:16 - 73:1 (Mr. Miller); March 23 Tr. 173:3-7 (Ms. Brader); March 27 Tr. 113:14-17 (Mr. Nabozny); Apr. 5 Tr. 57:20-58:9 (Ms. Carter); April 5 Tr. 79:7-12 (Mr. Leone); April 10 Tr. 32:15-25 (Mr. Kuhns); April 10 Tr. 59:20-60:13 (Mr. Frantz); April 10 Tr. 120:18-121:18 (Mr. Adams); April 12 Tr. 36:7-13, 39:25-40:3 (Mr. Hafer); April 13 Tr. 13:4-8 (Mr. Civitarese); April 13 Tr. 81:16-82:1 (Mr. Hausman).

Further, the Secretary also does not have a measure of unpaid overtime for uniformed employees who do not take a shower at the end of shift. During the Secretary's case, East Penn established that the shower requirement was suspended for certain low-lead or no-lead departments (fill, formation, and finish) during the COVID-19 pandemic and has not been reinstated. Thus, during this timeframe, employees in these departments have received at least 10 paid minutes at the end of shift merely to change into their street clothes. March 22 Tr. 191:25-192:7 (Ms. Brader); April 10 Tr. 103:16-20 (Mr. Gallucci); April 13 Tr. 81:2-11 (Mr. Hausman). In addition, even before the COVID-19 pandemic, there were employees who chose to wear the uniform but did not shower, and they too received 10 paid minutes for changing clothes at the end of shift. Indeed, one

of the subjects pursued during Dr. Radwin's study told the students performing the study that he did not shower at the end of shift, yet Dr. Radwin included him in his analysis of employees who shower and dress at the end of shift. March 29 Tr. 134:20-137:8 (Dr. Radwin). In short, Dr. Radwin does not have a measure for such employees because he incorrectly assumed that all employees who wear a uniform take a shower. As a result, the Secretary has no basis on which to argue that such employees have performed compensable clothes-changing and showering activities on unpaid time.

That the Secretary chose to bring suit on behalf of 11,780 individuals does not relax her obligation to prove her case through reliable and representative proof. *See United States v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M, 2016 WL 3449833, at *13 (N.D. Tex. June 20, 2016) ("But *Tyson Foods* concluded that the permissibility of statistical sampling turns on 'the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action.' *Id*. Here, Relator's statistical evidence is not reliable in proving that false claims were submitted. Further, statistical evidence was not the only practicable means to present data establishing Defendants' liability. Relator declined to evaluate the claims for the 12,000 patients in issue. . . These choices, made by Relator, do not reduce her burden to produce reliable evidence of liability.") (citing *Tyson Foods*, 577 U.S. at 455).

C.      **There is no Evidence Which the Jury Could Properly Find a Verdict that Non-Uniformed Employees are Entitled to Compensation Under the FLSA, Both Because the Time Spent on Standard PPE Items is Non-Compensable as a Matter of Law and There is Not Sufficient Evidence that These Items Were Always Donned/Doffed on Unpaid Time**

The testimony in the Secretary's case-in-chief established that the only non-uniform PPE items that employees must put on before entering the production area and take off after leaving the production area are safety shoes/boots and safety glasses. *See, e.g.*, March 16 Tr. 74:24-75:2 (Mr. Seyfried); March 20 Tr. 109:11-13 (Mr. Baez); March 20 Tr. 251:20-252:1 (Ms. Stump). All other

PPE items can be obtained and donned and doffed on the factory floor on paid time. *See*, *e.g.*,
March 16 Tr. 73:23-74:23, 75:3-8 (Mr. Seyfried); March 21 Tr. 90:5-8 (Ms. Vaquero); March 20
Tr. 109:25-110:10 (Mr. Baez); March 20 Tr. 167:2-10 (Mr. Berk); March 20 Tr. 251:20-252:1,
256:15-257:3 (Ms. Stump); March 21 Tr. 32:9-20, 33:16-21, 35:4-12, 89:25-90:8 (Ms. Sweitzer);
March 22 Tr. 101:3-13 (Mr. Gilmer); March 22 Tr. 152:21-153:1 (Ms. Kozak); March 23 Tr.
183:9-14 (Ms. Brader); March 23 Tr. 229:5-14 (Mr. Tomlinson); April 5 Tr. 30:7-10, 30:20-31:1
(Mr. Hartman); April 6 Tr. 217:10-20 (Mr. Molina).

