**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JULIE A. SU, ACTING SECRETARY OF LABOR[3],<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>         Plaintiff,<br><br>     v.<br><br>EAST PENN MANUFACTURING CO.,<br><br>         Defendant. | )<br>)<br>)<br>)    <br>)<br>)   Civil No. 5:18-cv-01194-GEKP<br>)<br>)<br>)<br>)<br>) |

**SECRETARY'S MEMORANDUM IN SUPPORT OF HER
MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

[3] Ms. Su is hereby substituted as Plaintiff in this matter. *See* Fed. R. Civ. P. 25(d).

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION/PROCEDURAL BACKGROUND ........................................................ 1

II.    LEGAL STANDARD.......................................................................................................... 2

III.    ARGUMENT ...................................................................................................................... 2

    A.    East Penn Failed to Rebut Evidence that the PPE  East Penn Required for Non-Uniformed Workers Was Compensable and East Penn Violated § 207 with respect to those workers............................................................................................................................. 2

    B.    No Reasonable Juror Could Find That East Penn Did Not Violate The FLSA's Overtime Provisions For Non- Uniformed Workers That Wore PPE. ...................................... 6

    C.    East Penn Failed to Present Evidence that It Kept Records of The Pre- And Post- Shift Work For Non-Uniformed Workers that Wore the Required PPE ............................................ 7

    D.    The Secretary Presented A Reasonable Estimate of All Uncompensated Time Through Representative Evidence, Which East Penn Failed to Rebut....................................................... 9

        1.    Legal Standard For Just And Reasonable Inference...................................................... 9

        2.    Legal Standard For Representative Testimony ......................................................... 11

        3.    The Secretary's Reasonable Estimate........................................................................ 12

        4.    The Secretary Supported his Reasonable Estimate with Other Representative Evidence........................................................................................................................... 14

        5.    East  Penn Failed to Present Evidence of the Precise Amount of Work Performed, or Evidence to Rebut the Secretary's Reasonable Estimate...................................................... 30

    E.    No Reasonable Jury Could find that the Time at Issue was De Minimis...................... 34

F.      No Reasonable Jury Could find East Penn's Violations Were Not Willful...................37

IV.  CONCLUSION.............................................................................................................39

## **TABLE OF AUTHORITIES**

**Cases**

*Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050 (6th Cir. 2019) .................................... 12, 21

*Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488 (3d Cir. 2002) ...................................................... 2

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ....................................................... 9, 11

*Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir. 2014), *aff'd and remanded*, 577 U.S.

    442 (2016) ................................................................................................................................ 12

*Bouaphakeo v. Tyson Foods, Inc.*, No. 5:07-CV-04009, 2012 WL 4471119 (N.D. Iowa Sept. 26,

    2012), *aff'd*, 765 F.3d 791 (8th Cir. 2014), *aff'd and remanded*, 577 U.S. 442, 136 S. Ct. 1036,

    194 L. Ed. 2d 124 (2016) ........................................................................................................ 17

*Brock v. Positive Changes Hypnosis, LLC*, 589 F. Supp. 2d 974 (W.D. Tenn. 2008) ................ 35

*Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300  (N.D. Ala. 2008) ........................................... 40

Colindres v. Quietflex Mfg., 427 F.Supp.2d 737 (S.D.Tex.2006) ................................................ 22

*De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 374 (3d Cir. 2007) ................................. 4, 37, 40

*Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113 (4th Cir. 1985) ................................................ 13

*Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982) .................................................... 16

*Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982) ....................................... 15

*Donovan v. Red Ball Interior Demolition Corp.*, 1982 WL 2052 (S.D.N.Y. 1982) ..................... 34

*Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83 (10th Cir. 1983) ........................................ 16

*Ealy-Simon v. Liberty Med. Supply, Inc.*, No. 05-14059-CIV, 2007 WL 7773834 (S.D. Fla. Feb.

    12, 2007) ................................................................................................................................... 22

*EEOC v. Nat'l R.R. Passenger Corp.*, No. 15-1269, 2016 WL 3655269 (W.D. Wash. July 8,

    2016) ......................................................................................................................................... 34

iii

*Hobbs v. EVO Inc.*, 7 F.4th 241 (5th Cir. 2021) ........................................................ 22

*Hobbs v. EVO Incorporated,* 7 F.4th 241 (5th Cir. 2021) ........................................... 20

*Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27 (2014) ........................................... 5

*Jemine v. Dennis*, 901 F.Supp.2d 365 (E.D.N.Y. 2012) ............................................... 21

*Kellar v. Summit Seating Inc.*, 664 F.3d 169 (7th Cir. 2011) ...................................... 39

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 11533d Cir. 1993) .................................... 2

*Lindow v. United States,* 738 F.2d 1057 (9th Cir.1984) .............................................. 37, 41

*Marshall v. Newport Motel, Inc.* 1979 WL 15529 (S.D. Fla. 1979) ............................. 20

*Martin v. Selker Bros., Inc.,* 949 F.2d 1286 (3d Cir. 1991) .......................... 9, 10, 11, 20

*McLaughlin v. DialAmerica Marketing, Inc.,* 716 F.Supp. 812 (D.N.J.1989), *aff'd,* 935 F.2d 1281

    (3rd Cir.1991), *cert. denied,* 501 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991) ......... 16, 21

*McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988) ...................................... 13, 16

*Mireles v. Frio Foods, Inc.*, 899 F.2d 1407 (5th Cir. 1990) ....................................... 40

*Perez v. Super Maid, LLC*, 55 F.Supp.3d 1065 (N.D. Ill. 2014) ................................. 21

*Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033 (10th Cir. 2021) ................ 38

*Reich v. Dep't of Conservation & Nat. Res., State of Ala.*, 28 F.3d 1076 (11th Cir. 1994). ......... 22

*Reich v. Gateway Press, Inc.*, 13 F.3d 685 (3d Cir. 1994) .................................... 10, 11

*Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir. 1998) ............................................ 41

*Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58 (2d Cir. 1997) ..................... 11

*Scalia v. Paragon Contractors Corp.*, 957 F.3d 1156 (10th Cir. 2020) ....................... 36

*Sec'y U.S. Dept. of Lab. v. Central Laundry, Inc.*, 790 Fed.Appx. 368, 372-73 (3d Cir. 2019)   20

*Sec'y U.S. Dept. of Lab. v. DeSisto*, 929 F.2d 789 (1st Cir. 1991) ............................. 11

*Steiner v. Mitchell*, 350 U.S. 247 (1956) ................................................................... 4

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .................................................... 9, 10, 12

*United States v. Cordova*, 157 F.3d 587 (8th Cir. 1998) ...................................................... 35

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) ................................................. 34

*United States v. Patrick*, 248 F.3d 11 (1st Cir. 2001) .......................................................... 34

*United States v. Veal*, 23 F.3d 985 (6th Cir. 1994) .............................................................. 33

**Statutes**

29 U.S.C. § 207 .......................................................................................................................... 32

29 U.S.C. § 213 .......................................................................................................................... 32

**Other Authorities**

Dkt. No. 279 ................................................................................................................................ 34

**Regulations**

29 C.F.R. § 785.47 ................................................................................................................ 33, 34

## I.       INTRODUCTION/PROCEDURAL BACKGROUND

East Penn Manufacturing Company has essentially put on no evidence to rebut the Secretary's case-in-chief.  Most of its defense consisted of putting the 2016 to 2018 Wage and Hour investigation on trial.  But the manner in which Wage and Hour conducted its investigation has no bearing on the issues before the jury.  East Penn did not present any evidence of the precise amount of work owed or evidence to negate the Secretary's reasonable inference. It did not conduct a time study, and its management employees could only offer speculation; they had no personal knowledge of the amount of unpaid work. Instead, it chose to argue that it owed its employees nothing.  In so doing, it relied on legal arguments that have no basis in law or fact. Further, it did not present a single witness (expert or otherwise) that could testify about what happened on the floor on any given day.  East Penn has also failed to meet its burden of establishing that any damages owed are *de minimis* as the evidence was clear that the amount of uncompensated time is substantial, particularly in the aggregate, and East Penn could have recorded all compensable time under the continuous workday in any number of ways.  As for willfulness, the evidence shows that East Penn's attorney, Gary Melchionni, informed it of the requirements of the law.  East Penn reviewed the advice, understood the advice, then persisted with its pay practices that violated the law. It did not produce any evidence that it did not know or recklessly disregard the requirements of the Fair Labor Standards Act.

Specifically, East Penn failed to present legally sufficient evidence for a reasonable juror to conclude: (1) the Personal Protective Equipment it required of non-uniformed workers was not compensable; (2) it did not violate 29 U.S.C. § 207 for non-uniformed workers that wore PPE; (3) it did not violate the FLSA's recordkeeping requirements for non-uniformed workers that wore PPE; (4) that the Secretary's estimate of the unpaid work for the workers that wore uniforms and non-uniformed workers that wore personal protective equipment was unreasonable;

(5) that the time it failed to pay the workers at issue in this case was de minimis; and (6) it that it did not willfully violate the law.[1]

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) permits a court to grant judgment as a matter of law after the nonmovant has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for them. Motions for judgment as a matter of law should be granted sparingly. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). The question before the court is whether the nonmoving party produced enough evidence such that the jury could properly find for that party. *Id.* (citing *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir.1978)).  "The court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 492 (3d Cir. 2002) (citations and quotations omitted). In deciding the motion, the court reviews the evidence in the light most favorable to the nonmovant and gives "every fair and reasonable inference." *Lightning Lube, Inc..*, 4 F.3d at 1166.

## III.     ARGUMENT

### A. East Penn Failed to Rebut Evidence that the PPE East Penn Required for Non-Uniformed Workers Was Compensable and East Penn Violated § 207 with respect to those workers.

East Penn required every employee to wear a minimum amount of personal protective equipment ("PPE") of boots and safety glasses for their safety. *See*, *infra* Section (III)(D)(4)(a). The evidence at trial established that employees could not perform their jobs without wearing

---

[1]There are two issues the Court must also decide that are not before the jury:  liquidated damages, and whether injunctive relief is appropriate.  The Secretary intends to file a motion on both of these issues following the jury's verdict.

this PPE. As such the PPE East Penn required was integral and indispensable and therefore time spent donning and doffing it was compensable.

