## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIE SU,** | : | |
| *Acting Secretary of Labor*, | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| | : | |
| **EAST PENN MANUFACTURING** | : | |
| **CO., INC.,** | : | |
| | : | |
| *Defendant* | : | **No. 18-1194** |

## MEMORANDUM

PRATTER, J.                                                          OCTOBER *17*, 2023

Long after the jury has reached its verdict, the lawyers remain, and this case about battery manufacturing employees donning and doffing their uniforms beats on with a persistence suggestive of a certain energized bunny.

The Secretary of Labor initiated this action against East Penn Manufacturing Co., Inc. alleging that East Penn failed to appropriately compensate its employees for clothes changing and showering activities. The crux of the parties' dispute was whether East Penn's policies, which afforded employees a "reasonable" amount of paid time for these tasks, were sound as a matter of law and sufficient as a matter of fact. Although the Court concluded at summary judgment that an employer is required under the Fair Labor Standards Act to pay its uniformed employees for the actual time it takes for them to don and doff their uniforms and shower, it left for the jury the bulk of the substantive issues raised in the parties' cross-motions and throughout the case.

1

After a two-month trial, the jury returned a verdict, unanimously finding that East Penn had violated the FLSA and owed $22,253,087.56 in back wages. Shortly thereafter, the parties submitted a host of post-trial motions seeking various alterations and amendments to the judgment. Of relevance here, the Secretary filed a Motion to Alter Judgment to Include Liquidated Damages, renewing many of the arguments she made at the summary judgment stage of the case. The Court held an evidentiary hearing and oral argument on the Motion. Having reviewed in detail the Motion and the volley of responses, replies, and surreplies, the Court is prepared to resolve the issue of liquidated damages.

## BACKGROUND

East Penn Manufacturing Company ("East Penn" or "Defendant") is a large manufacturer of lead acid batteries, battery accessories, wires, cables, and related components. Because lead exposure is an associated hazard of battery manufacturing, East Penn requires most of its hourly employees to wear uniforms. Apr. 10, 2023 Trial Tr. at 157:22–24. The time that uniformed employees spend donning, doffing, and post-shift showering is compensable under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 203 *et seq. See Walsh v. E. Penn Mfg. Co.*, 555 F. Supp. 3d 89, 98–99, 102 (E.D. Pa. 2021).

Prior to 2003, East Penn's Time Clock and Pay Procedures required each employee to be at his or her workstation at shift starting time. Doc. No. 157 ¶ 71; Doc. No. 176-1 ¶ 71(a). At all times relevant to this case, East Penn operated multiple shifts each day, often staggered among its many buildings on its Lyon Station, Pennsylvania campus. Doc. No. 157 ¶¶ 2, 19; Doc. No. 176 ¶ 19(a).

Since at least 1995, East Penn has retained the law firm Stevens & Lee to advise the company on labor and employment law. *See* Apr. 19, 2023 Trial Tr. at 196:2–9. In March 2003, East Penn's primary contact at Stevens & Lee, an attorney named Gary Melchionni, became aware

of reports of settlements between the Department of Labor ("DOL") and Honda and Mercedes-Benz involving allegations that the car manufacturers were not paying their respective employees for time spent donning and doffing their uniforms at the beginning and end of their work shifts. Apr. 25, 2023 Trial Tr. at 48:13–49:5. After a phone conversation with East Penn's personnel director, Ms. Alison Snyder, Mr. Melchionni reviewed and analyzed case law on issues concerning time recording and/or compensation for donning and doffing work clothing. *Id.* at 48:17–21; 50:17–51:3; 51:15–20. Mr. Melchionni drafted a memorandum concerning his research, as well as his understanding about East Penn's policies. He also reviewed a draft of a potential uniform policy. Apr. 25, 2023 Trial Tr. at 80:4–13. He addressed the memorandum, titled "Changing Clothes at Work as Compensable Time under the Fair Labor Standards Act (the "FLSA")," to Ms. Snyder, and conveyed it to East Penn on or about April 30, 2003. DX-52.

East Penn's actions after receiving the Melchionni Memorandum figure prominently in the liquidated damages determination.[1] Hence, the Court will describe the document in some detail. Mr. Melchionni split the memorandum into three sections. In the first section, "Factual Background," he described East Penn's position that donning uniforms was not a compensable activity, but that doffing and showering was. *Id.* at 1. He also described what he understood to be the material terms of the DOL settlements with Mercedes-Benz and Honda.

In the second section of the Memorandum, "Legal Background," Mr. Melchionni provided citations to, and explanations of, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946); The Portal-to-Portal Act, 29 U.S.C. § 254; *Steiner v. Mitchell*, 350 U.S. 247 (1956); various Department of Labor regulations; and *Reich v. IBP, Inc*, 38 F.3d 1123, 1127 (10th Cir. 1994). *Id.*

---

[1] During the trial, counsel for the Secretary labored mightily and wholly unsuccessfully to suggest that someone had nefariously edited this Memorandum either to erase or after-the-fact add material. *See e.g.,* Apr. 24, 2023 Trial Tr. at 119:10–121:6; April 25, 2023 Trial Tr. at 76:3–78:18; April 26, 2023 Trial Tr. at 11:15–25:4. None of these innuendos were effective.

at 5–7. In particular, he described the *de minimis* doctrine, writing that "the U.S. Supreme Court has recognized that even compensable time may be so negligible as to be *de minimis*." He then explained to East Penn that "[n]umerous cases have held 10 minutes or less to be *de minimis*." *Id.* at 8.