With respect to safety shoes/boots and safety glasses, the testimony has established that
these items are not unique to battery manufacturing, nor do they protect against risks specific to
battery making. Rather, the safety boots are the same type worn in construction and other industries
and protect employees' feet from the generic risk of dropping something heavy on the foot. Safety
shoes protect against the same generic risk, and look like and are put on the same way as regular
sneakers, and they can be purchased at Walmart or other general stores. In addition, the safety
boots could be worn from home during the period before September 2021 for which the Secretary
is seeking back wages. April 10 Tr. 138:21-22, 139:4-6 (Mr. Adams); *see* provisionally admitted
PX-2.0084, Declaration of Eric Diaz (wears boots and safety glasses from home). The safety
glasses are similar to those worn in high school chemistry classes, in other industrial settings, or
when engaging in activities such as wood-working. They protect against the generic risk of foreign
substances getting into an employee's eyes, which is not unique to battery making. *See, e.g.*, March
20 Tr. 180:21-181:9, 182:8-17 (Mr. Berk); March 21 Tr. 32:21-34:19 (Ms. Sweitzer); March 21
Tr. 118:16-119:17 (Mr. Meitzler); April 5 Tr. 30:11-19, 31:2-7 (Mr. Hartman); April 6 Tr. 217:21-
218:7 (Mr. Molina); April 11 Tr. 35:11-23, 37:21-40:4 (Mr. Greiss). With respect to the ear plugs,
they are simply standard foam ear plugs—similar to the type worn while sleeping, mowing the

lawn, going to a concert, or using a power tool. March 21 Tr. 32:21-33:1 (Ms. Sweitzer); April 6 Tr. 217:21-218:7 (Mr. Molina). There is nothing unique about the ear plugs that make them different from any other type of ear plug. April 11 Tr. 14:9-18 (Mr. Greiss).

The Secretary may respond by pointing to some testimony that wearing safety shoes/boots and safety glasses is required by East Penn and benefits East Penn as well as the employee. Neither factor is sufficient to establish that these PPE items are integral and indispensable to battery making and thus compensable under the Portal Act. As the Supreme Court held in *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 36-37 (2014), that an activity is required by and benefits the employer does not make it integral and indispensable. Rather, an "integral and indispensable" activity must be an intrinsic element of the job and one with which the employee cannot dispense if the employee is to perform the job. *Id.*; *see also IBP, Inc. v. Alvarez*, 546 U.S. 21, 42 (2005) (integral and indispensable test is tied to the productive work that the employee is employed to perform); *Smith v. Allegheny Tech., Inc.*, 754 F. App'x 136, 140 (3d Cir. 2018) (citing *Busk*, *Alvarez*, and *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956) in noting that required preliminary and postliminary activities are integral and indispensable only "when they affect[] the quality of the principal activity")).

More recently, the Middle District of Pennsylvania distilled the Supreme Court's rulings regarding the contours of the "integral and indispensable" test in the context of standard PPE items, finding that the appropriate inquiry is whether the PPE protects against "transcendent risks" associated with the employee's particular job. *See Tyger v. Precision Drilling Corp.*, 594 F. Supp. 3d 626, 650-52 (M.D. Pa. 2022) (time spent on standard PPE such as steel-toed boots, hard hats, safety glasses, gloves, and earplugs did not protect against "transcendent risk[s]" at the worksite and was therefore non-compensable); *see also Howard v. Post Foods, LLC*, No. 1:19-cv-570, 2022

WL 4233221, *6-*17 (W.D. Mich. Sept. 14, 2022) (donning and doffing standard safety gear, sanitizing, and going through COVID-19 screening are not integral and indispensable activities). None of the testimony elicited by the Secretary, or documentary evidence introduced, supports the conclusion that the safety shoes/boots and safety glasses worn by employees protect against "transcendent risks" specific to battery making.[10] Therefore, East Penn is entitled to judgment as a matter of law on this issue.