Under the Fair Labor Standards Act, absent limited exceptions, employers must pay from first principal activity to last principal activity. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 37 (2005). This is the continuous workday rule. *Id.* Principal activities that are integral and indispensable to the employee's principal activities are themselves principal activities. *Id.*

The donning and doffing of personal protective equipment for non-uniformed workers was an integral and indispensable activity. The Supreme Court held in *Mitchell v. King Packing Co.*, 350 U.S. 260 (1956), that time meatpacker employees spent sharpening their knives was "an integral part of and indispensable to the various butchering activities for which they were principally employed." *Id.* at 263. The Court cited testimony that dull knives slowed production, caused accidents, increased waste, and affected the quality of meat and hides. *Id.* at 262. Therefore, although the knife sharpening occurred "before or after the direct or productive labor for which the worker is primarily paid," *Id.* at 260, the Court deemed sharpening time integral and indispensable. There was no reference to the uniqueness of this activity.

East Penn's uniforms are not unique, yet they are personal protective equipment, and their donning and doffing are compensable under Supreme Court precedent. The uniforms East Penn requires are a form of personal protective equipment, and the policy states as such. P-7; P-8; 4/10/23 Tr. 257:20-258:7 (Troy Greiss). And the Secretary notes that East Penn's arguments concerning the compensability of personal protective equipment are inconsistent. Throughout this matter, East Penn has elicited testimony from witnesses that the tee-shirt and pants that East Penn's requires are "ordinary" tee-shirts and pants. *See*, *e.g.* 4/11/23 Tr. 26:1-28:25 (Troy Griess). Yet it concedes employees must be compensated for donning and doffing uniforms.

  
In *Steiner v. Mitchell*, the Supreme Court held that a battery manufacturer requiring its employees to don and doff their clothes had to pay for the time, noting that:

> in order to make their plant as safe a place as is possible under the circumstances and thereby increase the efficiency of its operation, petitioners have equipped it with shower facilities and a locker room with separate lockers for work and street clothing. Also, they furnish without charge old but clean work clothes which the employees wear.

*Steiner v. Mitchell*, 350 U.S. 247, 251 (1956). Like East Penn, its employees were exposed to lead and sulfuric acid, which posed a risk to the employees and their families. *Id.* at 250. There was no reference by the Supreme Court to the uniqueness of the clothing. Yet East Penn has correctly conceded throughout this case that the time spent donning and doffing this form of personal protective equipment is compensable under the law. *See* Dkt. 273 at p. 14.

The Third Circuit held in *De Asencio* that the focus of whether personal protective equipment was integral and indispensable—and therefore compensable—was the degree to which it was "controlled or required" by the employer. *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3d Cir. 2007). In that case, the personal protective equipment included: smock, hairnet, beard net, ear plugs, and safety glasses, dust mask, plastic apron, soft plastic sleeves, cotton glove liners, rubber gloves, a metal mesh glove, and rubber boots. *Id.* at 364. There was nothing unique about this gear, and the Third Circuit declined to draw such a distinction— instead focusing on whether the personal protective equipment was controlled or required by the employer.

Consistent with the Third Circuit in *De Asensio* the Supreme Court also held that an employer can make an activity "integral and indispensable" and therefore compensable if an employee cannot do his principal activities without it. The Supreme Court reaffirmed in *Busk* that the focus on whether an activity is integral and indispensable is if the activity is intrinsic to

the performance to his principal activities. *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014) ("We hold that an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities.")[2]

Here, East Penn required a minimum amount of personal equipment of protective boots and eye protection before employees could perform their productive work. *See* P-10 at PX010.00002; 4/13/23 Tr. 21:7-11 (stipulation). East Penn also required additional personal protective equipment for worker protection. Troy Griess Vice President of Environmental Health and Safety at East Penn testified at trial:

> Q. What determines if an employee has to wear PPE beyond the safety glasses and the steel-toed the boots?
> A. It would depend on the potential exposures that they may have on the job that they're performing.

4/11/23 Tr. 12:12-15 (Griess)

While East Penn elicited testimony on the relative ease and uniqueness of the personal protective equipment that East Penn required, it did not present any testimony to rebut that it required the personal protective equipment for employee safety.  On the other hand, in the Secretary's case-in-chief, employees testified that the protective boots protected their feet from being injured due to crushing. *See*, *e.g.* 4/5/23 Tr.32:17-33:2 (Stephen Hartman); 3/20/23 Tr. 263:13-25 (Collen Stump); 3/23/23 Tr. 160:5-14 (Jerry Berks); 4/6/23 Tr. 240:8-241:6 (Donald

---

[2] *Busk* involved the compensability of security screenings. *Id.* at 518.  The Supreme Court found that the security screenings were not integral and indispensable because the employer could have ended the practice without impairing its employees' ability to complete the work. *Id.* Here, the employees could not perform their production work without the personal protective equipment— they would have suffered injuries.

Muthard). Employees testified that the eye protection protected their eyes from debris flying during the workday. *See*, *e.g.*, 4/5/23 Tr. 33:3-14 (Stephen Hartman); 3/20/23 Tr. 263:13-25 (Collen Stump); 4/6/23 Tr. 243:8-244:2 (Donald Muthard). Simply put, the employees could not safely perform their jobs without this equipment. And, East Penn benefited from reduced workplace accidents. No reasonable juror could find that the personal protective equipment required of non-uniformed workers was not integral and indispensable to their principal activities.

### B. No Reasonable Juror Could Find That East Penn Did Not Violate The FLSA's Overtime Provisions For Non- Uniformed Workers That Wore PPE.

The evidence is overwhelming that East Penn violated the FLSA's overtime provisions for non-uniformed workers that wore PPE. East Penn's records, including the shift schedule (P-16B) and timeclock policy P-11 at ¶ 5, confirm that these non-uniformed workers that wore PPE worked at least 40 hours. *See also*, *infra* Section (III)(D)(4). As discussed *infra*, the evidence further confirmed that non-uniformed employees donned and doffed their PPE outside of their scheduled, paid shift. *See*, Section (III)(C). So, any uncompensated pre- and post-shift work necessarily was over 40 hours and necessarily overtime and subject to the overtime premium under 29 U.S.C. § 207. Accordingly, no reasonable juror could find that East Penn did not violate the FLSA's overtime provisions with respect to non-uniformed workers that wore PPE.

**C.  East Penn Failed to Present Evidence that It Kept Records of The Pre- And Post- Shift Work For Non-Uniformed Workers that Wore the Required PPE**

As the PPE for non-uniformed workers was integral and indispensable, the donning of PPE for non-uniformed workers commenced the continuous workday. *See Alvarez,* 546 U.S. at 37.  Absent limited exceptions such as *bona fide* meal periods and breaks of more than 20 minutes, East Penn was required to pay for all work until the employee's last principal activity. *See Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 433 (3d Cir. 2017) (stating breaks of 20 minutes or less are compensable is "a bright line rule"); 29 C.F.R. § 785.19 (stating bona fide meal periods of 30 minutes or more is not worktime).

East Penn produced several declarations for non-uniformed workers that wore PPE only that confirmed the workers put on their PPE before clocking in.

| Name | Beginning Bates | Ending Bates | Location |
|---|---|---|---|
| Adam, Jeannie | PX002.0001 | PX002.0003 | IM2 |
| Admas, Paul T.[3] | PX002.0004 | PX002.0007 | IM2 |
| Agramonte, Luz | PX002.0008 | PX002.0010 | IM1 |
| Alba, Martha | PX002.0014 | PX002.0016 | IM1 |
| Alloggio, Christina M. | PX002.0017 | PX002.0020 | IM1 |
| Coello, Mayra-156 | PX002.0050 | PX002.0052 | IM2 |
| Dale, Kathleen | PX002.0066 | PX002.0068 | IM1 |
| Gonzalez-Diaz, Juan | PX002.0129 | PX002.0131 | IM1 |
| Legal, Maxime | PX002.0172 | PX002.0174 | IM2 |
| Long, James S. | PX002.0175 | PX002.0177 | IM1 |
| Marte-Lopez, Laura P. | PX002.0191 | PX002.0194 | Smelter Annex |
| Miller, Darline | PX002.0208 | PX002.0211 | IM1 |
| Moyer, Anthony A. | PX002.0219 | PX002.0221 | IM1 |
| Olmo, Sara | PX002.0239 | PX002.0241 | IM2 |
| Rosario-Moreta, Lissette | PX002.0283 | PX002.0285 | IM2 |
| Santos-Santana, Johanny A. | PX002.0298 | PX002.0301 | Smelter Annex |
| Shade, Vicki | PX002.0324 | PX002.0326 | IM2 |
| Snyder, Mark | PX002.0330 | PX002.0332 | IM1 |
| Stamy, Andy | PX002.0340 | PX002.0342 | IM1 |

At a minimum, from the declarations it produced it confirms that it did not keep records of the pre-shift work for the non-uniformed workers. East Penn has never argued or offered any evidence that it actually tracked when non-uniformed employees began putting on their PPE and when they took it off.  Therefore, the undisputed record is that East Penn failed to keep records of this compensable work.

---

[3] Paul Adams testified at trial that to this day he continues to put on his personal protective equipment before clocking in for work. 4/10/23 Tr. 114:13-14; 115:17-118:1 (Adams)

**D. The Secretary Presented A Reasonable Estimate of All Uncompensated Time Through Representative Evidence, Which East Penn Failed to Rebut.**

As East Penn failed to keep records of both the uniformed[4] and non-uniformed employees' pre- and post-shift work, the Secretary is entitled to recover a reasonable estimate of wages owed using representative testimony.

### 1. Legal Standard For Just And Reasonable Inference

When an employer fails to keep records of its employees' work, the Secretary has a reduced burden of proof to establish the amount of uncompensated time using a reasonable estimate as a matter of "just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *see generally, Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); *Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1297-98 (3d Cir. 1991).

"[T]he 'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" *Bouaphakeo,* 577 U.S. at 455-56 (quoting *Mt. Clemens,* 328 U.S. at 687). Because East Penn failed to maintain records of all hours worked, Plaintiff need only to submit "sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." *Selker Bros.*, 949 F.2d at 1297 (*citing Mt. Clemens Pottery*, 328 U.S. at 687-88). In the absence of records, Plaintiff need only (1) show that employees performed work for which they were not properly paid, and (2) "produce sufficient evidence showing the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 1298. Thus, the

---

[4] The Court has held as a matter of law that for uniformed employees East Penn committed a "per se recordkeeping violation" under Section 11(c) of the Fair Labor Standards Act ("FLSA") when it failed to keep records of the "actual time [employees] spent on donning, doffing, and showering." Dkt. 273 at 24-25. The Court has also held as a matter of law that East Penn violated the FLSA's overtime requirement,29 U.S.C. § 207, for uniformed employees. Dkt. 273 at 29.