Finally, in the third section, "Compensability of Clothes Changing Activities at East Penn," Mr. Melchionni provided observations about East Penn's "situation" in light of the legal and factual background described in the Memorandum's preceding sections. *Id.* Although much of the Memorandum deals with the issue of employees donning their uniforms prior to their shifts, he opened the analysis section with an acknowledgment that "to the extent that the amount of work time allotted to shower and change clothes at the end of the shift is inadequate to reasonably cover the time needed to perform these activities, an FLSA violation may be occurring." DX-52, at 7. Mr. Melchionni next asserted, "[a]s to the preliminary activity of changing from street clothes into work clothes at the start of the shift, East Penn *could have three grounds for arguing that this time is not compensable*." *Id.* (emphasis added). These three grounds are:

> First, East Penn could argue that the act of donning the work clothing is not 'work' as defined by the FLSA . . . Second, East Penn could argue that even if such activity is considered work, only a few minutes are needed each day to change from street clothes into work clothes. Thus, the time required to perform this activity is *de minimis* and need not be considered compensable. Third, East Penn could argue that pre-shift donning is not compensable under the Portal Act because the donning of work clothing falls within the preliminary activity performed before the employee begins his principal activity at the beginning of the work day and thus falls within this non-compensable category.

DX-52, at 7–8. Mr. Melchionni then observed that "East Penn's defenses may likely be outweighed by the aggressive position taken by DOL," and offered two "solutions" for East Penn to consider, presumably if faced with an aggressive position by the DOL: "One solution to this issue would be … to allow the employees the option of changing into their uniforms prior to coming to work … Perhaps the simplest solution, although one that will decrease productivity, is to include the clothes

4

changing time as compensable work time during each shift." *Id.* at 8. Neither in the Memorandum nor from the witness box did Mr. Melchionni define the sense in which he used the adjective "aggressive."

Mr. Melchionni closed his Memorandum with a description of his conversation with a representative from the Department of Labor, Mr. Joseph Dietrich, about the Honda and Mercedes-Benz settlements and their "application to East Penn's situation." *Id.* As memorialized in Mr. Melchionni's final paragraph, he suggested that it was Mr. Dietrich's "strong opinion that East Penn is violating the FLSA by not compensating its employees for time spent donning work clothes prior to the start of their shifts." *Id.* Therefore, in Mr. Melchionni's opinion, "it seems likely that if challenged by the DOL or the employees themselves in a class action lawsuit, at the very least East Penn would be engaged in lengthy, time consuming and costly litigation in federal court. In addition, if East Penn was to settle or lose, damages likely would be measured in the millions of dollars." *Id.* Mr. Melchionni's crystal ball cast a bright spotlight on the well-known risks of contemporary litigation—whether with the Government or not—that may have little to do with substantive merits.

A few months after receiving Mr. Melchionni's memorandum, East Penn adopted a new policy, the Uniform and Shower Time Policy ("2003 Uniform Policy"). It reflected that East Penn implemented a formal five-minute "grace period" during which employees could don their uniforms prior to reporting to their workstations. Doc. No. 155-56, at 2, Apr. 19, 2023 Trial Tr. 226:13–20. In other words, East Penn decided to try Mr. Melchionni's "simplest solution" by officially treating donning time as compensable work.[2] Although East Penn sought and received

---

[2]      Specifically, the 2003 Uniform Policy provided that employees were expected to be at their workstations with their uniforms and other protective equipment on at the start of their scheduled shift, but "[f]or pay purposes, employees will be allowed a five-minute grace period after the start of their shift to report to their workstation." DX-3. At the end of their shift, employees would be dismissed five minutes

Mr. Melchionni's approval of this 2003 Uniform Policy, Apr. 19, 2023 Trial Tr. 226:13–227:12,

it did not conduct an investigation into the amount of time East Penn employees actually needed

to don, doff, and shower. Apr. 24, 2023 Trial Tr. at 161:14–25, 257:19–25. Instead, East Penn

determined—based on collective management experience—that five minutes on each side of the

shift was a reasonable amount of time in which employees could complete their donning, doffing,

and showering activities on the actual East Penn premises. *See* Snyder July 16, 2019 Dep. Tr.

124:10–21, 146:21–147:6; Apr. 19, 2023 Trial Tr. at 215:12–17. Moreover, it appears that some

number of East Penn's employees continued to arrive to their workstations, in uniform, at the start

of their scheduled shifts, even after the 2003 Uniform Policy went into effect on July 21, 2003.

March 14, 2023 Trial Tr. at 54:19–55:3; May 3, 2023 Trial Tr. at 154:2–8.

East Penn revisited the 2003 Uniform Policy in 2016, when an employee in one of its plants

reportedly complained to OSHA that East Penn provided insufficient paid time for showering.