Moreover, the Secretary has no measure of alleged unpaid overtime for non-uniformed employees who wear standard PPE. As an initial matter, the Secretary has not presented representative evidence demonstrating that this population dons and doffs standard PPE on unpaid time. Hourly testimony presented by the Secretary covered only five witnesses[11] covering three plants out of the 11% of the East Penn employees with "factory floor" jobs for which a uniform is not required. Dr. Radwin did not study this population, so his measurements cannot be applied to it. More specifically, Dr. Radwin does not have a measure of time from when non-uniformed employees first touched their boots or safety glasses, because he did not study them. *See* March 28 Tr. 8:4-12 (Dr. Radwin). While Dr. Radwin's team did follow one box room employee who does not wear a uniform, that resulted in a single measurement for beginning of the workday time. *See*

---

[10] The same is true of other standard PPE items worn by at least some employees, such as gloves. The testimony has established that they, too, are generic safety items that protect against generic safety risks; not items protective against risks unique to battery making or intrinsic to the battery-making process. March 21 Tr. 36:9-37:16 (Ms. Sweitzer); March 21 Tr. 89:12-24 (Ms. Vaquero); Apr. 11 Tr. 32:10-33:6 (Mr. Greiss). But for all of these items, employee testimony has established that they can be obtained and donned/doffed on the production floor on paid time. Thus, the Secretary has failed to establish that the issue of the compensability of such standard items is even eligible to be considered by the jury.

[11] The five witnesses were Mr. Arechiga, Mr. Berk, Ms. Stump, Mr. Leone, and Mr. Adams; and their testimony as to non-uniform positions applied only to plants IM1, IM2, and Smelter Annex. March 16 Tr. 136:13-18, 138:4-9 (Mr. Arechiga); March 20 Tr. 146:18-21 (Mr. Berk); March 20 Tr. 251:1-2 (Ms. Stump); April 5 Tr. 78:2-4 (Mr. Leone); April 10 Tr. 114:1-2 (Mr. Adams). The Secretary elicited no testimony as to non-uniformed employees at the remaining 21 plants.

March 28 Tr. 8:13-16 (Dr. Radwin); March 29 Tr. 114:6-117:22 (Dr. Radwin); DX-738. As previously determined by the Court, Dr. Radwin's study is not "representative of time spent by employees who do not wear uniforms." *See* dkt. 273 at 42.  The Secretary simply does not have a measure for non-uniformed employees with respect to either beginning or end of shift time; and, therefore, the jury will have no basis on which to determine the amount of time spent by non-uniformed employees on donning and doffing activities, much less a means for determining whether such activities occur on paid or unpaid time.

### D.   There is no Evidence Upon Which the Jury Could Properly Find a Verdict That East Penn Acted Willfully

To prove willfulness under the FLSA, the Secretary must do more than prove that East Penn's pay practices with respect to clothes-changing and showering violated the law. Rather, she must prove that East Penn either knew that its policies violated the law or acted in reckless disregard of the FLSA's overtime requirements. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (willfulness requires Plaintiff to prove that employer knew it was violating the law or acted in reckless disregard of the FLSA's overtime requirements); *Stone v. Troy Construction, LLC*, 935 F.3d 141, 150 (3d Cir. 2019) (same). Where an employer has relied upon advice of counsel in adopting a policy that was later determined to violate the FLSA (*i.e.*, where counsel's advice was incorrect), such reliance forecloses a willfulness finding because it is fundamentally incompatible with knowledge of a violation or reckless disregard of legal obligations. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 130 (1985) (under analogous ADEA willfulness standard, employer not willful in adopting a new transfer policy after consulting with legal counsel, even though the policy violated the ADEA); *Pignataro v. Port Authority of New York & New Jersey*, 593 F.3d 265, 273 (3d Cir. 2010) (employer not willful in misclassifying helicopter pilots as exempt where it relied on discussions with and research by employer's law