Secretary's burden is "merely to present a prima facie case." *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994).

Plaintiff can meet this relatively low burden of proof using representative testimony and evidence, and any existing records or documentary evidence. *Bouaphakeo,* 577 U.S. at 455-59; *Selker Bros.*, 949 F.2d at 1298. The Secretary need not show that the employees are identical. Rather, she can meet her burden by providing representative testimony that is "fairly representative" of the employees. Dkt. No. 273, p. 41.

East Penn cannot benefit from the ambiguity caused by its failure to keep records. Dkt. 273 at 23. As the Supreme Court has authoritatively stated, to require the Secretary to prove uncompensated time with precision would effectively reward East Penn for violating the FLSA and punish the very employees the statute is designed to protect:

> The solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Mt. Clemens*, 328 U.S. at 687; *Selker Bros.*, 949 F.2d at 1297. Therefore, once the Secretary meets her *prima facie* burden, it shifts to the employer to:

> come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [the Secretary's] evidence. If the employer fails to produce such evidence, the court may then award damages to the [Secretary], even though the result be only approximate.

*Mt. Clemens*, 328 U.S. at 687–88. Thus, employers bear the lion's share of the burden because their recordkeeping violations created the uncertainty in the first place. *See Id.* If employers fail to meet this burden, the court must award damages to all affected employees, even if those damages are an approximation. *Selker Bros.*, 949 F.2d at 1297; *Gateway Press*, 13 F.3d at 701.

### 2. Legal Standard For Representative Testimony

Evidence and testimony are sufficiently "representative" if they show that employees perform substantially similar work. *See e.g.*, *Sec'y U.S. Dept. of Lab. v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991); *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 67–68 (2d Cir. 1997).  Minor variances, such as the walking distance or differences in personal protective equipment, are insufficient to overcome representative evidence and do not prevent a one stroke determination. *Bouaphakeo*, 577 U.S. at 448, 456. The Supreme Court rejected these arguments and affirmed the use of representative evidence in back wage reconstruction cases. *Id.*at 459. It held that variances in donning and doffing time of up to 10 minutes a day were insufficient to overcome representative testimony. *Id.*at 456. It also indicated that variances in the type of protective gear were insufficient to overcome representative testimony. *Id.*at 448; *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 797 (8th Cir. 2014), *aff'd and remanded*, 577 U.S. 442 (2016) ("While individual plaintiffs varied in their donning and doffing routines, their complaint is not dominated by individual issues such that the varied circumstances . . . prevent one stroke determination.") (internal citations and quotations omitted). The Supreme Court noted that the key question of whether the evidence is sufficiently representative is whether the work was "similar"—not the same. *Id.*at 797.

Other courts have similarly held that minor inconsistencies are insufficient to rebut the Secretary's *prima facie* case under *Mt. Clemens*, and were thus insufficient for an employer to meet their higher burden of coming forward with precise evidence. Here, East Penn has not performed its own time study or offered an alternative to the Secretary's representative evidence of the amount of uncompensated time. Under *Mt. Clemens*, East Penn's failure to do so only underscores the "reasonableness" of the inferences drawn from the Secretary's evidence. *See Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1065 (6th Cir. 2019) ("The reasonableness

of the DOL's proposed calculation depends in part on the availability of other, more reasonable alternatives to that proposal."); *see also McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (holding that, while the testimony of employee witnesses were inconsistent in terms of exact days and hours of overtime, they established, "as a matter of just and reasonable inference," the amount of uncompensated overtime.); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985) (rejecting minor inconsistencies in evidence where "the evidence as a whole clearly suffices to establish the existence of a pattern or practice, at least as a 'just and reasonable inference.'").

### 3.   The Secretary's Reasonable Estimate

At trial, the Secretary presented a time study to measure the amount of pre- and post-shift work. The Secretary's expert, Dr. Robert Radwin, is an expert in "human factors in ergonomics which is the study of people and their interaction with different systems. 3/27/23 Tr. 163:9-11. His work involves the quantification and measurement of work activities. *Id.* at 163:14-16.  He has performed many efficiency studies for measuring how long work-related tasks should take. *Id.* at 167:13-21.  As for how long the tasks did take, which is the issue in a back wage reconstruction case, he has done dozens of studies similar to the one he did for East Penn. *Id.* at 167:24-168:2.  He has also performed many studies specifically related to the donning and doffing uniforms and showering. At trial he testified:

> Q.   Have you ever done a time study or a study of how long things take that was related to putting on uniforms, taking off uniforms and showering before?
> A.   Yes.  I've done many of those types of time studies.
>
> Q.   About how many?
> A.   I would say 20 or more of those time studies, and some of those involve many different buildings or plants.
>
> Q.   Is that the kind of study you did in this case, to measure how long something actually took?

A.      That's right.

*Id.* at 168:10-21 (Radwin).  Before conducting his study of East Penn, Dr. Radwin visited all the

plants. P-61. After visiting all of the locations, he selected and studied 7 plants—A-1, A-2, A-3,

A-4, Industrial Automotive, Central Services, S-1. P-62.  Dr. Radwin testified that he designed

his study to represent all uniformed employees in this action. 3/27/23 Tr. At 187:20-190:23

(Radwin). His sample covered 80 percent of uniformed workers at Lyon Station.  *Id.* Dr. Radwin

testified that his study was representative of the population of all plants at which uniformed

employees worked. *Id.* at 203:21-204:21 (Radwin). He stated that his study was representative of

the population as a whole, rather than any particular location. *Id.* at 203:21-204:21; 224:1-9

(Radwin).

Dr. Radwin's study was consistent with the continuous workday. At the beginning of the

day he measured from when the employee started changing into their unform and included either

touching their uniform, opening their locker, or starting to doff their street clothes. 3/27/23 Tr.

202:3-18 (Radwin); P-64. He compared that first touch to the adjusted punch time, which is

when East Penn starts paying for work.  *Id.*; D-78 (Kuhns Dep.) At the end of the shift he

measured from when the employee departed the production floor and continued to the last work

activity that included changing into street clothes, disposing of the towel after showering, or

disposing of the uniform. *Id.* at 203:6-20 (Radwin); P-64. For the pre-shift he measured when

employees began working 15.6 minutes on average before their paid shift. *Id.* at 212:5-213:8

(Radwin). He determined that with a 95 percent confidence interval of plus or minus 1.4. *Id.*  For

the post-shift work, Dr Radwin completed his end-of-shift activities 11 minutes after departing

the production floor. *Id.* at 222:24-10. He said this was an underestimate because it did not

measure all the walking time on the plant floor. *Id.*  He measured the post-shift work with a 95

percent confidence interval of plus or minus six tenths of a minute (.6). *Id.* at 222:1-5.

The Secretary presented testimony from Mr. Michael Murray, her summary witness, on

the amount of wages due to East Penn's employees applying Dr. Radwin's time study result of

26.6. 4/4/23 Tr. 160:21-24 (Murray). That added up to $160,414,764.85 in back wages. *Id.* at

169:3-5 (Murray)

### 4.   The Secretary Supported his Reasonable Estimate with Other Representative Evidence

#### a)   East Penn's Policies Ensured That All Workers In Radwin's Study And Murray's Calculations Performed Pre- And Post-Shift Work In A Similar Way

East Penn's policies at issue in this case ensured that the employees at issue in the case

performed substantially similar work.

Courts routinely accept testimony from a small number of employees as representative

evidence of a large number of employees, where the pay practices and polices ensured that the

work was substantially similar, if not identical, to the work of the non-testifying employees. *See*

*Monroe v. FTS USA, LLC*, 860 F.3d 389, 408 (6th Cir. 2017) (collecting cases that show a

pattern of violations that establish representative evidence and stating that "Our sister circuits

overwhelmingly recognize the propriety of using representative testimony to establish a pattern

of violations that include similarly situated employees who did not testify."); *Donovan v. New*

*Floridian Hotel, Inc.*, 676 F.2d 468, 473 (11th Cir. 1982) (stating that a pattern of employment

practices can establish representative evidence for non-testifying employees); *Donovan v.*

*Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) ("The plaintiff in the instant case

produced testimony of twelve former employees. This testimony was supported by that of the

compliance officer, as well as documentary evidence. While not every employee testified, at

least one employee from every station testified or was deposed. Not all injured employees need

testify in order to establish a prima facie case as a matter of "just and reasonable inference. The

plaintiff's evidence was sufficient to establish a pattern of violations, thereby causing the burden

to shift to the Employer.") (citations and quotations omitted); *Donovan v. Burger King Corp.*,

672 F.2d 221, 225 (1st Cir. 1982) (testimony of employees for six restaurants was sufficient to

establish violations for 44 restaurants where all the policies were the same); *McLaughlin v. Ho*

*Fat Seto,* 850 F.2d 586 (9th Cir.1988) (garment factory workers), *cert. denied,* 488 U.S. 1040,

109 S.Ct. 864, 102 L.Ed.2d 988 (1989); *McLaughlin v. DialAmerica Marketing, Inc.,* 716

F.Supp. 812 (D.N.J.1989) (home telephone number researchers), *aff'd,* 935 F.2d 1281 (3rd

Cir.1991), *cert. denied,* 501 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991)); *see also,*

*Bouaphakeo v. Tyson Foods, Inc.*, No. 5:07-CV-04009, 2012 WL 4471119, at *3 (N.D. Iowa

Sept. 26, 2012), *aff'd,* 765 F.3d 791 (8th Cir. 2014), *aff'd and remanded*, 577 U.S. 442, 136 S.

Ct. 1036, 194 L. Ed. 2d 124 (2016) (denying a Rule 50 motion when the plaintiff produced

evidence of a time study and testimony from several employee witnesses that said that the pay

practices and work was the same).