Apr. 13 Trial Tr. 245:15–246:16; Apr. 11, 2023 Trial Tr. at 108:9–19. Accordingly, in early March

of 2016, East Penn again sought Mr. Melchionni's advice, and he approved an update to the 2003

Uniform Policy that increased the amount of paid time allotted for showering from five minutes to

ten minutes. PX-8; *see also* DX-4; Apr. 19, 2023 Trial Tr. at 255:5–16. The amount of time for

pre-shift activities—like donning uniforms—did not change.[3] *See* DX-4. Shortly thereafter, on

March 11, 2016,[4] the DOL Wage and Hour Division sent an investigator to East Penn. Apr. 19,

---

early so that they could doff their uniforms and shower. DX-3. Earlier draft versions of the 2003 Uniform
Policy reflect that East Penn initially considered, but then declined, implementing another "solution"
offered by Mr. Melchionni—allowing employees to take a clean uniform home after shift and wear it to the
plant the following day. *See* Doc. No. 155-46.

[3]    East Penn recently adopted and implemented new pay and uniform policies consistent with an
agreement made by the parties during the oral argument on September 5, 2023. *See* September 28, 2023
Order, Doc. No. 664. That new policy is not at issue in the litigation.

[4]    Mr. Melchionni again provided East Penn with legal advice regarding its uniform policies at some
point in 2020, after East Penn received a collection of documents from the DOL through a FOIA request.
But the liquidated damages analysis is retrospective here, and as requested in the pending Motion, in the

2023 Trial Tr. at 248:19–249:1. This was the first time East Penn had ever been the subject of a Wage and Hour Investigation regarding its FLSA compliance. May 2, 2023 Trial Tr. at 257:4–11; Apr. 17 Trial Tr. at 154:1–8. Although East Penn had finalized the updated policy ("2016 Uniform Policy) before the Wage and Hour staff initiated their investigation, East Penn did not put it into effect until June 27, 2016. *See* Apr. 25, 2023 Trial Tr. at 163:16–164:16; Apr. 19, 2023 Trial Tr. at 263:3–11; DX-4.

Mr. Melchionni represented East Penn during the Department of Labor's two-year investigation, serving as the primary point of contact between the DOL and East Penn. Apr. 25, 2023 Trial Tr. at 197:13–18. Mr. Melchionni participated in a final conference with Wage and Hour investigators regarding the DOL's investigation of East Penn. Apr. 25, 2023 Trial Tr. at 228:15–22. During the conference on March 20, 2018, East Penn received, for the first time, a demand to pay back wages in the amount of $29.9 million. Apr. 25, 2023 Trial Tr. at 237:14–23; 238:15. About two hours after that conference broke up, the Department of Labor filed this lawsuit. Apr. 25, 2023 Trial Tr. at 241:3–5; *see also* Complaint, Doc. No. 1 (electronic stamp reflecting filing date of March 20, 2023).

The issue of liquidated damages first formally came up in this case during the summary judgment phase, when the parties cross-moved for summary judgment on the Secretary's claim for liquidated damages. *See* Doc. Nos. 155 & 161. The Court denied both motions, finding that material issues of fact remained, and that because East Penn had placed Mr. Melchionni's

---

sense that East Penn's actions after the DOL initiated its investigation are largely irrelevant. So, the Court will not include the 2020 Melchionni advice in its analysis. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991) ("Section 11 of the Portal-to-Portal Act requires *retrospective* analysis of an employer's conduct with respect to violations of the FLSA, not appraisal of an employer's post-violation conduct.") Likewise, the Court will not consider the Secretary's employee's subjective claims that East Penn did not adequately cooperate with Wage and Hour personnel during the investigation.

credibility at issue, the Court required additional testimony before deciding whether the Government or East Penn was entitled to relief. *E. Penn Mfg. Co.*, 555 F.Supp.3d at 133–34.

This case proceeded to a jury trial. The issues for the jury were: (1) whether East Penn has failed to pay its *uniformed* employees the overtime compensation required by law in 24 of its facilities; (2) whether that time was *de minimis*; (3) what sum of money would fairly compensate the uniformed employees for damages; (4) whether *non-uniformed* employees' donning and doffing of PPE was compensable; (5) whether East Penn had failed to pay those non-uniformed employees their overtime pay; (6) whether such time was *de minimis*; (7) what sum of money would fairly compensate such non-uniformed employees; (8) whether East Penn had acted willfully to violate the FLSA; and (9) if the Secretary had proved by a preponderance of the evidence that certain individuals even came within the scope of the litigation. *See* Verdict, Doc. No. 589. During the trial, approximately 60 witnesses appeared, and over 400 exhibits were offered and admitted.

The jury found that East Penn had violated the FLSA as to its hourly *uniformed* employees, that the violations were not *de minimis*, that East Penn had not acted willfully, and that it owed back wages in the amount of $22,253,087.56. *See id.* The jury found that the time non-uniformed employees spent donning and doffing PPE was non-compensable under the FLSA, and likewise found that the Secretary had also failed to prove that any of the named employee individuals on the verdict sheet belonged in the litigation. *Id.*

Following the verdict, the Secretary filed a Motion to Amend Judgment to Include Liquidated Damages, seeking to double the damages award for a total judgment of $44,506,175.12. Doc. No. 593, at 1.