department); *Brusstar v. Southeastern Penn. Transp. Auth.*, No. 85-3773, 1988 WL 85657, at *8 (E.D. Pa. Aug. 17, 1988) (although mass transit agency did not have reasonable grounds for believing FLSA did not apply, it did not act with reckless disregard because it acted upon advice of counsel and followed developments in the law); *see also Gonzalez v. Bustleton Servs., Inc.*, No 08-4703, 2010 WL 1813487, at *5 (E.D. Pa. Mar. 5, 2010) ("I cannot equate an erroneous belief, however unreasonable, with a willful violation").

Here, the Secretary has chosen to focus her "proof" of willfulness on the fact that some employees chose to perform clothes-changing and showering activities outside of the paid shift, and that East Penn is aware of this. In other words, the Secretary has erroneously conflated proof of an employer's obligation to pay for compensable work that it "suffers or permits" with proof of willfulness. But evidence that East Penn was aware that employees performed clothes-changing and showering activities outside of paid shift time does not prove willfulness, even resolving all credibility determinations regarding this point in the Secretary's favor. It is not enough for an FLSA plaintiff to prove that an employer knew that it was not paying employees for certain time; the relevant issue is the employer's state-of-mind as to whether it was required by the FLSA to pay for such time.

For example, in *Reich v. Gateway Press*, the evidence was that the newspaper employees on whose behalf the Secretary had brought suit were told by their employer not to record hours worked over 40. Had the employees been subject to the FLSA's requirements, this would have been a clear violation of the FLSA. However, the employer presented evidence that it believed the employees were exempt from the FLSA's requirements. While the employer's belief was incorrect, the Third Circuit concluded that it was not willful. *Reich*, 13 F.3d at 703. Thus, employee testimony that they chose to perform some of their clothes-changing and showering outside of the

19

paid shift is insufficient to demonstrate willfulness. *See also Pignataro*, 593 F.3d at 273 (employer not willful in misclassifying helicopter pilots as exempt and denying them overtime where it relied on discussions with and research by employer's law department; that employer repeatedly denied employee requests to be paid time-and-a-half for hours worked over 40 did not support willfulness claim).

For the same reason, the Secretary pointing to differences between employee "actual" and "adjusted" times is insufficient to prove willfulness. Such evidence, including sample time records shown by the Secretary (PX-49), Rule 1006 bar charts and graphs showing differences between employee pay and punch times (*e.g.*, PX-55 and PX-56), and Renee Geiger's emails to Troy Greiss presenting average differences between pay and punch times (PX-22 and PX-23) do not prove that employees spent all time between punch and pay times on uncompensated dressing and showering activities.[12] At best, such evidence does no more than establish the existence of unpaid dressing and showering time, and East Penn's awareness of it. And as discussed above and conceded by Dr. Radwin, employees regularly performed donning activities after swiping in and doffing activities before swiping out. The Secretary's case says absolutely nothing about whether East Penn knew it was violating the law or acted in reckless disregard with respect to its legal obligations, which is the relevant question.

---

[12] For example, Mr. Greiss testified that Ms. Geiger's presentation of the average difference between pay and punch times on one day in certain departments in certain plants was not a "time study," and DOL's own employee witness testified that one cannot tell from the averages whether employees spent the entire time differential on showering and dressing activities or also engaged in personal activities such as smoking and socializing. *See* April 11 Tr. 132:6-133:9, 135:2-15, 137:15-138:3, 141:4-143:11, April 12 Tr. 81:2-9 (Mr. Murray). But, even if one assumed, as the Secretary does, that the average differences reflect only compensable clothes-changing and showering activities, such evidence does not establish willfulness for the reasons stated above.