East Penn's policies and pay practices ensured that all 11,780 all performed ***the same***

uncompensated pre-and post-shift work in the same or similar locations. Specifically:

**Personal Protective Equipment Policies**

- East Penn policy that required all uniformed workers, regardless of plant, to put
  on their uniforms and personal protective equipment before arriving to their
  workstation. P-7; P-8.  These policies meant that every worker had to perform the
  integral and indispensable activity of putting on their uniform and personal
  protective equipment in their respective locker rooms before arriving to their
  machines.
- The practice of requiring all employees to be on the floor at the start of their shift.
  *See*, *infra* Section (III)(D)(4)(c).
- The policy providing the alleged five-minute grace period at the beginning of shift
  start. P-7; P-8; P-2; Exhibit A at pp. 45-70.

- The policy providing an alleged 5-minute dismissal from their workstation from 2003 to 2016 (P-7), which was later changed to an alleged 10-minute dismissal time. P-8.
- Its practice to permit employees not to use the alleged dismissal times for post-shift work and to continue working on the floor, which pushed the required post-shift work to uncompensated time. *See, e.g.* 3/23/23 Tr. 19:20-24 (Angel Canela); 3/23/23 Tr. 208:14-20 (William Tomlinson); 4/5/23 Tr. 47:9-17 (Amanda Carter); 270:1-5(Thomas Kerchner); 3/22/23 Tr. 177:4-13 (Dante Rivera); 3/22/23 Tr. 66:9-67:11 (Jesse Gilmer); 3/21/23 Tr. 47:10-25 (Donna Sweitzer).
- The policy of requiring safety glasses and steel-toed shoes as the minimum personal protective equipment for "all plant assignments." P-10 at PX010.00002; 4/13/23 Tr. 21:7-11.
- The policy that allowed employees to be disciplined for failing to wear their required personal protective equipment as required by East Penn. *Id.*at PX010.0004 at no.13.
- The policy requiring uniforms to stay at East Penn and disciplining employees for removing them from East Penn's premises. *Id.*at PX010.0004 at no.29.
- The policy to provide uniforms to employees as a form of personal protective equipment to limit the risk of lead exposure for employees and their families. 4/13/23 Tr. 21:18-21(stipulation).
- The policy to require its uniformed employees to shower at the end of their shift. 4/13/23 Tr. 21:22-24; P-33; 4/10/23 Tr. 246:15-247:13 (Troy Greiss)
- Its practice not to control when people performed pre-and post-shift work, which resulted in employees routinely performing compensable work before and after punching. *See*, *infra*, Section (III)(D)(4)(c).
- The facilities that East Penn provided for the pre- and post-shift work to occur were similar. Most plants had one locker room for employees to perform the work.

**Timekeeping/Pay Policies**

- The policy and practice to pay only for its employees' adjusted time, which was the scheduled shift time. P-78 (Kuhns Deposition, Snyder Deposition); *See, e.g.* 3/14/23 Tr. 74:19-83:7 (Rick Seyfried)
- The policy to only pay employees for their scheduled 8-hour shift, and not for pre and post shift work. P-78 (Kuhns Deposition, Snyder Deposition); *See, e.g.* 3/14/23 Tr. 74:19-83:7 (Rick Seyfried)
- Maintaining an electronic time and attendance system that recorded the actual times employees swiped in and out, 4/13/23 Tr. 22:6-9 (stipulation), which was reviewed weekly by plant management and plant secretaries. *Id.* at 22:15-20 (stipulation).
- The policy for disciplining employees for scanning in one minute late or out one minute early. *Id.*at PX010.0003 at No. 4.
- The policy to pay employees in 15-minute increments. P-11 at no. 3.
- The policy to permit employees to swipe in 14 minutes before shift start, which East Penn would round in its favor. *Id.* The policy to permit employees to swipe

out 14 minutes past shift end, which East Penn would round in its favor. *Id.* This rounding occurred for all hourly employees at East Penn. P-78 (Kuhns Deposition, Snyder Deposition)

• Its policy and practice not to pay for the actual time the employees were swiped into the timeclock. P-78 (Kuhns Deposition, Snyder Deposition)

East Penn's policies and practices placed 11,780 employees in a similar category and created a pattern of violations. They ensured that every single worker began the continuous workday the same way, by grabbing a clothing item that East Penn required. Its policies ensured that every single employee in this action ended their workday the same way, by restoring themselves into their street clothes—and for the overwhelming majority of employees, after showering.[5]

        **b) East Penn's Time Records Show It Shaved 13 minutes On Average Every Single Day, Which is the Minimum Amount of Unpaid time.**

East Penn produced time records that show the daily minimum actual time employees worked and cover every single worker at issue in this litigation, which constitutes representative evidence. Every single swipe, by every single employee, at the beginning and end of every single shift, on every single day each employee worked is reflected on these time records. East Penn's records reflect two sets of time entries, actual and adjusted. *See* P-4, P-49. The actual punch was the time the employee swiped the clock, and the adjusted time was when East Penn started paying them. *See supra* Section (III)(D)(4)(a). The testimony about when workers swiped the clock confirms that the time shown by the actual swipes is compensable work. *See infra* Section (III)(D)(4)(c).[6] This is shown by the testimony of virtually every employee at trial, who

---

[5] According to Dr. Woods, East Penn's expert, 89 percent of the jobs at issue are uniformed, 11 percent are non-uniformed PPE employees. 4/27/23 Tr. 66:4-10 (Woods).
[6] East Penn's documents show that it considered the swipes as the start and stopping time for work. P-22, P-23. In P-22 and P-23, East Penn reviewed the average time swipes to assess whether employes were working off the clock. Further, in P-42, East Penn's attorney, Mr. Melchionni, did not address or argue for any distinction between swipes and work.

consistently testified they either changed before clocking in (thus their continuous, compensable workday was even longer than what their actual punches show), or clocked in immediately after changing (making the clock in time the best proxy we have for when the work started). *See*, *e.g. id.* The same is true for the end of the workday. *See*, *e.g.*, *id.* East Penn also confirmed this in the declarations it gathered and produced. *See infra* Section (III)(D)(4)(c).

The difference between their time records and their paid shifts is direct, representative evidence of the *minimum* amount of uncompensated work East Penn employees performed—and the time for which they are owed. *See, e.g., Hobbs v. EVO Incorporated,* 7 F.4th 241, 257-258 (5th Cir. 2021) (using timesheets where plaintiff provided testimony that the time sheets were generally accurate over defendant's objections to show unpaid wages); *see also Marshall v. Newport Motel, Inc.* 1979 WL 15529, *7 (S.D. Fla. 1979) ("Absent any showing of inaccuracies therein, respondents' own timecards are the best evidence of employees' actual daily and weekly hours worked.").

Third Circuit precedent clearly establishes that the Secretary can meet her reduced burden using an employer's incomplete or deficient records as representative evidence. In *Selker Bros.*, 949 F.2d at 1297-98, the Third Circuit applied *Mt. Clemens* and affirmed the district court's award of back wages to non-testifying employees based in part on gas station gallon commission records: "Where employers have failed to comply with their statutory duty to keep adequate records, courts have resorted to documentary evidence as a basis for inferring hours worked." *Id.* at 1297 (citing *Donovan v. Williams Oil Co.*, 717 F.2d 503, 506 (10th Cir. 1983) (in the absence of time records, back wages were based partially on employer gallonage records)). Similarly, in *Sec'y U.S. Dept. of Lab. v. Central Laundry, Inc.*, the Third Circuit reversed the district court's denial of back wages for employees who did not testify. 790 Fed.Appx. 368, 372-

73 (3d Cir. 2019). Applying *Mt. Clemens* and *Selker Bros.*, the Third Circuit found that the Secretary presented sufficient evidence at trial to establish both liability and estimate damages for non-testifying employees who only appeared on a single, two-week time record. *Id.* On remand, the trial court awarded three years of back wages for the thirteen non-testifying employees based on that single two-week record. *See* Civ. Action No. 18-cv-190 at Dkt. 71.

Other courts have similarly held that the Secretary—or employees—can meet her burden under *Mt. Clemens* using an employer's deficient records as representative evidence. *See e.g., Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1064-65 (6th Cir. 2019) (applying *Mt. Clemens* and affirming the district court's award of estimated back wages based in part on the employer's incomplete records); *Perez v. Super Maid, LLC*, 55 F.Supp.3d 1065, 1080 (N.D. Ill. 2014) ("Where gaps existed in the records provided, the Secretary had to reconstruct an average hourly rate and total time worked to calculate what was due in minimum wage and overtime."); *Jemine v. Dennis*, 901 F.Supp.2d 365, 377-79 (E.D.N.Y. 2012) (applying *Mt. Clemens* and awarding reconstructed back wages based, in part, on the employer's incomplete time and payroll records); *McLaughlin v. DialAmerica Mktg, Inc.*, 716 F.Supp. 812, 825-26 (D. N.J. 1989) (awarding, in the absence of time records, the Secretary's reconstruction of hours worked and back wages due based, in part, on the employer's records related to piece-rate pay).

Courts routinely hold that time records are the best evidence of time worked.  *See Ealy-Simon v. Liberty Med. Supply, Inc.*, No. 05-14059-CIV, 2007 WL 7773834, at *6 (S.D. Fla. Feb. 12, 2007) ("The FLSA lays this responsibility clearly with the Defendants as the employer and regards the employer's punch clock records as the best evidence of time worked.");[7] *Colindres v.*

---

[7] Even still, East Penn cannot come forward with bare arguments that the time clock swipes are inaccurate. It must specify precisely how they are inaccurate or come forward with specific

*Quietflex Mfg.,* 427 F.Supp.2d 737, 751 (S.D.Tex.2006) (finding the actual punch time shown in the defendants' time records better accounts for work time than the scheduled shift time by which the employees were paid does). This is sensible. East Penn should not benefit from its negligence in ensuring that its timeclocks did not capture non-compensable activities, because employers are supposed to monitor their employees to ensure that employees are working while on the clock. *Reich v. Dep't of Conservation & Nat. Res., State of Ala.*, 28 F.3d 1076, 1083 (11th Cir. 1994). Regardless, there is simply no evidence in this case that the "actual" time reflected in the times swipes covers any significant amount of non-compensable work. The evidence showed the opposite— not a single employee testified to any significant non-compensable time following a time swipe.

In P-4, the Secretary has the raw data for 12 million time records that cover every single worker in this action and show the daily minimum time removed from every single worker at issue in the litigation, every single day. 4/4/23 Tr. 91:5-97:12 (Murray). The raw data that covers the employees at issue in the litigation is representative evidence. Indeed, it is the only true contemporaneous evidence of what happened during the workdays at issue. In no way could a jury's reliance on such extensive contemporaneous evidence be deemed unreasonable. The Court acknowledged at summary judgment that the Secretary could argue that the time records captured the minimum number of hours worked for pre- and post-shift work. Dkt. 273 at p. 32.