LEGAL STANDARDS

## I.    Liquidated Damages

The FLSA provides for the payment of unpaid wages and the equivalent amount in mandatory liquidated damages when an employer violates the Act's overtime provisions. 29 U.S.C. § 216(b). "[L]iquidated damages are compensatory, not punitive in nature," and therefore are presumptively awarded in FLSA actions. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)). But "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount" less than the equivalent of the unpaid overtime compensation. 29 U.S.C. § 260; *see Brunner*, 668 F.2d at 753. Before the Court exercises this discretion, it "must make findings . . . that the employer acted in good faith and with reasonable grounds." *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) (quoting *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1149 (3d Cir. 1983)). And the employer has a "plain and substantial" burden of proving entitlement to discretionary relief. *Cooper Elec. Co.*, 940 F.2d at 907. This burden can be "a difficult one to meet" and "[d]ouble damages are the norm, single damages are the exception. *Id.* at 908 (internal citations omitted).

To prove it is entitled to discretionary relief from an award of liquidated damages, East Penn must show that (1) it acted in good faith and (2) it had reasonable grounds for believing it was in compliance with the FLSA. *See* 29 U.S.C. § 260; *Lugo v. Farmer's Pride Inc.*, 802 F. Supp. 2d 598, 616–17 (E.D. Pa. 2011). "The good faith requirement is a subjective one that requires that the employer have an honest intention to ascertain and follow the dictates of the Act." *Sec'y U.S.*

*Dep't of Labor v. Am. Future Sys., Inc.*, 873 F.3d 420, 433 (3d Cir. 2017). In other words, East Penn "must affirmatively establish that [it] acted in good faith by attempting to ascertain the Act's requirements." *Tri-Cnty. Growers, Inc.*, 747 F.2d at 129. This is a retrospective analysis of East Penn's conduct, not an appraisal of its response to a Wage and Hour investigation. *See Cooper Elec. Supply Co.*, 940 F.2d at 909–10.

The reasonableness requirement "imposes an objective standard by which to judge the employer's conduct." *Tri-Cnty. Growers, Inc.*, 747 F.2d at 129. To satisfy this prong, East Penn must show that it acted "as a reasonably prudent man would have acted under the same circumstances." *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999). "Ignorance alone will not exonerate [East Penn] under the objective reasonableness test." *Tri-County Growers, Inc.*, 747 F.2d at 129.

The Secretary argues that liquidated damages in an amount equal to the damages awarded by the jury are actually now essentially mandatory because, in the Secretary's view, East Penn cannot show that it acted in good faith and had objectively reasonable grounds to believe that its donning, doffing, and showering policies complied with the FLSA. This is so, according to the Secretary, because the evidence at trial (at least seen through the Secretary's lenses) proved that East Penn was on notice that it had to pay for these pre- and post-shift activities, but nonetheless failed to prevent its employees from continuing to don, doff, and shower on unpaid time. *See* Doc. No. 593-2, at 7–8. The Secretary even goes so far as to characterize East Penn's actions as "closer to intentional bad faith, rather than good faith," this despite the jury's finding of non-willfulness. *Id.* at 8.

East Penn counters by referring to the evidence introduced during the trial that it took affirmative steps to ascertain its obligations under the FLSA by working with its labor and

employment lawyer to determine whether its policies comported with the Act and its options for doing so. *See* Doc. No. 642 at 29, 37–39. East Penn also highlights that there were splits in the reported case law about a number of operative issues, including whether using the concept of reasonable time—rather than actual time—to calculate compensable time was appropriate. The open issues, argues East Penn, made its belief that it was in compliance with the Act's goals and requirements objectively reasonable. *See id.* at 14. East Penn also emphasizes that the jury declined to find that East Penn was willful in violating the Act. *See id.* at 9–11.

DISCUSSION

## I.     East Penn Has Shown Good Faith

Having reviewed the documentary evidence and weighing the credibility of the knowledgeable witnesses whose acts *at the time* govern the Court's analysis here, the Court concludes that East Penn has carried its "plain and substantial burden" of showing that its violation of the FLSA was in good faith.

As an initial matter, the jury declined to find that East Penn acted willfully. Of course, that East Penn did not intentionally or recklessly violate the Act is not itself enough to establish good faith, *see Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984), but the jury's rejection of the DOL's willfulness claim[5] does militate against an award of liquidated damages.

---

[5]     That East Penn did not intentionally or recklessly violate the FLSA makes this case immediately distinguishable from most of the cases the Secretary cites in favor of her claim for mandatory liquidated damages. *See e.g., Martin v. Selker Bros.*, 949 F.2d 1286, 1299 (3d Cir. 1991) (affirming district court's finding of willfulness and award of liquidated damages); *Brunner*, 668 F.2d at 754-55 (finding employer knowingly made deliberate attempts to circumvent the FLSA and remanding with instructions to award full liquidated damages); *Mumby v. Pure Energy Services (USA), Inc.*, 636 F.3d 1266, 1272 (10th Cir. 2011) (affirming district court's finding of willfulness and award of liquidated damages); *Stillman v. Staples, Inc.*, No. 07-849 (KSH), 2009 WL 1437817, at *20–23 (D.N.J. May 15, 2009) (awarding liquidated damages where jury found willful violation). Perhaps her focus on such cases led the Secretary to hyperbolically assert that East Penn's "conduct is more appropriately characterized as intentional bad faith." Doc. No. 593-2, at 61.

*See Perez v. Mountaire Farms, Inc.* 650 F.3d 350, 375 (4th Cir. 2011); *Roy v. Cnty of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998); *see also Lugo v. Farmer's Pride Inc.*, 802 F. Supp. 2d 598, 618 (E.D. Pa. 2011) ("[T]he same facts that support the Court's findings as a matter of law that Defendant acted reasonably and in good faith also support a finding that Defendant did not knowingly or recklessly disregard the FLSA's requirements.").