With respect to what constitutes evidence addressing this question, the Secretary has previously suggested in motions in limine briefing that the only relevant facts are those facts *relied upon* by the employer at the time it adopted its employment policies. That is not the test. As the Third Circuit explained in *Brooks v. Village of Ridgefield Park*, 185 F.3d 130 (3d Cir. 1999), the test is how "a reasonably prudent man [*i.e.*, employer] would have acted under the same circumstances." *Id.* at 137. When considering the "circumstances," the Third Circuit has fairly clearly implied that *all* circumstances must be considered. *See Reich v. Gateway Press*, 13 F.3d at 703 ("The district court concluded that under all the circumstances, Gateway's actions were not willful. We are not inclined to disturb this conclusion."); *see also Rhea Lana, Inc. v. Dept. of Labor*, 824 F.3d 1023, 1031 (D.C. Cir. 2016) (noting that Department of Labor conceded that there is a "totality-of-circumstances inquiry regarding willfulness").

At summary judgment, the Court noted that in finding that East Penn had violated the FLSA by not recording and paying for actual time spent on compensable *Steiner* activities (*i.e.*, changing into and out of the uniform and showering), its ruling was one of first impression, as neither the Supreme Court nor the Third Circuit had resolved the issue. *See* dkt. No. 273 at 64-65. Against this backdrop, the Secretary has not adduced evidence that East Penn has acted in any way other than as a reasonably prudent employer. The Secretary may point to three events as evidence of willfulness, but they do not disturb this conclusion.

First, the Secretary may assert that PX-42, Mr. Melchionni's April 2003 legal memorandum addressed to Ms. Snyder, put East Penn on notice that its policies violated the FLSA by summarizing the oral opinion of DOL official Joseph Dietrich, which he provided in a telephone

call to Mr. Melchionni.[13] The Secretary may also point to Ms. Snyder's designated deposition testimony (played March 23) that East Penn did not rely on Mr. Melchionni's legal analysis. But neither of these assertions is relevant to the question of willfulness. The designated deposition testimony established that Mr. Melchionni provided three legal arguments as to why changing into the uniform at the start of shift might *not* be compensable, as well as Mr. Dietrich's opinion in a brief phone call, that it was.[14] Snyder Dep. 140:25-141:22, 144:16-22.

---

[13] The Court has previously recognized the parties' stipulation that the Secretary could not call Mr. Melchionni in her case-in-chief. *See* dkt. no. 501. The parties reached this stipulation after East Penn moved in limine pursuant to Rule 37(c)(1) to prevent the Secretary from calling Mr. Melchionni, as she had not disclosed during discovery Mr. Melchionni's advice and memorandum as a basis for her claim of willfulness. *See* dkt. no. 501. Thus, she cannot now point to Mr. Melchionni's advice in opposing East Penn's instant motion. But in any event, nothing about Mr. Melchionni's advice would preclude judgment as a matter of law on the willfulness claim. The oral, hearsay statement of a single Wage and Hour Division employee (*i.e.*, Mr. Dietrich) does not establish willfulness. The Secretary has not established that a Wage and Hour Division employee has any authority to provide an interpretation of the FLSA that is legally binding on employers. Further, after reporting and considering Mr. Dietrich's statement, Mr. Melchionni provided advice regarding East Penn's legal obligations for paying for clothes-changing activities at the start of shift and then approved East Penn's uniform policy and thus its approach to paying for clothes-changing and showering time. *See* DX-14 (cover note to draft 2003 uniform policy sent to senior management representing that it had been approved by counsel); April 11 Tr. 95:8-96:14, 97:10-22 (Mr. Greiss's testimony that Mr. Melchionni provided guidance in 2003 on legal obligations with respect to donning uniform for use in developing "comprehensive" uniform policy addressing labor law applicable to dressing activities as well as pay for shower time). Even hostile witness and former personnel employee Dave Nabozny conceded that Stevens & Lee approved the 2003 uniform policy that set forth the grace period. *See* March 27 Tr. 107:8-109:13 (Mr. Nabozny). This approval means the Secretary cannot point to the Dietrich statement as proof of willfulness. *See Pignataro*, 593 F.3d at 273 (employer not willful in misclassifying helicopter pilots as exempt where it relied on discussions with and research by employer's law department, even though Wage and Hour Division and Department of Labor Review Board had previously taken the position that airline pilots are not exempt); *Brock v. The Claridge Hotel and Casino*, 846 F.2d 180, 188 n.9 (3d Cir. 1988) (that employer did not change its practices was not proof of willfulness; employer can disagree with Secretary's position, especially where it is a close question).