To exemplify what the raw data shows, in P-55 and P-56, the Secretary summarized 7,092,848 time records, which represent 95.67 percent of all shifts between November 23, 2014 and December 31, 2019. It covers the time records of thirteen plants—A1, A2, A3, A4, S1,

---

evidence to negate the records. *Id.* (citing *Mt. Clemens*, 328 U.S. at 687); *Hobbs v. EVO Inc.*, 7 F.4th 241, 257 (5th Cir. 2021) (Same)

Industrial, Industrial Auto, IM1, IM2, Maintenance, Smelter Annex, S1 Annex, and Laundry. These exhibits show the average amount of time East Penn adjusted off each worker, each day, between November 2014 and December 2019. For the 13 plants for the proscribed time period, each year East Penn adjusted on average between 12.39 minutes and 13.96 minutes every day from workers. For a 5-day work week, this adds up to 4.1 and 4.7 hours of pay every single month. Plants such as IM1 and IM2, which are predominately PPE (P-16B) fall within this average, which shows that locations where employees did not wear uniforms performed uncompensated work in a similar manner to plants where employees mostly wore uniform. This supports the Secretary's use of Dr. Radwin's 26.6 for workers that did not wear uniforms.

By way of another example, the Secretary's summary witness Mr. Michael Murray testified that for that same five-year period only 67 out of 11,700 employees were able to have zero time shaved off for pre- and post-shift work. 4/4/2023 Tr. 153:14-159:7. This analysis shows that virtually every employee had time rounded in East Penn's favor every single day.

The declarations that East Penn gathered and produced also establish that the time clock records captured unpaid work. East Penn concedes in 612 declarations that employees swipe out immediately after completing their end of shift activities. Dkt. 569-2, at pp. 19-40; P-2. For the pre-shift work, 312 of East Penn's declarations state that employees swipe the timeclock just before performing their pre-shift work. Dkt. 569-2, at pp. 1-18. The remaining 451 of East Penn's declarations state that workers begin work before swiping the time clock, so their compensable continuous workday has already begun. *See* Dkt. 569-2, at pp. 19-40. The declarations that East Penn gathered and produced therefore support the conclusion that the time clock records captured work.

East Penn's expert, Dr. Jeffery Fernandez, measured the time that elapsed for Dr.
Radwin's participants between swiping a timeclock and grabbing a uniform. P-101.  Most of
these workers he found that the time that elapse was less than a minute, and for many it was a
few seconds. *Id.*; P-101; 5/2/23 Tr. 139:2-146:11 (Dr. Fernandez).

The time records show the minimum amount of rounded time each day was 13 minutes.
There is no evidence that employees were not working during the time they were swiped into the
clock. To the contrary, the evidence shows that employees were working before swiping in and
after swiping out.  East Penn failed to present evidence to rebut that the time records captured
compensable time during the continuous workday. Therefore, the time records are the minimum.
A minimum of 13 minutes owed to workers, supports that Dr. Radwin's estimate of 26.6 minutes
was reasonable.

### c) Employee Testimony Confirmed that the Secretary's Estimate Was Reasonable.

The Secretary's witnesses not only testified on their own behalf, but they also testified to
seeing their co-workers working off the clock every day. Many employees testified that they saw
their coworkers and subordinates were at their machines by shift-start fully donned in uniforms
and/or personal protective equipment, which meant they performed compensable work off-the-
clock. At all relevant times during this litigation, workers continued to arrive to their machines
by shift start. At the end of the day, employees testified that employees would leave the floor late
and that it was not possible for employees to complete all of the work of doffing and showering
on paid time. For example:[8]:

---

[8] While the chart below focuses on the pre-shift there were also several employees, who testified
that employees did not use the 10-minute dismissal time. *See, e.g.* 3/23/23 Tr. 19:20-24 (Angel
Canela); 3/23/23 Tr. 208:14-20 (William Tomlinson); 4/5/23 Tr. 47:9-17 (Amanda Carter);

| Location[9] | Testimony |
|---|---|
| A-1 | • **Richard Seyfried**- He testified that A1 was no different from A4 in terms of the pre and post shift work (3/14/23 Tr. 63:19-64:11). As a lead person he generally supervised between 30 and 40 employees (3/14/23 Tr. 7:5-9, 9:6-9). He saw employees swiping in and out the time clock in full uniform in A1, A3, and A4. (3/14/23 Tr. 94:8-95:1)<br>• **Michael Zumas**-Was a leader from 2016-2019. (3/22/23 Tr. 228:14-24) He supervised 13-15 people and only a couple came out after shift start. (*Id*.239:7-17)<br>• **Richard Arechiga**-He supervised 18 quality assurance employees between A-1 and Smelter Annex between 2014 and 2016. (3/16/23 Tr. 136:16-22) As a leader, he understood that the rule was that all employees had to be at their line by shift start, and if not, they were late. (3/16/23 149:3-150:20) All 18 of his employees arrived at their workstation by shift start. (3/16/23 Tr. 189:21-24) He never learned of a grace period while working for East Penn (3/16/23 Tr. 192:6-80, 255:25-256:13)<br>• **Ellen Christman**- She testified she was a janitor in A1 for three years, and before that was in Cast on Strap ("COS") (enveloping for 30 years). (3.23/23 Tr. At 105:20-106:8). While in COS she would punch in 14 minutes before shift start. (*Id.* at 109:18-110:19). She would see other employees there when she was at her workstation 14 minutes before shift start. (*Id.*at 113:10-13). Also, her partner on the machine would be there before shift start. (Id.at 113:21-114:2). |
| A-2 | • **Thomas Pittman**-He supervised 40 employees from 2014-2020 in pasting. (3/21/23 Tr. 126:22-127:3). He saw all his employees arrive to the floor by shift start. (*Id.*at 128:14-17, 132:6-12). He further testified that the expectation was that employees be at their workstation ready to work by shift start. (*Id.*133:10-22).<br>• **Charles Baez**- He has worked in A2 since at least 2014. (3/20/23 Tr. 69:20-70:2).  He clocks in 14 minutes before shift start and works the 14-minute unpaid period off the clock. (3/20/23. at 70:21-72:3) He confirmed that he saw all his department arriving by shift start. (*Id.*at 77:6-78:3).  His supervisor told him that he had to be at his machine by shift start. (*Id.*at 78:12-16)<br>• **Steve Rogers**-He testified that he worked in A2 and Industrial Auto Finishing for about a month in 2020 and also saw workers arriving to their workstations in full uniform (3/20/23 Tr. 187:22-24,189:11-15, 222:7-10) |

---

270:1-5(Thomas Kerchner); 3/22/23 Tr. 177:4-13 (Dante Rivera); 3/22/23 Tr. 66:9-67:11 (Jesse Gilmer); 3/21/23 Tr. 47:10-25 (Donna Sweitzer).

[9] This list is for illustration purposes and is non-exhaustive.

| | |
|---|---|
| | • **Dante Rivera**-He testified he was a leader from 2016-2021. (3/22/23 Tr. 165:25-166:1, 167:2-167:10) He did not hear of grace period until 2018. (*Id.*189:10-16). He supervised 30 employees. (*Id.*at 223:9-224:1).<br>• **Amanda Carter**-She testified that she has worked at East Penn for two and a half years. (4/5/23 Tr. 36:10-11) She started in A2 in November 2020, (*Id.*at 37:19-20). She would get to work 30 minutes before and get the uniform. (*Id.*at 38:3-15).  When she clocks in there are a line of employees waiting to clock in. (*Id.*at 40:7-13) She approximated that she sees about 15 of 70 people from her shift. (*Id.*at 40:14-21). She further testified to seeing 85 to 90 percent of employees are at their machines by shift start. (*Id.*at 41:23-42:11).<br>• **David Nabozny -**He testified that from 2014 to 2015 he was a leader in A2. (3/27/23 Tr. 62:22-63:1) In this role would observe employees swiping out before they showered. (*Id.*at 63:2-5) He supervised 8 to 10 employees, and his expectation was that those employees should be at their workstation by shift start, which they complied with. (*Id.*at 67:6-14). At the end of shift he only allowed five-minute dismissal—not 10. (*Id.*at 67:15-22) |
| A-3 | • **Steve Rogers**- He testified that he was a leader in formation, finishing, raw fill and supervised 80-100 employees from 2014-2021. (3/21/23 Tr. 161:3-19). He testified that 85 percent of his employees would be on the floor by shift start. (*Id.*at 165:17-19). He further testified that if an employee was not on the floor by shift start before 2016, he would discipline them. (*Id.*at 167:5-9). He did not know of a grace period until 2019. (*Id.*at 168:5-16)<br>• **Gary Brendle**-He testified that he was a leader for maintenance and supervised 5 employees from 2014 to 2016. (3/21/23 at 279:13-280:19; 3/22/23 Tr. 4:25-5:3). He did not know of a grace period until 2020. (*Id.*at 283:20-284:3). He further testified that employees did not use any grace period until 2020. (*Id.*at 284:23-285:4, 285:25-286:3).<br>• **Jesse Gilmer**- He testified that he was a foreman from 2014-2021 (3/22/23 Tr.  56:16-57:11) He testified that employees would run the machine all the way up until shift end "to make money." (*Id.*at 62:16-64:12). He further testified that he supervised about 30-35 people and they would all show up by shift start. (*Id.*at 70:8-16) He testified that he did not recognize the grace period until 2018. (*Id.* at 104:10-21) |
| A-4 | • **Richard Seyfried**- He testified that he supervised 30-40 people from 2014-2015 (3/14/23 Tr. 19:22-20:7) He further testified that most people came to their workstation 5 minutes before the paid shift. (*Id.* at 38:11-39:5) He also testified that he saw employees swiping in and out the time clock in full uniform in A1, A3, and A4. (3/14/23 Tr. 94:8-95:1). |