East Penn demonstrated that it actually took affirmative action to ascertain its FLSA obligation each time an issue on clothes-changing or showering arose, well before Wage and Hour commenced its investigation in 2016. In 2003, after the DOL settled with Honda and Mercedes-Benz over allegations that those car manufacturers were not compensating employees for time spent donning and doffing uniforms, East Penn directed its outside labor and employment counsel, Mr. Melchionni, to advise the company on the legality of its own uniform policy and pay practices. *See* Apr. 19, 2023 Trial Tr. at 205:1–13; April 25, 2023 Trial Tr. at 48:17–21; 50:17–51:3. After a 45-minute phone call with Ms. Snyder (one of the primary drafters of the policies at issue), Mr. Melchionni "review[ed], [and] analyze[d] recent case law under [the] FLSA . . . re[garding] . . . the issue of [the] compensable status of employees for time spent donning work clothes before starting [their] shift and [the] Honda case settlement details." Apr. 25, 2023 Trial Tr. at 51:15–20.

---

The only cases the Secretary cites that are from the Third Circuit and have both an affirmative finding of non-willfulness on the merits *and* a liquidated damages award are *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir.1991); *Souryavong v. Lackawanna Cnty.*, 872 F.3d 122 (3d Cir. 2017); and *Williams v. Tri-Cnty. Growers, Inc.*, 747 F.2d 121 (3d Cir. 1984). But none of these cases are particularly helpful to the Secretary here. Unlike East Penn, the defendant employers in all three of these cases offered *zero* evidence that they attempted to ascertain the Act's requirements. *See Cooper Elec.*, 940 F.2d at 909 (reversing refusal to award liquidated damages because defendant "did not do any analysis or conduct any inquiry to determine whether" he was compliant with the FLSA); *Souryavong v. Lackawanna Cnty.*, 159 F.Supp.3d 514, 519 (M.D. Pa. 2016) ("[T]here was no evidence that the [employer] took affirmative steps to ascertain the FLSA's requirements or acted in 'good faith' with regard to its failure to pay overtime to Plaintiffs."); *Tri-Cnty. Growers*, 747 F.2d at 129 ("The record is silent as to any efforts [defendant] made to ascertain and follow the dictates of the FLSA.").

At East Penn's request, Mr. Melchionni then prepared a memorandum, described at length above, which analyzed the legality of East Penn's policies and practices. Apr. 25, 2023 Trial Tr. at 50:17–51:3. In this memorandum, Mr. Melchionni presented East Penn with rational options that could lessen the risk of a lawsuit over its uniform and pay policies. Apr. 25, 2023 Trial Tr. at 127:7–130:7; 133:9–134:21; *see* Apr. 19, 2023 Trial Tr. at 221:10–23. Of course, the initiation of a lawsuit, no more than a demand letter, does not translate inexorably to a non-nuanced trial or appellate court victory for the complainant. Every litigated case has some quotient of risk for every party. There are typically no "pure winners" and no "pure losers." Lawyers may be confident in their prediction skills, but they cannot know for sure. They make guarantees to their clients at their peril.

In any event, East Penn elected to adopt one of Mr. Melchionni's "solutions" for militating against the risks attendant to a suit, by promulgating the 2003 Uniform Policy, which Mr. Melchionni reviewed and approved before it was implemented. Apr. 19, 2023 Trial Tr. at 226:13–227:12; Apr. 25, 2023 Trial Tr. at 135:3–17. Per Mr. Melchionni's billing records, after he reviewed and analyzed the proposed 2003 Policy regarding "FLSA," he had another telephone conference with Ms. Snyder and two East Penn executives, Ms. Sally Miksiewicz and Mr. Robert Harrop, about the status of the Policy. Apr. 25, 2023 Trial Tr. at 139:11–14. A few weeks after that telephone conference, and with Mr. Melchionni's final endorsement, East Penn officially adopted the 2003 Uniform Policy. *Id.* at 130:9–19, 135:3–17.

In 2016, after receiving an employee's OSHA complaint about the amount of paid time allotted for showering in a single one of its plants, East Penn again sought and received Mr. Melchionni's legal advice. PX-8; *see also* DX-4; Apr. 19, 2023 Trial Tr. at 255:5–16. Ms. Snyder testified at trial that she sent Mr. Melchionni a draft of the 2016 Uniform Policy via email because she

"wanted . . . Mr. Melchionni to review th[e] policy, like he does all of [East Penn's] policies, to review for legal compliance and make sure that we were okay to implement it." *See* PX-8, at 2; Apr. 19, 2023 Trial Tr. at 262:9–12. Mr. Melchionni responded to his client's email by stating "this is an issue that has seen a lot of class action lawsuits in recent years. Let me check it out." PX-8, at 2. Mr. Melchionni's billing records reflect that he exchanged these emails and had a telephone conference with Ms. Snyder about the draft of the 2016 Uniform Policy and whether it complied with the FLSA and pertinent DOL regulations. Apr. 25, 2023 Trial Tr. at 163:16–164:16. At some point subsequent to the initial email exchange, Mr. Melchionni seems to have told Ms. Snyder that the revised policy was "good to go," which Ms. Snyder interpreted as meaning that Mr. Melchionni had completed "a review and checked [the Policy] for [East Penn] . . . Made sure that what [East Penn] was doing was legally compliant before [the Company] implemented [the Policy]." Apr. 19, 2023 Trial Tr. at 260:6–9; 263:3–8. The Court considers Ms. Snyder's testimony as entirely credible on this point. Ms. Snyder circulated the final policy to East Penn's Policy Committee and informed them that she had reviewed it with Mr. Melchionni and that "he [had] okayed it." *Id.* at 268:5–10. East Penn implemented the 2016 Uniform Policy on June 27, 2016. PX-8.[6]