[14] Mr. Melchionni's memorandum did not address the issue of pay for shower time and dressing at the end of shift, other than to note that East Penn was already paying for such time. Thus, the Secretary cannot point to any isolated statement in his memorandum as supporting her claim for willfulness as to these end-of-shift activities.

Ms. Snyder testified in her deposition that East Penn did not rely on Mr. Melchionni's arguments as to why changing into the uniform might not be compensable, *not* that East Penn did not rely on his advice at all. Snyder Dep. 141:23-142:2. To the contrary, her deposition testimony establishes that East Penn considered the very option that Mr. Melchionni described as adopted by two auto manufacturers in settlements with the Department of Labor, namely, allowing employees to take their uniforms home and wear them into work. Snyder Dep. 142:23-144:1. When it became apparent that that option was not practicable, East Penn instead decided to document the five-minute grace period at the start of the shift as part of its written uniform policy, as that was what the Company believed was a reasonable time for dressing at the start of shift. Snyder Dep. 145:4-18, 146:21-25. The evidence also establishes that the Stevens & Lee law firm approved of the uniform policy—with the five-minute grace period and allowances for paid time to shower and dress at the end of shift—in the summer of 2003 and that the documentation of paid shower time responded to specific questions about paid shower time raised by OSHA during its 2003 VPP recertification of the Metals Division. *See* DX-14; April 11 Tr. 85:7-92:5, 99:17-102:9 (Mr. Greiss); PX-18.

A single witness called by the Secretary, Dave Nabozny, tried to cast aspersions on East Penn's state-of-mind in adopting the 2003 uniform policy by claiming that in one meeting in approximately 2002, Troy Greiss, East Penn's head of Environmental Health and Safety, said that East Penn needs to pay for clothes-changing and showering to comply with the FLSA and that former East Penn executive Sally Miksiewicz responded that she did not want to pay back pay anyone. March 27 Tr. 23:7-18, 25:14-19, 31:13-22 (Mr. Nabozny). Putting aside serious questions

as to Mr. Nabozny's credibility established through cross-examination,[15] his testimony, even if accepted at face-value, does not establish willfulness.[16] Employee testimony uniformly establishes that East Penn has paid for showering and dressing time throughout the maximum limitation period, so any supposed statement regarding the FLSA and back pay before 2003 cannot be relevant to willfulness during the limitations period. And nothing in Mr. Melchionni's memorandum raises the issue of needing to pay back pay for changing into the uniform; indeed, as noted above, his memorandum and supporting deposition testimony from Ms. Snyder establishes that the memorandum presented arguments as to why dressing time might not be compensable at all, as well as the option of paying for dressing time going forward. In any event, any comment regarding back pay allegedly made in 2002/2003, and necessarily relating to the time period before then, cannot be relevant to East Penn's state-of-mind during the limitations period.