| | |
|---|---|
| | • **Chad Miller**-He testified that he was a leader in A-4 since 2014 but has worked in East Penn for 26 years. (3/24/23 Tr. 54:19-24) He supervises 40 employees. (*Id.* at 55:17-20). He has personally documented for people being on the floor past shift start (*Id.*65:2-13). He further testified that employees were required to be at their workstation at the start of their shift until 2021. (*Id.*at 69:7-15) He also stated that before litigation everyone came out by shift start, now 7 out of 40 come out late—the rest are on time. (*Id.*at 73:25-74:12, 92:20-25). |
| **Industrial** | • **Michelle Kozak**-She testified she was a foreperson from 2014-2020. (3/22/23 Tr. 122:6-18). She supervised between 18-37 people. (*Id.*127:6-15). She testified that 75 to 80 percent of the employees would arrive to the floor by shift start. (*Id.*at 127:19-25). She understood that East Penn expected workers to put on their uniform during the 14 minute unpaid period and that if worker needed additional time for end-of shift work, they did it on unpaid time. (3/22/23 Tr. 138:10-19) |
| **Industrial Automotive** | • **Michael Zumas**- He testified that he supervised 20 people from 2019-2021, and about half came out by shift start. (3/22/23 Tr. 228:22-229:2, 239:21-240:18)<br>• **Gary Brendle**- Testified has been a foreman since 2016. (3/21/23 Tr. 279:13-19). First heard of the grace period in 2020: (*Id.* at 283:20-284:3). Employees did not use any grace period until 2020. (*Id.*at 284:23-285:4, 285:25-286:3).<br>• **Steve Rogers**-He testified that he worked in A2 and Industrial Auto for about a month in 2020 and also saw workers arriving to their workstations in full uniform (3/20/23 Tr. 222:7-10) |
| **IM1** | • **Jerry Berk**-He testified that he supervised 30-35 people. (3/20/23 Tr. 155:16-20) He stated that he saw his employees walk by him at the beginning of the shift on to the plant floor (*Id.* at 154:25-156:12) He said that the rule was for employees to be at their workstation by shift start. (*Id.* at 158:14-18). He further stated that he never heard of a grace period. (*Id.* at 158:25-159:3). He worked in IM1 from2014-2015, (*Id.* at 165:7-9). |
| **IM2** | • **Colleen Stump**- She testified that she retired in 2016, but as a foreperson she supervised 50-60 employees before retirement. (3/20/23 Tr. 251:8-19). She testified that she never heard of a 5-minute grace period. (*Id.* at 252:2-6) She would see employees getting to the floor fully donned with PPE 5 minutes before shift start. (*Id.* at 261:24-263:5) She further testified that employees could not be on the floor without PPE (*Id.* at 264:10-14)<br>• **Stephen Hartman**- He testified that he was a leader/foreman in IM2 from June 2019 to August 2022. (4/5/23 Tr. 11:22-12:19; 18:12-21) When he was a leader, he supervised 40 employees and when he was a foreman he supervised 80 employees. (*Id.* at 18:15-21). He |

| | |
|---|---|
| | testified that 90 percent of his employees arrived at the work floor by shift start. *Id.* at 20:16-21:1) |
| **S-1** | • **Dante Rivera**-He was a leader from 2014-2016. (3/22/23 at 166:2-167:10). He supervised 25-30 employees. (*Id.* at 173:6-9). He testified that employees were expected to be at their workstation by shift start. (*Id.* at 174:2-4). He would see people in full uniform swiping the clock in S1 (*Id.* at 185:3-15)<br><br>• **Moses Molina**-He testified that he has been a leader since 2014 and supervises about 20 people. (4/6/23 Tr. at 184:2-9) He said he did not know of a five-minute grace period until 2018. (4/6/23 Tr. 191:3-192:2) When he was told to tell his employees, the message was that East Penn would "start" giving a five-minute grace period. (*Id.* at 191:24-192:5). Once the message was communicated about half would get to the floor a little later than shift start, which was 3 to 4 minutes past shift start. (*Id.* at 192:13-25). |
| **Manufacturing Services** | • **Bill Tomlinson**- He testified that he was a leader and supervised around 45 employees from 2018 to 2021 (3/23/23 at 216:17-217:11). He would be on the floor before his employees and most of the employees were at their workstation by shift start. (*Id.*at 217:22-218:10). |
| **Central Services** | • **Guillermo Fernandez**-He testified he has been foreman in laundry since at least 2014. (3/21/23 Tr. 229:10-23). He testified that employees were required to be at their workstation in uniform by shift start until 2019. (*Id.*at 238:5-22, 239:11-16). He supervises 40-45 employees: (*Id.*at 230:5-7).<br><br>• **Donald Muthard**- He supervised 26 people in the Stock Room. (4/6/23 Tr. 228:8-24). Most of his employees got to their workstation at the start of their shift or a minute or two after. (*Id.* at 235:7-15).). |
| **Smelter/Oxide I** | • **Jack Sell**-He testified that he supervised 8 to 10 people in Smelter and Oxide from at least 2014-2019. (4/11/23 Tr.  216:18-217:14) Identified one worker that he supervised that got dressed in oxide. (*Id.* at 24:10-225:8). As a supervisor, his expectation was for everyone to be at the workstation at the start of shift in uniform. (*Id.*at 225:20-226:6) |
| **Smelter Annex** | • **Steven Hartman**- He testified that he worked in Smelter Annex from 2013 to 2019, and in August 2022 became a foreman. (4/5/23 Tr. 11:10-12:21). When he was a line worker, would get to their workstation 5 minute before shift start, it was his understanding that he had to be on the floor before shift start. (*Id.*at 15:14-16:1). As a line worker he noticed that 90-95 percent of workers would be on the floor before shift start. (*Id.*at 16:15-17:5).  When he returned in 2022 as a foreman, he oversaw 70 to 80 employees, and 90 percent of them are at their workstation by shift start. (*Id.*at 23:12-19).<br><br>• **Richard Arechiga**-He testified that he supervised 18 QA employees between A-1 and Smelter Annex between 2014 and 2016. (3/16/23 |

| | Tr. 136:16-22) He understood that the rule was that all employees had to be at their line by shift start, and if not, they were late. (*Id.* at 149:3-150:20) He further testified that all 18 arrived at their workstation by shift start. (*Id.* at 189:21-24) He also stated that he never learned of a grace period while working for East Penn (*Id.* at. 192:6-80). |
|---|---|
| **S-1 Annex** | • **Donna Sweitzer**-She testified that she has been a leader since at least 2014 and supervises 20-22 people. (3/21/23 Tr. 5:3-17)  She testified that she is on the floor before her employees (*Id.* at 12:21-14:20). She said that her expectation is for the machines start at shift start. (*Id.* at 13:20-14:2). She also stated that her employees had to be at the line by shift start. (*Id.* at 16:5-17). |

In addition to the testimony elicited and set forth above, witnesses testified to the unpaid work that they personally performed for East Penn every day, which was significant unpaid work for both pre- and post-shift work. For example:

| Location[10] | Testimony |
|---|---|
| A-1 | • **Frances Brader**-25 minutes of unpaid work. 3/23/23 Tr. 168-173.<br>• **Ellen Christman**-over 28 minutes of unpaid work. 3/23/23 Tr. 107-117.<br>• **Matthew Ulrich**- 37 minutes of unpaid work. 3/20/23 Tr. 195-201.<br>• **Fanny Vaquero**-11 minutes of unpaid work. 3/21/23 Tr. 55-97. |
| A-2 | • **Charles Baez**-over 44 minutes of unpaid work. 3/20/23 Tr. 71-83,<br>• **Amanda Carter**- over 38 minutes of unpaid work. 4/5/23 Tr. 38-52.<br>• **Lloyd Frantz**-37 minutes of unpaid work. 4/10/23 Tr. 37-50.<br>• **Rocco Galluci**-25 minutes of unpaid work. 4/10/23 Tr. 77-82.<br>• **Cory Hauseman**-over 22 minutes of unpaid work.4/13/23 Tr. 36:6-58.<br>• **David Nabozny**-14 minutes of unpaid work. 3/27/23 Tr. 65-68.<br>• **Matthew Ulrich**- 37 minutes of unpaid work. 3/20/23 Tr. 195-206<br>• **Jesse Gilmer** -47 minutes of unpaid work. 3/22/23 Tr. 12-76. |

---

[10] This list is for illustration purposes and is non-exhaustive.

| A-3 | • **Brandon Berger-Mercado**-17 minutes of unpaid work. 4/12/23 Tr. 202-206. <br> • **Gary Brendle**-17 minutes of unpaid work. 3/21/23 Tr 279, 281; 3/22/23 Tr. 6-8.- <br> • **Jesse Gilmer** - 47 minutes of unpaid work. 3/22/23 Tr. 12-66. <br> • **Thomas Kerchner**-over 31 minutes of unpaid work. 4/6/23 Tr. 262-281. <br> • **Steven Rogers**- 36 minutes of unpaid work. 3/21/23 Tr. 164-177. |
|---|---|
| A-4 | • **Frank Civitrese**-30 minutes of unpaid work.4/12/23 Tr. 230-241. <br> • **Kody Kuhns**-23 minutes of unpaid work. 4/10/23 Tr. 12-17 <br> • **Jeff Leone**-15 minutes of unpaid work. 4/5/23 Tr. 64-72. <br> • **Chad Miller**-13 minutes of unpaid work. 3/23/23 Tr. 60-72. <br> • **Rick Seyfried**-21 minutes of unpaid work. 3/14/23 Tr.25:17-52:23.- |
| AAPP | • **Rick Seyfried**-21 minutes of unpaid work. 3/14/23 Tr.25:17-52:23.- |
| Industrial | • **Michelle Kozak**-24 minutes of unpaid work. 3/22/23 Tr. 124-134. <br> • **William Tomlinson**- 29 minutes of unpaid work. 3/23/23 Tr. 204-231. |
| Industrial Automotive | • **Rocco Galluci**-25 minutes of unpaid work. 4/10/23 Tr. 77-82; 88:4-9; 89:4-6. <br> • **Thomas Kerchner**-over 31 minutes of unpaid work. 4/6/23 Tr. 262-281. <br> • **Amanda Carter**- over 38 minutes of unpaid work. 4/5/23 Tr. 38-52 4/5/23 Tr. 49:20-50:11, |
| IM2 | • **Paul Adams**-30 minutes of unpaid work. 4/10/23 Tr. 115-121. <br> • **Stephen Hartman**-10 minutes of unpaid work. 4/5/23 Tr. 19. |
| Garage | • **Angel Canela**-28 minutes of unpaid work. 3/23/23 Tr. 13-20. |
| Water Treatment | • **Jeffery Meitzler**-17 minutes of unpaid work.  3/21/23 Tr. 106-111. |
| S-1 | • **Angel Canela**-longer than 28 minutes of unpaid work. 3/23/23 Tr. 13-20; 24:8-26:5) <br> • **Moses Molina**- 15 minutes of unpaid work. 4/6/23 Tr. 186-197. <br> • **Dante Rivera**-46 minutes of unpaid work. 3/22/23 Tr. 170-178. |
| Manufacturing Services | • **William Tomlinson** 24 minutes of unpaid work. 3/23/23 Tr. 204-231. |

| Central Services | • **Donald Muthard**- 10 minutes of unpaid work. 4/6/23 Tr. 223-237. |
|---|---|
| Smelter | • **David Drago**-70 minutes of pre- and post- shift work. 4/12/23 Tr. 180-187. <br> • **Kody Kuhns**-23 minutes of pre- and post-shift work. 4/10/23 Tr. 12-22 |
| Smelter Annex | • **Stephen Hartman**-20 minutes of unpaid work. 4/5/23 Tr. 14-22. |
| S-1 Annex | • **Donna Sweitzer**-18 minutes of unpaid work. 3/21/23 Tr. 7-18. |
| Transload | • **Ricky Hafer**-33 minute of unpaid work. 4/12/23 Tr. 20-23. |
| Continuous Improvement | • **Fanny Vaquero**-over 8 minutes of unpaid work. 3/21/23 Tr. 68-72. |