In other words, East Penn relied in good faith on the advice of a properly experienced labor and employment attorney[7] who, at East Penn's request, specifically attempted to ascertain whether

---

[6] As the Secretary points out, the Wage and Hour group initiated its investigation prior to June 27, 2016. However, the 2016 Policy was approved and finalized before the investigation started on March 11, 2016, so these events are still relevant to the liquidated damages analysis. *See* Apr. 25, 2023 Trial Tr. at 163:10–164:16; Apr. 19, 2023 Trial Tr. at 266:5–12.

[7] At summary judgment, much ink was spilled and air consumed about whether East Penn may shield itself from liquidated damages using the advice of counsel defense, which is "available only to those who, after full and honest disclosure of the material facts surrounding a possible course of action, seek and obtain the advice of counsel on the potential legality of their actions." *See Walsh*, 555 F.Supp.3d at 131 (quoting *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, No. CV 161343, 2017 WL 960941, at *1 (E.D. Pa. Mar. 10, 2017)). The Secretary is fighting the wrong battle on this point. As East

East Penn's policies regarding donning, doffing, and showering complied with the FLSA. *See*
*Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375-76 (4th Cir. 2011) ("[Defendant] . . . produced
evidence of its good faith by showing that the company relied on the advice of . . . an
attorney . . . and 'clearly' changed it policies based on [that] information and advice."); *see also*
*Lugo*, 802 F. Supp. 2d at 617 ("Defendant also retained, consulted with, and relied on the advice
of its attorneys on how to comply with the FLSA, and adopted new compensation procedures.").
The record reflects that East Penn tailored its policies[8] in response to, and consistent with, the
information and guidance it received from its attorney. Additionally, East Penn submitted evidence
that Ms. Snyder and other members of management are members[9] of the Society of Human
Resource Management, a professional society that regularly discusses FLSA coverage. *See* Apr.
19, 2023 Trial Tr. at 169:19–171:10. In sum, there is sufficient evidence that East Penn took
affirmative steps to ascertain, and endeavored to meet, its obligations under the FLSA. Based on

---

Penn pointed out during the jury charge conferences, and reiterates now, the "advice of counsel defense" is
a defense to *liability*, not liquidated damages. *See* Apr. 28, 2023 Trial Tr. at 163:12–167:4; *Cf. United States
v. Traitz*, 871 F.2d 368, 382–83 (3d Cir. 1989) (discussing advice of counsel defense as a defense to liability
in RICO and mail fraud case); *United States v. Park*, 505 F. App'x 186, 189 (3d Cir. 2021) (discussing
advice of counsel defense as defense to conspiracy to defraud charge). Consequently, East Penn does not
need to meet the specific requirements of that defense to escape "mandatory" liquidated damages. Rather,
East Penn's burden is simply the affirmative defense to liquidated damages set forth explicitly in 29
U.S.C. § 260, *i.e.*, the good faith and reasonableness defense, rather than the technicalities of the "advice
of counsel" defense.

[8]     The Secretary also argues that East Penn cannot have violated the FLSA in good faith because Mr.
Melchionni told East Penn it had to pay for donning, doffing, and showering, and East Penn knew that
employees were continuing to complete these activities on unpaid time. This argument is unavailing for
two reasons. First, Mr. Melchionni did *not* tell East Penn that it had to pay for pre-shift donning to avoid
"breaking the law." *See* Apr. 19, 2023 Trial Tr. at 213:23–214:8. Second, Mr. Melchionni told East Penn
that it could arguably consider any work that takes ten minutes or less to be *de minimis*, and therefore not
compensable. Thus, it would not necessarily matter that employees were not using the five and ten-minute
grace periods on either side of the shift because that unpaid work was arguably *de minimis*. *See* DX-52, at
7–8.

[9]     Ms. Snyder is a certified member of the Society. Apr. 19, 2023 Trial Tr. at 169:3–171:10. To
achieve this certification, Ms. Snyder took an exam at some point in 2000 that covered a variety of topics,
including OSHA and the FLSA. *See* March 27, 2023 Trial Tr. at 34:4–35:20.

this evidence, the Court concludes as a matter of law that although East Penn violated the FLSA, it did so in good faith.

## II.     East Penn Was Objectively Reasonable

East Penn has also carried its burden of showing that it was objectively reasonable in its belief that it complied with the FLSA. The heart of the Secretary's argument to the contrary is that East Penn knew, or should have known, that the policies at issue—as they existed on paper and in practice—unequivocally violated the law. *See e.g.*, Doc. No. 593-2, at 6. But that is not accurate.