The Secretary may also assert that Mr. Mowday, the Department of Labor's Assistant District Director for the Wage and Hour Division, established that East Penn refused to comply when presented with a back-wage calculation and finding of FLSA violation during the March 20, 2018, final conference at the conclusion of the Wage and Hour's investigation of East Penn. But declining to change pay practices that an employer does not believe violate the FLSA is not evidence of willfulness. *See Brock v. The Claridge Hotel and Casino*, 846 F.2d 180, 188 n.9 (3d Cir. 1988) (that employer did not change its practices was not proof of willfulness; employer can disagree with Secretary's position, especially where it is a close question).

---

[15] *See, e.g.*, March 27 Tr. 77:25-78:13, 83:2-15, 84:5-85:9, 86:17-88:6, 89:2-12, 94:20-96:10 (Mr. Nabozny).

[16] Further, Mr. Greiss, a health and safety officer, denied ever advising East Penn management regarding FLSA compliance and also denied hearing Ms. Miksiewicz say anything about back wages. *See* April 11 Tr. 96:16-18, 96:21-97:9 (Mr. Greiss). He also made clear that he is not responsible for FLSA compliance as part of his job duties. *See id*. 96:16-20.

Finally, there is no evidence supporting the Secretary's claim of willfulness with respect to standard PPE items worn by non-uniformed employees. There is not an iota of testimonial or documentary evidence adduced by the Secretary to show that East Penn knew or acted in reckless disregard of a legal obligation to pay non-uniformed employees for time spent donning and doffing standard PPE items. This is not surprising, as there is no binding authority in the Third Circuit holding that standard PPE items are compensable. To the contrary, case law from within the Third Circuit supports the conclusion that such items are not compensable because they do not protect against transcendent risks specific to battery-making. *See* discussion *supra* at 16. Indeed, nothing in Mr. Mowday's testimony indicates that the Wage and Hour Division even considered the compensability of such items as part of its investigation. *See* DX-96 ("FLSA Narrative"). Further, Mr. Melchionni's April 30, 2003 legal memorandum (PX-42) specifically noted that standard safety items such as safety shoes, earplugs, safety glasses, and a hard hat had been held to be non-compensable in *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994). *See* PX-42 at 5-6. These facts foreclose the Secretary's willfulness claim with respect to employees who don/doff standard PPE items.

## IV.    CONCLUSION

For the foregoing reasons, East Penn's motion for judgment as a matter of law should be granted.

Dated: April 17, 2023                Respectfully submitted,

/s/ Michael J. Mueller
Michael J. Mueller *pro hac vice*
Tonya Gray *pro hac vice*
Evangeline C. Paschal *pro hac vice*
Perie Reiko Koyama *pro hac vice*
Brianne M. Reese *pro hac vice*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
mmueller@huntonak.com
tonyagray@huntonak.com
epaschal@huntonak.com
pkoyama@huntonak.com
breese@huntonak.com

/s/ Daniel B. Huyett
Daniel B. Huyett
Pa. Attorney I.D. No. 21385
STEVENS & LEE, P.C.
111 North Sixth Street, P.O. Box 679
Reading, PA 19603-0679
Telephone: (610) 478-2219
Facsimile: (202) 988-0801
dbh@stevenslee.com

*Counsel for Defendant*
      *East Penn Manufacturing Co.*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Mueller, hereby certify that a true and correct copy of the foregoing was

served on counsel listed below on April 17, 2023, through the Court's ECF system:

OSCAR L HAMPTON
U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street, Mailstop SOL/22
Philadelphia, PA 19103-2968 (all further recipients are at this same mailing address)
215-861-5120; Email: hampton.oscar@dol.gov

ADAM F. WELSH
215-861-5159; Email: welsh.adam@dol.gov

ALEXANDER E. GOSFIELD
215-861-5124; Email: gosfield.alexander.e@dol.gov

ELIZABETH A. KUSCHEL
215-861-5113; Email: kuschel.elizabeth.a@dol.gov

SAMANTHA N. THOMAS
202-594-7755; Email: thomas.samantha.n@dol.gov

Dated: April 17, 2023                          /s/ Michael J. Mueller
                                               Michael J. Mueller