East Penn's 763 declarations from current employees confirm the Secretary's reasonable estimate. Ex. A; P-2. These declarations cover the 17 plants: A-1 (56 Declarations), A-2 (45 declarations), A-3 (118 declarations), A-4 (127 declarations), Central Services (37 declarations), IM-1 (43), IM-2 (74), Industrial (24 declarations), Industrial Automotive (52 declarations), Oxide 1 (14 declarations), Oxide 2 (2 declarations), S-1 (137 declarations), S-1 Annex (12 declarations), Smelter (6 declarations), Smelter Annex (24 declarations)[11], Transload (1 declaration), and Water Treatment (1 declaration). East Penn's declarations include 114 employees that do not wear uniforms in three plants. P-2.

For 312 declarations, covering 15 plants, employees performed pre-shift work before swiping in for work. Dkt. 569-2, at pp.1-18. This confirms that the continuous workday began even prior to the swipe and therefore all the time shown by the swipe is compensable. A simple comparison of the declarations to the time records (or East Penn's shift schedule DX-380; P-16B) show that across these plants workers uniformly performed pre-shift work off-the-clock.

---

[11] While the Court concluded at summary judgment that certain employees from Smelter, Oxide 1, and Oxide 2 are excluded from the Secretary's action due to different pay practices, the jury may consider the declarations that East Penn provided for its explanation for how long the pre- and post-shift work took as these workers used the same locker room facilities as the employees within the scope of the action. P-2.

During Ms. Snyder's testimony on April 24, 2023, she revealed that she counted declarations in a similar manner and arrived at similar numbers. She testified that 208 declarations stated the employee was aware of the grace period. 4/264/23 Tr. 65:21-25; 176:13-19 (Snyder). She said that 64 of the declarations stated the employee "uses" the grace period. 4/24/23 Tr. 66:1-12 (Snyder). She further stated that only 24 out of 756 say the employee uses it frequently. 4/24/23 Tr. 66:6-7 (Snyder). She also admitted that zero declarations say that the employee used the 5-minute grace period every day to don uniforms and/or personal protective equipment. 4/24/23 Tr. 176:24-178:2; 178:17-20 (Snyder).  The jury may count the declarations and reach their own conclusions. P-2. Both East Penn and the Secretary agree that zero declarations say that the employee used the five minute grace period every day to don uniforms and/or personal protective equipment.

The employee testimony and East Penn's declarations confirm that there is a substantial amount of unpaid work across the plants and also supports the Secretary's reasonable estimate.

### 5.  East Penn Failed to Present Evidence of the Precise Amount of Work Performed, or Evidence to Rebut the Secretary's Reasonable Estimate

East Penn did not present any evidence of the precise amount of unpaid work, nor did it present evidence sufficient to negate the Secretary's reasonable inference. For part of its case, it put the Secretary's investigation on trial by calling witnesses from Wage and Hour including Jason Mowday, Brian Johnson, Steven Fedock, Luis Nieves, Amy Iannelli, and Alphonso Gristina. It also called the OSHA investigator that received the complaint in 2016, Timothy Braun. It also called an expert—Brian Farrington—to further attack the investigation. 5/2/23 Tr. pp. 209-296 (Farrington). The investigation was irrelevant to its defense as it had nothing to do with the amount of time that East Penn failed to pay its employees, or the Secretary's reasonable estimate.

"[W]hether the government's investigation [has] been good or bad" has no bearing on whether East Penn was willful or if the Secretary is entitled to liquidated damages. *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (a criminal case wherein the defendant sought to attack the quality of the investigation). *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("To have allowed McVeigh to put the government on trial because there might have been something more the government perhaps could have done [ . . .] would inevitably divert the jury's attention from the issues of the trial. [. . .] The jury is not asked to render judgment [. . .] on the government's investigation."); *United States v. Patrick*, 248 F.3d 11, 22–23 (1st Cir. 2001) ("Merely showing that an investigation is sloppy does not establish relevance. [. . .] Such speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against Arthur to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value."); *see also EEOC v. Nat'l R.R. Passenger Corp.*, No. 15-1269, 2016 WL 3655269, at *4 (W.D. Wash. July 8, 2016)("information to attack the sufficiency of the EEOC's pre-suit investigation . . . is irrelevant")

As such, courts hold that the "thoroughness and quality of the plaintiff's investigation" in an FLSA case are irrelevant at trial. *See*, *e.g. Donovan v. Red Ball Interior Demolition Corp.*, 1982 WL 2052, *1 (S.D.N.Y. 1982). Applying this principle, courts exclude, as irrelevant, evidence about the actions the government failed to take during its investigation. *United States v. Cordova*, 157 F.3d 587, 594 (8th Cir. 1998) (things not done during investigation are irrelevant); *see also Brock v. Positive Changes Hypnosis, LLC*, 589 F. Supp. 2d 974, 978 (W.D. Tenn. 2008) (excluding expert's opinion that Wage and Hour should have reached a different conclusion as irrelevant).

Outside of the Wage and Hour investigators, East Penn called witnesses that did not have experience working on East Penn's floor. East Penn did not call a single line employee or any other employee to testify about when they performed the work at issue in this case.  East Penn did not put a single employee on the stand to say that they performed all of their donning, doffing and showering on paid time – which is East Penn's primary defense in this case.  This is frankly not surprising, as the evidence is overwhelming that nobody did all of this work on paid time.   Instead, East Penn called just two managers: Alison Snyder and Troy Griess. They did not testify about the precise amount of time that East Penn owes or offer other information that would negate the Secretary's inference. East Penn did call Howard Chavous, who had experience working a production job on the floor. But East Penn declined to elicit testimony from him about that work, and instead focused on his time in personnel and what, if anything he trained employees on. He admitted that he had no information about what employees do on any given day. 4/27/23 Tr. 34:5-35:8 (Chavous).

East Penn then called its lawyer, Gary Melchionni, who admitted that he did not have any information regarding what happens on the floor of East Penn, and that he accepted whatever the client told him. 4/25/23 Tr. 28:21-31:13; 80:4-21 (Melchionni);

Then East Penn moved on to its experts—Dr. Nathan Woods, Dr. Jeffery Fernandez, and Brian Farrington.  Dr. Woods confirmed that he had no information about what employees actually did on any given day, and that his calculations were based on hypotheticals.  Essentially, Dr. Wood's testimony amounted to nothing more than "this is how much 5 to 10 of minutes of paid time is worth." *See*, *e.g.*, 5/1/23 Tr. 78:5-80:5; 82:11-25; 121:24-122:8 (Woods). His testimony assumed that employees were using those minutes to perform clothes-changing and

showering activities, but it was just that – an assumption.[12]  Its expert Dr. Fernandez did not do a

time study, and several times during his testimony he stated that the charts that he put together

were "anecdotal." 5/1/23 Tr. 221:18-25; 238:10-19; 241:21-242:9 (Dr. Fernandez); 5/2/23 Tr.

109:6-10 (Fernandez). As a matter of law, anecdotal statements regarding what random

employees may have done on random days in the past is insufficient to rebut the Secretary's

reasonable estimate. *See Scalia v. Paragon Contractors Corp.*, 957 F.3d 1156, 1165 (10th Cir.

2020) (stating that "[e]vidence of sporadic practice by some of the workers was not enough to

rebut" the Secretary's reasonable inference)  Dr. Fernandez's testimony was focused on

critiquing Dr. Radwin.  But even assuming the jury accepts his critiques, as discussed above, Dr.

Radwin's study is not the sole evidence of the amount of uncompensated time, and East Penn has

failed to rebut any of the Secretary's other evidence. His testimony, reduced to its essences, was

that Dr. Radwin's study could have been better.  But that is legally insufficient to rebut the

Secretary's reasonable estimate. *Id.*, 957 F.3d at 1163 ("Paragon has shown merely that it could

arrive at estimates of hours worked more favorable to itself were it in the Secretary's position.

That is both unsurprising and insufficient to negate the just and reasonable inferences arising

from the Secretary's analysis. Paragon has not shown that the Secretary's methods were so

---

[12] Dr. Wood's presented other irrelevant testimony including the average tenure and median pay
of employees that work at East Penn employees.  4/27/23 Tr. 242:22-244:19 (Dr. Woods).
Whether East Penn's pay is low or high, and the average tenure of employees that work there are
irrelevant to the calculation of damages. Having set its wages and entered into a covenant with
its employees to pay them a set rate for a set amount of work, East Penn is obligated to pay
overtime when the work required exceeds 40 hours in a week.  These are not exempt employees;
it is undisputed that these employees are entitled to the overtime premium when they work
overtime.  The FLSA does not exempt East Penn from paying overtime if its hourly wage rises
above a certain threshold or is higher than what other employers pay.  *See generally* 29 U.S.C.
§§ 207, 213 (setting forth overtime pay requirement and exemptions

deficient that inferences arising from its analysis cannot be trusted.") East Penn could have conducted its own time study, it chose not to.