As the evidence adduced at trial[10] concerning contemporaneous actions and circumstances demonstrates, East Penn was not aware when it adopted its 2003 Policy that it needed to pay for actual, as opposed to "reasonable," time employees spend on clothes-changing and showering. In his 2003 memorandum on the subject, Mr. Melchionni described for East Penn the state of the law regarding donning and doffing as "unsettled," and did not advise East Penn that it needed to change its pay policies to comply with the unsettled FLSA law. DX-52; Apr. 25, 2023 Trial Tr. at 127:7–130:7. Likewise, Mr. Melchionni did not tell East Penn that it was legally required to include clothes-changing as compensable work time. *Id.*   No other source of legal standards or requirements so informed East Penn either. On the contrary, Mr. Melchionni provided East Penn with three distinct arguments as to why it could argue sensibly that it *did not* have to pay for time employees spent changing their clothes. Apr. 25, 2023 Trial Tr. at 123:2–6; *see also* DX-52, at 7–8; Apr. 19, 2023 Trial Tr. at 213:23–214:8.   On their face, those arguments were not incoherent, inconceivable, or indecipherable—the fact that the Secretary or the DOL staff were unimpressed by them is not the be all and end all. They were, at most, reason for cautious consideration.

---

[10]     The Court does not call upon the testimony or expert report of Brian Farrington in making any of the factual findings or legal conclusions described in this opinion.

Thus, contrary to the Secretary's assertion, the 2003 Memorandum did not put East Penn on notice that it was breaking the law.[11] Rather, the memorandum provided East Penn with a "risk analysis," and offered two options for East Penn to consider that could decrease the risk (or reduce the expense of taking the risk) of getting tangled in a "lengthy, time consuming and costly litigation in federal court" that could result in damages "measured in the millions of dollars." DX-52, at 8; *see also* Apr. 19, 2023 Trial Tr. at 221:10–23. Likewise, East Penn was not on notice that it needed to pay employees based on the actual time it took them to don, doff, and shower when it increased paid shower-time in 2016.[12] Apr. 13 Trial Tr. 245:15–246:16; DX-20; Apr. 11, 2023 Trial Tr. at 108:13–19; PX-8; *see also* DX-4; Apr. 19, 2023 Trial Tr. at 255:5–16.

---

[11]    Much has been made about the "warning" from a DOL investigator, Mr. Dietrich, described in the 2003 Memorandum, that East Penn was violating the FLSA by not paying for actual time spent donning uniforms. This "warning" does not, however, make East Penn's conduct objectively unreasonable. For one thing, Mr. Dietrich's opinion can be viewed as further support for Mr. Melchionni's conclusion that the DOL had recently taken an "aggressive" position on the issue of whether time spent donning work clothes is compensable. *Cf.* Apr. 18, 2023 Trial Tr. at 221:10–23. For another, an employer is certainly free to disagree with a Wage and Hour investigator's interpretation of the law, especially where, as was the case here, the question is a close one. *See Claridge Hotel*, 846 F.2d 180, 188 n. 9 (3d Cir. 1988) ("[P]rivate parties must retain a right to disagree with the Secretary's interpretation of the regulations, especially here where the question is a close one."). It is not legal sacrilege or suicide to disagree with a regulator's assertion that has not become the basis of sufficiently unequivocal authoritative judicial decision-making. Nor is it irrational to reflect that political appointees such as a Secretary of Labor (and very senior staff with him or her) come and go with elections. This recognition is one of the root reasons that agency-made "law" engenders much disagreement.

[12]    During the trial, the Secretary attempted to prove a willful violation by eliciting testimony from several Wage and Hour investigators regarding whether East Penn was aware in 2016 that it needed to pay employees for the actual time it took for them to don, doff, and shower. *See e.g.,* Apr. 18, 2023 Trial Tr. at 213:12–214:4 (Mr. Nieves). These investigators alleged that East Penn received Wage and Hour's "Handy Reference Guide to the Fair Labor Standards Act" at some point prior to 2016 because it is Wage and Hour's practice to distribute this literature to employers during investigations (FLSA-related or not), and East Penn was previously investigated for alleged violations of the Family and Medical Leave Act. It appears that East Penn received a copy of this Handy Reference Guide at some point prior to November 20th, 2014. *See* Apr. 13, 2023 Trial Tr. at 216:8–15 (Mr. Johnson); DX-66. But this Handy Reference Guide did not put East Penn on notice that it needed to pay actual time for these pre- and post-shift activities to comply with the law because: (1) nowhere in the guide does it say that the appropriate measure of compensable time is "actual" instead of "reasonable" time; and (2) notwithstanding the fact that "actual time" appears nowhere in the publication, the Handy Reference Guide does not carry the force of law and does not constitute a binding, authoritative interpretation of the FLSA. *See* 29 C.F.R. § 785.2; *Am. Future Sys., Inc.*, 873 F.3d at 426-27; *see also* DX-66.  In sum, the Secretary did not provide any supporting documentary or contemporaneous evidence or elicit any testimony from knowledgeable witnesses to prove

East Penn further supports its reasonableness argument by pointing to the fact that, consistent with the admonition it received from Mr. Melchionni in his 2003 Memorandum, the law on donning, doffing, and showering was then unsettled, so it was objectively reasonable for East Penn to believe its pay practices were legal. *See Claridge Hotel*, 846 F.2d at 187 ("The ambiguity of the regulation, the government's inconsistency . . . and the closeness of the question all argue that [Defendant] had a reasonable basis for presuming" compliance with the FLSA."); *Cooper Elec. Supply Co.*, 940 F.2d at 910 ("Legal uncertainty must have actually led the employer who violated the Act to believe that it was in compliance at the time of the violation."). The Secretary disagrees, and posits that at the very least, the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005) "should have been yet further notice to East Penn that its pay practices violated the law." *See* Doc. No. 593-2, at 25. The fact remains, however, that it is not necessary for East Penn to prove that its conduct at the time was utterly risk-free in order to succeed with its reasonableness argument.