Accordingly, East Penn failed to present legally sufficient evidence of the precise extent of unpaid work, or evidence sufficient to negative the reasonableness of the Secretary's estimate.

### E.  No Reasonable Jury Could find that the Time at Issue was De Minimis

In evaluating whether time is de minimis, courts in the Third Circuit apply the following factors:

(1) the practical administrative difficulty of recording the additional time;

(2) the aggregate amount of compensable time; and

(3) the regularity of the additional work.

*De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 374 (3d Cir. 2007) (quoting *Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir.1984)).

The focus of the factors is whether the employer could administratively track the time—not the number of minutes or money owed.  *Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir. 1984) ("The *de minimis* rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes. ***Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes***.") (citing 29 C.F.R. § 785.47) (emphasis added). The *De Asensio* factors are derived from this regulation.  The de minimis defense does not serve as a shield for the employer that routinely fails to calculate certain regular hours, no matter how small the regular hours are:

> This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's

fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

*Id.* (quoting 29 C.F.R. § 785.47). In other words, if employees spent 11 minutes on compensable activities, East Penn cannot choose to compensate employees for 10 minutes of those activities and then claim de minimis—it must pay for the precise amount of time. For example, The Tenth Circuit decided in *Peterson* that 2-3 minutes per day was not de minimis. *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1049 (10th Cir. 2021). It held that ability to count the time and anticipate how long the task would take weighs more heavily than the relatively small size of the claim. *Id.* It further held that $125 of unpaid wages a year, was not necessarily negligible to the working person. *Id.* at 1048.

East Penn bears the burden on its de minimis defense. Dkt. 279, 9/15/21 Order p. 3 (citing *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176 (7th Cir. 2011)).

For the administrative difficulty prong, no reasonable juror could find that East Penn could not track the time. For uniformed workers, the Court has already decided that East Penn could record the hours worked down to the minute and therefore violated 29 C.F.R. § 785.47. Dkt. No. 279 at p. 4; *see also* Dkt. 273 p. 34. East Penn had this same time keeping system for all employees that worked at Lyon Station, including for non-uniformed workers that wore PPE. P-78 (Kuhns Dep.). In other words, East Penn could also keep time down to the minute for non-uniformed PPE workers. So, no reasonable juror could find that the time was de minimis.

What East Penn claims is administrative difficulty is its recharacterization of its lack of desire to control the work. At trial Ms. Snyder, Assistant Vice President of Personnel. testified:

Q.     Do you have an understanding as to why East Penn has not adopted a rule about when employees specificallycan be in the locker room before shift and at the end of  shift to do their dressing and showering activities?

> A.     Because we like to give employees flexibility todo things in
> the order and preference that they like to do, because everybody is
> different.

4/24/23 Tr. 228:12-19. "I don't feel like controlling the work" does not constitute administrative

difficulty. Further, as this Court aptly noted at summary judgment, East Penn's recourse to

control work was to set policies to prevent excess idling:

> East Penn's argument is pragmatic and, for that reason, tempting. But it is not
> legally sound. Theoretically, a worker could arrive well in advance of his shift, don
> his uniform-thereby initiating the continuous workday-then lounge about for some
> extended amount of time, and claim compensation for that leisure time. The Court
> is certainly mindful of this possibility. To the extent East Penn is fearful of excess
> idling, it can implement policies to manage the work performed during the
> continuous workday. *But speculation that an intrepid, self-indulgent employee
> might take advantage of the legal standard cannot support prophylactically
> chiseling wages.*

Dkt. 273 at p. 18 (emphasis added).[13]

For the aggregate amount, the evidence shows it is high and East Penn failed to rebut this.

The time clock records show that from 2014 to 2019, East Penn rounded in its favor over on

average 4 hours of overtime each month, for both uniformed and non-uniformed plants. P-55, P-

56, P-22, P-23. Third Circuit has indicated that courts should look at the aggregate claims in

assessing whether off-the-clock work activity was de minimis. *De Asencio v. Tyson Foods, Inc.*,

500 F.3d 361, 375 (3d Cir. 2007) (citing *Lindow*, 738 F.2d at 1063) ("We will consider the size

of the aggregate claim. Courts have granted relief for claims that might have been minimal on a

daily basis but, when aggregated, amounted to a substantial claim.").  The Third Circuit has not

condoned approaches taken by other courts that look at the time spent per individual on any

---

[13] For example, it could have specified when employees were to report to work. *See Mireles v.
Frio Foods, Inc.*, 899 F.2d 1407, 1414 (5th Cir. 1990), *superseded on different grounds as stated
in Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222 (5th Cir. 2017) (de minimis doctrine did not
apply to workers that were required by the employer to show up at a specific time and perform
up to 15 minutes of pre-shift work before they could perform production work.).

individual day. *Compare Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1319 (N.D. Ala.
2008) ("the proper focus is on the aggregate amount of uncompensated time for each employee
*per day,* not the total number of employees over *any* length of time."); *Lindow v. United States*,
738 F.2d 1057, 1062 (9th Cir. 1984) (looking at individual claims on individual days, but also
looking at the aggregate amount per individual and also the aggregate amount of the litigation);
*Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998). Put differently, the Secretary's
reasonable estimate is $106,414,764.85. No reasonable juror could find that number to be de
minimis.

      For uniformed workers, East Penn has already lost prong 3. At summary judgment, the
Court found that there was no dispute that employees regularly don, doff, and shower as part of
their work. Dkt. No. 273 at p. 33.  The same would be true of the non-uniformed workers who
were required each day to wear the minimum amount of PPE of boots and safety glasses every
shift. *See*, *supra* Section (III)(D)(4)(a); P-10 at EPM-0000562.

      Accordingly, no reasonable juror could find the time was de minimis.

### F.  No Reasonable Jury Could find East Penn's Violations Were Not Willful

      The evidence shows that in 2003 East Penn's lawyer told it unequivocally that it had to
pay for employees to put on a uniform at the beginning of the day. P-42. The memo also made it
clear that the time spent on changing clothes and showering at the end of the day was also
compensable, though Mr. Melchionni assumed (without a in independent factual basis other than
East Penn's assertions) that East Penn was already paying for that time. P-42 at EPM-00004906.
The 2003 Melchionni memo stated:

> With respect to East Penn's situation, the changing of clothes at the end of the work
> shift by its employees is already counted as work time and therefore, would appear
> not be an issue. However, to the extent that the amount of work time allotted to
> shower and change clothes at the end of the shift is ***inadequate to reasonably cover***
> ***the time needed to perform these activities, an FLSA violation may be occurring.***

*Id*. After being warned by its attorney, East Penn continued and (continues to this day) permit

employees to don on unpaid time and arrive to their workstation by shift start. East Penn

continues to permit employes to stay on the floor at the end of the shift and to work up until shift

end, or to swipe out before showering, or to otherwise finish their end-of shift changing and

showering on unpaid time. *See*, *supra*, Section (III)(D)(4)(c).  It has not made any effort to stop

this practice.

When asked why it had no rules to curtail off-the-clock work, Ms. Snyder testified that

East Penn preferred not to. *See*, 4/24/23 Tr. 228:12-19. Again, "I don't feel like controlling the

work" is not a defense under the FLSA. East Penn had an obligation to prevent off-the-clock

work and to pay for all work it knew about or had reason to know about.  As this Court held in

its decision in *DiFlavis*,

> An employer, however, may not stand idly by and permit an employee to work
> overtime without proper compensation, even in cases where the employee does not
> submit a claim for overtime compensation. In the event an employee does not want
> an employee to work overtime, the employer is responsible to make every effort to
> prevent the employee from working overtime. This duty arises even where the
> employer has not requested the overtime be performed or does not desire the
> employee to work, or where the employee fails to report his overtime hours. As
> long as the employer knows or has reason to know that the employee continued
> working, those overtime hours must be counted.

*DiFlavis v. Choice Hotels Int'l, Inc.*, No. CV 18-3914, 2020 WL 610778, at *13 (E.D. Pa. Feb.

6, 2020) (Pratter, J.) (internal citations and quotations omitted)..

None of the evidence at trial undermines the conclusion that East Penn: 1) knew that it

had to pay its employees to put on their uniforms, and 2) continued to observe employees putting

on their uniforms on unpaid time.  To the extent that East Penn thought the law was it only had

to pay reasonable time—not actual—this argument not hold water when it concedes it paid

*nothing* for pre-shift clothes-changing  Additionally, the evidence at trial did not undermine the

conclusion that East Penn did nothing to ensure that employees finished all of their clothes-changing and showering at the end of the day on paid time, even though it was well aware it had to pay for this work (and even falsely told its attorney it was paying for it). Despite having this knowledge, East Penn took no steps to stop it. East Penn either knew or recklessly disregarded its obligations under the FLSA, and no reasonable juror could decide otherwise. As East Penn willfully violated the FLSA, the Secretary is entitled to a three-year statute of limitations and to recoup back wages until November 23, 2014, which is reflected in Mr. Murray's calculation of $106,414,764.85. 29 U.S.C.A. § 255; *Acosta v. East Penn Manufacturing Co., Inc.*, 5:17-mc-00179 at Doc. 13 (setting statute of limitations)

## IV.    CONCLUSION

Accordingly, for the reasons set forth above, the Secretary respectfully requests that the Court grant her motion for judgment as a matter of law and enter judgment in the amount of $106,414,764.85. The Secretary further requests that the Court permanently enjoin East Penn from violating 29 U.S.C. §§ 206 and 207 in the future.

Dated: May 3, 2023                    Respectfully submitted,

Mailing Address:                      **UNITED STATES DEPARTMENT OF LABOR**

U.S. Department of Labor              Seema Nanda
Office of the Regional Solicitor      Solicitor of Labor
1835 Market Street, Mailstop SOL/22
Philadelphia, PA 19103-2968           */s/ Elizabeth A. Kuschel*
                                      Oscar L. Hampton III,
(215) 861-5162 (fax)                  Regional Solicitor (MO ID# 36778)
                                      Adam F. Welsh, Regional
                                      Counsel for Wage & Hour (PA ID# 84988)
                                      Alexander E. Gosfield,
                                      Trial Attorney (PA ID# 209537)
                                      Elizabeth A. Kuschel,
                                      Trial Attorney (PA ID# 318537)
                                      hampton.oscar@dol.gov
                                      welsh.adam@dol.gov
                                      gosfield.alexander.e@dol.gov
                                      kuschel.elizabeth.a@dol.gov
                                      (215) 861-5124