As was articulated earlier in this litigation, the question at the heart of this case—whether actual time or reasonable time is the correct way to measure compensable time—was a matter of first impression in the Third Circuit. *See E. Penn. Mfg.*, 555 F. Supp. at 136.[13] And even assuming the Secretary correctly interprets the then-extant Third Circuit case law, courts outside of the Third Circuit disagreed about the appropriate method.[14] The Supreme Court's *Alvarez* opinion could not

---

that East Penn knew that it was breaking the law during the time period relevant to the liquidated damages analysis.

[13] The Secretary attempts to circumvent this reality by once again relying on her well-worn toehold, *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121 (3d Cir. 1984), to support her claim that it has been "crystal clear since 1984" that East Penn must pay employees based on actual hours worked. *See* Doc. No. 593-2, at 44, 48. For the reasons the Court already provided at summary judgment, the Court concludes that Secretary's reliance on *Tri-County* is misplaced. *See E. Penn. Mfg.*, 55 F. Supp. At 107 n.12. Rather than crystal clarity, the prism could be said to be frustratingly foggy.

[14] *Compare Alvarez v. IBP, Inc.*, 339 F.3d 894, 914 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005) *and Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994) *with Brock v. City of Cincinnati*, 236

have put *East Penn* "on notice" that East Penn's reasonable time standard violated the law because *Alvarez* did not in fact resolve this "burgeoning circuit split over how to calculate compensable time." *E. Penn Mfg.*, 555 F.Supp.3d at 106. While *Alvarez* clarified that donning, doffing, and showering are compensable, it did so with an important caveat: it is only compensable if the aggregate time spent completing these activities exceeds the *de minimis* standard. *Id.* (quoting DOL Wage & Adv. Mem. No. 2006-2 n.1 (May 31, 2006). And East Penn's attorney explicitly told East Penn in 2003 that it could indeed argue that pre-shift donning was not compensable because "[n]umerous cases have held 10 minutes or less to be *de minimis*."[15] DX-52, at 7.[16] East Penn has demonstrated that the legitimate legal uncertainty about the compensable status of pre-shift donning and the correct method of measuring paid time led it to believe that its policies and practices complied with the FLSA.[17] *See Cooper Elec. Supply Co.*, 940 F.2d at 910. Based on the foregoing facts, the Court concludes that East Penn was objectively reasonable as a matter of law.

---

F.3d 793, 803 (6th Cir. 2001) *and Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 528 (2d Cir. 1998). Thus, an employer could reasonably assess the possibilities for achieving a mitigation or modification of Third Circuit case law.

[15]      This also counters the Secretary's argument that East Penn cannot have had an objectively reasonable belief that it was in compliance because "in reality employees did not use [the grace periods] . . . which [East Penn] knew." Doc. No. 593-2, at 23. For one thing, the evidence adduced at trial does not necessarily support the Secretary's claim that East Penn was knowingly "paying nothing" for this work. *See e.g.,* March 21, 2023 Trial Tr. at 23:21-24:3; 90:20–91:21. Notwithstanding this evidence, it would not be unreasonable for East Penn to pay nothing specifically for pre-shift donning and still believe it was complying with the FLSA because its labor and employment counsel told East Penn in 2003 that it could consider the pre-shift work *de minimis*. And to the extent that East Penn was aware its policies provided employees an insufficient amount of paid time in which to shower, East Penn could have reasonably believed that that time also fell within the *de minimis* standard as described by Mr. Melchionni.

[16]      Because the law relevant to this case was unsettled, the facts at bar are distinguishable from those in *Secretary United States Dept. of Labor v. American Future Systems, Inc.*, in which the Court of Appeals affirmed the district court's decision to award liquidated damages even though the defendant employer had obtained legal advice. 873 F.3d 420, 434-35 (3d Cir. 2017). In that case, the court found that the employer's efforts to ascertain his obligations under the law did not establish that he acted reasonably because those efforts should have "informed him of the bright line rule" that made his policies illegal. *Id.* at 434. Here, there was no "bright line rule" for East Penn to ignore.

[17]      East Penn adopted the 2003 Uniform Policy based on the legal advice it received in the 2003 Memorandum. That Memorandum explicitly described the relevant case law as "unsettled" and referenced

The decision to award liquidated damages is within the Court's discretion. This is one of the albeit few, exemplary cases where liquidated damages should not be imposed, for the reasons outlined above. *See Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999).

### CONCLUSION

For the reasons set out in this Memorandum, the Court denies the Secretary's Motion to Amend or Alter Judgment to Include Liquidated Damages (Doc. No. 593). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

the *de minimis* standard as a basis for which East Penn could argue its pay practices prior to 2003 were legal. *See generally* DX-52.